# KOBRE & KIM

800 Third Avenue
New York, New York 10022
www.kobrekim.com
Tel +1 212 488 1200

January 17, 2025

**VIA ECF**
Honorable Valerie Figueredo
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:   <u>In re B&C KB Holding GmbH</u>, Case No. 1:22-mc-00180-LAK-VF

Dear Judge Figueredo:

      On behalf of Applicant B&C KB Holding GmbH ("<u>B&C</u>"), we write pursuant to Your Honor's order, dated December 18, 2024 (ECF No. 151), to identify a dispute regarding the assertions of privilege by Respondents Goldberg Lindsay & Co. ("<u>Lindsay Goldberg</u>") and Michael Dees ("<u>Dees</u>") in connection with Section 1782 discovery concerning Schur Flexibles Group ("Schur"). As noted in the parties' separately filed joint status update (ECF No. 152), on December 19, 2024, we took the deposition of Dees. On or about December 26, 2024, B&C filed with the Austrian public prosecutor in aid of the subject criminal investigation: (i) a letter summarizing the relevance of certain Section 1782 evidence obtained from Respondents, (ii) a certified transcription of Dees' deposition testimony, and (iii) exhibits marked during the deposition.[1]

      As explained below, B&C disputes that U.S. privilege law governs many if not most of the privilege designations in Respondents' privilege log. And even if U.S. law applied to all of Respondents' privilege designations, the attorney-client privilege does not shield from disclosure a large number of documents that Respondents have withheld as privileged.

   **I.**    **<u>Disputed Assertions of Privilege</u>**

      On December 16, 2024, Respondents produced a categorical privilege log identifying seven broad categories of privilege designations, spanning the time frame from May 2016 to June 2022. *See* Exh. F. The log reflects that 4,212 documents were withheld from production. *Id.* However, a vast number of privilege designations should be governed by German law, which does not recognize evidentiary privilege. B&C thus challenges those designations.

---

[1] B&C has since exercised its rights under Austrian law to obtain and use these materials (among others) from the Austrian public prosecutor's file. Copies of certain materials from the prosecutor's file, bearing the prosecutor's handwritten numbering, that are pertinent here are attached as Exhibits A to E. These materials consist of the German-language cover letter to the prosecutor from B&C's Austrian criminal counsel, portions of Dees' deposition transcript and certain exhibits that are cited in that cover letter. A certified translation of the cover letter is attached hereto as part of Exhibit A. Respondents redacted their document production for, among other things, the European Union's General Data Protection Regulation (GDPR) compliance.

**Americas** (New York, Delaware, Miami, San Francisco, São Paulo, Washington DC)
**APAC** (Hong Kong, Seoul, Shanghai), **Caribbean** (BVI, Cayman Islands), **EMEA** (Cyprus, Dubai, London, Tel Aviv)

Kobre & Kim refers to Kobre & Kim llp, a New York Limited Liability Partnership.

Moreover, a litany of communications, which were withheld solely on attorney-client privilege grounds, includes an array of third parties, such as investment bankers and accounting firms, that break privilege even if U.S. privilege law applied. Respondents also withheld almost 3,000 communications from the time frame after irregularities at Schur were discovered by B&C, on the grounds of both attorney-client privilege and attorney work product. Exh. F at 6-7. Those communications, however, also include third-party non-lawyers such as bankers and accounting firms. B&C challenges those privilege designations for that reason, as well.

By email, dated January 7, 2025, counsel for B&C requested that Respondents identify: (i) the law Respondents claim applies to their privilege designations, (ii) the bases for asserting protection over communications involving non-clients and non-lawyers, and (iii) a detailed, non-categorical privilege log for certain documents. *See* Exh. J. Counsel for B&C and Respondents conferred regarding those issues via email exchanges on January 13, 15 and 16 (*see* Exh. J at 1-5), and additionally, by an audio conference on January 16, 2025.[2] As to the first item, the parties disagree whether U.S. law governs Respondents' privilege assertions. As to the second, Respondents have not provided grounds for withholding communications involving third parties, even if U.S. law on attorney-client privilege applied. And, as to the third, Respondents appear to have agreed to provide a non-categorical privilege log for certain documents. Exh. J at 4-5.

### a. Pertinent Background Facts

Lindsay Goldberg purchased Schur through an investment fund it calls "Fund IV." Exh. B at 20:1-23, 39:10-40:24; Exh. C at 16. That transaction was governed by German law. Lindsay Goldberg's investment in Schur was held through a Dutch entity, Atlas Flexibles Coöperatief U.A. ("Atlas Coop") (formerly named Atlas Flexibles BV), which owned approximately 85% of a German entity, Atlas Flexibles GmbH. Ex. B at 216:19-217:10. Lindsay Goldberg's German affiliate, Lindsay Goldberg Europe GmbH ("LGE"), acquired the remaining approximately 15% of Atlas Flexibles GmbH. *Id.* Atlas Flexibles GmbH is the parent company of Schur Flexibles GmbH, which, in turn, is the parent company of Schur Flexibles Holding GesmbH. *Id.* at 39:10-41:2; 41:10-42:25; Exh. C at 16. Until 2020, Lindsay Goldberg held a 20% ownership interest in LGE. Exh. C at 9.

After Lindsay Goldberg acquired Schur, Dees was appointed as one of three members of the Advisory Board of Schur Flexibles Holdings GesmbH. Exh. B at 22:9-24. The other two Advisory Board members, Dieter Vogel and Thomas Ludwig, were senior LGE officers. Thomas Unger, who is among the suspects in the Austrian criminal investigation, later joined LGE as a managing director and became Chair of the Advisory Board. *Id.* at 85:10-22, 73:6-14; 92:13-25. Dees served on the Advisory Board from at least January 2017 to September 2021. *Id.* at 44:15-47:22; Exh. E at 45 (Section 9.4.2.). Schur's management was governed by Rules of Procedure enacted in May 2019 that required its Advisory Board to approve, among other things, annual budgets, executive compensation, and other specified expenditures. Exh. B at 49:5-23, 53:7-54:24, 57:2-18, 59:13-63:5, 196:25-198:20, 227:17-228:24; Exh. C at 24-32.[3] Dees also became a

---

[2] The attorneys who participated were Igor Margulyan for B&C, and Jooyoung Yeu for Respondents.

[3] In May 2019, the Advisory Board also appointed Michael Schernthaner (among the criminal suspect as well) as CEO of Schur. Exh. B at 117:16-20; *see also id.* at 192:7-195:5, 198:21-201:21, 207:24-208:9, 211:11-22.

Honorable Judge Valerie Figueredo
January 17, 2025
Page 3

director of Atlas Coop, a role that he apparently maintains today. Exh. B at 41:1-24; 261:15-24. And Dees has been one of the two managing partners at Lindsay Goldberg in New York since 2020. *Id.* at 20:1-7.

In 2019, Lindsay Goldberg attempted to sell Schur as part of an effort codenamed "Project Sky." Exh. B at 151:14-21; Exh. D at 10-29. Goldman Sachs was hired as financial advisor for that potential sale, with substantial involvement by its bankers located in Frankfurt, Germany. *See*, *e.g.*, Exh. B at 153:8-18, 171:22-173:24; Exh. D at 7, 10-30. According to Schur's Group Director of Finance Michael Fischkin (also a criminal suspect), Project Sky failed in January 2020 because of the wide gap between "Adjusted EBITDA" and "Cash EBITDA". Exh. C at 121. Mr. Fischkin stated in a written submission to the Austrian public prosecutor that Unger as Schur's *de facto* CEO, the Advisory Board, and Goldman Sachs dictated Schur's capitalizations, which accounted for the gap between Adjusted EBITDA and Cash EBITDA. *Id.* at 88, 97, 120; Ex. B at. 119:16-133:4; 249:11-250:13, 258:17-261:12; *see also* Exh. D at 84; Exh. E at 56.

Lindsay Goldberg's effort to sell Schur resumed in 2021 and Goldman Sachs continued as financial advisor. Exh. C at 122-126, 131. In September 2021, B&C acquired an 80% ownership stake in Schur. That transaction, codenamed "Project Stelvio", closed pursuant to a Share Purchase Agreement, dated May 15, 2021, which is governed by German law. *Id.* at 122; ECF No. 21-2 at 11, 45.

    **b. German Law Should Dictate Whether Documents in Categories 1, 2, 3, 5 and 6 Are Privileged in any Way**

In Section 1782 proceedings, courts apply the "touch base" test to determine which law applies to a responding party's privilege claims. *Mangouras v. Squire Patton Boggs*, 980 F.3d 88, 99 (2d Cir. 2020). Under that test, "a court applies 'the law of the country that has the 'predominant' or 'the most direct and compelling interest' in whether ... communications should remain confidential, unless that foreign law is contrary to the public policy of this forum.'" *Id.* (citation omitted). In turn, "[t]he country with the predominant interest is either 'the place where the allegedly privileged relationship was entered into,' or 'the place in which that relationship was centered at the time the communication was sent.'" *Id.*

Here, for reasons set out below, German law should govern whether documents in Categories 1-3 and 5-6 of Respondents' log are privileged under the "touch base" test:

- <u>Category 1</u>: According to Respondents, documents in this category were withheld as privileged because they purportedly involve communications with counsel concerning Lindsay Goldberg's acquisition of Schur in 2016. Exh. F at 1. As noted above, the terms of that acquisition were governed by German law. Indeed, the privilege log lists

Honorable Judge Valerie Figueredo
January 17, 2025
Page 4

>    the German law firm of Gleiss Lutz[4] among the counsel involved in Category 1 communications.[5]

- Category 2: In this category, Respondents withheld documents as privileged because they purportedly involve communications about "advisory and shareholder resolutions concerning Schur corporate actions and financing." Exh. F at 2. German lawyers from Gleiss Lutz are listed as counsel involved in these communications. That shows that most, if not all, of the communications in Category 2 implicated legal advice, if any, on matters of German law. Indeed, documents produced by Lindsay Goldberg show that although the shareholder resolutions were circulated by Gleiss Lutz in a dual-language format (*i.e.*, German and English), those materials specified that the German version "is binding" and cited provisions of the German Civil Code, as the law governing those resolutions. Exh. G at 3; Exh. H at 4.[6]

- Category 3: Documents in this category were withheld as privileged because they purportedly concern communications with counsel about "Project Sky non-disclosure agreement, due diligence, transaction structure and documentation." Exh. F at 3. Aside from Lindsay Goldberg's in-house counsel, only German lawyers are identified in those communications; they include one attorney from Gleiss Lutz and multiple current and former attorneys from the German offices of the law firm, Freshfields.[7] Accordingly, most, if not all, communications in Category 3 would have involved legal advice on issues of German law.

- Categories 5 and 6: Respondents withheld documents in these categories as protected by attorney-client privilege because they purportedly contain legal advice "regarding Project Stelvio [*i.e.*, B&C's acquisition of Schur]" as well as "regarding notices and distributions" after that transaction closed. Exh. F at 5-6. As noted above, B&C's acquisition of Schur closed pursuant to a share purchase agreement governed by German law. Indeed, aside from Lindsay Goldberg's in-house counsel and a lone Cravath attorney listed in Category 5, the lawyers identified in these two categories are

---

[4] *See* https://www.gleisslutz.com/en

[5] The other lawyers listed in Category 1 are Lindsay Goldberg's in-house counsel and lawyers from Cravath, Swain & Moore. Given the categorical format of the log, it is unclear what legal advice, if any, those attorneys might have provided regarding the 2016 acquisition of Schur that was governed by German law.

[6] Category 2 communications also list Lindsay Goldberg's in-house counsel and lawyers from Weil Gotschal as the other counsel. The categorical format of the log makes it impossible to determine the role said counsel played in those communications and whether they provided any U.S. law advice with respect to advisory and shareholder resolutions concerning Schur.

[7] *See*, *e.g.*, Arend von Riegen (https://www.freshfields.us/contacts/find-a-lawyer/v/von-riegen-arend/);
Markus Paul (https://www.freshfields.us/contacts/find-a-lawyer/p/paul-markus/);
Steffen Kleefass (https://www.freshfields.us/contacts/find-a-lawyer/k/kleefass-steffen/);
Carfsten Haak (https://www.freshfields.us/contacts/find-a-lawyer/h/haak-carsten/);
Hendrik Braun (https://www.kirkland.com/lawyers/b/braun-hendrik).

all predominantly from Freshfields' German offices.[8] Two other listed lawyers from Freshfields appear to work in the Brussels office but their online biographies highlight their experience working on transactions governed by German law.[9]

Respondents' privilege log shows that, to the extent documents in Categories 1-3 and 5-6 disclosed any legal advice, that advice predominately was being sought from or provided by German lawyers on matters of German law. In such circumstances, application of the touch base test dictates that German law governs whether Respondents are entitled to withhold those documents from disclosure on grounds of attorney-client privilege. *See*, *e.g.*, *In re BM Brazil 1 Fundo de Investimento em Participacoes Multistrategia*, 347 F.R.D. 1, 10 (S.D.N.Y. 2024) (holding that English law governed respondent's assertions of privilege where claims of privilege arose from party's relationship with English lawyers, who were proving English-law advice in connection with share purchase agreements governed by English law); *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 65 (S.D.N.Y. 2010) ("[C]ommunications regarding … foreign law 'touch base' with the foreign country."); *Tulip Computers Int'l B.V. v. Dell Computer Corp.*, Civ. A. 00–981(MPT), 2002 WL 31556497, at *3 (D. Del. Nov. 18, 2002) (applying Dutch law to documents containing legal advice regarding Dutch law).

### c. Under German Law, Documents in Categories 1, 2, 3, 5 and 6 Are Not Protected by Privilege

None of the documents that Respondents withheld in Categories 1-3 and 5-6 may be shielded from disclosure based on claims of attorney-client privilege. That is because "German law does not recognize legal privilege as an overall concept," which means that "[a]ttorney-client communication and attorney work product are therefore not protected as such." The Sedona Conference, *Commentary on Cross-Border Privilege Issues*, 23 Sedona Conf. J. 475, 580 (2022) (hereinafter *Sedona Commentary*).[10]

Although German law "imposes a professional secrecy obligation on lawyers (*Rechtsanwalts*) that prohibits them from disclosing client-related information," that right does not attach to the information itself. *Sedona Commentary*, 23 Sedona Conf. J. at 580. Accordingly, under German law, a document containing legal advice "is not protected if it is in the possession of the client." *Id.*; *see also* Thompson Reuters, Practical Law UK, Dr Jochen Lehmann, *Legal Professional Privilege and Professional Secrecy: Overview (Germany)* (noting that professional secrecy obligation under German law "is not a privilege in the sense that it may be invoked if the

---

[8] *See*, *e.g.*, David Anschuetz (https://www.freshfields.us/contacts/find-a-lawyer/a/anschuetz-david/); Anna Dominke (https://www.freshfields.us/contacts/find-a-lawyer/d/dominke-anna/).

[9] *See* https://www.freshfields.us/contacts/find-a-lawyer/v/van-weelden-vanessa/ (highlighting that Ms. Van Weelden's "practice covers all aspects of EU and German competition law"); https://www.freshfields.us/contacts/find-a-lawyer/w/wessely-thomas/ (noting that Dr. Wessely is "adept at working on domestic German projects").

[10] Under Federal Rule of Civil Procedure 44.1, in determining foreign law, this Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." If the principles of German law summarized above are disputed by Respondents, although it appears that they are well-established, B&C would respectfully request the opportunity to supplement the record on that issue.

Honorable Judge Valerie Figueredo
January 17, 2025
Page 6

opposing party makes demands for the disclosure of documents, but rather a duty and an obligation of the lawyer") (attached hereto as Exhibit I). Thus, while attorneys are entitled to refuse disclosure of attorney-client communications, the clients have no such right under German law. *Sedona Commentary*, 23 Sedona Conf. J. at 580-81 (noting that "[i]f ordered by the court, a party cannot refuse the production of such documents *even if they contain attorney-client communication or attorney work product*, although in ordering the production of documents, the court should consider whether the documents could contain any confidential information") (emphasis added).

Indeed, courts in this District have routinely held that "the fact that a [foreign] statute requires a party to keep clients' affairs secret does not mean that a privilege exists." *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, No. 95 CIV. 8833 (RPP), 1998 WL 158958, at *3 (S.D.N.Y. Apr. 2, 1998); *Gucci*, 271 F.R.D. at 67–68 (collecting cases) (finding that Italian law's imposition of secrecy obligation on attorneys "is not an evidentiary privilege"); *Bayer AG & Miles, Inc. v. Barr Lab'ys, Inc.*, No. 92 CIV. 0381 (WK), 1994 WL 705331, at *5 (S.D.N.Y. Dec. 16, 1994) (finding communications with professional cannot be deemed privileged under foreign law "simply because" foreign law grants professional "the right not to testify about information she obtains in the course of her duties").

Given the above, documents that Respondents logged as purportedly privileged in Categories 1-3 and 5-6 cannot be withheld from disclosure because under German law, Respondents, unlike outside lawyers, have no right to refuse disclosure of any materials in their possession, even if those materials reflect legal advice on German law.

### d. Communications Shared with External Non-Lawyer Professionals Are Not Privileged in Any Event

Respondents withheld solely on grounds of attorney-client privilege numerous communications involving non-client, third parties. *See* Exh. F. Indeed, all but one category in Respondents' log identifies one or more non-legal advisors as an author and/or recipient of purportedly privileged communications.[11] *Id.* Thus, even if U.S. law governed those communications, they would not be protected by privilege. It is black-letter law that the attorney-client privilege *only* protects communications between an attorney and their client made for the purpose of requesting or receiving legal advice and, generally, is waived by the presence of a third party. *Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015) (attorney-client privilege "is generally waived by voluntary disclosure of the communication to another party").

Here, there is no evidence whatsoever that any of the non-lawyers identified in the Respondents' log were hired for, or otherwise acted with, the limited purpose of serving as the interpreter for Respondents' attorneys. To the contrary, the record shows that Goldman Sachs, for

---

[11] Category 1: CW Downer (Transaction Advisor) and Intertrust Group (Trust Management Services); Category 2: PES Trust (Financial Services) and Intertrust Group (Trust Management Services); Category 3: Goldman Sachs (Financial Advisor) and PwC (Financial Due Diligence); Category 4: BMO (Financial Services) and E&Y (Tax Advisor); Category 5: Goldman Sachs (Financial Advisor); Category 7: Rothchild (Transaction Advisor) and Alix (Accounting Advisor).

example, was a financial advisor in connection with Project Sky and Project Stelvio, and certainly was not engaged for the limited purpose of facilitating Lindsay Goldberg's communications with its counsel. *See, e.g.*, Exh. B at 153:8-18, 171:22-172:9, 183:1-17; *see also id.* at 161:20-164:23; Exh. D at 5. In fact, in his lengthy statement to the Austrian public prosecutor, Schur's former finance director, Michael Fischkin, explained that Goldman Sachs served as "a permanent advisor (in particular during [Lindsay Goldberg's] two exit processes in 2019 [*i.e.*, Project Sky] and 2021 [*i.e.*, Project Stelvio] and investment bank of Lindsay Goldberg." Exh. C at 93; *see also* Exh. B at 127:22-128:8 (Dees' testifying to his belief that Goldman Sachs acted as "M&A advisor to one of the Schur entities" in connection with Schur's sale to B&C). Mr. Fischkin further stated that, in advising Lindsay Goldberg regarding the sale of Schur, "Goldman Sachs helped to shape the EBITDA discussions and decided together with Lindsay Goldberg which EBITDA would be communicated to the potential buyer." Exh. C at 94.[12]

The inclusion of Goldman Sachs, an investment banker, on a communication with counsel plainly defeats any claim of attorney-client privilege. *See*, *e.g.*, *Export–Import Bank,* 232 F.R.D. 103, 112–14 (S.D.N.Y. 2005) (attorney communications with financial advisor and consulting firm were not privileged where the advisor's role was not limited to helping the lawyer give effective advice by explaining financial concepts but, instead, involved advisor's helping lead a company through a debt restructuring, negotiating on behalf of client, and helping formulate financial strategies); *United States v. Adlman*, 68 F.3d 1495, 1500 (2d Cir. 1995) (where company acted as a tax and business advisor to client, and did not merely serve as an accountant assisting the attorney in rendering legal advice, communications were not privileged); *United States v. Ackert*, 169 F.3d 136, 139-40 (2d Cir. 1999) (where attorney communicated with outside investment banker in order for the attorney to understand the tax consequences of a transaction, rather than to improve communications with client, there was no privilege).

### e. Communications Shared with Schur Are Not Privileged

Category 3 of Respondents' privilege log shows that Respondents withheld as privileged documents that included personnel from Schur on communications between Lindsay Goldberg and its counsel. Exh. F at 3. Respondents have not shown how or why including Schur personnel (putting aside Dees who had roles with both Schur and Lindsay Goldberg) on Lindsay Goldberg's correspondence with its counsel would not break privilege. *See* Exh. J. For example, Respondents provided no evidence of any joint representation arrangement between Lindsay Goldberg and Schur with respect to the communications in Category 3. Moreover, Respondents' log specifies that the subject matter of communications in Category 3 concerned Project Sky transactional matters. Exh. F at 3.

### f. Request for Document-by-Document Log of Documents in Category 7

As noted, Respondents logged in a single category almost 3,000 documents that purport to deal with various litigation and transaction-related matters and include various attorneys (both U.S.

---

[12] Mr. Fischkin further represented that "Lindsay Goldberg coordinated very closely and intensively with Goldman Sachs with regard to the EBITDA (2019 to 2021) during the B&C sales process and discussed the financial key figures in great detail (EBITDA reconciliations and value-relevant KPIs were even largely created by Lindsay Goldberg and Goldman Sachs themselves, as various Excel sheets show) …" Exh. C at 96.

Honorable Judge Valerie Figueredo
January 17, 2025
Page 8

and non-U.S.) as well as third-party advisors. Exh. F at 6-8. Accordingly, B&C has requested that Respondents provide a document-by-document log of documents in Category 7 that involve third-party advisors and/or deal with transactional (as opposed to litigation) matters in order to assess whether such documents were properly withheld from production. Ex. J at 3. The parties continue to negotiate the scope of such supplemental log and the deadline by which Respondents will produce it. B&C reserves its right to raise this issue with the Court if the parties are unable to agree in the near future on B&C's request for a document-by-document log.

      We thank the Court for its attention to this matter.

Respectfully submitted,

s/ Zachary D. Rosenbaum
Zachary D. Rosenbaum
Leif T. Simonson
Igor Margulyan

*Counsel for the Petitioner*

cc:    All counsel of record (via ECF)

Attachments