# Exhibit A

To
*Zentrale Staatsanwaltschaft zur Verfolgung von Wirtschaftsstrafsachen und Korruption* [State Public Prosecutor's Office for the Prosecution of Economic Crimes and Corruption]
Dampfschiffstrasse 4
1030 Vienna

<table>
<tr><td colspan="1">[hw:] */1204*</td></tr>
</table>

**Submission re: 5 St 1/22g** [hw:] – *866*

Electronically submitted on December 26, 2024
Rohregger Rechtsanwalts GmbH

**Contributor (P131049)**

Represented by: Document submission
Rotenturmstrasse 17, 1010 Vienna
Email: office@rwk.at
Phone: +43 1 53553 1000
IBAN: AT212011128621931600
BIC: GIBAATWWXXX
Reference: 1154-004

---

### Document submission

Please refer to the attached PDF document.

**1 Appendix**

1. **Document submission**



**ROHREGGER ATTORNEYS-AT-LAW**

Rotenturmstrasse 17
A-1010 Vienna

t +43 1 53553 1000
e office@rwk.at
w www.rwk.at

State Public Prosecutor's Office for the Prosecution
    of Economic Crimes and Corruption
Dampfschiffstrasse 4
1030 Vienna

**5 St 1/22g**

| | |
|---|---|
| **Defendant** | Michael Schernthaner |
| | Michael Fischkin |
| | Conny Stöhrer |
| | Amra Sejdic |
| | Thomas Unger |
| | among others |
| | |
| **Civil Claimants** | B & C KB Holding GmbH |
| | Universitätsring 14, 1010 Vienna |
| | |
| represented by | Rohregger Rechtsanwalts GmbH |
| | Rotenturmstrasse 17, 1010 Vienna |
| | |
| **on the grounds of** | § 153, inter alia, of the Austrian Criminal Code (StGB) |

# Document submission

R S R
[logo:] R S R    Rohregger
Rechtsanwalts GmbH   |   P131049
AT42 2011 1286 2193 1610   |   Vienna Commercial Court
  FN 531446 p

**R | S | R**
[logo] R S R

The civil claimant submits the following                                                 1

## Document submission

in the case described overleaf and explains it as follows:

As already stated in ON 779, 837, and 1190, the civil claimant has initiated so-called "§   2
1782 discovery proceedings" under US law regarding

(i)    Goldberg Lindsay & Co LLC ("LG") and Michael Dees, a managing partner of LG, in
       New York and

(ii)   four state pension funds in Texas, Louisiana, Wisconsin, and New York, which have
       each invested in "Fund IV" managed by Lindsay Goldberg.

On December 19, 2024, the civil claimant conducted a so-called "deposition" (also known   3
as a witness testimony) of Michael Dees and hereby submits the transcript of Michael
Dees' testimony together with its integrated exhibits.[1]

Michael Dees' witness testimony suggests that he was closely involved in and had          4
extensive knowledge of the affairs of the Schur Flexibles Group and its sale. It also
suggests that the Schur Flexibles Group was obviously given the highest level of attention
at LG, as evidenced by Alan Goldberg's final decision to hire Thomas Unger (inter alia,
as Chairman of the Advisory Board of Schur Flexibles Holding GesmbH).

The following is a summary of certain facts based on the testimony of Michael Dees and     5
the evidence presented to him during the testimony.

## 1.    Relevant companies and the different roles of Michael Dees

---

[1]    In the transcript, these are referred to as "Exhibits" and abbreviated as "Ex" in the protocol.

LG is a private equity firm that purchased the Schur Flexibles Group (hereinafter referred to as "SF") in 2016 through subsidiaries. Dees confirmed that LG purchased SF in 2016 through a fund called "Fund IV".[2] The investment was made through Atlas Flexibles Coöperatief U.A. (formerly Atlas Flexibles BV), which held approximately 85% of the shares in Atlas Flexibles GmbH; the other approximately 15% of the shares in Atlas Flexibles GmbH were held by Lindsay Goldberg Europe GmbH (formerly Lindsay Goldberg Vogel GmbH). Atlas Flexibles GmbH is the parent company of Schur Flexibles GmbH, which in turn is the parent company of Schur Flexibles Holding GesmbH (hereinafter referred to as "SFH").[3]

6



Dees headed LG's so-called "deal team lead" and supervised the due diligence at LG.[4] He was also a member of LG's investment committee, which approved the transaction.[5]

---

2    Transcript, pages 20, 39, and 40, as well as Exhibit 3 to the transcript. In the following, the term "Exhibit(s)" always refers to the exhibits to the transcript.

3    Transcript, pages 39 to 42, as well as Exhibit 3.

4    Transcript, page 21.

5    Transcript, page 21.

R | S | R

[logo] R S R

After the takeover of the shares, Dees was appointed as member of the Advisory Board of SFH (at least from January 2017 until September 2021).[6] In addition, Dees was (and is) director of Atlas Flexibles Coöperatief U.A.[7]

8

The acquisition was awarded to Lindsay Goldberg Vogel (hereinafter referred to as "LGV"). This company later became Lindsay Goldberg Europe (hereinafter referred to as "LGE"). LGV/LGE was the first party contacted regarding the potential acquisition.[8] In 2020, LG held a 20 percent stake in LGV/LGE.[9]

9

Prior to the acquisition of SF, Thomas Unger worked as a consultant for LG.[10] Thomas Unger became a consultant for SF immediately after the acquisition[11] and in 2017 became managing director of LGE.[12] Alan Goldberg was also involved in the decision to hire Unger.[13]

10

## 2. The Advisory Board and the Management Board each had binding Rules of Procedure

Dees confirmed that both SFH's Advisory Board and the Management Board were regulated by written Rules of Procedure.[14] These Rules of Procedure contain provisions that are relevant for the assessment of the facts of the case. This applies in particular to the following provisions:

11

---

[6]   Transcript, page 22.
[7]   Transcript, pages 41 and 261. From August 8, 2016, to May 19, 2017, Dees was also managing director of Atlas Flexibles GmbH (the parent company of Schur Flexibles GmbH).
[8]   Transcript, page 23.
[9]   Transcript, page 24 as well as Exhibit 1.
[10]  Transcript, page 68.
[11]  Transcript, page 72.
[12]  Transcript, page 68.
[13]  Transcript, page 73.
[14]  Transcript, pages 49 and 53, as well as Exhibit 5.

[hw:] 7

R | S | R

[logo:] R S R

- In accordance with § 7 of its Rules of Procedure , the Management Board had to inform the Advisory Board, via the Chairman of the company, of "all relevant questions of planning, business development, risk situation, and risk management for the company and all direct and indirect subsidiaries".[15] Moreover, the Management Board had to inform the Advisory Board, via the Chairman, "no later than 10 working days before the end of each financial year, of a draft annual budget for the following financial year ("budget") in order for it to be approved by the Shareholders' Meeting. The budget for the following financial year must include monthly planning of profit and loss, cash flow, income, expenses and cash, as well as a budgeted balance sheet at the end of each quarter [...]."[16]    12

- According to § 8 of the Rules of Procedure, the Management Board, through the Chairman, "shall present the budget of the company approved by the management [...] as well as a risk concept for hedging transactions in foreign currencies (except for the euro) no later than 10 days before the end of each financial year."[17]    13

- According to § 9 of the Rules of Procedure, the Management Board required the approval of the Advisory Board before it could carry out certain measures and transactions.[18] These include:[19]    14

    (a)    determining the company's budget and determining and/or amending the accounting and valuation principles;

        …

    (j)    taking out or granting financial loans, including finance leasing, issuing bonds... as well as other corporate financing measures, insofar as these exceed an amount of EUR 1,000,000 in the financial year;

        …

    (m)    non-budgeted investment plans in excess of EUR 250,000, and, even if already included in the budget, the assumption of a liability in connection with an investment plan of at least EUR 1,000,000.

        …

---

[15]    Transcript, page 54 as well as Exhibit 5.
[16]    Transcript, page 57 as well as Exhibit 5. See also transcript, page 224, regarding the agreement that the Management Board was required to submit a budget for each year, and it was a requirement of the management that the Advisory Board approve the budget.
[17]    Transcript, page 59 as well as Exhibit 5.
[18]    Transcript, pages 60 and 61, as well as Exhibit 5.
[19]    Transcript, pages 60 to 62, as well as Exhibit 5.

R|S|R
[logo] R S R

(o)    conclusion of consultancy agreements—with the exception of personnel consultants—with annual payment obligations of the Company to the respective consultant totaling more than EUR 200,000 in the financial year.

**3.    As a member of the Advisory Board, Dees received information (including budgets) that reflected expenses that were to be capitalized**

According to the Rules of Procedure, the Advisory Board (including Dees) approved SFH's annual budgets.[20] The budgets reflect SFH's plan for "capitalized expenditures" and "investment expenditures." Dees confirmed that "capital expenditures" are expenses "that can be capitalized"[21] and that the term "capex" means the same thing.[22] Dees also confirmed that capital expenditures do not reduce EBITDA, whereas operating expenses do.[23]

15

These documents thus prove that Dees was undoubtedly aware of expenses that were capitalized at Schur. For example, Dees received the 2017 budget.[24] This shows in detail capitalized expenditures, which, as Dees repeatedly confirmed, reflect "capitalized expenditures".[25] In fact, Dees admitted that he knew about the capitalization at SFH based on the budgets.[26]

16

---

[20]    Transcript, pages 140 and 141, as well as Exhibit 5.
[21]    Transcript, page 71.
[22]    Transcript, page 83.
[23]    Transcript page 253; see also transcript page 227.
[24]    Transcript, page 79, as well as Exhibit 10.
[25]    Transcript, pages 138 and 139, as well as Exhibit 10.
[26]    Transcript, page 139.

| 15 | Q. So you were aware of the capitalization at Schur based on this |
| 16 | document. Correct? |
| 17 | A. I had this document. That is correct. |
| 18 | Q. And this document reflects the projects |
| 19 | that are going to be capitalized in the following |
| 20 | year. Correct? |
| 21 | A. As the title of the document indicates, I think that's what it |
| 22 | represents. |

Translation:

> Question: So you were aware of the capitalization at Schur based on this document. Correct?
>
> Answer: I had this document. That is correct.
>
> Question: And this document reflects the projects that are going to be capitalized in the following year. Correct?
>
> Answer: As the title of the document indicates, I think that's what it represents.

The budget for 2020 also includes capital expenditures on a location basis.[27] LG was, therefore, aware of SFH's capital expenditures, including those for "footprint, cylinder and engraving, IT, R&D, and others."[28]

---

[27]    Transcript, page 225, as well as Exhibit 32.
[28]    Transcript, page 225.

R | S | R
[logo] R S R

| 20 | Q. So Lindsay Goldberg, whether you or not, was made |
| 21 | aware in -- in 2020 of Schur's Capital expenditure budgets for that |
| 22 | year of 2020, right? |
| 23 | A. At least one member of our team was provided with |
| 24 | this page. |

Translation:

> Question: So Lindsay Goldberg, whether you or not, was made aware in -- in 2020 of Schur's Capital expenditure budgets for that year of 2020, right?
>
> Answer: At least one member of our team was provided with this page.

Dees also confirmed that he had received budgets with charts showing the differences between "reported EBITDA", "adjusted EBITDA," and "cash-EBITDA".[29]  For example, Dees received the budget for 2021, which contains the following table.[30]

18

---

[29]    Transcript, pages 132 and 133.

[30]    Transcript exhibit 19.

[hw:] *11*

R | S | R

[logo:] R S R

| Budget 2021 | | | | | | |
|---|---|---|---|---|---|---|
| *in m€ / % of Net Sales* | | | | COVID scenarios | | |
| | **2019** | **2020** | **FY21** | **FY21** | **FY21** | **BUD 21** |
| | Actual | FC | Full Covid recovery | 50% COVID recovery | No Covid recovery | Core |
| **Flexibles Sales** | 417.8 | 417.0 | 433.7 | 425.3 | 417.0 | 431.1 |
| reported EBITDA* | 77.8 | 76.0 | | | | |
| **Adjusted EBITDA**** | 82.6 | 84.4 | 95.0 | 89.0 | 84.5 | 91.9 |
| Cash Based EBITDA*** | 57.5 | 55.7 | 71.7 | 66.7 | 63.2 | 69.6 |
| *Flexibles Division adj. EBITDA Margin* | *18.9%* | *19.3%* | *20.8%* | *20.0%* | *19.3%* | *20.0%* |
| | | | ❶ | ❷ | ❸ | |

\* Reported Group EBITDA means audited EBITDA // 2019 reported EBITDA, adjusted by Moneta litigation receivable
\*\* Adjusted Group EBITDA means EBITDA according to SFA definition, 2019 EBITDA incl. PwC quality of earnings (QoE) adj
\*\*\* Cash based Group EBITDA means reported EBITDA minus IFRS 16, IT, R&D and Cylinder Engravings
\*\*\*\* including adjustments from badwill, IFRS 5 and severance cost

This is consistent with the *statement regarding the comments by Thomas Unger and the role of Lindsay Goldberg's managemen*t, which Michael Fischkin submitted as ON 1172 on December 3, 2024.[31] On page 22 of this statement, Michael Fischkin explained:

> These budget documents, which were made available to the **entire Lindsay Goldberg Advisory Board,** already show the "Reported-EBITDA," the "Adjusted-EBITDA," and the "Cash-based EBITDA" separately. The significant difference between "Adjusted EBITDA" and "Cash-based EBITDA," which is due to IFRS capitalizations, is also clearly visible. For this reason alone, the **entire Advisory Board was aware of the capitalizations and the amount of the cash EBITDA.**

Dees admitted that he knew that expenses were being capitalized and that, on the basis of the documents submitted to him, he received documents showing certain capitalized expenditures.[32] For example, the spreadsheet shown in Michael Fischkin's statement (ON 1172) (which is identical to the spreadsheet above from the 2020 budget that was shown to Dees in Exhibit 19) shows that IT, R&D, and cylinder engraving were capitalized.[33] Dees also admitted that he was thus aware that these items were capitalized.[34]

---

[31]    Transcript, Exhibits 17 and 17A.
[32]    Transcript, page 266.
[33]    Transcript, page 267 and Exhibit 17.
[34]    Transcript, page 267 to 269.

R | S | R

[logo.] R S R

## 4.    The valuations made and communicated by LG are based on EBITDA

Dees admitted that, throughout his investment activities, LG                    21
      (i)     received monthly reports,
      (ii)    prepared quarterly portfolio reviews, and also
      (iii)   received valuations from Schur at least twice a year.[35]

He went on to admit that the valuations carried out by LG were based, inter alia, on    22
SFH's EBITDA[36] and that LG made representations to its investors as to the value of
SFH and that one component of that valuation was the EBITDA.[37]

## 5.    Dees approved the appointment of Deloitte

In 2022 Dees signed the shareholder resolution appointing Deloitte as auditor of    23
SFH's 2021 annual financial statements.[38] In its audited financial reports for 2021
Deloitte then stated that "in numerous cases in the previous periods, unjustified
capitalization took place without the conditions prescribed by IFRS having been
met."[39] Dees stated that he could not recall whether he had approved a budget that
included the items that Deloitte objected to.[40]

---

[35]    Transcript, pages 242 and 243.
[36]    Transcript, page 243; see also Exhibits 36 and 37.
[37]    Transcript, page 254.
[38]    Transcript, page 229 and Exhibit 33.
[39]    Transcript, page 230 and Exhibit 33B.
[40]    Transcript, pages 236 and 237.



## 6.  On approvals by the Advisory Board and the absence of minutes of the Advisory Board

Throughout the entire sworn testimony, Dees claimed that he could not remember whether the Advisory Board had approved various measures.

The Rules of Procedure did, however, stipulate that the Advisory Board had to approve the salaries and wages of certain employees, including those of Michael Schernthaner.[41] Dees claimed that he could not remember whether he had approved the compensation for Michael Schernthaner.[42] However, he admitted that if there had been board meeting minutes, he would have been able to determine whether the Advisory Board had approved Michael Schernthaner's remuneration.[43]

Dees also confirmed that the Rules of Procedure for unbudgeted investment projects in excess of EUR 250,000.00 required the approval of the Advisory Board.[44] Dees claimed that he could not remember whether he had given this approval for 2020. However, if minutes had been taken, this would certainly have shortened the discussion.[45]

---

[41]    Transcript, pages 192 and 193 as well as Exhibit 5 (therein § 8 para. 3).
[42]    Transcript, page 193.
[43]    Transcript, pages 197 and 198.
[44]    Transcript, page 227.
[45]    Transcript, page 228.

R | S | R
[logo] R S R

### 7. LG's initially positive attitude towards the existing management of SFH

When LG bought SFH in 2016 the founder of SFH, Jakob Mosser, was its CEO.[46] The documents that Dees submitted show that, at the time of the takeover, LG believed that Mosser was "very capable" and "crucial to the company's success".[47] As discussed below, this view later changed when LG became dissatisfied with SFH's 2016 financial performance, including EBITDA.

### 8. Following poor financial performance in 2016, (i) LG and LGE fired Mr. Mosser, (ii) hired Unger and Schernthaner, and (iii) prepared the exit (sale of SFH) by the end of 2019

In 2016 after the acquisition, the SFH financials came in weaker than expected.[48] LGE's Thomas Ludwig decided to replace Schur's CFO with Michael Schernthaner from Constantia.[49] Dees and Ludwig were also not satisfied with Jakob Mosser's financial performance.[50] Thomas Unger (also from Constantia) was brought in from LGV and joined Schur's Advisory Board in 2017.[51]    28

Dees and the other members of the Advisory Board fired Mosser as CEO.[52] Unger was appointed the "operational CEO" at SFH.[53] Although Dees denied that Unger was the "operational CEO," documents submitted to Dees show that LG told investors or potential investors that he was.[54]    29

Schernthaner joined Schur as CFO in 2017.[55]    30

---

[46]  Transcript, page 36.
[47]  Transcript, pages 37 to 39, 66, and 67 as well as Exhibits 2 and 6. Although Dees initially denied having this view, he admitted that he had sent Alan Goldberg a presentation he had prepared that expressed exactly this (see Transcript, pages 66 and 67 and Exhibit 6).
[48]  Transcript, pages 76 and 80.
[49]  Transcript, page 84 and Exhibit 9.
[50]  Transcript, page 84 and Exhibit 9.
[51]  Transcript, page 85 and Exhibit 9.
[52]  Transcript, pages 86 and 87, as well as Exhibit 12.
[53]  Transcript, page 87.
[54]  Transcript, pages 88 and 89 as well as 90 to 94 and Exhibit 12. In this regard, it is worth noting that Dees was repeatedly evasive during this testimony. See pages 94 to 96 (he denied understanding what "operational CEO" meant, even though the term was used in LG's documents).
[55]  Transcript, pages 96 and 97. After Mosser's dismissal, Dees was involved in hiring a new CEO named Thorsten Kuhn (Transcript, page 99). Kuhn started on April 1, 2018, but in July 2018 Dees was involved in the decision to fire Kuhn again (Transcript, pages 101 to 103 as well as Exhibit 14). At the beginning of August 2018, Kuhn was dismissed from Schur (Transcript, pages 110 and 111 as well as Exhibit 15).



LG decided to sell SFH by the end of 2019 or early 2020. Meanwhile, SFH decided to refinance its debt in 2018 and use some of the proceeds to pay a dividend to its shareholders (i.e., LG's subsidiaries).[56] As a member of the Advisory Board, Dees approved the dividend recapitalization.[57]

At the time of the refinancing, Dees wrote internally that Paul Pruss "implicitly communicated" that it would be more difficult to convince the lenders of SFH's pro forma EBITDA.[58] Dees wanted Unger to "reframe" the refinancing transaction and deliver the 2018 and 2019 results because the "clear path is an exit in late 2019/early 2020."[59] Dees stated that by "exit," he meant exiting the Schur investment—essentially the sale of SFH.[60]

In 2019 Dees approved Michael Schernthaner becoming CEO and Chairman of the Management Board of SFH.[61] After that, SFH no longer had a CFO.[62] Michael Fischkin was hired as Group Finance Director.[63]

## 9.    SFH's EBITDA, "serious adjustments," and the abandonment of the Sky project

During the refinancing of the dividend repayment, newspaper articles were published stating that SFH's profits had been[64] "polished up"[65] by "serious adjustments".[66] Exhibit 20 is a December 2018 article that refers to "serious adjustments" and "puffy adjustments"[67] that Pruss forwarded to Dees in May 2019 when the Sky project was underway.[68] The article stated that the "EBITDA adjustments were very aggressive."[69] According to Dees, this meant that for someone investing in the refinancing loan, "the adjustments were aggressive and that the leverage would be higher at a lower EBITDA."[70] Meanwhile, cash generation was poor, according to the article.[71]

The documents also show that lenders in Project Sky had questions about adjustments to negative goodwill of about EUR 30 million (related to the UNI Packaging

31

35

---

| | |
|---|---|
| 56 | Transcript, page 107; see also pages 151 and 152. |
| 57 | Transcript, pages 152 and 153. |
| 58 | Transcript, page 107 and Exhibit 14. |
| 59 | Transcript, page 109 and Exhibit 14. |
| 60 | Transcript, pages 105 and 106. |
| 61 | Transcript, page 117. |
| 62 | Transcript, pages 115 and 116. |
| 63 | Transcript, pages 114 and 115, as well as Exhibit 16. |
| 64 | In the English original: "heavy adjustments". |
| 65 | In the English original: "spruced up". |
| 66 | Transcript, pages 154 et seq., in particular 158 ("puffy adjustments") and Exhibit 20. |
| 67 | In the English original: "puffy adjustments". |
| 68 | Transcript, page 156. |
| 69 | Transcript, page 159 and Exhibit 20. |
| 70 | Transcript, page 160. |
| 71 | Transcript, page 160. |

acquisition), but Dees claimed not to remember this.[72]

In August 2019, Dees was concerned about interest from European sponsors, as he stated in a letter to Goldman Sachs.[73]    36

One of the bidders for Project Sky was Partners Group. According to an email from Goldman Sachs, the understanding of SFH's EBITDA was the "highest priority area for due diligence" for Partners Group.[74] Dees received this email and forwarded it to Thom[a]s Unger.[75]    37

In mid-October 2019, Dees realized that market players were not participating in Project Sky because they thought that the EBITDA of SFH must somehow be "inflated".[76] Dees reported this finding to LG's CEO, Alan Goldberg.[77]    38

On November 7, 2019 Dees received an email from Goldman with a proposed "script" for responding to statements by the rating agency Moody's that SFH was an "illustrative example of broad application of EBITDA adjustments across a wide range of categories."[78] The email shows that Moody's doubted the achievability of EBITDA forecasts in view of the significant gap between the "reported EBITDA" of EUR 26 million and the "adjusted EBITDA pro forma" of EUR 67 million.[79]    39

Dees also sent emails showing that Michael Schernthaner had an aversion to Goldman Sachs.[80] Dees also wrote an email to Thomas Unger that involving Michael Schernthaner in discussions with Partners Group "carried a great risk".[81]    40

---

[72]    Transcript, page 241 and Exhibit 35.
[73]    Transcript, pages 161 to 164, as well as Exhibit 21.
[74]    Transcript, pages 168 to 170, as well as Exhibit 23.
[75]    Transcript Exhibit 23.
[76]    Transcript, pages 171 to 173 and Exhibit 24; in the English original: "because they thought Schur's EBITDA must be overinflated."
[77]    Transcript, pages 171 to 173, as well as Exhibit 24.
[78]    Transcript, page 182 and Exhibit 27.
[79]    Transcript Exhibit 27.
[80]    Transcript, page 183 and Exhibit 28.
[81]    Transcript, page 186 and Exhibit 28.



Partners Group did not make an offer to acquire SFH.[82] This is consistent with Michael Fischkin's statement dated December 3, 2024 (ON 1172), in which he states that the reason for the failure of Project Sky was the gap between "adjusted EBITDA" and "cash-based EBITDA".[83]

Vienna, December 26, 2024                    B & C KB Holding GmbH

---

82      Transcript, page 186.
83      Transcript, pages 186 and 187, as well as Exhibit 17.



City of New York, State of New York, County of New York

I, Shayna Himelfarb, hereby certify that the document "Pages from 1204 RAe Rohregger - Urkundenvorlage-c" is, to the best of my knowledge and belief, a true and accurate translation from German into English.

_____
Shayna Himelfarb

Sworn to before me this
January 9, 2025

_____
Signature, Notary Public



_____
Stamp, Notary Public

An
Zentrale Staatsanwaltschaft zur Verfolgung
von Wirtschaftsstrafsachen und Korruption
Dampfschiffstraße 4
1030 Wien

**14204**

**Eingabe zu: 5 St 1/22g** — 866

Elektronisch eingebracht am 26.12.2024
Rohregger Rechtsanwalts GmbH

**Einbringer (P131049)**

Vertreten durch: Urkundenvorlage
Rotenturmstraße 17, 1010 Wien
E-Mail: office@rwk.at
Telefon: +43 1 53553 1000
IBAN: AT212011128621931600
BIC: GIBAATWWXXX
Zeichen: 1154-004

## Urkundenvorlage

Auf das beiliegende pdf-Dokument wird höflich verwiesen.

**1 Anhang**

1. **Urkundenvorlage**



**R | S | R**

ROHREGGER RECHTSANWÄLTE

Zentrale Staatsanwaltschaft zur Verfolgung von
    Wirtschaftsstrafsachen und Korruption
Dampfschiffstraße 4
1030 Wien

### 5 St 1/22g

**Beschuldigte**          Michael Schernthaner
                          Michael Fischkin
                          Conny Stöhrer
                          Amra Sejdic
                          Thomas Unger
                          ua

**Privatbeteiligte**      B & C KB Holding GmbH
                          Universitätsring 14, 1010 Wien

vertreten durch           Rohregger Rechtsanwalts GmbH
                          Rotenturmstraße 17, 1010 Wien

**wegen**                 § 153 StGB ua

## Urkundenvorlage

R S R   Rohregger            P131049                      HG Wien
        Rechtsanwalts GmbH    AT42 2011 1286 2193 1610     FN 531446 p

R | S | R

Die Privatbeteiligte erstattet in umseits bezeichneter Rechtssache die nachstehende

## Urkundenvorlage

und führt hierzu aus wie folgt:

Wie bereits in den ON 779, 837 und 1190 dargetan, hat die Privatbeteiligte sogenannte "§ 1782 discovery-Verfahren" unter US-amerikanischem Recht betreffend

(i)     Goldberg Lindsay & Co LLC ("LG") sowie Michael Dees, einem geschäftsführenden Gesellschafter von LG, in New York und

(ii)    vier staatliche Pensionsfonds in Texas, Louisiana, Wisconsin und New York, welche jeweils in den von Lindsay Goldberg verwalteten "Fund IV" investiert haben,

eingeleitet.

Am 19.12.2024 hat die Privatbeteiligte eine sogenannte "Deposition" (dies ist eine eides-stattliche Zeugenvernehmung) von Michael Dees durchgeführt und legt hiermit das Protokoll der Aussage von Michael Dees zusammen mit dessen integrierte Beilagen[1] vor.

Aus der Zeugenaussage von Michael Dees ergibt sich insbesondere eine intensive Involvierung und ein umfassender Kenntnisstand von Michael Dees betreffend die Belange der Schur Flexibles-Gruppe und deren Verkauf, sowie auch dass die Beteiligung an der Schur Flexibles-Gruppe offensichtlich höchste Aufmerksamkeit bei LG erhielt, indem beispielsweise Alan Goldberg die finale Entscheidung zur Besetzung von Thomas Unger (unter anderem als Vorsitzender des Beirates der Schur Flexibles Holding GesmbH) getroffen hat.

Im Folgenden werden bestimmte Fakten zusammengefasst, die auf der Zeugenaussage von Michael Dees sowie auf den ihm während der Aussage vorgelegten Beweismitteln basieren.

## 1.    Relevante Unternehmen und die verschiedenen Rollen von Michael Dees

LG ist ein Private-Equity-Unternehmen, das 2016 über Tochtergesellschaften die Schur Flexibles-Gruppe (im Folgenden "SF" genannt) gekauft hat. Dees bestätigte, dass LG die

---

[1]    Im Protokoll werden diese als "Exhibits" bezeichnet und im Protokoll mit "Ex." abgekürzt zitiert.

R | S | R

SF im Jahre 2016 über einen Fonds namens "Fund IV" gekauft hat.[2] Die Investition wurde über Atlas Flexibles Coöperatief U.A. (früher Atlas Flexibles BV) getätigt, die einen Anteil von etwa 85% an der Atlas Flexibles GmbH hielt; die anderen etwa 15% der Anteile an der Atlas Flexibles GmbH wurden von der Lindsay Goldberg Europe GmbH (früher Lindsay Goldberg Vogel GmbH) gehalten. Die Atlas Flexibles GmbH ist die Muttergesellschaft der Schur Flexibles GmbH, diese wiederum die Muttergesellschaft der Schur Flexibles Holding GesmbH (im Folgenden "SFH" genannt).[3]



Dees hatte den sogenannten "Deal Team Lead" von LG und beaufsichtigte die Due Diligence von LG.[4] Er war auch Mitglied des Investitionsausschusses von LG, der die Transaktion genehmigte.[5]

---

[2]    Protokoll Seiten 20, 39 und 40 sowie Beilage 3 zum Protokoll. Im Folgenden sind mit "Beilagen" immer die Beilagen zum Protokoll gemeint.

[3]    Protokoll Seiten 39 bis 42 sowie Beilage 3.

[4]    Protokoll Seite 21.

[5]    Protokoll Seite 21.

Nach der Übernahme der Geschäftsanteile wurde Dees zum Mitglied des Beirats der SFH ernannt (und zwar mindestens von Januar 2017 bis September 2021).[6] Darüber hinaus war (und ist) Dees Direktor von Atlas Flexibles Coöperatief U.A.[7]

Die Übernahme wurde an Lindsay Goldberg Vogel (im Folgenden "LGV" genannt) "vergeben". Diese Gesellschaft wurde später zu Lindsay Goldberg Europe (im Folgenden "LGE" genannt"). LGV/LGE war die erste Partei, die bezüglich der potenziellen Übernahme kontaktiert wurde.[8] Im Jahr 2020 hielt LG eine 20-prozentige Beteiligung an LGV/LGE.[9]

Vor der Übernahme der SF war Thomas Unger als Berater für LG tätig.[10] Thomas Unger wurde unmittelbar nach der Übernahme Berater für die SF,[11] und im Jahr 2017 Geschäftsführer von LGE.[12] Alan Goldberg war auch an der Entscheidung beteiligt, Unger einzustellen.[13]

## 2.    Für Beirat und Vorstand bestanden jeweils verbindliche Geschäftsordnungen

Dees bestätigte, dass sowohl der Beirat als auch der Vorstand der SFH durch schriftliche Geschäftsordnungen geregelt wurden.[14] In diesen Geschäftsordnungen finden sich Regelungen, die für die Beurteilung des hier maßgeblichen Sachverhaltes von Bedeutung sind. Dies gilt insbesondere für folgende Bestimmungen:

-    Gemäß § 7 seiner Geschäftsordnung hatte der Vorstand über den Vorsitzenden des Unternehmens den Beirat über "alle für die Gesellschaft und aller unmittelbaren und mittelbaren Tochtergesellschaften relevanten Fragen der Planung, der Geschäftsentwicklung, der Risikolage und des Risikomanagements" zu informieren".[15] Darüber hinaus hatte der Vorstand über den Vorsitzenden den

---

[6]    Protokoll Seite 22.

[7]    Protokoll Seiten 41 und 261. Dees war von 08.08.2016 bis 19.05.2017 auch Geschäftsführer der Atlas Flexibles GmbH (der Muttergesellschaft der Schur Flexibles GmbH).

[8]    Protokoll Seite 23.

[9]    Protokoll Seite 24 und Beilage 1.

[10]    Protokoll Seite 68.

[11]    Protokoll Seite 72.

[12]    Protokoll Seite 68.

[13]    Protokoll Seite 73.

[14]    Protokoll Seiten 49 und 53 sowie Beilage 5.

[15]    Protokoll Seite 54 und Beilage 5.

Beirat "nicht später als 10 Werktage vor dem Ende eines jeden Geschäftsjahres einen Entwurf des Jahresbudgets für das folgende Geschäftsjahr (,Budget') zur Genehmigung durch die Gesellschafterversammlung [zu informieren]. Das Budget muss für das Folgegeschäftsjahr monatliche Planungen des Gewinns uns Verlusts, des Kapitalflusses, der Erträge, der Ausgaben und der Barmittel sowie eine Planbilanz zum jeweiligen Quartalsjahresende beinhalten. [...]"[16]

–  Gemäß § 8 der Geschäftsordnung legt der Vorstand über den Vorsitzenden "spätestens 10 Tage vor dem Ende eines jeden Geschäftsjahres das von der Gesamtgeschäftsführung verabschiedete Budget der Gesellschaft ... sowie eines Risikokonzepts zur Absicherung von Geschäften in Fremdwährungen (außer Euro)" vor[17]

–  Gemäß § 9 der Geschäftsordnung benötigte der Vorstand für die Durchführung bestimmter Maßnahmen und Transaktionen die Zustimmung des Beirats.[18] Dazu gehörten[19]

   (a)  die Festlegung des Budgets der Gesellschaft sowie die Festlegung und/oder Änderung der Bilanzierungs- und Bewertungsgrundsätze;

        ...

   (j)  die Aufnahme oder Gewährung von Finanzkrediten, einschließlich Finanzierungsleasing, die Ausgabe von Schuldverschreibungen ... wie auch sonstigen Maßnahmen der Unternehmensfinanzierung, soweit diese einen Betrag von EUR 1.000.000 im Geschäftsjahr übersteigen;

        ...

   (m)  nicht budgetierte Investitionsvorhaben in Höhe von jeweils mehr als EUR 250.000, sowie, selbst wenn im Budget bereits berücksichtigt, die Eingehung einer Verbindlichkeit im Zusammenhang mit einem Investitionsvorhaben in Höhe von mindestens EUR 1.000.000.

        ...

---

[16]  Protokoll Seite 57 und Beilage 5. Siehe weiters Protokoll Seite 224 betreffend die Einigung darüber, dass der Vorstand verpflichtet war, für jedes Jahr ein Budget vorzulegen, und es eine Anforderung der Geschäftsführung war, dass der Beirat dem Budget zustimmt.

[17]  Protokoll Seite 59 und Beilage 5.

[18]  Protokoll Seiten 60 und 61 sowie Beilage 5.

[19]  Protokoll Seiten 60 bis 62 und Beilage 5.

(o)   Abschluss von Beraterverträgen – außer Personalberater – mit jährlichen
Zahlungspflichten der Gesellschaft gegenüber dem jeweiligen Berater von
insgesamt mehr als EUR 200.000 pro Geschäftsjahr.

**3.   Als Mitglied des Beirats erhielt Dees Informationen (einschließlich Budgets), die
Ausgaben widerspiegelten, die zu aktivieren waren**

Gemäß der Geschäftsordnung erhielt der Beirat (einschließlich Dees) die jährlichen
Budgets der SFH zur Genehmigung.[20] Die Budgets spiegeln den Plan der SFH für
"aktivierte Ausgaben" bzw "Investitionsausgaben" wider. Dees bestätigte, dass
"Kapitalaufwendungen" Ausgaben sind, "die kapitalisiert werden können"[21] und dass
der Begriff "Capex" dasselbe bedeutet.[22] Dees bestätigte auch, dass Kapitalauf-
wendungen das EBITDA nicht verringern, während Betriebsausgaben dies schon tun.[23]

Diese Dokumente belegen somit, dass Dees zweifellos Kenntnis von Ausgaben hatte,
welche bei Schur aktiviert wurden. So erhielt Dees etwa das Budget für 2017.[24] Dieses
zeigt detailliert aktivierte Ausgaben, die - wie Dees wiederholt bestätigte - "aktivierten
Ausgaben" widerspiegeln.[25] Tatsächlich gab Dees zu, dass er die Kapitalisierung bei der
SFH anhand der Budgets kannte.[26]

---

[20]   Protokoll Seiten 140 und 141 sowie Beilage 5.
[21]   Protokoll Seite 71.
[22]   Protokoll Seite 83.
[23]   Protokoll Seite 253; siehe auch Protokoll Seite 227.
[24]   Protokoll Seite 79 und Beilage 10.
[25]   Protokoll Seiten 138 und 139 sowie Beilage 10.
[26]   Protokoll Seite 139.

R | S | R

```
15        Q.    So you were aware of the capitalization at
16    Schur based on this document.  Correct?
17        A.    I had this document.  That is correct.
18        Q.    And this document reflects the projects
19    that are going to be capitalized in the following
20    year.  Correct?
21        A.    As the title of the document indicates, I
22    think that's what it represents.
```

Übersetzung:

> Frage: Sie kannten also die Kapitalisierung bei Schur anhand dieses Dokuments. Richtig?
>
> Antwort: Ich hatte dieses Dokument. Das ist richtig.
>
> Frage: Und dieses Dokument spiegelt die Projekte wider, die im folgenden Jahr kapitalisiert werden. Richtig?
>
> Antwort: Wie der Titel des Dokuments andeutet, denke ich, dass es das ist, was es darstellt.

Das Budget für 2020 umfasst ebenfalls Kapitalausgaben auf Standortbasis.[27] Somit war LG über die Kapitalausgaben der SFH informiert, einschließlich der Ausgaben für "Grundfläche, Zylinder und Gravuren, IT, F&E und andere".[28]

---

[27]    Protokoll Seite Seite 225 und Beilage 32.
[28]    Protokoll Seite 225.

```
10        Q.    So Lindsay Goldberg, whether you or not,
11    was made aware in -- in 2020 of Schur's capital
12    expenditure budgets for that year of 2020, right?
13        A.    At least one member of our team was
14    provided with this page.
```

Übersetzung:

> Frage: Lindsay Goldberg, ob Sie es waren oder nicht, wurde also im Jahr 2020 über die Investitionsausgabenbudgets von Schur für das Jahr 2020 informiert, richtig?
>
> Antwort: Mindestens ein Mitglied unseres Teams hat diese Seite erhalten.

Dees bestätigte auch, dass er Budgets mit Diagrammen erhalten hat, die die Unterschiede zwischen "reported EBITDA", "adjusted EBITDA" und "cash-EBITDA" widerspiegeln.[29] Zum Beispiel erhielt Dees das Budget für 2021, das die folgende Tabelle enthält.[30]

---

[29]    Protokoll Seiten 132 und 133.
[30]    Protokoll Beilage 19.

R | S | R

## Budget 2021

| in m€ / % of Net Sales | | | COVID scenarios | | | |
|---|---|---|---|---|---|---|
| | 2019 Actual | 2020 FC | FY21 Full Covid recovery | FY21 50% COVID recovery | FY21 no Covid recovery | BUD 21¹ Core |
| Flexibles Sales | 417.8 | 417.0 | 433.7 | 425.3 | 417.0 | 431.1 |
| reported EBITDA* | 77.8 | 76.0 | | | | |
| Adjusted EBITDA** | 82.6 | 84.4 | 95.0 | 89.0 | 84.5 | 90.0 |
| Cash Based EBITDA*** | 57.5 | 55.7 | 71.7 | 66.7 | 63.2 | 69.0 |
| Flexibles Division adj. EBITDA Margin | 18.9% | 19.3% | 20.8% | 20.0% | 19.3% | 20.0% |
| | | | ❶ | ❷ | ❸ | |

\* Reported Group EBITDA means audited EBITDA /v 2019 reported EBITDA adjusted by Moneta litigation receivable
\*\* Adjusted Group EBITDA means EBITDA according to SFA definition. 2019 EBITDA incl. PwC quality of earnings (QoE) adj.
\*\*\* Cash-based Group EBITDA means reported EBITDA minus IFRS 16, IT, R&D and Cylinder Engravings
\*\*\*\* including adjustments from badwill, IFRS 5 and severance cost

Dies steht im Einklang mit der *Äußerung zu den Stellungnahmen von Thomas Unger und zur Rolle des Managements von Lindsay Goldberg*, die am 03.12.2024 von Michael Fischkin als ON 1172 eingereicht wurde[31] Auf Seite 22 dieser Äußerung erklärte Michael Fischkin:

> Bereits diese Budget-Unterlagen, die dem **gesamten Beirat von Lindsay Goldberg zur Verfügung gestellt** wurden, weisen das „Reported-EBITDA", das „Adjusted-EBITDA" sowie das „Cash-based EBITDA" separat aus. Der signifikante Unterschied zwischen dem „Adjusted-EBITDA" und dem „Cash-based-EBITDA", der auf die IFRS Aktivierungen zurückzuführen ist, ist daraus ebenso klar ersichtlich. Schon allein deswegen waren dem **gesamten Beirat die Aktivierungen und die Höhe des Cash-EBITDAs bekannt**.

Dees gab zu, dass er wusste, dass Ausgaben aktiviert wurden, und dass er auf der Grundlage der ihm vorgelegten Dokumente Unterlagen erhielt, aus denen bestimmte aktivierte Ausgaben hervorgingen[32] So zeigt etwa die in der Äußerung von Michael

---

31    Protokoll Beilagen 17 und 17A.
32    Protokoll Seite 266.

Fischkin (ON 1172) gezeigte Tabelle (die identisch ist mit der obigen Tabelle aus dem Budget 2020, die Dees in Beilage 19 gezeigt wurde), dass IT, F&E und Zylindergravuren <u>kapitalisiert</u> wurden.[33] Wie Dees auch zugab, hat er somit gewusst, dass diese Posten kapitalisiert wurden.[34]

## 4. Die von LG vorgenommenen und kommunizierten Bewertungen basieren auf dem EBITDA

Dees gab zu, dass LG während seiner gesamten Investitionstätigkeit

    (i)    monatliche Berichte erhielt,

    (ii)   vierteljährliche Portfolioüberprüfungen erstellte und außerdem

    (iii)  mindestens zweimal im Jahr Bewertungen von Schur erstellte.[35]

Er gab weiters zu, dass die von LG vorgenommenen Bewertungen unter anderem auf dem EBITDA der SFH basierten[36] und dass LG gegenüber seinen Investoren Zusicherungen über den Wert der SFH machte und ein Bestandteil dieser Bewertung das EBITDA war.[37]

## 5. Dees genehmigte die Ernennung von Deloitte

Im Jahr 2022 unterzeichnete Dees den Aktionärsbeschluss, mit dem Deloitte zum Prüfer des Jahresabschlusses 2021 der SFH ernannt wurde.[38] In seinen geprüften Finanzberichten für 2021 stellte Deloitte sodann fest, dass "in zahlreichen Fällen in den Vorperioden eine ungerechtfertigte Kapitalisierung stattgefunden hat, ohne dass die von den IFRS vorgeschriebenen Voraussetzungen erfüllt waren".[39] Dees sagte aus, dass er sich nicht daran erinnern könne, ob er ein Budget genehmigt habe, das die verschiedenen von Deloitte beanstandeten Posten enthielt.[40]

---

[33]    Protokoll Seite 267 und Beilage 17.

[34]    Protokoll Seiten 267 bis 269.

[35]    Protokoll Seiten 242 und 243.

[36]    Protokoll Seite 243; siehe auch Beilagen 36 und 37.

[37]    Protokoll Seite 254.

[38]    Protokoll Seite 229 und Beilage 33.

[39]    Protokoll Seite 230 und Beilage 34B.

[40]    Protokoll Seiten 236 und 237.

R | S | R  13

**6. Zu Genehmigungen durch den Beirat und zum Fehlen von Protokollen des Beirats**

Während der gesamten eidesstattlichen Aussage behauptete Dees, er könne sich nicht daran erinnern, ob der Beirat verschiedene Maßnahmen genehmigt habe.

Die Geschäftsordnung sah freilich vor, dass der Beirat die Gehälter und Löhne bestimmter Mitarbeiter, einschließlich jener von Michael Schernthaner, genehmigen musste[41] Dees behauptete, er könne sich nicht daran erinnern, ob er die Vergütung für Michael Schernthaner genehmigt hat.[42] Er gab jedoch zu, dass er - wenn es ein Vorstandsprotokoll gegeben hätte - feststellen könnte, ob der Beirat die Vergütung von Michael Schernthaner genehmigt hatte[43]

Dees bestätigte auch, dass die Geschäftsordnung für nicht budgetierte Investitionsprojekte von mehr als 250.000,00 EUR eine Zustimmung des Beirats verlangte[44] Dees behauptete, er könne sich nicht erinnern, ob er diese Zustimmung für 2020 erteilt hat. Wenn es jedoch ein Protokoll gegeben hätte, hätte dies die Diskussion sicherlich verkürzt[45]

**7. LG's anfänglich positive Einstellung gegenüber der bestehenden Geschäftsführung der SFH**

Als LG die SFH 2016 kaufte, war der Gründer der SFH, Jakob Mosser, deren CEO[46] Die von Dees vorgelegten Unterlagen zeigen, dass LG zum Zeitpunkt der Übernahme der Ansicht war, Mosser sei "sehr fähig" und "entscheidend für den Erfolg des Unternehmens"[47] Wie unten erläutert, änderte sich diese Ansicht später, als LG mit der finanziellen Leistung der SFH im Jahr 2016, einschließlich des EBITDA, unzufrieden wurde.

---

[41]  Protokoll Seiten 192 und 193 sowie Beilage 5 (dort § 8 Abs 3).

[42]  Protokoll Seite 193.

[43]  Protokoll Seiten 197 und 198.

[44]  Protokoll Seite 227.

[45]  Protokoll Seite 228.

[46]  Protokoll Seite 36.

[47]  Protokoll Seiten 37 bis 39, 66 und 67 sowie Beilagen 2 und 6. Obwohl Dees anfänglich bestritt, diese Ansicht zu vertreten, räumte er ein, dass er Alan Goldberg eine von ihm erstellte Präsentation geschickt hatte, in der genau dies zum Ausdruck kam, siehe Protokoll Seiten 66 und 67 und Beilage 6.

R | S | R

8.  **Nach schlechter Finanzleistung im Jahr 2016 i) kündigen LG und LGE Herrn Mosser, (ii) stellen Unger und Schernthaner ein und (iii) bereiten den Ausstieg (Verkauf der SFH) bis Ende 2019 vor**

Im Jahr 2016, nach der Übernahme, schnitt die SFH bei den Finanzkennzahlen schwächer ab als erwartet[48] Thomas Ludwig von LGE beschloss, den CFO von Schur durch Michael Schernthaner von Constantia zu ersetzen[49] Dees und Ludwig waren auch mit Jakob Mosser aufgrund der finanziellen Leistung nicht zufrieden[50] Thomas Unger (ebenfalls von Constantia) wurde zu LGV geholt und trat 2017 dem Schur-Beirat bei[51]

Dees und die anderen Mitglieder des Beirats haben Mosser als CEO entlassen ("fired")[52] Unger wurde als "operativer CEO" bei der SFH eingesetzt[53] Obwohl Dees bestritt, dass Unger "operativer CEO" war, zeigen Dokumente, die Dees vorgelegt wurden, dass LG Investoren oder potenziellen Investoren mitteilte, dass er es war[54]

Schernthaner trat 2017 als CFO bei Schur ein[55]

LG beschloss, die SFH bis Ende 2019 oder Anfang 2020 zu verkaufen. In der Zwischenzeit beschloss die SFH, ihre Schulden im Jahr 2018 zu refinanzieren und einen Teil des Erlöses zur Zahlung einer Dividende an ihre Aktionäre (dh die Tochtergesellschaften von LG) zu verwenden[56] Als Mitglied des Beirats genehmigte Dees die Dividenden-rekapitalisierung[57]

---

48   Protokoll Seiten 76 und 80.
49   Protokoll Seite 84 und Beilage 9.
50   Protokoll Seite 84 und Beilage 9.
51   Protokoll Seite 85 und Beilage 9.
52   Protokoll Seiten 86 und 87 sowie Beilage 12.
53   Protokoll Seite 87.
54   Protokoll Seiten 88 und 89 sowie 90 bis 94 und Beilage 12. Dazu muss angemerkt werden, dass Dees während dieser Aussage wiederholt ausweichend war. Siehe die Seiten 94 bis 96 (er bestritt etwa, zu verstehen, was "operativer CEO" bedeutet, obwohl der Begriff in den Dokumenten von LG verwendet wurde).
55   Protokoll Seiten 96 und 97. Nach der Entlassung von Mosser war Dees an der Einstellung eines neuen CEO namens Thorsten Kuhn beteiligt (Protokoll Seite 99). Kuhn trat am 01.04.2018 seine Stellung an, aber im Juli 2018 war Dees an der Entscheidung beteiligt, Kuhn wieder zu entlassen (Protokoll Seiten 101 bis 103 sowie Beilage 14). Anfang August 2018 wurde Kuhn bei Schur gekündigt (Protokoll Seiten 110 und 111 sowie Beilage 15).
56   Protokoll Seite 107; siehe auch die Seiten 151 und 152.
57   Protokoll Seiten 152 und 153.

R | S | R

Zum Zeitpunkt der Refinanzierung schrieb Dees intern, dass Paul Pruss "implizit mitteilte", dass es schwieriger sein würde, die Kreditgeber von SFH's Pro-forma-EBITDA zu überzeugen[58] Dees wollte, dass Unger die Refinanzierungstransaktion "neu ausrichtet" und die Ergebnisse 2018 und 2019 liefert, da der "klare Weg ein Ausstieg Ende 2019/Anfang 2020 ist"[59] Dees sagte aus, dass er mit "Ausstieg" den Ausstieg aus der Schur-Investition meinte - im Wesentlichen den Verkauf der SFH[60]

Im Jahr 2019 genehmigte Dees, dass Michael Schernthaner CEO und Vorsitzender der Geschäftsführung der SFH wurde[61] Danach hatte die SFH keinen CFO mehr[62] Michael Fischkin wurde als Group Finance Director eingestellt[63]

9. **Das EBITDA der SFH, "gravierende Anpassungen" und Abbruch des Projekts Sky**

Während der Transaktion zur Refinanzierung der Dividendenrückzahlung waren Zeitungsartikel erschienen, in denen es hieß, dass die Gewinne der SFH durch "gravierende Anpassungen"[64] "aufpoliert"[65] worden seien[66] Bei Beilage 20 handelt es sich um einen Artikel vom Dezember 2018, in dem von "gravierenden Anpassungen" und "geschönten Anpassungen"[67] die Rede ist, den Pruss im Mai 2019, als das Projekt Sky lief, an Dees weiterleitete[68] In dem Artikel hieß es, dass die "EBITDA-Anpassungen sehr aggressiv waren"[69] Laut Dees bedeutete dies, dass für jemanden, der in den Refinanzierungskredit investierte, "die Anpassungen aggressiv waren und dass der Hebel bei einem niedrigeren EBITDA höher sein würde"[70] In der Zwischenzeit war die Cash-Generierung laut dem Artikel schlecht[71]

---

58    Protokoll Seite 107 und Beilage 14.
59    Protokoll Seite 109 und Beilage 14.
60    Protokoll Seiten 105 und 106.
61    Protokoll Seite 117.
62    Protokoll Seiten 115 und 116.
63    Protokoll Seiten 114 und 115 sowie Beilage 16.
64    Im englischen Original: "heavy adjustments".
65    Im englischen Original: "spruced up".
66    Protokoll Seiten 154 ff, insbesondere 158 ("puffy adjustments") und Beilage 20.
67    Im englischen Original: "puffy adjustments".
68    Protokoll Seite 156.
69    Protokoll Seite 159 und Beilage 20.
70    Protokoll Seite 160.
71    Protokoll Seite 160.

Aus den Unterlagen geht auch hervor, dass die Kreditgeber im Rahmen von Project Sky Fragen zu Anpassungen des negativen Firmenwerts in Höhe von etwa 30 Millionen Euro (im Zusammenhang mit der Übernahme von UNI Packaging) hatten, aber Dees bestritt, sich daran zu erinnern.[72]

Im August 2019 war Dees besorgt über das Interesse europäischer Sponsoren, wie er in einem Schreiben an Goldman Sachs feststellte.[73]

Einer der Bieter bei Project Sky war Partners Group. Laut einem email von Goldman Sachs war das Verständnis des EBITDA der SFH der "höchste Prioritätsbereich für die Sorgfaltspflicht" der Partners Group.[74] Dees erhielt dieses email und leitete es an Thoms Unger weiter.[75]

Mitte Oktober 2019 wurde Dees klar, dass Marktteilnehmer nicht an Project Sky teilnahmen, weil sie dachten, dass das EBITDA der SFH irgendwie "überhöht sein muss".[76] Dees berichtete diese Erkenntnis dem CEO von LG, Alan Goldberg.[77]

Am 07.11.2019 erhielt Dees ein email von Goldman mit einem vorgeschlagenen "Skript" für die Reaktion auf Aussagen der Ratingagentur Moody's, wonach die SFH ein "anschauliches Beispiel für eine breite Anwendung von EBITDA-Anpassungen in einer Vielzahl von Kategorien" sei.[78] Aus dem email geht hervor, dass Moody's die Erreichbarkeit von EBITDA-Prognosen angesichts der erheblichen Lücke zwischen dem "reported EBITDA" von 26 Millionen Euro und dem „adjusted EBITDA pro forma" von 67 Millionen Euro bezweifelte.[79]

Dees schickte auch emails, aus denen hervorgeht, dass Michael Schernthaner eine Abneigung gegen Goldman Sachs hatte.[80] Dees schrieb auch ein email an Thomas

---

[72]    Protokoll Seite 241 und Beilage 35.
[73]    Protokoll Seiten 161 bis 164 und Beilage 21.
[74]    Protokoll Seiten 168 bis 170 und Beilage 23.
[75]    Protokoll Beilage 23.
[76]    Protokoll Seiten 171 bis 173 und Beilage 24; im englischen Original: "because they thought Schur's EBITDA must·be overinflated."
[77]    Protokoll Seiten 171 bis 173 und Beilage 24.
[78]    Protokoll Seite 182 und Beilage 27.
[79]    Protokoll Beilage 27.
[80]    Protokoll Seite 183 und Beilage 28.

R | S | R /17

Unger, dass die Einbeziehung von Michael Schernthaner in Besprechungen mit der Partners Group "ein großes Risiko birgt"[81]

Die Partners Group machte schließlich kein Angebot zum Erwerb der SFH[82] Dies steht im Einklang mit der Äußerung von Michael Fischkin vom 03.12.2024 (ON 1172), in der er angibt, dass der Grund für das Scheitern von Project Sky in der Lücke zwischen dem "adjusted EBITDA" und dem "cash-based EBITDA" lag[83]

Wien, 26.12.2024                                                    B & C KB Holding GmbH

---

[81]    Protokoll Seite 186 und Beilage 28.
[82]    Protokoll Seite 186.
[83]    Protokoll Seiten 186 und 187 sowie Beilage 17.

15