# Exhibit B

# (Part 2 of 2)

The Ex Parte Application of B&C KB Holding GmbH

Michael Dees
December 19, 2024

114

1    operating officer, is to be responsible for the

2    operations of the company.

3        Q.   Did you have involvement in the hiring of

4    Mr. Arteaga for that role?

5        A.   I don't recall that I did.

6        Q.   Who then hired Mr. Arteaga?

7            MR. LEON:   Object to form.

8        A.   I don't know who interviewed him for

9    the job.

10        Q.   Do you recall that Mr. Arteaga was on the

11    management board at Schur?

12        A.   Yes, I do.

13        Q.   Okay.  And you approved Mr. Arteaga being

14    part of the management board at Schur?

15        A.   I did.

16        Q.   Was Mr. Humer part of the management board

17    at Schur as well?

18        A.   I recall that he was.

19        Q.   And you approve Mr. Humer being part of

20    the management board at Schur, correct?

21        A.   Correct.

22        Q.   Now, it also mentions, in the lower

23    left-hand corner, Mr. Fischkin, who we've been

24    speaking about, and it identifies him as group

25    finance director.

1           What is "group finance director" at Schur?

2           A.   I don't know.

3           Q.   So did you know, at the time you served on

4    the advisory board, what the group finance director

5    did at Schur?

6                MR. LEON:  Object to form.

7           A.   I may have, but I don't recall today.

8           Q.   And apart from the title, does looking at

9    this document refresh your memory at all as to what

10   Mr. Fischkin's roles and responsibilities were at

11   Schur?

12          A.   It does not.

13          Q.   But you have no doubt that he -- as of the

14   time of this presentation, he was the group finance

15   director at Schur, fair?

16          A.   Based on reviewing this email and the

17   attachment, I have no reason to doubt that.

18          Q.   And this document does not identify a

19   chief financial officer, fair?

20          A.   This page does not.  I haven't reviewed

21   the whole document, but this page does not.

22          Q.   Well, wouldn't you expect that the page --

23   pardon me -- that the management team it would refer

24   to -- it would identify a CFO -- the CFO if there

25   was one?

116

1       A.    I would expect.

2       Q.    Does that refresh your memory at all as to

3   whether there was a CFO following Mr. Schernthaner's

4   elevation to CEO?

5       A.    As I said, I don't see it on the page.

6             I don't -- I don't see a CFO on the page.

7       Q.    And you don't know why, one way or the

8   other, that was the case.  Correct?

9       A.    I don't recall.

10      Q.    Did -- did you ever meet Mr. Fischkin?

11      A.    I may have met him virtually.  I don't

12  recall if I met him in person.

13      Q.    Did you form any views as to his

14  capabilities?

15      A.    I did not.

16      Q.    And again, you -- but you didn't know what

17  exactly his job responsibilities were.  Do I have

18  that right?

19      A.    You have that right.

20      Q.    Who did you believe was in charge of the

21  day-to-day financial responsibility at Schur after

22  Mr. Schernthaner was elevated?

23      A.    The management board had a responsibility

24  for Schur, its financials, and everything else.  I

25  don't know who below that was responsible.

Case 1:22-mc-00180-LAK-VF    Document 153-3    Filed 01/17/25    Page 5 of 106
The Ex Parte Application of B&C KB Holding GmbH
Michael Dees
December 19, 2024

117

1         Q.    Let's go back to Dees 5, if you could

2    locate that.

3              So this is a document we looked at

4    earlier.  I want to now draw your attention to --

5    back to page 2, under the resolutions, the -- the --

6    the second resolution.

7         A.    Okay.

8         Q.    It states, The advisory board approves the

9    schedule of responsibilities of the management board

10   as resolved by the management board and attached

11   Schedule 1.  You see that?

12             We -- we put a pin in Schedule 1 before,

13   and if you can turn to -- starting on page 5 of the

14   document, and then carrying over into page 6.  Let

15   me know when you're there.

16             So, as of May 2019, you approved

17   Mr. Schernthaner being the chief executive officer,

18   or CEO, and the chairperson of the management board.

19             Do I have that right?

20        A.    Yes, you do.

21        Q.    And your understanding of his

22   responsibilities were in the bullets below that.

23   Correct?

24        A.    As I -- as I read this, yes.

25        Q.    And that would include finance?

119

1    Lindsay Goldberg?

2        A.    No.

3        Q.    Do you have an understanding of what

4    "IFRS" is?

5        A.    I'd have -- I'm trying to remember.

6    International Financial Reporting Board or Body.

7        Q.    And did you understand that those were the

8    rules governing Schur's accounts?

9        A.    Yes.

10       Q.    And just so I have it, were -- was the

11   accounting policy, including the use of

12   capitalization rules prescribed by IFRS, dictated by

13   Lindsay Goldberg Europe at Schur?

14           MR. LEON:   Object to form.

15       A.    No.

16           MR. ROSENBAUM:   Let's mark this as 17 and

17       18.   Or 17 and 17A.   Let's do 17 and 17A.

18           (Document in German was marked Dees

19       Exhibit 17 for identification, as of this

20       date.)

21           (Translation of document in German was

22       marked Dees Exhibit 17A for identification, as

23       of this date.)

24       Q.    I'm showing you what has been marked as

25   Dees 17, and -- along with Dees 17A.   And I'll

120

1  represent for the record that 17A is a certified

2  translation of Dees 17.

3          So, starting on the first page of 17A --

4  well, let me ask a preliminary question.  Do you

5  speak German, Mr. -- Mr. Dees?

6      A.   I do not.

7      Q.   Starting on the first page of 17A, it

8  says, Statement on the comments by Thomas Unger and

9  on the role of management of Lindsay Goldberg.

10          Do you see that?

11      A.   I do.

12      Q.   Have you seen this document before today?

13      A.   I have not.

14      Q.   Okay.  If you turn to page 2, it

15  identifies Dr. Michael Fischkin.

16          Do you see that?

17      A.   Okay.  So -- not the one page, which page,

18  the one in the bottom or the --

19      Q.   Page 2 of the document.

20      A.   Okay.

21      Q.   So it's --

22      A.   The page after the cover.

23      Q.   Correct.

24          Under -- it says, Defense attorney,

25  Dr. Michael Fischkin, represented by PLCB, and it

Case 1:22-mc-00180-LAK-VF    Document 153-3    Filed 01/17/25    Page 8 of 106
The Ex Parte Application of B&C KB Holding GmbH
Michael Dees
December 19, 2024

139

121

1    continues.

2           Do you see that?

3      A.    I see that.

4      Q.    I'll represent to you that this is a

5    statement that was submitted to the Austrian

6    prosecutor by Mr. Fischkin. And I want you to turn

7    to -- now, bottom right-hand corner, page 3, of the

8    document. The first sentence on the top of the

9    page, I just want to make sure we are on the same

10   place, it says, What is more, the accounting

11   policy -- namely the use of capitalization rules

12   prescribed by IFRS was dictated by Lindsay Goldberg.

13          Is that a true statement?

14     A.    It is not.

15     Q.    So you believe Mr. Fischkin was lying to

16   the prosecutor if he made that statement?

17     A.    I said it's not a true statement. I do

18   not believe it's a true statement.

19     Q.    So then you believe that Mr. Fischkin was

20   not telling the truth if that's what he said. Fair?

21     A.    I'm simply saying, this is not a true

22   statement.

23     Q.    Let's go to page 4. Top of the page, the

24   first bullet, it says, Lindsay Goldberg's management

25   was actively involved in the -- in operational

Case 1:22-mc-00180-LAK-VF    Document 153-3    Filed 01/17/25    Page 9 of 106
The Ex Parte Application of B&C KB Holding GmbH                                      Michael Dees
                                                                            December 19, 2024

                                                                                         122

 1  financial matters at Schur and in EBITDA

 2  calculations for Schur.

 3          Is that a true statement?

 4      A.  It is not.

 5          MR. LEON:  Object to form.

 6      A.  It is not a true statement.

 7      Q.  If --

 8          MS. YEU:  Could we just quickly clarify,

 9      at least based on page 2, "Lindsay Goldberg"

10      is -- is a shorthand for Lindsay Goldberg

11      Europe?

12          MR. ROSENBAUM:  Yeah, I was going to --

13          MS. YEU:  Oh, okay.  Sorry.

14          MR. ROSENBAUM:  -- I was going to ask the

15      same question and -- in two ways because

16      it's --

17          MS. YEU:  Sorry about that.  I just --

18      Q.  So if I were to read it, Lindsay Goldberg

19  Europe's management was actively involved in

20  operational financial matters at Schur and in EBITDA

21  calculations for Schur, would you understand that

22  statement to be true?

23          MR. LEON:  Objection to form.  Foundation.

24      A.  I would not say that that's a true

25  statement.

Case 1:22-mc-00180-LAK-VF    Document 153-3    Filed 01/17/25    Page 10 of 106
The Ex Parte Application of B&C KB Holding GmbH                    Michael Dees
                                                        December 19, 2024

                                                              123    141

1          Q.    So, again, if Mr. Fischkin made the

2    statement to the prosecutor, your -- your testimony

3    is he was lying; is that right?

4          A.    My testimony is that this is not a true

5    statement.

6          Q.    And if someone made that statement, then

7    to your -- in your view, they're not telling the

8    truth, correct?

9          A.    I'm simply stating this is not a true

10   statement.

11         Q.    Go to page 7.  Go to the -- the second

12   full paragraph, the sentence starting with, The

13   accused will show this with some documents he has

14   received in the context of this statement.

15               I want you to start there.

16         A.    Start where?  Which page?

17         Q.    Page 7.  Bottom right-hand corner, page 7.

18         A.    Okay.

19         Q.    Middle paragraph.

20         A.    Oh, there -- The accused will show?

21         Q.    Yeah.

22         A.    Okay.

23         Q.    The accused will show this with some

24   documents he has received in the context with the --

25   of this statement.

124

1           And he continues, Thomas Unger and the

2    other members of the advisory board were closely

3    involved in the financial affairs of Schur, and as

4    can be proven were fully informed at all times about

5    the key financial figures and the amount of IFRS

6    capitalizations in detail.

7           Is that a true statement?

8           MR. LEON:  Object to form.

9       A.   This complete statement is not true.

10      Q.   So if Mr. Fischkin told the prosecutor

11   this, you would say he was lying?

12      A.   I'm saying this statement is not true.

13      Q.   It continues, The decision on which

14   activation should be exercised came from

15   Lindsay Goldberg herself.

16          Is that a true statement?

17          MR. LEON:  Objection to form.

18      A.   That is not a true statement.

19      Q.   And if I were to place -- replace, just so

20   we're clear on definitions, the decision on which

21   activation should be exercised came from

22   Lindsay Goldberg Europe, is that a true statement?

23          MR. LEON:  Object to form.  Foundation.

24      A.   To my knowledge, that would not be a true

25   statement.

1          Q.   And you base that knowledge on your role

2    as an advisory board member with Mr. Unger and

3    Mr. Ludwig, correct?

4               MR. LEON:   I object to form.

5          A.   I base it on my knowledge.

6          Q.   Let's go to page 10.  First paragraph, the

7    sentence starting with, For this reason, as numerous

8    documents show.

9               Let me know when you're there.

10         A.   I'm there.

11         Q.   It says, For this reason, as numerous

12   documents show, the focus was also placed on the

13   presentation and disclosure of the, quote, cash

14   EBITDA, end quote, EBITDA less noncash accounting

15   items such as IFRS capitalizations, when preparing

16   the company's key figures for the 2021 exit process.

17              First of all, have you heard the term

18   "cash EBITDA" in the context of your role at Schur?

19         A.   It was not a commonly used term.

20         Q.   Is -- that wasn't my question.  Was the

21   term "cash EBITDA" used, that you recall, in

22   presentations that you received from Schur?

23         A.   I can't recall if it was in presentations

24   on Schur.

25         Q.   Do you have an understanding of what the

126

1  term "cash EBITDA" meant at Schur?

2      A.   I don't.

3      Q.   Did you ever?

4           MR. LEON:  Object to form.

5      A.   I don't because, as I said, I don't know

6  if there were presentations that I saw that had cash

7  EBITDA.

8      Q.   It continues, Michael Dees, Thomas Ludwig,

9  Thomas Unger, and Paul Pruss, Philipp Schall, and

10  Goldman Sachs, as investment bank and M&A advisor to

11  Lindsay Goldberg were provided with detailed

12  reconciliations of cash EBITDA.

13           Is that a true statement?

14      A.   I don't recall if it is.

15           MR. LEON:  Is "Lindsay Goldberg" there

16      Lindsay Goldberg Europe?

17           MR. ROSENBAUM:  Where?

18           MR. LEON:  In the sentence you just read.

19           MS. YEU:  Second page it says

20      Lindsay Goldberg is --

21           MR. LEON:  I believe all references to

22      "Lindsay Goldberg" are Lindsay Goldberg Europe

23      so --

24           MR. ROSENBAUM:  It's unclear to me whether

25      he is defining "Lindsay Goldberg" as including

127

1       Atlas Coöperatief, it really is.  So I'm going

2       to -- if you want me to ask it both ways -- I

3       want a clear record on this.  I'm not trying

4       to -- as you can see, I'm trying to ask it both

5       ways, because it's --

6               MR. LEON:  Right.

7               MR. ROSENBAUM:  -- it's not his testimony.

8       But he can testify from his knowledge whether

9       it's accurate, and I will ask it both ways.

10              MR. LEON:  I understand.  My objection is,

11      as to the extent you're asking about Lindsay

12      Goldberg Europe, there's a foundation problem,

13      obviously, not as to Lindsay Goldberg.  That's

14      the point I'm making.

15              MR. ROSENBAUM:  We'll deal with the

16      foundation problem separately.  I don't view it

17      as a problem.  I don't think there's a

18      foundation issue.  He was on the advisory board

19      with two members of Lindsay Goldberg Europe.

20      Q.    So let me go back to that sentence and ask

21  it two different ways.

22              Mr. Fischkin says, Michael Dees, Thomas

23  Ludwig, Thomas Unger, Paul Pruss, Philipp Schall,

24  and Goldman Sachs, as investment bank and M&A

25  advisor to Lindsay Goldberg, and he continues.

128

1           First of all, was it your understanding

2    that -- that Goldman Sachs was the investment bank

3    and M&A advisor to Lindsay Goldberg?

4         A.    That's not my recollection.

5         Q.    Who was Goldman Sachs investment bank and

6    M&A advisor to?

7         A.    I believe they were M&A advisor to one of

8    the Schur entities.

9         Q.    So reading it as a whole, Michael Dees,

10   Thomas Unger -- I'm sorry.

11          Michael Dees, Thomas Ludwig, Thomas Unger,

12   Paul Pruss, Philipp Schall, and Goldman Sachs were

13   provided with detailed reconciliations of cash

14   EBITDA.

15          Is that true?

16        A.    I can't recall.

17        Q.    Let's go to page 12.  The top bullet says,

18   The requirement to interpret IFRS standards in the

19   sense of private equity structure and thus to make

20   comprehensive use of the capitalization options

21   provided by IFRS came from Thomas Unger.

22          Do you believe that to be a true

23   statement?

24          MR. LEON:  Objection to form.

25        A.    I -- I don't even understand what he means

129

1    by the beginning of that statement.

2        Q.   What part don't you understand?

3        A.   In the sense of the private equity

4    structure.

5        Q.   Let's read that out.  The requirement to

6    interpret IFRS standards and thus to make

7    comprehensive use of capitalization options provided

8    by IFRS came from Thomas Unger.

9             Do you believe that to be a true statement

10   in the context of Schur?

11            MR. LEON:  Object to form.

12       A.   To my knowledge, I do not believe it to be

13   a true statement.

14       Q.   So it's your testimony that Mr. Unger was

15   not involved in that process?

16            MR. LEON:  Object to form.

17       Q.   Do I have that right?

18            MR. LEON:  Foundation.

19       A.   My knowledge is that he was not involved

20   in that process.

21       Q.   And that would -- you -- would you expect

22   the executive chairman to be involved in that

23   process?

24            MR. LEON:  Object to form.  Speculation.

25       A.   I would not expect members of the advisory

130

1  board to be involved in that process.

2       Q.   Would you expect an operating CEO to be

3  involved in that process?

4       A.   I would expect the management board to

5  prepare the financial statements.

6       Q.   It continues in that sentence,

7  Lindsay Goldberg dictated which EBITDA adjustments

8  were to be made.

9            Let me ask that in two ways.

10           If it were to say Lindsay Goldberg Europe

11 dictated which EBITDA adjustments were to be made,

12 would you understand that to be true statement?

13           MR. LEON:  Object to form.  Foundation.

14      A.   To my knowledge, it would not be a true

15 statement.

16      Q.   And you base your knowledge on your role

17 on the advisory board at Lindsay Goldberg -- at

18 Schur, correct?

19           MR. LEON:  Object to form.

20      A.   It's based upon my knowledge.

21      Q.   And that knowledge includes the knowledge

22 you gained on the advisory board of Schur, correct?

23           MR. LEON:  Object to form.

24      A.   Yes, that's correct.

25      Q.   And if it were to say Lindsay Goldberg the

131

1  way we previously defined it dictated which EBITDA

2  adjustments were to be made, would that be true?

3      A.    That would not be true.

4      Q.    And you base that on your -- your position

5  as a partner in Lindsay Goldberg.  Do I have that

6  right?

7           MR. LEON:  Object to form.

8      A.    Yes.

9      Q.    Let's go to page 8.

10      A.    Page?  Which one?

11      Q.    I'm sorry, page 21.

12           (Witness reviewing document.)

13      Q.    The last paragraph on the page says, For

14  the formal budget documents for 2021, a

15  reconciliation between, quote, reported EBITDA,

16  adjusted EBITDA, and cash EBITDA, was prepared,

17  including a detailed explanation of capitalization

18  shown in order to provide Lindsay Goldberg with

19  transparent information about the composition of

20  EBITDA.

21           Do you recall that having happened?

22      A.    I don't -- I don't have a recollection.

23      Q.    Okay.  Mr. Fischkin continues, This is

24  shown, among other things, by the following extract

25  from budget document presentation as of December 31,

132

1   2020, according to which the difference between

2   adjusted EBITDA, cash-based EBITDA -- I'm sorry,

3   adjusted EBITDA and cash-based EBITDA is

4   approximately 30 million.

5            And then there's an excerpt.

6            Do you dispute that you received the

7   budget for 2021 containing that excerpt?

8       A.    I do not dispute that I received a budget.

9   I don't know if I received this presentation or this

10  page.

11      Q.    But you -- and we can get further into

12  that, but you see that this page excerpted by

13  Mr. Schernthaner does identify cash-based EBITDA as

14  distinct from adjusted EBITDA and reported EBITDA.

15  Correct?

16      A.    Yes, I do.

17      Q.    And then it has different explanations,

18  with asterisks.

19            Do you see that?  There's three next to

20  cash-based EBITDA?

21      A.    I see what's written there.

22      Q.    Okay.  Did you receive that type of

23  information from Schur?

24            MR. LEON:  Object to form.

25      A.    I -- I don't know if I received this exact

133

1  page.

2       Q.    Would it surprise you if you did?

3       A.    It would not surprise me if I received

4  this page.

5       Q.    And I take it, you know, in your role on

6  the advisory board, you were aware of the expenses

7  that Schur was capitalizing, correct?

8            MR. LEON:  Object to form.

9       A.    As a member -- as a member of the advisory

10  board, I received financial statements from the

11  management team and from the auditors.

12      Q.    And so in that capacity, you were aware of

13  expenses, or expenditures, that Schur was

14  capitalizing, correct?

15      A.    It would depend upon the information I was

16  provided by either the auditors or the management

17  team.

18      Q.    That wasn't my question.

19            Were you informed of expenditures that

20  Schur was capitalizing, in your capacity as an

21  advisory board member?  Yes or no.

22      A.    I was --

23            MR. LEON:  Objection.  Asked and answered.

24            You answer it as --

25            MR. ROSENBAUM:  No, it was not answered.

138

1          A.    Yes, it is.

2          Q.    Okay.

3                And within that budget, this capex, by

4    site, is identified.  Right?

5                Starting on page 143.

6          A.    Yes, it is.

7          Q.    And capex are expenses that are -- they're

8    expenditures that are being capitalized, correct?

9          A.    That's an informal way of saying it.

10         Q.    But you agree with it.

11         A.    That's an informal management reporting

12   way of saying it.

13         Q.    Of saying -- saying what?

14         A.    Capex, what capital expenditures are.  I

15   mean, they're using capex and capital expenditures

16   interchangeably.

17         Q.    I see.  But -- but -- we're probably

18   missing each other, and it's probably my fault

19   because this is your area, not mine.

20               But when you hear "capex," that's

21   referring to expenditures that are being capitalized

22   by a company.  Right?

23         A.    Yes.

24         Q.    Okay.  And then, this budget that you

25   received summarizes, by site on the page we're

Case 1:22-mc-00180-LAK-VF   Document 153-3   Filed 01/17/25   Page 22 of 106
The Ex Parte Application of B&C KB Holding GmbH
Michael Dees
December 19, 2024

157

139

1   looking at, the budgeted capex figures for each

2   site. Fair?

3       A.   That's -- that's fair.

4       Q.   And then, when you continue into it, it

5   gives detail for each capital expenditure on a

6   project-by-project basis that identifies amounts,

7   whether it's major or minor, and other information.

8   Is that right?

9       A.   Yes, that's right.

10      Q.   And if you remember, we -- I can show it

11   to you again, but after receiving this budget, you

12   decided you want to look -- you wanted to look at

13   capex by facility. And you did that. Correct?

14      A.   I asked someone to do that.

15      Q.   So you were aware of the capitalization at

16   Schur based on this document. Correct?

17      A.   I had this document. That is correct.

18      Q.   And this document reflects the projects

19   that are going to be capitalized in the following

20   year. Correct?

21      A.   As the title of the document indicates, I

22   think that's what it represents.

23      Q.   So if you said to Mr. Fry you were unaware

24   of expenses that were capitalized at Schur, that's

25   not correct. Am I right?

140

 1          Strike that.

 2          So going back to these five, the advisory

 3 board's and management board rules of procedure, and

 4 specifically page 12, or 5 of 9, let me know when

 5 you're there.

 6          Under 3C -- we reviewed this earlier -- it

 7 says, No later than ten days before the end of each

 8 financial year, a draft annual budget for the

 9 following financial year for consent for the meeting

10 of the shareholders.

11          And that's how it defines budget.  Right?

12     A.   That's how it defines budget.

13     Q.   And it continues, The budget for the

14 following financial year must include monthly plans

15 for profit and loss, cash flows, income, and

16 expenditure.  Right?

17     A.   I think it says --

18     Q.   Among other things.

19     A.   -- income, expenditure, and cash.

20     Q.   Okay.  And the -- those capex tables that

21 we just looked at for the 2017 budget identified

22 expenditures for the following year.

23          Fair?

24     A.   It did.  For that year.

25     Q.   So that is the type of budget document

141

1  that you would find consistent with the requirements

2  of the rules of procedure for the management board,

3  correct?

4          MR. LEON:  Object to form.

5      A.   That was the budget that was provided in

6  2017.

7      Q.   And you joined the -- the advisory board

8  in 2017, correct?

9      A.   Correct.

10     Q.   And now going to page 6 of 9, Section 9,

11 "Acts Requiring Consent of the Advisory Board," 1A,

12 Determination of the budget as well as determination

13 and/or changes of the accounting and valuation

14 policies.

15         So you approved the budget, correct?

16     A.   The budget --

17         MR. LEON:  Object --

18     A.   Not every page of a budget; a budget for

19 the company.

20     Q.   So you -- the budget we just reviewed,

21 that is marked as Dees 10, it was your

22 responsibility on the advisory board to review and

23 approve it.  Fair?

24     A.   My responsibility was to approve the

25 budget, not to approve a presentation.

Case 1:22-mc-00180-LAK-VF    Document 153-3    Filed 01/17/25    Page 25 of 106
The Ex Parte Application of B&C KB Holding GmbH
Michael Dees
December 19, 2024

161

143

1    assumption of liability in connection with an

2    investment project of at least 1 million, that was

3    required to be approved by the advisory board,

4    including you, correct?

5        A.    I could simply read what's on this

6    document.

7        Q.    Yeah, that's what it says, right?

8        A.    I'm reading 1M the same as you are.

9        Q.    Okay. And if you go back to Dees 10,

10   starting on page 144, the bottom right-hand corner,

11   this document identifies site-by-site investment

12   projects, correct?

13       A.    It appears to.

14       Q.    So your understanding would be that those

15   were approved by the advisory board, correct?

16       A.    I don't recall if they were approved or

17   not.

18       Q.    Well, you don't dispute that you received

19   these ten, right?

20       A.    I'm not disputing that I received it.

21       Q.    And you would, likewise, agree with me

22   that if an investment project of over 250,000 that

23   was not budgeted was going to be undertaken by the

24   management committee, the management committee

25   had -- or management board had to come back to the

144

1 advisory board and get separate approval, correct?

2 A. That's -- that's what it says in this

3 document. I don't know if there are any other

4 procedures that were undertaken that would be

5 different than this.

6 Q. Are you aware of any other procedures

7 besides this that were in effect after May of 2019?

8 A. I -- I'm not. I'm not aware of the

9 documents.

10 Q. Are you familiar with a company called

11 Stern Stewart?

12 A. Yes, I am.

13 Q. What is Stern Stewart?

14 A. They're a consulting firm.

15 Q. Did Schur engage Stern Stewart?

16 A. We did.

17 Q. Did you approve it?

18 A. I don't recall if the advisory board did

19 or not.

20 Q. Do you know how much Schur paid to Stern

21 Stewart in any given year?

22 A. I do not.

23 Q. Did you ever know?

24 A. I --

25 MR. LEON: Object to form.



151

1       A.    Yes, I do.

2       Q.    And is this the same table that

3    Mr. Fischkin referred to?

4            MR. LEON:  Object to form.

5       A.    I'd have to --

6       Q.    You can pull it --

7       A.    -- back to the --

8       Q.    It's 17A.  I know -- I know it's

9    cumbersome, but this is what we do.

10           And it's on page 22 of 17A.

11           (Witness reviewing document.)

12      A.    These look to be very similar, if not the

13   same page.

14      Q.    Okay.

15           You can put that to the side.

16           We talked about Project Sky earlier, so I

17   want to just reorient you to that subject matter.

18           What -- what was Project Sky, in your

19   words?

20      A.    Was a process to try to sell the company

21   in either 2019 or 2020.

22      Q.    And as I recall, there was a refinancing

23   transaction in 2018?  Does that -- is that right?

24      A.    Yes, that's right.

25      Q.    And that was also called dividend recap?

1    Is that a term you're familiar with?

2        A.    That was part of the financing

3    transaction.

4        Q.    Okay.  Yeah, just can you explain to me

5    what "dividend recap" was as part of the financing

6    transaction in 2018?

7        A.    In 2018, Schur raised debt.  It had

8    two purposes, one was to refinance the existing

9    debt, and the other was to pay a dividend to the

10   shareholders of Schur.

11       Q.    And how much existing debt did -- did

12   Schur have prior to the dividend recap financing?

13       A.    I don't recall.

14       Q.    How much was raised in the -- the

15   refinancing in 2018, in total?

16       A.    I don't recall.

17       Q.    Do you recall roughly around 300 million

18   euros?

19       A.    I recall it's hundreds of millions of

20   euros --

21       Q.    Okay.  But you don't --

22       A.    -- I don't know how many.

23       Q.    Were you involved in the process of the

24   dividend recap?

25       A.    As a member of the advisory board, we

Case 1:22-mc-00180-LAK-VF    Document 153-3    Filed 01/17/25    Page 29 of 106
The Ex Parte Application of B&C KB Holding GmbH                    Michael Dees
December 19, 2024

171

153

1    certainly approved the dividend recap.

2         Q.    And who -- was there an advisor to Schur

3    in that process?

4         A.    I don't recall if there was.

5         Q.    Do you recall Goldman Sachs being involved

6    or -- at all?

7         A.    I don't recall.

8         Q.    But Goldman Sachs was involved in

9    Project Sky?

10        A.    Yes, they were.

11        Q.    Who engaged -- what entity engaged

12   Goldman?

13        A.    I don't recall which entity.

14        Q.    But you recall it was a Schur entity?

15        A.    I think it was, but I don't recall.

16        Q.    Was -- was it Lindsay Goldberg?

17        A.    I don't know if it was.  I don't -- again,

18   I don't recall who engaged Goldman Sachs.

19        Q.    Did -- did you -- in -- in the context of

20   the -- what we're calling the dividend recap

21   financing transaction, did you hear any reactions

22   from the market about the placement of that debt?

23        A.    I read news articles about it.

24        Q.    Do you recall what you read in those news

25   articles?

154

1       A.    I don't remember any of the details.

2       Q.    Do you recall reading that the market

3    reaction was that earnings had been spruced up by

4    heavy adjustments?

5       A.    I don't recall that phrasing.

6       Q.    And who -- who was the lender on that

7    transaction?

8       A.    Again, I don't recall.

9       Q.    You don't recall one way or the other

10   whether it was Morgan Stanley?

11      A.    I really don't recall if it was Morgan

12   Stanley.

13      Q.    But you -- you had worked at

14   Morgan Stanley, right?

15      A.    Yes, I had.

16      Q.    Okay.  And, nonetheless, you don't

17   remember if they were involved in a financing

18   transaction, involved hundreds of millions of

19   dollars for a portfolio company that you were on the

20   advisory board of?

21          MR. LEON:  Object to form.  Asked and

22       answered.

23      Q.    Is that correct?

24      A.    I don't recall who the investment banker

25   was on the refinancing transaction.

156

1          MR. LEON:  If you're going to ask

2     questions about the substance, can he have a

3     minute to review the article?

4          MR. ROSENBAUM:  Sure.

5          (Witness reviewing document.)

6     Q.    Have you read it?

7     A.    Yes, I have.

8     Q.    The -- so Mr. Pruss forwarded this article

9  to you on May 15, 2019.  Do you understand that

10 based on your review of the document?

11    A.    Sorry?

12    Q.    Mr. Pruss forwarded this article to you on

13 May 15, 2019.  Do you understand that based on your

14 review of this document?

15    A.    Yes, I do.

16    Q.    And that was during the time that

17 Project Sky was underway.  Do I have that right?

18    A.    I believe this was during the -- the

19 beginnings of Project Sky.

20    Q.    And the -- the article, it appears, is

21 from late 2018; is that right?

22    A.    From here, it appears, yes.

23    Q.    Okay.  And did -- in 2018, did you see

24 this article or any articles like it?

25    A.    I don't know if I saw this article.  I had

158

1   the way down from the article, under the -- you see

2   the heading, "Puffy Adjustments"?

3        A.   I see that.

4        Q.   Okay.

5             It says, Management-normalized LTM EBITDA

6   to September was just 38.4 million euro, although

7   the Cats-Hansel and Nimax and UNI Packaging

8   acquisitions will add some 14.7 million of EBITDA,

9   taking the figure to 53.1, which suggests leverage

10  closer to 5.7X.

11            You see that?

12       A.   I see that.

13       Q.   Do you have an understanding what that

14  means?

15       A.   Yes, I do.

16       Q.   What?

17       A.   It means that they added -- they added the

18  LTM EBITDA through September, there were

19  two acquisitions that they included in adjusted

20  EBITDA, which got it to 53.1, and that the proposed

21  leverage was closer to 5.7 times that adjusted

22  number.

23       Q.   What does "5.7 times leverage" mean, in

24  your opinion?

25       A.   It means the amount of debt divided by the

159

1   EBITDA, the adjusted EBITDA was 5.7.

2        Q.    It continues, But even those figures

3   contain heavy add-backs.

4             Do you know what "add-backs" are?

5        A.    Yes.  Add-backs to financial statements.

6        Q.    Such as euro 10 million of management

7   normalization for transaction restructuring cost.

8             It continues, Actual reported EBITDA,

9   excluding the earnings contribution from recent

10  acquisitions was just 26 million EUR.

11            Do you have an understanding what that

12  meant?

13       A.    I do.

14       Q.    What does that mean?

15       A.    It means as it says, the actual reported

16  EBITDA, excluding the earnings from the acquisitions

17  that had been recently done, was 26 million euros.

18       Q.    And it continues, The EBITDA adjustments

19  were very aggressive.  The second buyer agreed.

20  Working off a more realistic EBITDA means leverage

21  is much higher than advertised by the arrangers.

22            Do you have an understanding what that

23  meant?

24       A.    I do.

25       Q.    What?

160

1          A.    The opinion of a buy sider, someone

2    investing in the loan, is that the adjustments were

3    aggressive and that the leverage would be higher

4    with lower EBITDA.

5          Q.    And it -- it then has a section entitled

6    "Poor Cash Generation."  Did Schur have poor cash

7    generation as of year end 2018?

8          A.    I don't recall its cash generation.

9          Q.    So you don't recall whether this article

10   is accurate in that respect?

11         A.    I don't recall if it's accurate.

12         Q.    It says, on the following page, Based on

13   actual EBITDA, they don't generate cash, and even on

14   their own forecasts cash generation in 2019-'20 will

15   be minimal while the integration process is ongoing.

16              Do you agree with that?

17         A.    I don't agree -- I don't know what

18   forecasts -- I don't have in front of me what

19   forecasts they were looking at for 2019 and 2020.

20         Q.    And then further down on that page, it

21   says, This deal is one of the worst I've seen in

22   terms of lack of information.

23              Did you hear that?

24         A.    No.

25         Q.    Well, you saw it in this article.  Other

161

1    than this article, did you hear that from the market

2    about the dividend recap?

3        A.    I did not.

4        Q.    When was Goldman engaged for purposes of

5    Project Sky, if you recall?

6        A.    I don't recall when.

7        Q.    Okay.  But you -- you did recall that May

8    of 2019 was when Project Sky was just about getting

9    started?  Do I have that right?

10       A.    Yes.

11       Q.    Okay.  Do you recall, you know, by August

12   of 2019 being concerned regarding the interest level

13   of European sponsors in Schur?

14       A.    I don't recall that.

15           (Email dated August 20, 2019 from Mr. Dees

16       to Sarah-MarieMartin@GS.com was marked Dees

17       Exhibit 21 for identification, as of this

18       date.)

19           (Witness reviewing document.)

20       Q.    Showing you what's been marked as Dees 21

21   for identification.  It's an email dated August 20,

22   2019 from you to Sarah-Marie Martin at GS.com.  Who

23   is Sarah-Marie Martin?

24       A.    She is a former employee of Goldman Sachs.

25       Q.    And you wrote to her, I had a long call

162

1   today with Christopher and Tobias.

2          Who are they?

3      A.   I recall that's Christopher Droege and

4   Tobias Koester.

5      Q.   Are they both with Goldman?

6      A.   At that time they were.

7      Q.   Where are they located?

8      A.   In Europe.

9      Q.   Where is Sarah-Marie Martin located?

10     A.   She is located in the U.S.

11     Q.   In New York, at Goldman Sachs?

12     A.   I believe so.

13     Q.   What was her role in Project Sky?

14     A.   I do not believe she had a direct role in

15  Project Sky.

16     Q.   Well, you were communicating with her

17  about Project Sky, correct?

18     A.   Yes, I was.

19     Q.   So she had a role of some sort, no?

20     A.   She was a relationship investment banker

21  at Goldman Sachs.

22     Q.   Was -- what did that mean in the context

23  of Project Sky?

24     A.   Nothing in particular with respect to

25  Project Sky.

The Ex Parte Application of B&C KB Holding GmbH

Michael Dees
December 19, 2024

181

163

1        Q.   Why were you writing to her?

2        A.   Because she worked at Goldman Sachs, and I

3   had talked to her for a long time.

4        Q.   Did you have a relationship with her prior

5   to this transaction?

6        A.   Yes.

7        Q.   And you worked with Goldman Sachs before

8   on transactions?

9        A.   Yes.

10       Q.   Was she a principal point of contact for

11  you at Goldman Sachs?

12       A.   She was one of them.

13       Q.   And you -- you continue, I am concerned

14  about the interest level of the European sponsors in

15  Schur.

16            And then you indicate you'll write a more

17  specific email.

18            Does that refresh your memory that as of

19  August 2019 you were concerned about the interest of

20  European sponsors in Schur?

21       A.   I can only read what's in this email.  I

22  don't recall the -- the details of why I would have

23  written this email.

24       Q.   You have no doubt that you were telling

25  her the truth, it's still your perception at the

164

1    time, though, correct?

2         A.   I have no doubt it was my perception when

3    I wrote the email.

4         Q.   And do you have any memory as to why it

5    was you had concerns regarding the level of interest

6    by European sponsors as of this time?

7         A.   It was certainly based upon the call I had

8    had earlier in that day with Christopher and Tobias.

9         Q.   So you can -- presumably they communicated

10   to you that there was some lack of interest by

11   European sponsors.  Is that fair?

12        A.   They communicated something to me that had

13   me write this email.

14        Q.   And when you say "European sponsors," what

15   do you mean?

16        A.   I mean sponsors who are based in Europe.

17        Q.   But "sponsor" signifies a private equity

18   sponsor or some other type of market participant?

19        A.   A private equity sponsor.

20        Q.   So when you wrote "European sponsors," you

21   meant Europe private equity sponsors.  Is that -- is

22   that fair?

23        A.   That is fair.

24        Q.   And shortly after that interaction with

25   Ms. Martin, you -- you had communicated a status

Case 1:22-mc-00180-LAK-VF Document 153-3 Filed 01/17/25 Page 39 of 106
The Ex Parte Application of B&C KB Holding GmbH
Michael Dees
December 19, 2024

168

1  name of Partners Group?

2      A.   I am.

3      Q.   What is Partners Group?

4      A.   They are a private equity firm.

5      Q.   Are they European or -- or U.S. based?

6      A.   European.

7      Q.   And were they a participant in

8  Project Sky?

9      A.   They were.

10     Q.   In what way?

11     A.   They were a participant in the process.

12 They were a bidder in the process.

13     Q.   And do you recall a person by the name of

14 Michael Sexton at Partners Group?

15     A.   I -- I recall the name, but I don't recall

16 much else.

17     Q.   I -- and was understanding EBITDA the

18 highest priority of Partner Group's diligence?

19          MR. LEON:  Object to form.

20     Q.   To your knowledge?

21          MR. LEON:  Speculation.

22     A.   I don't know what the highest priority of

23 Partners Group was in their diligence.

24          (Email from Michael Sexton to Christina

25      Bosse-Janzing dated September 3, 2019, 1536,

The Ex Parte Application of B&C KB Holding GmbH

Michael Dees
December 19, 2024

169    187

```
 1            was marked Dees Exhibit 23 for identification,

 2            as of this date.)

 3                (Witness reviewing document.).

 4        Q.   I'm showing you what's been marked as Dees

 5    23 for identification.  You can take a moment to

 6    review it if you haven't.

 7                (Witness reviewing document.)

 8        A.   I read it.

 9        Q.   Okay.  So I want to look down at the email

10    from Michael Sexton to Christina Bosse-Janzing, it

11    appears, dated September 3, 2019, 1536, just to

12    orient you.

13        A.   I see that.

14        Q.   Okay.  And then if you -- if you scroll up

15    with your eyes, it appears in the second email from

16    the top that an Andrew Oliver at Partners Group

17    forwards the email chain below that to you, Michael

18    Dees, on September 3, at 1:24 p.m.

19                Do I have that right?

20        A.   That's what -- that's what it says.

21        Q.   And the heading is "Project Sky Schur

22    Flexibles CEO meeting."

23        A.   That is the title of the email.

24        Q.   Okay.  First of all, who is Andrew Oliver

25    at Partners Group?
```

170

1    Let me say it in a better way.  Do you --

2  what was Andrew Oliver's position at Partners Group?

3    A.    I don't recall his position at Partners

4  Group.

5    Q.    Okay.  And -- and is it your understanding

6  that this is referring to a meeting that Partners

7  Group was going to have with Schur's CEO,

8  Mr. Schernthaner, at this time?

9    A.    Based on my reading of the email down

10  below, Next week's meeting with the CEO of Schur

11  Flexibles, it appears to be.

12    Q.    Okay.  And if -- if I look down now to the

13  email from Mr. Sexton to a number of people but not

14  you, addressed to Christina, again, 1536, it says,

15  Better understanding EBITDA remains our highest

16  priority diligence area.

17    And it goes on.  Does that refresh your

18  memory that better understanding EBITDA remained

19  Partners Group's highest priority for diligence as

20  of September 2019 when this email was written?

21    MR. LEON:  Object to form.  Speculation.

22    A.    All -- all I can say is that what it says

23  in this email on this day.

24    Q.    And you received this email?  It was

25  forwarded to you, correct?

Case 1:22-mc-00180-LAK-VF    Document 153-3    Filed 01/17/25    Page 42 of 106
The Ex Parte Application of B&C KB Holding GmbH
Michael Dees
December 19, 2024

189

171

1       A.    It appears that I received this email.

2       Q.    You write then -- I'm sorry, Mr. Oliver

3  writes to you, Michael, per your suggestion, reached

4  out to GS through my VP to get access to financials,

5  and it seems they won't be available for a meeting

6  with the CEO.

7             You see that?

8       A.    I see that.

9       Q.    Okay.  And then you forward this on to

10  Mr. Unger, Thomas, let's discuss Partners Group when

11  we speak next.

12             Did you -- did you speak to the CEO about

13  this exchange, Mr. Schernthaner?

14       A.    I don't recall that I did.

15       Q.    Did you speak to Mr. Unger about this

16  exchange?

17       A.    I don't know if I did.

18       Q.    Do you recall doing anything after

19  receiving this email?

20       A.    I -- I don't recall what I did after I

21  received this email.

22       Q.    But by the middle of October of 2019, with

23  the exception of Partners, your understanding was

24  that parties in the market were not participating in

25  Project Sky because they thought Schur's EBITDA must

172

1    be overinflated.

2           Correct?

3      A.    That was potentially one of the reasons.

4      Q.    That's a reason that you believed, at that

5    time, that market participants were not

6    participating in Project Sky.  Correct?

7      A.    That's a reason I had been told.

8      Q.    Who told you that?

9      A.    It was likely Goldman Sachs.

10      Q.    And that is information that you then

11    reported to Alan Goldberg, correct?

12      A.    I believe I did.

13           (Email chain beginning with Bates number

14      LG 3660 was marked Dees Exhibit 24 for

15      identification, as of this date.)

16      Q.    I'm showing you what's been marked as

17    Dees 24.  And looking at the paragraph starting,

18    Other than Partners.  Let me know when you're there.

19      A.    Uh-huh.

20      Q.    You wrote to Mr. Goldberg, Other than

21    Partners, the valuations are disappointing and the

22    number of bidders are disappointing.

23           While we do not know for certain, it

24    appears that many parties are not participating

25    because they think that, one, we are flipping this

Case 1:22-mc-00180-LAK-VF    Document 153-3    Filed 01/17/25    Page 44 of 106
The Ex Parte Application of B&C KB Holding GmbH                    Michael Dees
                                                          December 19, 2024

173

1    asset very quickly after completing several add-on

2    acquisitions in 2018, and two, our EBITDA must be

3    overinflated somehow.

4              So that's -- those were the two statements

5    that you communicated to Alan Goldberg as to your

6    understanding why the market was not participating

7    at the level that you had hoped in Project Sky.

8    Fair?

9         A.    Those were two reasons that I had heard

10   from advisors and, therefore, communicated.

11        Q.    Okay.  And that advisor was Goldman Sachs,

12   to your memory, that you heard that from.

13        A.    It was likely them, but it could be

14   others.

15        Q.    And you used the term "overinflated."

16              What does "overinflated" mean?

17        A.    In this context, it meant that -- that the

18   buyers had a view that our adjusted EBITDA was

19   higher than their view of adjusted EBITDA.

20        Q.    So if I'm hearing it right, it wasn't just

21   inflated but it was overinflated?  That's the word

22   you chose, correct?

23        A.    I don't -- parsing my language, I don't

24   know the difference between the two.

25        Q.    Now, you were a member of the advisory

174

1  board, as we've long established, at Schur during

2  this time.  Correct?

3      A.    Correct.

4      Q.    What did you do, after learning from

5  Goldman Sachs or other advisors that the market

6  believed Schur's EBITDA was overinflated, to satisfy

7  yourself that it was or was not overinflated?

8           MR. LEON:  Object to form.

9      A.    I did not believe there was anything I

10 needed to do.  Potential buyers had one view of

11 adjusted EBITDA, we had a different view of adjusted

12 EBITDA.

13     Q.    So you didn't do anything, as a member of

14 the advisory board, after receiving that information

15 from Goldman Sachs, or other advisors, correct?

16          MR. LEON:  Object to form.

17     A.    I did not.

18     Q.    Okay.

19          MR. ROSENBAUM:  Why don't we take dinner

20     break now.  This is a good time to --

21          THE VIDEOGRAPHER:  Time right now is

22     6:00 o'clock p.m.  We're off the record.

23          (Dinner recess at 6:00)

24

25

182

1          Q.    In the first bullet, it says, Your

2    statement is that we are, quote, vivid example of a

3    wide use of EBITDA adjustments across a wide range

4    of categories.

5                Do you recall the context for which

6    Moody's was apparently making that statement that

7    needed a response?

8          A.    I do not.

9          Q.    Were you involved in preparing a response?

10         A.    I don't recall.

11         Q.    And the second is -- says, You relate your

12   assessment to LTM June 2018 with a reboarded EBITDA

13   of 26 million and a PF adjusted EBITDA of

14   67 million, with the significant gap raising doubts

15   on future achievability.

16               Do you recall hearing that statement being

17   made by Moody's in the context of this script?

18         A.    I do not.

19         Q.    Okay.  And were you involved in any

20   response to Moody's?

21         A.    I was not.

22         Q.    Are you aware of anyone having responded

23   to Moody's?

24         A.    I don't know if anyone responded.

25         Q.    You can put that to the side.

183    201

1              In your view, was Michael Schernthaner

2      showing disdain for Goldman Sachs?

3          A.    That could be a word to describe how he

4      interacted with them.

5          Q.    Okay.  And why would you use the word

6      "disdain" to describe how Michael Schernthaner

7      interacted with Goldman Sachs?

8          A.    He had difficult -- difficult interactions

9      with them.

10         Q.    In what way?

11         A.    He was short with them.  He didn't like

12     the deadlines they put.

13         Q.    Did you intervene in that?

14         A.    I don't recall if I did.

15         Q.    Was that of concern to you, that

16     Mr. Schernthaner was short with Goldman Sachs?

17         A.    It was not a concern.

18         Q.    Do you recall having to tell Partners that

19     Schur could not deliver the numbers that were

20     requested by Partners in the context of Project Sky?

21             MR. LEON:  Object to form.

22         Q.    You can answer.

23         A.    I don't require that I had to provide that

24     message to Partners.

25         Q.    Do you recall there being an issue that

The Ex Parte Application of B&C KB Holding GmbH
Michael Dees
December 19, 2024

186

1   will not respond to their request well.

2           Why did you believe that the meeting with

3   Michael S. carried a lot of risk?

4       A.   I think, as I said, he will not respond to

5   this request well, which came from the -- one of the

6   emails earlier that you see where he said he could

7   not deliver these numbers.

8       Q.   And Partners Group, you know, ultimately,

9   didn't submit any kind of binding proposal to -- for

10  the purchase of Schur, correct?

11      A.   Correct.

12      Q.   And they had -- they communicated that the

13  potential acquisition failed in their investment

14  committee?  Do you recall that?

15      A.   I don't recall what they communicated on

16  that topic.

17      Q.   Okay.  Did you learn that it was their

18  lack of trust in Schur's EBITDA that was the reason

19  for Partners Group not to proceed with an offer to

20  acquire Schur?

21      A.   I don't know why Partners did not proceed

22  with an offer to buy Schur.

23      Q.   Are you aware that Project Sky failed from

24  the point of view of Partners Group because the gap

25  between adjusted EBITDA and cash-based EBITDA was

The Ex Parte Application of B&C KB Holding GmbH

Michael Dees
December 19, 2024                    205

187

1    too large, around 30 million euro?

2         A.    I don't know the reason why it failed in

3    their investment committee.

4         Q.    Would it surprise you that Mr.Fischkin

5    told the Austrian prosecutor that the reason that

6    Project Sky failed with Partners Group was the gap

7    between adjusted EBITDA and cash-based EBITDA was

8    too large and amounted to approximately 30 million

9    euro?

10              MR. LEON:  Object to form.  Foundation.

11        A.    I can't assess whether or not Mr. Fischkin

12   talked to Partners Group.

13        Q.    Did Mr. Unger talk to Partners Group?

14        A.    I don't know.

15        Q.    You don't know if Mr. Unger ever talked to

16   Partners Group?

17        A.    I don't know if he ever talked to Partners

18   Group.

19        Q.    Did Mr. Pruss talk to Partners Group?

20        A.    I don't recall.  You'd have to ask them.

21        Q.    Are you aware that Mr. Unger told

22   Mr. Schernthaner not to give a reason why

23   Project Sky process was shortened?

24        A.    I don't know what Mr. Unger told to

25   Mr. Schernthaner about Project Sky.

192

1      Q.   And you didn't think about it?

2           MR. LEON:  Object to form.

3      A.   It didn't matter.

4           MR. LEON:  Are we back to Dees 5?

5           MR. ROSENBAUM:  No, no.  I just -- I

6      couldn't find my copy, so I'm not there yet.

7      Q.   What was Mr. Schernthaner's compensation

8  once he became CEO of Schur?

9      A.   I don't know.

10     Q.   You -- you recall, when we reviewed Dees 5

11 earlier, that among the rules of procedure were the

12 presentation of management to the advisory board of

13 salary and wages for certain employees.  Does that

14 sound right?

15     A.   Let me get back to Dees 5.

16          (Witness reviewing document.)

17     A.   Could you point me to where that would be?

18     Q.   Section -- well, page 6 of 9, or 13,

19 Section 8.2.

20          I'm sorry.  It's 8.3.

21     A.   8.3.

22          I see that.

23     Q.   It's your understanding that the amount of

24 compensation paid to the CEO was a decision of the

25 advisory board?

1       A.    Yes, I do.

2       Q.    And in your capacity as an advisory board

3  member, do you know what the agreed-upon

4  compensation was for Mr. Schernthaner in his

5  capacity as CEO of Schur?

6       A.    I do not.

7       Q.    Did you approve the compensation for

8  Mr. Schernthaner as CEO of Schur?

9       A.    I can't recall if I specifically did.

10      Q.    Okay.  But you would agree that as

11  advisory board member, it was among your obligations

12  to have approved that compensation.  Correct?

13      A.    I understand per 8.3, that was an

14  obligation of the advisory board.

15              (Document in German and translated into

16        English, Managing Director Agreement, was

17        marked Dees Exhibit 29 for identification, as

18        of this date.)

19      Q.    I'm showing you Dees 29.  Have you seen

20  this document before?

21      A.    I don't recall if I have.

22      Q.    I want to turn your attention to page 5

23  von 19.  The portion that's in English along -- on

24  the right-hand side.

25      A.    I see that.

194

1           Q.    First of all, do you agree with me that

2    this appears to be an employment contract between

3    Schur and Michael Schernthaner?

4           A.    It appears that way.

5           Q.    Okay.  And it -- it states, on page 5 of

6    19, Starting on 1 July 2019, the managing director

7    receives an annual salary of 400,000 euro gross for

8    his activity.  And it continues.

9                 You see that?

10          A.    I see that.

11          Q.    Subsection 3 says, The managing director

12   also receives an annual bonus measured by the

13   achievements -- the achievement of targets set by

14   chairman of the advisory board.  See below.

15                Mr. Unger was chairman of the advisory

16   board?

17          A.    Yes, he was.

18          Q.    And it continues, At the beginning of each

19   financial year, the chairman of the advisory board

20   agrees with the managing director on the targets

21   relevant for allocation of the bonus.  The bonus

22   amounts to 400,000 euro, if 100 percent of these

23   targets are achieved.

24                You see that?

25          A.    I see that.

Case 1:22-mc-00180-LAK-VF    Document 153-3    Filed 01/17/25    Page 53 of 106
The Ex Parte Application of B&C KB Holding GmbH                    Michael Dees
                                                                  December 19, 2024    213

                                                                             195

```
1          Q.   As an advisory board member, were you

2    aware that Mr. Schernthaner was to receive a

3    400,000 euro bonus if 100 percent of his targets

4    were achieved?

5          A.   I don't recall if I was.

6          Q.   You ever seen any minutes reflecting

7    approval of Mr. Schernthaner's compensation?

8          A.   I can't recall if I have.

9          Q.   Were minutes kept by the -- by the

10   advisory board?

11         A.   I can't recall.

12         Q.   Do you know whether minutes were decided

13   not to be kept by the advisory board?

14              MR. LEON:  Object to form.

15         A.   I can't -- I can't recall that either.

16         Q.   You're on seven to ten boards.  Would you

17   agree that it is typical that boards prepare minutes

18   for their regular meetings, in your experience?

19         A.   In my experience, there's a wide range of

20   minutes.  Some boards prepare them, some boards do

21   not, in the middle, there's a range of minutes.

22         Q.   You -- so -- so other than Schur, you're

23   on boards that do not prepare minutes for their

24   meetings.  Is that your testimony?

25         A.   That is my testimony.
```

196

```
 1        Q.   For a -- for formal meetings of the board,
 2   no minutes are taken.
 3             MR. LEON:  Object to form.
 4        Q.   I just want to make sure --
 5        A.   Yes.
 6        Q.   -- I understand that.
 7        A.   Yes.
 8        Q.   Okay.  And in those -- where no minutes
 9   are taken, are resolutions recorded?
10        A.   I don't recall if they are.
11        Q.   Okay.  So you consider it to be a normal
12   practice for boards to meet, make decisions, and not
13   record them?  Do I have that right?
14        A.   No, I said it's not unusual.
15        Q.   Well, what's the difference between not
16   unusual and typical?
17        A.   I said there's a wide range of practices
18   that boards undertake.
19        Q.   Okay.  On boards that you sit on, what
20   would you consider to be the better practice, taking
21   minutes and recording decisions, or not?
22             MR. LEON:  Object to form.
23        A.   I said there's a wide range of practices
24   these boards undertake.
25        Q.   But you're sitting here today, you --
```

1    you -- you agreed with me that there's an obligation

2    of the advisory board to approve Mr. Schernthaner's

3    compensation.  Correct?

4         A.    I agree with you what the document said.

5         Q.    Yeah.  And -- that's what it said,

6    correct?

7         A.    That's what -- that's what the document

8    said on that topic.

9         Q.    Right.  And you -- you -- are you aware of

10   any record, minutes, resolution, or otherwise, of

11   the advisory board approving Mr. Schernthaner's

12   compensation?

13        A.    I can't recall of the records with respect

14   to that.

15        Q.    And don't you think it would be better

16   practice, then, so that if I was asking you this

17   question today, you could point to a minutes or

18   resolution that would say, you did this, or didn't

19   do it?  Right?

20            MR. LEON:  Object to form.  It's just

21        argumentative, Zach.

22            MR. ROSENBAUM:  No, it's actually not.

23        We're sitting here today --

24            MR. LEON:  Yes, it is.

25            MR. ROSENBAUM:  -- I'm asking him

Case 1:22-mc-00180-LAK-VF KB Document 153-3   Filed 01/17/25   Page 56 of 106
The Ex Parte Application of B&C KB Holding GmbH

Michael Dees
December 19, 2024

198

1      questions.  He -- he confirmed there was an

2      obligation, and he has no idea whether it

3      happened because there are no minutes.  That's

4      not argument, those are facts.

5          MR. LEON:  He said he doesn't recall.

6      A.   It would make the discussion with you

7  shorter.

8      Q.   And, therefore, good practice, no?

9      A.   No, therefore, the discussion would be

10  shorter.

11      Q.   Because we would know if you -- it

12  undertook an obligation, correct?

13      A.   I could provide you minutes.

14      Q.   Yeah.  And you can't provide me minutes of

15  the approval of Mr. Schernthaner's compensation?

16      A.   I cannot do that.  I don't know if someone

17  else could.

18      Q.   But you didn't see any minutes that you

19  recall, right?

20      A.   I said I did not.

21      Q.   Okay.

22          Continuing, it says, in -- under the

23  heading, "Salaries," The bonus increases or

24  decreases in proportion to whether the targets are

25  exceeded or not reached.  However, it shall -- it

199

1   shall not exceed 1.5 times this amount, i.e.,

2   600,000 euro.

3          Do you see that?

4      A.   I see that.

5      Q.   In your capacity as advisory board member

6   of Schur, at this time, were you aware that there

7   was a maximum bonus of 600,000 euro for

8   Mr. Schernthaner?

9      A.   I don't recall.

10     Q.   I may have asked you this, but do you know

11  what Mr. Schernthaner's total bonus compensation was

12  for 2019?

13     A.   I do not.

14          (Certified English translation of a

15      document originally in German was marked Dees

16      Exhibit 30 for identification, as of this

17      date.)

18     Q.   I'm showing you what's been marked as

19  Dees 30, which is a submission in the criminal case

20  that is the subject of this examination.

21          I want to turn your attention to page 15

22  of 29, and -- and I'll note for the record, this is

23  an English -- certified English translation of a

24  document that was originally in German.

25          Looking at page 15 of 29.  Yeah, for the

1   record, the -- the -- the exhibit before the witness

2   has both the original German and the certified

3   translation into English.  The version I have in

4   front of me is only the English.

5           So the record -- the actual exhibit is

6   correct.

7           On page 15 of 19, on the top-hand portion,

8   it says, In 2019, the defendant had himself paid out

9   in each case, in addition to his annual salary,

10  3,045,956 euro.

11          Were you aware that Mr. Schernthaner

12  received a bonus, for 2019, of 3 -- over

13  3 million euro?

14      A.   I was not aware of that.

15      Q.   And since there's a fair amount of things

16  you said you didn't recall, you are confident that

17  you did not know that fact as an advisory board

18  member, correct?

19      A.   I'm confident I did not know that fact.

20  Or did not know that -- I don't know if these are

21  facts.  So this is the first time I've seen this

22  document.

23      Q.   But if that -- if that statement is, in

24  fact, correct, you never heard that in your capacity

25  as advisory board member of Schur, correct?

201    219

1          A.    Correct.

2          Q.    And you would have expected that you

3    should have not only known that, but approved it,

4    correct?

5                MR. LEON:   Object to form.

6          A.    I would have expected to know that.

7          Q.    Would you have also expected to have

8    approved it?

9          A.    I would expect to have approved an

10   agreement that allowed him to have that bonus.

11         Q.    That sentence continues, In year 2020, a

12   total of $4,954,899.46 in bonuses was paid to

13   Mr. Schernthaner.

14               In your capacity as advisory board member

15   for Schur, did you know that fact?

16         A.    I don't -- I don't recall knowing that

17   fact.

18         Q.    And you expect that if that fact is true,

19   you would have known it, correct, in your capacity

20   as advisory board member?

21         A.    I expect that I would have known it.

22         Q.    Do you expect that Mr. Unger would have

23   known it too?

24         A.    Yes.

25         Q.    Did Mr. Unger ever tell you he approved

202

1  that bonus?

2       A.   I don't recall.

3       Q.   Did -- well, you said you didn't know

4  about it.  So --

5       A.   I don't recall him telling me.

6       Q.   And same for 2019, Mr. -- I take it

7  Mr. Unger never told you he approved the bonus for

8  that year either to Mr. Schernthaner, correct?

9       A.   I don't recall him telling me that.

10      Q.   And it continues in the next paragraph,

11 The bonuses actually paid out were recognized under

12 other cost item, for example, as refinancing costs,

13 to conceal them, as additional bonus provisions

14 would have burdened EBITDA.

15           Were you aware that these bonuses were

16 capitalized by Schur for the years 2019 and 2020?

17      A.   I'm not aware of any of this, and I'm

18 unable to assess any of what's being written here.

19      Q.   So me presenting you with this information

20 is the first time you're hearing it?

21      A.   Yes.

22      Q.   I take it that's concerning to you if that

23 information is true?

24           MR. LEON:  Object to form.

25      A.   I -- I am unable to determine if this is

The Ex Parte Application of B&C KB Holding GmbH

Michael Dees
December 19, 2024

203    221

1    true.

2        Q.    But if it were true and it's in a document

3    that the prosecutor prepared in Austria, would it be

4    concerning to you as a former member of Schur's

5    advisory board?

6            MR. LEON:    Object to form.

7        A.    I would need to understand what happened,

8    what it was -- I don't have any assessment on what

9    was paid, why it was paid, whether it was paid, I

10    have no information on that.

11        Q.    Isn't -- isn't that itself concerning

12    since you sat on the advisory board and were

13    supposed to know those facts?

14        A.    As I say, I don't have any information on

15    that.

16        Q.    I understand that.    But isn't that of

17    concern to you that you do not have any information

18    on that?

19        A.    I'm not able to make that determination

20    because I don't have any ability to assess what's

21    being written here.

22        Q.    So is it not concerning -- I'm just trying

23    to understand, like, what you care about.    Sitting

24    on the advisory board, would you care that in

25    two years the CEO was paid 8 million euro in bonuses

204

1    that you weren't told about?  Yes or no?

2        A.    I'm not going to speculate about something

3    that I -- is entirely hypothetical.  I do not know

4    if any of this is true or any of the context of

5    this --

6        Q.    I get that.  You just said it, this is the

7    first you're hearing of it.  So I want you to assume

8    one thing, that it's true.  Would it then concern

9    you?

10            MR. LEON:  Objection.  Improper

11        hypothetical.  You know you're not supposed

12        to --

13            MR. ROSENBAUM:  It's not improper.  It's

14        perfectly proper.

15            MR. LEON:  You're not supposed to ask

16        hypotheticals of fact witnesses.  We both know

17        that.

18            MR. ROSENBAUM:  That's not even true.  But

19        go ahead --

20            MR. LEON:  That's a hundred percent true.

21            MR. ROSENBAUM:  That's not true.  He was

22        an advisory board member.  He is being

23        presented with facts about $8 million in

24        bonuses that he -- in euros that he wasn't

25        aware of.

The Ex Parte Application of B&C KB Holding GmbH                    Michael Dees
                                                                  December 19, 2024

                                                                          205

 1              MR. LEON:  I --

 2              MR. ROSENBAUM:  It's very simple to ask.

 3         I don't know why it -- you're resisting it.

 4         Q.   I imagine it would be very concerning to

 5    you, and it's shocking to think it wouldn't be.

 6    Would it be concerning to you as an advisory board

 7    member who was -- who --

 8              MR. LEON:  Just ask the question.

 9              MR. ROSENBAUM:  No.

10         Q.   -- that you weren't told of these bonuses?

11              MR. LEON:  Object to form.  Same

12         objection.

13         A.   You're asking me to speculate about a

14    hypothetical that you have just created.

15         Q.   I -- it's not a hypothetical.  I'm asking

16    you to read a document and assume it's true.  That

17    is not a hypothetical.

18         A.   It's very difficult to answer a question

19    when it's simply a hypothetical, assume something is

20    true that is dozens and dozens of pages, and I have

21    never seen this document before.

22         Q.   So, then, I take it, then, it wouldn't be

23    concerning to you if that happened?

24         A.   Same -- it's hard to answer that question

25    when you have presented me a paragraph in a very

206

1    long document I've never seen before.

2            Q.    Would you consider CEO bonuses capex?

3                  MR. LEON:  Object to form.

4            A.    I do not know in what context a bonus was

5    paid.

6            Q.    I'm not asking you that.  As a general

7    matter, you already -- we already talked about what

8    capex is.  Do you, Michael Dees, in your experience

9    as a financial professional, consider bonuses paid

10   to a CEO capex?

11                 MR. LEON:  Object to form.

12           A.    There are bonuses that are expensed.

13           Q.    Did you -- were you aware that these

14   bonuses were being expensed?

15           A.    I was not aware of these bonuses.

16           Q.    Bonuses -- when you says "bonuses are

17   being expensed," you're aware of bonuses that are

18   treated as capital expenditures?

19           A.    There are situations in which bonuses are

20   capitalized.

21           Q.    Give me one example.

22           A.    A bonus with respect to an acquisition.  A

23   bonus with respect to a refinancing could be.

24           Q.    Was Mr. Schernthaner paid a bonus in 2019

25   with respect to a refinancing?

207    225

```
 1        A.    As I said, I don't know if he was paid a

 2   bonus with respect to that in 2019.

 3        Q.    And was he paid a bonus in 2020 with

 4   respect to refinancing or an acquisition?

 5        A.    I don't know if he was paid a bonus.

 6        Q.    Staying in -- in the year 2021, what

 7   was -- if you recall, happened to raw material

 8   prices in 2021 with respect to Schur?

 9        A.    As I recall, near the end of the year they

10   were increasing.

11        Q.    Only near the end of the year, not earlier

12   than the end of the year?

13        A.    I -- the second half of the year -- I

14   don't know if it was earlier than the second half of

15   the year, but the second half of the year.

16        Q.    Okay.  Do you recall that shortly after

17   the share purchase agreement was signed with B&C,

18   raw material prices spiked?  Does that sound right

19   to you?

20        A.    I don't recall when in '21 they spiked.

21        Q.    But you recall somewhere in '21 they

22   spiked?

23        A.    I do.

24        Q.    And were you aware that Mr. Schernthaner

25   and Mr. Fischkin, in July of 2021, set up an account
```

208

1  that -- in order to transfer 4 million euros to a

2  company controlled by Mr. Schernthaner from Schur?

3      A.   I was not aware of that.

4      Q.   Is that something that as an advisory

5  board member you would have expected to be aware of?

6      A.   I would expect that been to -- that to

7  have been disclosed.

8      Q.   And so your testimony is it was not?

9      A.   That is my testimony.

10      Q.   But this isn't the first you're hearing

11  about that subject, correct?

12           MR. LEON:  Let me just caution the

13      witness, in answering the question, you are not

14      to disclose anything you learned in

15      communications with counsel.  If you learned it

16      outside of communications with counsel, you can

17      discuss that.

18           You understand the instruction?

19           THE WITNESS:  Yes.

20           MR. LEON:  Okay.

21      A.   I'm not going to answer the question.

22      Q.   But that is a subject you talked to the

23  Austrian prosecutor about, correct?

24      A.   I believe it is.

25      Q.   And do you have any understanding, sitting

209    227

1   here today, whether that payment was made?

2           MR. LEON:  Object to form.  What payment?

3       Q.   Payment of 4 million euro from Schur to an

4   account set up by Mr. Schernthaner and Mr. Fischkin,

5   that was then transferred to Mr. Schernthaner's

6   company named Pure Performance?

7       A.   I learned that through discussions with

8   counsel.

9           MR. LEON:  Should have had some --

10      Q.   That's privileged anyway, but you don't --

11  you don't have to tell me what counsel told you

12  about that.

13          MR. LEON:  Thank you.

14      Q.   Okay.  So -- and you -- you -- did you

15  ever hear -- again, if you only heard it from

16  counsel, your counsel can give you an instruction,

17  that Mr. Schernthaner subsequently called that

18  transfer of money a loan?

19          MR. LEON:  Again, if your only knowledge

20      on this comes from discussions with counsel, I

21      instruct you not to answer.

22          If you have knowledge outside of

23      discussions with counsel, this is something you

24      discussed with the Austrian prosecutor, for

25      example, that you can disclose.

1        Do you understand the instruction?

2        THE WITNESS:  If I discussed -- if I

3    learned it from counsel, do you want --

4        MR. LEON:  Can -- can I take him outside

5    quick?  Thanks.  Real quick.

6        THE VIDEOGRAPHER:  The time right now is

7    7:41 p.m.  We're off the record.

8        (Discussion off the record.)

9        THE VIDEOGRAPHER:  The time right now is

10   7:43 p.m.  We are back on the record.

11   Q.   Mr. Dees, you spoke to the Austrian

12 prosecutor about this 4 million euro transfer that

13 we've been discussing now tonight.  Do I have that

14 right?

15   A.   Yes, you do.

16   Q.   Okay.  What did you say to the prosecutor

17 about that?

18   A.   I said I was not aware of that transfer

19 when it happened.

20   Q.   What did the prosecutor say to you on that

21 subject?

22   A.   I don't recall.

23   Q.   Now, you recall that it was the summer of

24 2021 that you came to understand that transfer

25 occurred?  Is that fair?

Michael Dees
December 19, 2024

229

211

1        A.    I -- I believe that was the timing that

2    would have occurred.

3        Q.    And Schur needed every euro possible in

4    the summer of 2021 because of its cash situation.

5    Isn't that true?

6        A.    I don't recall if that's true.

7        Q.    You would expect that Mr. Humer would have

8    a good sense of Schur's cash position in the summer

9    of 2021.  Correct?

10       A.    I did not expect that he would.

11       Q.    Did you -- do you believe you had an

12   understanding of Schur's cash position in the summer

13   of 2021?

14       A.    I don't think I had a particularly good

15   understanding of its position.

16       Q.    So then you don't know whether Schur had a

17   good cash position at that time or bad one.  Is that

18   fair?

19       A.    That is fair.

20       Q.    Okay.

21             Did you ever come to learn that

22   Mr. Humer's signature was placed on what was called

23   a loan agreement, unbeknownst to him?

24       A.    I did not.

25       Q.    Would it concern you if the CEO and

212

1    Mr. Fischkin, director of finance, appeared to be

2    forging other officers' signatures on documents

3    concerning a transfer of money to Mr. Schernthaner?

4            MR. LEON:  Objection --

5        Q.   Would that concern you?

6        A.   All that would be difficult for me to

7    assess.  I haven't talked to Mr. Humer, I haven't

8    seen the documents.  It's difficult for me to assess

9    that.

10       Q.   Okay.  But you -- you -- you recognize you

11   sat on the advisory board of this company, and all

12   I'm asking you is if you -- if these facts were

13   presented to you, would they be of concern to you in

14   that capacity, and it seems like you're resisting

15   the answer.  So --

16       A.   No.

17       Q.   -- yes or no.

18           MR. LEON:  Objection.  Improper

19       hypothetical.

20       A.   If there were verified forged documents,

21   it would be concerning.

22       Q.   Okay.  And if there were verified payment

23   of transfer of 4 million euro to the CEO that was

24   unauthorized by you on the advisory board, that

25   would be concerning too?

213

1        A.    Yes.

2        Q.    And if that happened at a time when a

3   company's cash position was weak, that would also be

4   concerning to you, correct?

5             MR. LEON:  Object to form.

6        A.    Regardless of when it happened, it would

7   be concerning.

8        Q.    Now, you can take a look at page 9 of 28

9   on this --

10       A.    9 --

11       Q.    -- same document.

12       A.    9 of 28.  Or --

13       Q.    Dees 30.

14       A.    Sorry.  There's a lot of "of 20."

15       Q.    I'm sorry, 9 of 29.

16       A.    It would have two translations or --

17       Q.    You might -- it's the English one.  Would

18  be easier for you --

19       A.    I just have two copies of it.

20       Q.    Oh.

21       A.    There's two copies included in here.

22       Q.    Oh.  Is there a German one too?

23       A.    There's -- yeah, don't ask me about that.

24  There's German.

25       Q.    But you have -- you have page 9 of 29 in

214

```
 1   front of you.  That's in English.

 2       A.   I do.

 3       Q.   Now, I want you to look at the -- the

 4   second paragraph, or maybe the third full paragraph,

 5   starting -- starting with, According to signatures.

 6            You see that?

 7       A.   According -- sorry.  You said second

 8   paragraph -- oh.  According to the signatures.

 9   Okay.

10       Q.   It states, According to the signatures on

11   the present loan agreement, it was signed jointly by

12   Dr. Michael Fischkin and Friedrich Humer on behalf

13   of lender SFH.

14            When asked about this in his testimony

15   before the Korneuburg regional court,

16   Friedrich Humer stated he had no recollection of

17   this document and, therefore, could not remember

18   signing it, nor had such a loan ever been discussed

19   by management.

20            He continued, He would certainly have

21   questioned such a request because -- in italics,

22   because we needed every euro in the summer of 2021,

23   given the cash situation.  It was the case that we

24   had regular meetings starting in the spring on how

25   to improve the cash situation in the group.  These
```

Case 1:22-mc-00180-LAK-VF    Document 153-3    Filed 01/17/25    Page 73 of 106
The Ex Parte Application of B&C KB Holding GmbH    Michael Dees
December 19, 2024

215
233

1    were held under the direction of Dr. Fischkin, with

2    the heads of various plants and the finance

3    department and also myself.  Against this background

4    the request for 4 million euro would, of course,

5    have had to be questioned.

6          Do you have any reason to disagree with

7    the statements of Mr. Humer that I just read to you?

8          MR. LEON:  Object to form.

9          Foundation.

10   A.    I -- I have no reason to disagree with it,

11   but I've never spoken to Mr. Humer about any of

12   this.

13   Q.    You signed an agreement with

14   Mr. Schernthaner concerning a payment for initiation

15   commission with respect to the B&C sale transaction.

16   Do I have that right?

17   A.    I don't recall the agreement I signed.

18   Q.    Do you recall that you were involved with

19   the decision to make a payment to Mr. Schernthaner

20   in connection with the B&C sale transaction?

21   A.    Yes, I do.

22   Q.    Okay.  Do you recall that it was an

23   initiation commission?

24   A.    I do not recall that.

25   Q.    Okay.  Do you have an understanding of

216

1    what an initiation commission is?

2          A.    I don't.   I've never used that term

3    before.

4          Q.    Well, I think you did.

5                (Email exchange beginning with Bates LG

6          28890 was marked Dees Exhibit 31 for

7          identification, as of this date.)

8          Q.    Showing you 31, what's been marked as

9    Dees 31 for identification.

10               Have you reviewed it?

11         A.    Yes, I have.

12         Q.    Have you reviewed the attachment?

13         A.    I -- I've reviewed the page.

14         Q.    And if you go to the bottom right-hand

15   corner, LG 28892, your signature is affixed on

16   behalf of Atlas Flexibles Coöperatief UA.  Is that

17   right?

18         A.    Yes.

19         Q.    And Atlas -- if I recall the chart we

20   looked at earlier, Atlas Flexibles Coöperatief U.A.

21   was the -- was a shareholder of the company that

22   owned Schur Flexibles.  Do I have that right?

23               I -- we can get a little more granular

24   because I'm probably not saying it well, but I just

25   want to make sure you and I are in alignment.

Michael Dees
December 19, 2024

235

217

1    A.    It's a shareholder of a company that owns

2    the Schur Flexibles business.

3    Q.    And if I have it right, Atlas Flexibles

4    Coöperatief owned approximately 85 percent of the

5    Schur Flexibles Group.  Is that fair?

6    A.    That is fair.

7    Q.    And the other 15 percent, as we talked

8    about earlier, was owned by Lindsay Goldberg Europe.

9    I have that right?

10    A.    Yes, you do.

11    Q.    Okay.  And so this reflected work that

12    Mr. Schernthaner was doing for Atlas Flexibles

13    Coöperatief in connection with the Schur -- I'm

14    sorry, the B&C sale transaction.  Correct?

15    A.    Correct.

16    Q.    And it's labeled "An Initiation

17    Commission," so you understand that he was being

18    paid a percentage of the transaction price as a

19    commission for that work.  Is that correct?

20    A.    I -- I don't know if he's being paid a

21    percentage.  I see here he's being paid

22    3.9 million euros.

23    Q.    And that was to be split roughly

24    85 percent by Atlas Coöperatief and 15 percent by

25    Lindsay Goldberg Europe.  Correct?

Case 1:22-mc-00180-LAK-VF    Document 153-3    Filed 01/17/25    Page 76 of 106
The Ex Parte Application of B&C KB Holding GmbH
Michael Dees
December 19, 2024

218

1          A.    Correct.

2          Q.    And that was to reflect the ownership

3    split between those entities.  Is that -- do I have

4    that right?

5          A.    Yes, you do.

6          Q.    Okay.  And now having looked at it, what

7    is an "initiation commission"?

8          A.    Looking at this, I still don't know what

9    it is.  I know there's a payment.  I don't know why

10   it's called an initiation commission.

11         Q.    But you signed something that said it was

12   an initiation commission.  Right?

13         A.    Yes.

14         Q.    Did Mr. Schernthaner source the

15   transaction with B&C?

16         A.    I don't recall.

17         Q.    Do you recall who sourced the transaction?

18         A.    I don't.

19         Q.    Was this amount paid to Mr. Schernthaner

20   after the transaction with B&C closed?

21         A.    I believe that it was.

22         Q.    And just so I have this right, he was paid

23   by Atlas Co-op and LGE as they're defined in this

24   document, Dees 31, for the work he did in connection

25   with the B&C transaction.  Correct?

Case 1:22-mc-00180-LAK-VF    Document 153-3    Filed 01/17/25    Page 77 of 106
The Ex Parte Application of B&C KB Holding GmbH                Michael Dees
December 19, 2024

219    237

```
 1        A.   I believe that he was.
 2             MR. LEON:  If you're switching subjects,
 3        can we take a five-minute break?
 4             MR. ROSENBAUM:  Sure.
 5             MR. LEON:  Just five.
 6             MR. ROSENBAUM:  That's fine.
 7             THE VIDEOGRAPHER:  Time right now is
 8        7:55 p.m.  We're off the record.
 9             (A recess was taken from 7:55 to 8:11.)
10             THE VIDEOGRAPHER:  Time right now is
11        8:11 p.m.  We're back on the record.
12        Q.   Good evening, Mr. Dees.  I want to turn
13   back to a document we've gone over a few times, but
14   I want to look at it again, Dees 5, the rules of
15   procedure in particular.
16        A.   I'm looking.
17             I have it.
18        Q.   We -- we were talking about minutes and
19   resolutions and, you know, writings with respect to
20   a board.  I want to go back to this document for a
21   moment.
22             In the rules of procedure, page 4 of 9,
23   under Section 7.
24        A.   Okay.
25        Q.   You agree with me, under Section 2, The
```

Case 1:22-mc-00180-LAK-VF    Document 153-3    Filed 01/17/25    Page 78 of 106
The Ex Parte Application of B&C KB Holding GmbH                        Michael Dees
                                                                December 19, 2024

                                                                        220

1   management board, via the chairperson of the

2   management board, shall inform the advisory board in

3   particular of, A, actions for which the consent of

4   the advisory board is required, usually in writing,

5   and in sufficient time to allow the advisory board

6   sufficient time to consider its decisions.

7           You see that?

8       A.   I do see that.

9       Q.   Mr. Schernthaner was the chairperson of

10  the management board from the time he became CEO

11  forward during your tenure on the advisory board,

12  correct?

13      A.   I believe so.

14      Q.   And so you would agree with me that it was

15  the obligation of Mr. Schernthaner to inform the

16  advisory board of decisions that required advisory

17  board consent, usually in writing, correct?

18          MR. LEON:  Object to form.

19      A.   You said "decisions."  It says "actions."

20      Q.   Oh, I'm sorry.  It says, Actions for which

21  the advisory board -- consent of the advisory board

22  is required.

23          Let me -- let me rephrase.

24      A.   That's what it says.

25      Q.   I know you're reading it correctly.

The Ex Parte Application of B&C KB Holding GmbH                    Michael Dees
                                                                  December 19, 2024

221

1        A.    Yes.

2        Q.    So my question was flawed, which is why

3    I'm going to ask it again.  You're right.

4             The chairman of the management board,

5    Mr. Schernthaner, was required to inform the

6    advisory board of actions for which the consent of

7    the advisory board was required, usually in writing,

8    correct?

9        A.    That's what it says, correct.

10       Q.    So you understood that to be a requirement

11   of the management -- the chairman of the management

12   board, right?

13       A.    Yes.

14       Q.    Okay.  And did Mr. Schernthaner present

15   information to the advisory board, usually in

16   writing, where advisory board consent was required?

17            MR. LEON:  Object to form.

18       A.    I don't recall the form in which he

19   provided that information.

20       Q.    Okay.  We -- we touched on this earlier.

21   But do you know whether a budget was provided by

22   Schur management to the advisory board in compliance

23   with the rules of procedure for the year 2020?

24       A.    I don't know if it was.

25       Q.    And we saw in -- in prior years, before

1    2020, budgets being provided to the advisory board

2    in the middle of December of the -- of the preceding

3    year.  Does that sound right?

4        A.    I think we talked earlier about 2017's

5    budget.  I don't know about the other years.

6        Q.    But you would expect if the rules of

7    procedure were being complied with, that the budget

8    would be provided ten days or more prior to the year

9    that the budget was for; is that right?

10       A.    If they were complying with this document,

11   yes.

12       Q.    I show you...

13             (Email between Philipp Schall and Daniel

14       Routh, dated March 19, 2020, heading "As

15       Discussed" was marked Dees Exhibit 32 for

16       identification, as of this date.)

17       Q.    I'm showing you what has been marked as

18   Dees 31 for -- 32 for identification.  And this is

19   an email between Philipp Schall and Daniel Routh,

20   dated March 19, 2020, heading "As Discussed."

21             Who is Philipp Schall?

22       A.    He's an employee of Lindsay Goldberg

23   Europe, I think Europe or Vogel.  I don't know about

24   the time.

25       Q.    And who is Daniel Routh?

A. He's a former employee of Lindsay Goldberg.

Q. If you look in this document, starting on page LG 47264.

A. I see that page.

Q. It says, Budget 2020.

Right?

A. Yes.

Q. Okay. Are you aware of any other budget being provided by Schur to you as advisory board member for 2020?

A. I can't recall if I was provided a budget, and I can't recall if I received this document.

Q. And that was my next question. So -- so you don't know whether either Mr. Schall, Mr. Routh, or anyone else provided you as an advisory board member with a budget for 2020 from Schur management. Do I have that right?

A. You do.

Q. And you don't know if you did receive one, when you received it?

A. That's correct.

Q. And I'll represent for the record, this is the only budget we've seen that came from Lindsay Goldberg files. Are you aware of any other budget

Case 1:22-mc-00180-LAK-VF Document 153-3 Filed 01/17/25 Page 82 of 106
The Ex-Parte Application of B&C KB Holding GmbH                    Michael Dees
                                                                  December 19, 2024

224

1    for 2020, sitting here today?

2         A.   I'm not aware of any other budget.

3         Q.   And, again, you don't know if you received

4    a budget at all for that year.

5         A.   Correct.

6         Q.   But you would agree with me that it was an

7    obligation of the advisory board to have not only

8    received the budget for each year but to have

9    approved it, correct?

10        A.   I think it was an obligation of the

11   management board to provide it.  I don't know if the

12   advisory board had an obligation.

13        Q.   Let's go to Section 9, page 6 of 9.  Under

14   1, it says, The management board requires the

15   consent of the advisory board for the implementation

16   of the following measures and transactions, or the

17   assumption of obligations.

18             And it continues.

19             A is, Determination of the budget, capital

20   B, as well as determination and/or change of the

21   accounting and valuation.

22             That refresh your memory that it was a

23   requirement of management that the advisory board

24   consent to the budget?

25        A.   That's what it says.

Case 1:22-mc-00180-LAK-VF    Document 153-3    Filed 01/17/25    Page 83 of 106
The Ex Parte Application of B&C KB Holding GmbH                          Michael Dees
                                                                December 19, 2024

                                                                      225    243

1          Q.    Okay.  And you don't know if you even got

2     a budget for 2020 as an advisory board member of

3     Schur, right?

4          A.    Correct.

5          Q.    Now, if you look in Dees 32, recognizing

6     that you don't recall having received or reviewed

7     it, on page -- if you go into LG 47273, let me know

8     when you're there.

9          A.    I'm here.

10         Q.    It budgets capital expenditures on a

11    site-by-site basis for 2020.  I have that right?

12         A.    It appears to.

13         Q.    And then, below total capex plants of

14    16 million 8, are we in the same place?

15         A.    Yes.

16         Q.    It budgets additional capital expenditures

17    for footprints, cylinder and engravings, IT, R&D,

18    and other.  You see that?

19         A.    I see that.

20         Q.    So Lindsay Goldberg, whether you or not,

21    was made aware in -- in 2020 of Schur's capital

22    expenditure budgets for that year of 2020, right?

23         A.    At least one member of our team was

24    provided with this page.

25         Q.    And as I look on the next page, capex cash

The Ex Parte Application of B&C KB Holding GmbH                    Michael Dees
                                                                  December 19, 2024

245

227

```
 1        Q.   Not on the bridge, as a general matter?

 2        A.   If it's a capital expenditure, it is not

 3   deducted from EBITDA.

 4        Q.   But this bridge is just showing how much

 5   of EBITDA is attributed to -- to expenditures that

 6   can be capitalized.  Do I have that right?

 7        A.   No, this is simply showing the amount of

 8   capital expenditures.  I -- I'm not entirely sure

 9   where you're -- what you're asking.

10        Q.   And you -- you would agree with me, if we

11   go back to Dees 5, for example, M --

12        A.   Where are you again?  1 --

13        Q.   Dees 5, pages 7 and 9.

14        A.   7 and 9, okay.

15        Q.   Section 9M.

16        A.   Yes.

17        Q.   You would agree with me that any

18   unbudgeted investment projects of -- of more than

19   250,000 each for 2020 required a consent from you as

20   an advisory board member?

21        A.   This document says that it would require

22   the advisory board consent.

23        Q.   Did you give consent to any, for 2020,

24   unbudgeted investment projects?

25        A.   I can't recall.
```

228

1        Q.   So you might have, you just don't

2    remember?

3        A.   I can't recall.

4        Q.   And is that another area where minutes

5    would have helped?

6             MR. LEON:  Object to form.

7             MR. ROSENBAUM:  Yeah.

8             He said it would make the examination

9        shorter, so he understands.

10       A.   Would certainly make the discussion

11   shorter.

12       Q.   You're not aware of any minutes or board

13   resolutions approving investment projects for 2020

14   that were unbudgeted by the advisory board, correct?

15       A.   Correct.

16       Q.   Same question as to O, for any consultancy

17   agreements with an annual payment obligation towards

18   the -- the respective consultant of more than

19   200,000 altogether approved or consented to by the

20   advisory board for 2020?

21       A.   I can't recall.

22       Q.   I take it you haven't seen any minutes

23   or -- or resolutions reflecting that, right?

24       A.   I have not.

25             (Shareholder resolution in the year 2022

The Ex Parte Application of B&C KB Holding GmbH                                    Michael Dees
December 19, 2024

247

229

1          appointing Deloitte as auditor for Schur group

2          was marked Dees Exhibit 33 for identification,

3          as of this date.)

4      Q.    Did you sign a shareholder resolution in

5  the year 2022 appointing Deloitte as auditor for

6  Schur group?

7      A.    Appears that I did.

8      Q.    Did you see the audit of the consolidated

9  financial statements as of December 31, 2021

10  prepared by Deloitte?

11     A.    I have not reviewed it.

12     Q.    Are you aware of it?

13     A.    I'm aware of it.

14     Q.    You've never looked at it?

15     A.    I've not reviewed it.

16     Q.    Okay.  Let's take a quick look at it.

17          MR. ROSENBAUM:  Let's do an A and B, the

18          German and...

19          (German original audit of consolidated

20          financial statements as of December 31, 2021,

21          was marked Dees Exhibit 34A for identification,

22          as of this date.)

23          (Certified translation was marked Dees

24          Exhibit 34B for identification, as of this

25          date.)

230

1          Q.    Showing you Dees 34B.  Do you have a 34B

2    in front of you?

3          A.    I do.

4          Q.    Okay.  And is that in English?

5          A.    Yes, it is.

6                MR. ROSENBAUM:  I'll represent for the

7          record that Dees 34A is German original audit

8          of consolidated financial statements as of

9          December 31, 2021, and B -- 34B is the

10         certified translations.

11         Q.    If you could first turn to page 38.

12         A.    Okay.

13         Q.    Under the heading, "Error Corrections with

14    Regard to 2020 IFRS Consolidated Financial

15    Statements."

16                You see that?

17         A.    I do.

18         Q.    Okay.  About halfway down the page, it

19    says, Description of the type of identified errors.

20                And it continues, The analysis of the

21    previous balance sheet preparation described in the

22    above paragraph showed that in numerous cases,

23    unjustified capitalizations occurred in the previous

24    periods without the prerequisites prescribed by IFRS

25    being met.

236

1    acquisition, total capex plants.

2            Do you see that?

3            And then below that, there are additional

4    items, Footprint, cylinder and engravings, IT, R&D,

5    and other.

6            You see that?

7        A.    I see that.

8        Q.    Okay.  2.6 million euro is listed next

9    to R&D.

10            Right?

11        A.    It's next to R&D and other.

12        Q.    Okay.  You would agree with me if -- if

13    capitalized expenditures exceeded 2.6 million euro,

14    if this were a budget that were reviewed and

15    approved by the advisory board, additional approval

16    would be required.  Fair?

17        A.    I'd have to look back and see how it's

18    specified.  I think it's by project.  Isn't it by

19    project or overall?

20        Q.    Well, by investment project.

21        A.    Yes.  And that's not an investment

22    project.

23        Q.    Okay.  Do you believe it would have needed

24    approval?

25        A.    I'm saying, I don't think -- if we go back

237    255

```
 1   to the document, I think the approval is by project,

 2   not by category.

 3        Q.   But in any event, you didn't -- you don't

 4   recall approving a budget for 2020, in any event?

 5        A.   As I said --

 6             MR. LEON:  Zach, I'm pretty sure we --

 7        A.   As I said --

 8             MR. LEON:  -- asked and answered that one.

 9        A.   As I've said --

10        Q.   Fair enough.

11        A.   -- I do not recall.

12        Q.   If you go to page 40, Plant redesign and

13   ramp-up.

14        A.   Wait, we're back in the audits?

15        Q.   Yeah.  34B.

16        A.   Okay.

17        Q.   You see where -- the heading, "Property

18   Plant and Equipment Plant Redesign and Ramp-Up"?

19        A.   Yes, I see that.

20        Q.   Okay.  Want to read it.

21             (Witness reviewing document.)

22        Q.   Now flip over to page 53.

23             Did you see, next to ramp-up, parentheses,

24   Including trial runs and plant redesign, minus

25   28,000,737.  There.
```

259

241

1    Feedback." Let me know if you're there.

2        A.    I see that.

3        Q.    Okay. Turn in to the document -- I'm

4    sorry.

5            If you look at the first page of the deck,

6    7025, it's called "Project Sky Initial Lender

7    Feedback, Goldman Sachs Bank Europe SE." So do you

8    have an understanding of what this -- this deck

9    reflects?

10       A.    I think it reflects the initial lender

11   feedback Goldman Sachs received.

12       Q.    Go to page 7028. Under the heading,

13   "J.P. Morgan," the second bullet, "Questions around

14   bad will adjustments of 30 million euro." Do you

15   recall that subject matter coming up in the context

16   of Project Sky?

17       A.    I do not.

18       Q.    Do you know what's referred to here by --

19   under the heading, "J.P. Morgan, Questions around

20   bad will adjustments"?

21       A.    I don't recall.

22       Q.    And do you recall whether bad will

23   adjustments were made on Schur's financial

24   statements for any year?

25       A.    I don't recall.

242

1          Q.    Do you recall the -- the -- the concept of

2    bad will in -- in connection with the acquisition by

3    Schur of a company called UNI Packaging?

4          A.    I do not.

5          Q.    Do you recall the acquisition by Schur of

6    a company called UNI Packaging?

7          A.    I recall that Schur acquired a company by

8    that name.

9          Q.    Okay.  Do you recall whether that

10   acquisition had an impact on Schur's EBITDA?

11         A.    I don't recall the quantum.  I'm sure it

12   had some impact on EBITDA.

13         Q.    Do you recall that Lindsay Goldberg

14   received monthly financial reporting from Schur?

15         A.    I recall that.

16         Q.    And Lindsay Goldberg also prepared a

17   quarterly portfolio review during the time it owned

18   Schur.  Do I have that right?

19         A.    It provide them -- it prepared them in

20   some quarters.

21         Q.    What is a quarterly portfolio review?

22         A.    It's a review of the performance of

23   certain portfolio companies on a quarterly basis.

24         Q.    And for presentation to whom?

25         A.    Partners of Lindsay Goldberg.

243

2₆₁

```
1         Q.   Okay.  Did Lindsay Goldberg also prepare
2    quarterly investment summaries for its investors
3    that would have reflected the performance of Schur?
4         A.   I believe that it did.
5         Q.   Okay.  And did Lindsay Goldberg prepare
6    valuations of Schur at least twice a year?
7         A.   Yes.
8         Q.   Was -- were those valuations predicated on
9    Schur's EBITDA?
10        A.   They were predicated on many different
11   metrics.
12        Q.   And was EBITDA a metric for valuation used
13   by Lindsay Goldberg?
14        A.   One of the metrics.
15        Q.   Any other metrics?
16        A.   Discounted cash flow was another metric.
17   And other multiples of financial metrics.
18             (Email from Connie Lu to, among others,
19         Maggie Hines, was marked Dees Exhibit 36 for
20         identification, as of this date.)
21        Q.   Showing you what's been marked as Dees 36
22   for identification.  It's an email from Connie Lu
23   to, among others, Maggie Hines.
24        A.   Connie Lu to Maggie Hines?
25             MR. ROSENBAUM:  I messed that up.  Only
```

Case 1:22-mc-00180-LAK-VF    Document 153-3    Filed 01/17/25    Page 93 of 106
The Ex Parte Application of B&C KB Holding GmbH                                Michael Dees
December 19, 2024

249                                                                              267

1    cannot expect my teams to do IFRS reporting packs on

2    a monthly basis.

3              You see that?

4              Yes, you see that?

5        A.    Yes.

6        Q.    And, then, above that, in German there is

7    an email between Mr. Schernthaner and Mr. Unger, and

8    if you flip into the document, where the translation

9    is -- let me know when you're there.

10       A.    Uh-huh.  I'm on the translation.

11       Q.    This is Schernthaner saying to Unger,

12   Actually we had agreed with Michael Dees in

13   Frankfurt that he would, quote, manage, end quote,

14   reported EBITDA internally.

15             You see that?

16       A.    I see that.

17       Q.    Did you meet with Mr. Schernthaner and

18   Unger in Frankfurt, Germany, prior to this email?

19       A.    At some point prior to this email, I met

20   in Frankfurt with him.

21       Q.    Okay.  And when you met with them in

22   Frankfurt, prior to this email, did you discuss

23   managing reported EBITDA internally at Lindsay

24   Goldberg?

25       A.    I did not.

250

```
 1        Q.    Did that topic ever come up in a
 2   conversation among you, Mr. Schernthaner, and
 3   Mr. Unger?
 4        A.    It did not.
 5        Q.    So you have no idea what they're talking
 6   about when they say, We had agreed with Michael Dees
 7   in Frankfurt that he would manage reported EBITDA
 8   internally?
 9        A.    I have no idea what they're talking about.
10        Q.    And so you're denying that you agreed to
11   that with either Mr. Schernthaner or Unger.  Is that
12   fair?
13        A.    Yes.
14        Q.    Does it concern you at all that they
15   believe that?
16              MR. LEON:  Object to form.
17        A.    I have no idea why they would write this.
18        Q.    Going back to -- to Dees 36, which was the
19   valuation that we were looking at earlier.
20        A.    Yes.
21        Q.    If you go back also to the -- to the --
22   the attachment, page 1 of 9, I just want to make
23   sure we're in the same place.
24        A.    I'm on 1 of 9.
25        Q.    Okay.  And there is a row that says,
```

Case 1:22-mc-00180-LAK-VF    Document 153-3    Filed 01/17/25    Page 95 of 106
The Ex Parte Application of B&C KB Holding GmbH                    Michael Dees
December 19, 2024

253    271

1        A.    There are many elements that go into how

2    we derive a valuation.

3        Q.    I understand, but is one of them EBITDA?

4        A.    We are not making any representations

5    about the components that go into the valuation.

6        Q.    But you -- you put an EBITDA figure in

7    here.  Right?

8              This -- that's all I'm asking you.

9        A.    There's an EBITDA figure on this page.

10       Q.    Okay.  We can agree on that, right?

11       A.    Yes, we can agree on that.

12       Q.    Okay.  And we can -- we also agree that

13   costs that are capitalized do not reduce EBITDA.

14   Correct?

15       A.    Correct.

16       Q.    But costs that are operating expenses do

17   reduce EBITDA.  Correct?

18       A.    Yes.

19             MR. LEON:  Object to form.

20       Q.    Yes?

21       A.    Yes.

22       Q.    Okay.

23             And, therefore, you would -- it would be

24   important for you to know what costs were

25   capitalized versus ones that were operating costs,

254

1  in making these representations to your investors.

2  Correct?

3       A.   I am not making any representations to my

4  investors about the EBITDA.

5       Q.   Do you make representations to your

6  investors about the valuation of Schur?

7       A.   I believe we do.

8       Q.   Okay.  And would you agree with me that

9  EBITDA is a component of the valuation of Schur?

10           In the representations you made to your

11  investors.

12       A.   EBITDA is one of the components in how we

13  consider the valuation of a company.

14           (Loan agreement between Atlas Flexibles

15       GmbH and Schur Flexibles Uni SAS was marked

16       Dees Exhibit 39 for identification, as of this

17       date.)

18           MR. ROSENBAUM:  We're up to 40, I think,

19       yes?

20           THE COURT REPORTER:  This is 40, yes.

21           (Agreement for financial support between

22       Atlas Flexibles GmbH and Schur Flexibles Uni

23       SAS was marked Dees Exhibit 40 for

24       identification, as of this date.)

25       A.   Are they different?

258

1    obligation for the principal amount of funds.

2           And identifies dates and tranches.

3           You see that?

4      A.   I see that.

5      Q.   Okay.

6           Did you approve, in your capacity as an

7    advisory board member of Schur, the transaction

8    reflected in this document?

9      A.   I don't recall.

10     Q.   Were you aware of the transaction

11   reflected in this document in your capacity as an

12   advisory board member at Schur?

13     A.   I don't recall.

14     Q.   Do you have any knowledge regarding the

15   circumstances about which this document was created?

16     A.   I do not.

17     Q.   Did you ever have a conversation with

18   Michael Fischkin when you were affiliated with

19   Schur?

20     A.   I did not.

21     Q.   So you don't believe you ever spoke to

22   Mr. Fischkin.

23     A.   I do not believe I ever directly spoke to

24   Mr. Fischkin.

25     Q.   Did you ever communicate to Mr. Fischkin

259    277

```
 1    that if you pay someone, slip someone some money,

 2    they'll do what you want them to do?

 3         A.   I did not.

 4         Q.   You've seen an instant message to that

 5    effect, by Mr. Fischkin, correct?

 6         A.   I have.

 7              MR. LEON:   Object to form.

 8              MR. ROSENBAUM:   Let's mark.

 9              (Series of text messages was marked Dees

10         Exhibit 41 for identification, as of this

11         date.)

12         Q.   I'm showing you what's been marked as

13    Dees 41, and I'll point you to the English

14    translation that's certified.   If you look on the

15    bottom right-hand corner, page 999756-00004.

16              Let me know when you're there.

17         A.   I see it.

18         Q.   Okay.

19              And just to orient you, you see, starting

20    towards the bottom, 12:04 p.m., from Conny Stohrer,

21    Can we somehow replace Marius with someone else,

22    question, question.

23              You see that?

24         A.   I see that.

25         Q.   Okay.   If you look two down, Mr. Fischkin
```

Case 1:22-mc-00180-LAK-VF KB Document 153-3   Filed 01/17/25   Page 99 of 106
The Ex Parte Application of B&C KB Holding GmbH

Michael Dees
December 19, 2024

260

1  writes back, I don't think so.  Horst will never do

2  that.  Marius is a genuine auditor.

3         You see that?

4     A.   I see that.

5     Q.   And Ms. Stohrer replies, But he's a pain

6  in the ass, exclamation.

7         You see that?

8     A.   I see that.

9     Q.   And Mr. Fischkin responds, Maybe we tell

10  Michael Dees to slip him some more money.  He thinks

11  that always -- that is always possible.

12         You see that?

13     A.   I see that.

14     Q.   Did you ever intimate to Mr. Fischkin in

15  any way that slipping someone money, an auditor or

16  otherwise, can cause them to act the way that you

17  want?

18     A.   I absolutely did not.

19     Q.   So sitting here today, you have absolutely

20  no idea why Mr. Fischkin would associate you with

21  slipping Horst some more money?  Do I have that

22  right?

23     A.   You have that right.

24     Q.   And you say under oath you've never even

25  spoken to Mr. Fischkin?

The Ex Parte Application of B&C KB Holding GmbH

Michael Dees
December 19, 2024

261

279

```
1        A.   I would say under oath I've never spoken
2    to Mr. Fischkin.
3        Q.   Yet you agree he mentions you by name as
4    the genesis of the idea to slip some more money to
5    PwC, correct?
6        A.   I will agree with you that he has used my
7    name in this -- in this chat.
8        Q.   And he goes on to say, he thinks that
9    always works or it's always possible, appears
10   referring to you, correct?
11       A.   It appears he's referring to me in this
12   chat.
13            MR. ROSENBAUM:   Nothing further.
14   EXAMINATION BY MR. LEON:
15       Q.   Mr. Dees, it's been a long day.  I just
16   want to clean up three subjects.  Shouldn't take
17   more than five minutes, if you'll just indulge me.
18            First, you were asked questions about your
19   role as a director of Atlas Flexibles Coöperatief.
20   Do you recall that?
21       A.   Yes, I do.
22       Q.   Just so the record is clear, are you still
23   a director of that entity today, to your knowledge?
24       A.   Yes, I am.  And I made a mistake earlier.
25       Q.   Second subject, you were asked a series of
```

266

1    R&D was capitalized?

2        A.   I don't recall if I was aware of R&D being

3    capitalized.

4        Q.   You were not aware of whether cylinder

5    engravings were capitalized?

6        A.   Cylinder engravings, I don't know if those

7    were an expense or a purchase of an asset.

8        Q.   That's not my question.  Were cylinder

9    engravings capitalized at Schur?

10       A.   Based upon reading what you presented to

11   me today, it must have been.

12       Q.   And you were presented with that

13   information as an advisory board member at Schur,

14   correct?

15       A.   I don't recall if I was.

16       Q.   Well, the document was produced by

17   Lindsay Goldberg, so it's somehow miraculously got

18   to Lindsay Goldberg's files presumably through you.

19   Fair?

20       A.   Which one are you referring to?

21       Q.   Dees 19.  You can pull it up.  But there's

22   a -- there's a host of them, so we can go back

23   through them.

24       A.   What page?

25       Q.   2069.

267    285

1              You there?

2        A.    Yup.

3        Q.    Okay.  So this document says, under

4   asterisk 3, Cash-based EBITDA group EBITDA means

5   reported EBITDA minus IFRS 16.

6              Do you know what "IFRS 16" is?

7        A.    I don't.

8        Q.    It then says, IT.

9              Do you know what "IT" is?

10       A.    It usually means information technology.

11       Q.    So you knew that cash-based EBITDA on this

12  document meant that for reported and adjusted

13  EBITDA, IT was being capitalized, correct?

14       A.    That's what this document said.

15       Q.    And you -- it then says, R&D.

16             What's "R&D"?

17       A.    Usually means research and development.

18       Q.    So from this document, if you received it,

19  you would have known that R&D was being capitalized,

20  correct?

21       A.    If I received it and if I reviewed it.

22       Q.    Yes?

23       A.    If I received it and if I reviewed this

24  footnote, I would have known that.

25       Q.    And then it says, Cylinder engravings.

268

1          Those were also being capitalized per this

2     document, correct?

3          A.   Per this document, they -- per this

4     document they are.

5          Q.   Let's go to -- oh.  Let's go to the first

6     page of that document, in case it wasn't already

7     clear.  Dees 19 is an email to you from

8     Mr. Schernthaner, correct?

9          A.   This is 19, Dees 19?

10         Q.   Yes.

11         A.   Yes.

12         Q.   So you received it, right?

13         A.   I received it.

14         Q.   Let's go to Dees 32.  We just reviewed

15    this.  Page 47273.  This page identifies

16    expenditures that Schur was budgeting for

17    capitalization?

18         A.   That's what this document shows.

19         Q.   And that includes descriptions on a site

20    basis and then also it includes footprint, cylinder

21    and engraving, IT, R&D, and other, correct?

22         A.   That's what the page includes.

23         Q.   So if you received that document, then you

24    had knowledge of expenses at Schur that were being

25    capitalized, correct?

Michael Dees
December 19, 2024

287

269

1        A.    If I received this document, that means

2   it's -- it doesn't mean I have knowledge.  It would

3   have been in this document.

4        Q.    And going back to the first page, you

5   don't know if you received this document, but

6   you're -- but the people who work for you did,

7   correct?

8        A.    One person who worked for me did.

9        Q.    Let's go to 10, and then we can move --

10       A.    Going to when?  10?

11       Q.    To Dees 10.  Take a look at pages 145 to

12  149.

13             (Witness reviewing document.)

14       Q.    This document identifies on a site basis

15  and on a project-by-project basis investment

16  projects that for the year 2017 Schur intended to

17  capitalize, correct?

18       A.    That's what it appears to show.

19       Q.    And therefore it shows expenses to be

20  capitalized in that year based on the budget,

21  correct?

22       A.    Yes.

23             MR. ROSENBAUM:  I have nothing further.

24             MR. LEON:  Give us five minutes.

25             THE VIDEOGRAPHER:  The time now is

277

295

```
 1              A C K N O W L E D G E M E N T

 2

 3

 4        I, MICHAEL DEES, hereby certify, I have read

 5   the transcript of my testimony taken under oath in

 6   my deposition of December 19, 2024; that the

 7   transcript is a true, complete and correct record

 8   of what was asked, answered and said during this

 9   deposition, and that the answers on the record as

10   given by me are true and correct.

11

12   _____

13   MICHAEL DEES

14   Subscribed and sworn to

15   before me on this _____ day

16   of _____, 2024

17

18   _____

19            NOTARY PUBLIC

20

21

22

23

24

25
```

278

```
 1                  C E R T I F I C A T E

 2

 3    STATE OF NEW YORK     )
                            )  Ss.:
 4    COUNTY OF NEW YORK    )

 5

 6         I JEFFREY BENZ, a Certified Realtime

 7    Reporter, Registered Merit Reporter and Notary

 8    Public within and for the State of New York, do

 9    hereby certify:

10         That the witness whose examination is

11    hereinbefore set forth was duly sworn by me and

12    that this transcript of such examination is a true

13    record of the testimony given by such witness.

14         I further certify that I am not related to

15    any of the parties to this action by blood or

16    marriage and that I am in no way interested in the

17    outcome of this matter.

18         IN WITNESS WHEREOF, I have hereunto set my

19    hand this 19th of December, 2024.

20

21

22    JEFFREY BENZ, CRR, RMR

23

24

25
```