# Exhibit C



D&

Lindsay Goldberg Europe GmbH - Full Company View

Saved by **Fernando Zanzarini** | 04-17-2022

# Summary

~~~ www.buvoi.axtarantewkobrokim.com | Report as of: 04-17-2022 | using Currency as USD

## Lindsay Goldberg Europe GmbH

**GLOBAL ULTIMATE**

| | |
|---|---|
| Address: | ......... 69, 40213 Düsseldorf, .......... Westfalen, Germany |
| Phone: | ... 8620150 |
| D-U-N-S: | .... 425- |
| Registration Number: | ..8050994 |
| VAT Number: | ...... T441 |
| In Portfolio: | |

| Failure Score | PAYDEX ® | Age of Business | Employees |
|---|---|---|---|
| (lowest last month) | 80<br>(No change since last month) | **17 years**<br>2004 Year Started | **6**<br>6 (here) |

## Company Profile

| | | |
|---|---|---|
| **D-U-N-S** | **Telephone**<br>+49 211 8620150 | **Employees**<br>6 |
| **Legal Form**<br>... ...... company | **Website**<br>www.lindsaygoldbergeurop... | **Age (Year Started)**<br>17 years (2004) |
| **Date of Registration** | **Email**<br>info@lindsaygoldbergeurope.com | **Named Principal**<br>Thomas Ludwig, Managing Director |
| **Ordinary Share Capital** | | **Line of Business**<br>Financial services |

Risk Assessment

**Overall Business Risk**

**Maximum Credit Recommendation**



| LOW | LOW-MODERATE | MODERATE | MODERATE-HIGH | HIGH |

**US$ 63,790**

325

The recommended limit is based on a low risk of business failure and historical credit usage of the companies within the same industry.

## Dun & Bradstreet Thinks...

- Overall assessment of this organization over the next 12 months: **VERY STABLE CONDITION**
- Based on the predicted risk of failure: **STRONG LIKELIHOOD OF CONTINUED OPERATIONS**
- Based on the trade data received by D&B for this company: **EXHIBITS ON TIME OR SLIGHTLY LATE PAYMENT BEHAVIOR**

**Failure Score** Formerly Financial Stress Score

Past 12 Months


**86**
Low Risk (100)

High Risk (1)

Company's risk level is: **LOW**

Probability of failure over the next 12 months: **0.12 %**

**PAYDEX ®**

Past 24 Months

**80**
Low Risk (100)
Pays On Time

High Risk (0)

## D&B Rating

Current Rating as of 03-22-2022

**Financial Strength based on Net Worth**

**B** : € 250,000 to € 499,999 in Tangible Net Worth or Equity

**Risk Indicator**

**1** : Minimum Risk

This Company's Net Worth : € 266,107

Previous Rating

**Financial Strength based on Net Worth**

**B** : € 250,000 to € 499,999 in Tangible Net Worth or Equity

**Risk Indicator**

**2** : Lower than Average Risk

Trade Payments

## Highest Past Due



Highest Now Owing
-

Total Trade Experiences
**4**

Largest High Credit
**US$ 85**

---

Ownership

This company is a **Global Ultimate, Domestic Ultimate, Parent**

---

People

Current Principals

2

New Appointments

1

Resignations

0

Closures

0

## Executive Leadership

Thomas Unger, *Managing Director*

Thomas Ludwig, *Managing Director*

---

Financial Overview

Source: D&B

| Balance sheet Fiscal (individual) 12-31-2020 | Amount (In Single Units) | Last 5 Years |
|---|---|---|
| Total Long Term Assets: | US$ 28,432 | |
| Total Current Assets: | US$ 514,132 | |
| Total Equity: | US$ 287,713 | |
| Provisions: | US$ 9,378 | |
| Liabilities Falling Due Within One Year: | US$ 261,831 | |
| Liabilities Falling Due More Than One Year: | - | |

**Key Business Ratios**

Equity Ratios:

51.50

## Country/Regional Insight

**Germany**



### Risk Category



**LOW**     MODERATE

Low Risk     High

As crippling European economic issues related to the Russo-Ukraine crisis bite, Germany faces intensive short-to-medium-term challenges due to its high reliance on Russian energy supplies.

# Risk Assessment

D&B Risk Assessment

## Overall Business Risk

   

LOW   LOW-MODERATE   MODERATE   MODERATE-HIGH

### Maximum Credit Recommendation

**US$ 63,790**

### Dun & Bradstreet Thinks...

- Overall assessment of this organization over the next 12 months: **VERY STABLE CONDITION**
- Based on the predicted risk of failure: **STRONG LIKELIHOOD OF CONTINUED OPERATIONS**
- Based on the trade data received by D&B for this company: **EXHIBITS ON TIME OR SLIGHTLY LATE PAYMENT BEHAVIOR**

The recommended limit is based on a low risk of business failure and historical credit usage of the companies within the same industry.

**Failure Score** Formerly Financial Stress Score



**86**

Low Risk (100)

- The cash ratio of the company is strong
- Payment experiences paid greater than 90 days is low
- Frequent changes in subject's management
- Good Paydex



| Level of Risk | Raw Score | Probability of Failure | Industry Average |
|---|---|---|---|
| | **1522** | **0.12%** | **45** |

Business and Industry Trends

Failure Score — Industry Median ...

PAYDEX ®

Based on 24 months of data

80

Low Risk (100)

High Risk (0)

Risk of Slow Pay

Low

Payment Behavior

Pays on time:

View Trade Payments

Business and Industry Trends

7389 - Financial services

Businesses in the same industry - 402

PAYDEX ® — Industry Median ... — Industry Upper Q...

Industry Lower Q...

D&B Rating

329

Current Rating as of 03-22-2022

Previous Rating

**Financial Strength based on Net Worth**

**Risk Indicator**

**1** : Minimum Risk

**B** : € 250,000 to € 499,999 in Tangible Net Worth or Equity

This Company's Net Worth : € 266,107

**Financial Strength based on Net Worth**

**Risk Indicator**

**2** : Lower than Average Risk

**B** : € 250,000 to € 499,999 in Tangible Net Worth or Equity

# Trade Payments

Trade Payments Summary (Based on 24 months of data)

Overall Payment Behavior

**0**

Days Beyond Terms

% of Trade Within Terms

**100%**

Highest Past Due

-

**Highest Now Owing:**
-

**Total Trade Experiences:**
4

Largest High Credit:
€ 79

Average High Credit:
€ 53

Trade Credit Analysis



€212
in 4
Experiences

■ Within Terms

■ 1 - 30 Days Beyond Terms

■ 31 - 60 Days Beyond Terms

■ 61 - 90 Days Beyond Terms

■ 91+ Days Beyond Terms

**0%** of the Total Value reported as Overdue

This company generally pays on time and has a payment score of **80**

Trade Payments By Credit Extended (Based on 12 months of data)

| Range of Credit Extended (€) | Number of Payment Experiences | Total Value | % Within Terms | 1 - 30 Days | 31 - 60 Days | 61 - 90 Days | 91 + Days |
|---|---|---|---|---|---|---|---|
| 100,000 & over | - | - | - | - | - | - | - |
| 50,000 - 99,999 | - | - | - | - | - | - | - |
| 15,000 - 49,999 | - | - | - | - | - | - | - |
| 5,000 - 14,999 | - | - | - | - | - | - | - |
| 1,000 - 4,999 | - | - | - | - | - | - | - |
| Less than 1,000 | 4 | € 212 | 100 | - | - | - | - |

## Legal Events

| Insolvency | Debtor Process | Legal Contracts | Other Legal Events |
|---|---|---|---|
| No | No | No | No |

D&B has not received any Public Filings for this company

## Special Events

There are no Special Events recorded for this business.

## Corporate Linkage

| Members in the Tree | Subsidiaries of this Company | Branches of this Company |
|---|---|---|
| 3 | 2 | 0 |

Ownership

This company is a **Global Ultimate, Domestic Ultimate, Parent**

Shareholders

| Shareholder Name | Interest | Start of Interest | Type of Interest | Birth Date / Year of Foundation | Address |
|---|---|---|---|---|---|
| Thomas Friedrich Ludwig | 50% | 11-19-2020 | Partner (German ownership without shares) | - | 40212 Düsseldorf, DE |
| Thomas Unger | 50% | 11-19-2020 | Partner (German ownership without shares) | - | Bad Homburg, DE |

**Previous Shareholders**

| Shareholder Name | Int ere st | Start of Interest | Type of Interest | Birth Date / Year of Foundation | Address | End Date |
|---|---|---|---|---|---|---|
| Goldberg Lindsay & Co. LLC | 20% | 11-10-2020 | Partner (German ownership without shares) | - | New York, US | 11-18-2020 |
| Dieter H. Vogel | 80% | 11-10-2020 | Partner (German ownership without shares) | - | 40212 Düsseldorf, DE | 11-18-2020 |

**Subsidiaries**

| Company Name | Address | Operates as | Ownership Started | % Shares Owned |
|---|---|---|---|---|
| Locaro Main GmbH | Bad Homburg, DE | Real estate leasing and rentals | 2019 | 100% |

**Minority Interests**

| Company Name | Address | Operates as | Interest Started | % Shares Owned |
|---|---|---|---|---|
| Atlas Flexibles GmbH | Kempten (Allgäu), Germany | Holding companies, nec | 09-30-2021 | 3% |
| PACCOR Holdings GmbH | Düsseldorf, Germany | Holding companies, nec | 02-11-2021 | 13% |

# Company Profile

Company Overview

**D-U-N-S**
31-255-1425

**Legal Form**
Private Limited Liability Company

**Date of Registration**
12-27-2004

**Ordinary Share Capital**
€ 25,000

**Telephone**
+49 211 8620150

**Website**
www.lindsaygoldbergeurope.com

**Email**
info@lindsaygoldbergeurope.com

**Employees**
6

**Age (Year Started)**
17 years (2004)

**Named Principal**
Thomas Ludwig, Managing Director

**Line of Business**
Financial services

Business Registration

| | |
|---|---|
| Registered Name | Lindsay Goldberg Europe GmbH |
| Registered Address | Breite Str. 67, 40213 Düsseldorf, Nordrhein-Westfalen, Germany |
| Legal Form | Private Limited Liability Company |
| Registration Date | 06-02-2004 |
| Start Date | 06-02-2004 |
| Registered In | Düsseldorf 40227 |
| Registration Number | HRB50994 |
| VAT Number | DE238351441 |
| Ordinary Share Capital | € 25,000 |
| Date of Latest Capitalization | |

---

Business Activities And Employees

### Business Information

| | |
|---|---|
| Employees | 6 |
| Description | Finanzdienste, Finanzberatung |

### SIC Information

| SIC Codes | Type | Source | SIC Description |
|---|---|---|---|
| 66190 | Germany Classification of Economic Activities, edition 2008 | D&B | Other activities auxiliary to financial services, except insurance and pension funding |
| 67130 | WZ 2003 | D&B | Activities auxiliary to financial intermediation n.e.c. |
| 74877 | WZ 2003 | D&B | Other asset consulting |
| 73890900 | D&B Standard Industry Code | D&B | Financial services |
| 87429908 | D&B Standard Industry Code | D&B | Financial consultant |

| Other Operating Details: | Finanzdienste, Finanzberatung |
|---|---|

---

History

| Change Type | Date Changed | Changed To | Changed From |
|---|---|---|---|
| Registered Address | 09-29-2016 | Breite Str. 67, 40213 Düsseldorf, Nordrhein-Westfalen, Germany | Königsallee 60 A, 40212 Düsseldorf, Nordrhein-Westfalen, Germany |
| Business Address | 09-29-2016 | Breite Str. 69, 40213 Düsseldorf, Nordrhein-Westfalen, Germany | Königsallee 60 a, 40212 Düsseldorf, Nordrhein-Westfalen, Germany |

| Change Type | Date Changed | Changed To | Changed From | 333 |
|---|---|---|---|---|
| Registered Name | 11-23-2020 | Lindsay Goldberg Europe GmbH | Lindsay Goldberg Vogel GmbH | |

# Principals

| Current Principals | New Appointments | Resignations | Linked to Closures |
|---|---|---|---|
| 2 | 1 | 0 | 0 |
| | (in the last 12 months) | (in the last 12 months) | |

---

### TOP-FIVE-PRINCIPALS

| | |
|---|---|
| Thomas Unger | 03 Nov 2021 - Current |
| Doctor Thomas Friedrich Ludwig | 08 Jan 2010 - Current |
| Prof. Dr. Dieter H. Vogel | 15 Nov 2016 - 09 Nov 2020 |

---

### CURRENT PRINCIPALS

**Thomas Unger**
Managing Director
in LinkedIn Profile

| | |
|---|---|
| **Date Appointed** | 11-03-2021 |
| **Address** | Bad Homburg, Hessen, Germany |
| **Date of Birth** | |
| **Nationality** | DE |

## Associations

| | |
|---|---|
| Unger.one GmbH | 14 Jul 2017 - Current |

**Doctor Thomas Friedrich Theo Ludwig**
Managing Director
in LinkedIn Profile

| | |
|---|---|
| **Date Appointed** | 01-08-2010 |
| **Address** | 40212 Düsseldorf, Nordrhein-Westfalen, Germany |
| **Date of Birth** | |

Nationality                          DE

## Associations

VHM Metals Holding GmbH    02 Mar 2018 - Current

PREVIOUS PRINCIPALS

**Prof. Dr. Dieter H. Vogel**
Managing Director
in  LinkedIn Profile

| | |
|---|---|
| Date Appointed | 11-15-2016 |
| Date Resigned | 11-09-2020 |
| Address | 40667 Meerbusch, Nordrhein-Westfalen, Germany |
| Date of Birth | ███████████ |
| Nationality | DE |

## Associations

VHM Metals Holding GmbH    02 Mar 2018 - Current

# Financials

## Overview

Source: D&B  |  Currency: All figures shown in EUR unless otherwise stated

Financial Statement Comparison

The values displayed below are for the subject company.



| | 2016 | 2017 | 2018 | 2019 | 2020 |

Total Equity   —○—        Total Current Ass...  —△—      Liabilities Falling...  —□—

|  | Individual<br>12-31-2020<br>In Single Units | Individual<br>12-31-2019<br>In Single Units | Individual<br>12-31-2018<br>In Single Units | Individual<br>12-31-2017<br>In Single Units | Individual<br>12-31-2016<br>In Single Units |
|---|---|---|---|---|---|
| Total Long Term Assets | 26,297 | 28,253 | 28,862 | 38,622 | 47,879 |
| Total Current Assets | 475,524 | 4,709,440 | 784,192 | 725,579 | 1,470,368 |
| Total Equity | 266,108 | 230,061 | 241,513 | 299,166 | 323,357 |
| Provisions | 8,674 | 720,100 | 17,000 | 15,200 | 14,900 |
| Liabilities Falling Due Within One Year | 242,169 | 3,818,174 | 600,897 | 485,044 | 1,236,754 |
| Liabilities Falling Due More Than One Year | - | - | 0 | - | - |
| Employees | 8 | 8 | 7 | 7 | 7 |

* = In Single Units

## Employees Based On Investigation

|  | Individual<br>Based On Investigation<br>01-01-2021<br>In Single Units | Individual<br>Based On Investigation<br>12-31-2020<br>In Single Units | Individual<br>Based On Investigation<br>01-01-2020<br>In Single Units | Individual<br>Based On Investigation<br>01-01-2018<br>In Single Units |
|---|---|---|---|---|
| Employees | 6 | 8 | 6 | 7 |

# Balance Sheet

Source: D&B  |  Currency: All figures shown in EUR unless otherwise stated

Financial Statement Comparison

The values displayed below are for th

Annual



Total Equity —○—    Total Current Ass —△—    Liabilities Falling... —□—

| Assets | Fiscal Individual 12-31-2020 In Single Units | Fiscal Individual 12-31-2019 In Single Units | Fiscal Individual 12-31-2018 In Single Units | Fiscal Individual 12-31-2017 In Single Units | Fiscal Individual 12-31-2016 In Single Units |
|---|---|---|---|---|---|
| **FIXED ASSETS** | | | | | |
| Intangibles | - | 0 | 3,152 | 8,754 | 13,758 |
| **Total Fixed Assets** | 26,297 | 28,253 | 25,710 | 29,868 | 34,121 |
| Financial Assets | - | - | - | - | 0 |
| **Total Long Term Assets** | 26,297 | 28,253 | 28,862 | 38,622 | 47,879 |
| **Accounts Receivable And Other Assets** | 155,551 | 4,316,516 | 535,045 | 300,873 | 209,443 |
| Liquid Assets | 319,973 | 392,924 | 249,147 | 424,706 | 1,260,925 |
| **Total Current Assets** | 475,524 | 4,709,440 | 784,192 | 725,579 | 1,470,368 |
| **TOTAL CURRENT ASSETS** | | | | | |
| Defered Charges And Prepaid Expenses | 15,131 | 30,641 | 46,356 | 35,209 | 56,765 |
| **Total Assets** | 516,951 | 4,768,334 | 859,410 | 799,410 | 1,575,012 |

| Liabilities | Fiscal Individual 12-31-2020 In Single Units | Fiscal Individual 12-31-2019 In Single Units | Fiscal Individual 12-31-2018 In Single Units | Fiscal Individual 12-31-2017 In Single Units | Fiscal Individual 12-31-2016 In Single Units |
|---|---|---|---|---|---|
| **TOTAL CURRENT LIABILITIES** | | | | | |
| Issued Capital | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Accumulated Profit/Loss | 205,061 | 216,513 | 274,166 | 298,357 | 337,022 |
| Net Profit/Loss | 36,047 | (11,453) | (57,653) | (24,191) | (38,664) |
| Retained Profit / Loss (-) | 241,108 | 205,061 | 216,513 | 274,166 | 298,357 |
| **Total Equity** | 266,108 | 230,061 | 241,513 | 299,166 | 323,357 |
| Provisions | 8,674 | 720,100 | 17,000 | 15,200 | 14,900 |
| Liabilities Falling Due More Than One Year | - | - | 0 | - | - |
| **Liabilities Falling Due Within One Year** | 242,169 | 3,818,174 | 600,897 | 485,044 | 1,236,754 |
| **Total Liabilities & Equity** | 516,951 | 4,768,334 | 859,410 | 799,410 | 1,575,012 |

## Profit And Loss Accounts

D&B currently has no financial information on file for this company

## Cash Flow

337

D&B currently has no financial information on file for this company

## Financial Ratios

Source: D&B | Currency: All figures shown in EUR unless otherwise stated

| **Financial Situation** | 2020 | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|
| Equity Ratios | 51.5 | 4.8 | 28.1 | 37.4 | 20.5 |

| **Regarding The Financial State** | 2020 | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|
| Liquidity Ratio Of Assets A | 1,011.9 | 814.3 | 836.8 | 774.6 | 675.4 |
| Liquidity Ratio Of Assets B | 1,011.9 | 814.3 | 836.8 | 774.6 | 675.4 |
| Liquidity Ratio 1 (x) | 132.1 | 10.3 | 41.5 | 87.6 | 102.0 |
| Liquidity Ratio 2 (x) | 196.4 | 123.3 | 130.5 | 149.6 | 118.9 |
| Liquidity Ratio 3 (x) | 196.4 | 123.3 | 130.5 | 149.6 | 118.9 |

Growth Rates (%)

| | 2020 vs 2019 | 2019 vs 2018 | 2018 vs 2017 | 2017 vs 2016 |
|---|---|---|---|---|
| Number of Employees | 0 | 14.29 | 0 | 0 |
| Total Intangible Assets | 0 | 0 | (63.99) | (36.99) |
| Total Tangible Fixed Assets | (6.92) | 9.89 | (13.92) | (12.86) |
| Total Current Assets | (89.90) | 500.55 | 8.08 | (50.55) |
| Total Assets | (89.16) | 454.84 | 7.51 | (49.29) |
| Current Liabilities | (93.66) | 535.41 | 23.89 | (60.78) |
| Net Current Assets (Liabilities) | (73.82) | 386.25 | (23.80) | 2.96 |
| Total Assets less Current Liabilities | (71.08) | 267.55 | (17.77) | (7.06) |
| Long Term Liabilities | 0 | 0 | 0 | 0 |
| Shareholders Funds | 15.67 | (4.74) | (19.27) | (7.49) |
| Employees | 0 | 14.29 | 0 | 0 |

This information may not be reproduced in whole or in part by any means of reproduction.

©Dun & Bradstreet, Inc. 2022. All rights reserved

Fund IV
Schur Flexibles Structure Chart
07. April 2021

EXHIBIT 2
LG
6/4/2024
Jessica Waack, CSR
RDR, CRR, NVACR, NYACR

John F. Aiello
Authorized Signature

355

Beilage 3

# EXHIBIT_AM-189

## SF Holding - Advisory Board Resolution CEO 190517



## ALVAREZ & MARSAL DISPUTES AND INVESTIGATIONS GMBH

## Privileged & Strictly Confidential

## ADVISORY BOARD RESOLUTION

of the advisory board members of

### Schur Flexibles Holding GesmbH

a limited liability company (*Gesellschaft mit beschränkter Haftung*) incorporated under the laws of the Republic of Austria, having its corporate seat in Wiener Neudorf and its registered business address at IZ NÖ-Süd Straße 1, Objekt 50 Haus C, 2351 Wiener Neudorf, Austria, registered with the companies register (*Firmenbuch*) of the regional court of Wiener Neustadt (*Landesgericht Wiener Neustadt*) under FN 366305 i (the "**Company**").

### PREAMBLE

Mr. Michael Schernthaner shall be appointed as CEO and Chairperson of the Management Board. In light of this appointment, the Advisory Board wishes to amend the rules of procedure of the management and approve the new schedule of responsibilities of the management board.

### RESOLUTIONS

NOW, THEREFORE, consenting to the following resolution being adopted in writing by way of a circular resolution (*Umlaufbeschluss*) and waiving all requirements as to form and time regarding the announcement, convention and/or holding of an advisory board meeting, we, being all members of the advisory board (*Beiratsmitglieder*) of the Company, after careful consideration, hereby resolve:

1.  Mr. Michael Schernthaner is appointed as Chief Executive Officer (CEO) and Chairperson of the Management Board. Mr. Friedrich Humer shall serve as Chief Sales Officer (CSO) and Mr. Juan Luís Martinez Arteaga as Chief Operations Officer (COO) of the Company.

2.  The Advisory Board approves the schedule of responsibilities of the management board as resolved by the management board and attached as <u>Schedule 1</u>.

3.  The rules of procedure for the members of the management board attached as <u>Schedule 2</u> are enacted.

No further resolutions are adopted.

*[signatures to follow]*

AM-189

**Signature Page**
**ADVISORY BOARD RESOLUTION**

2C May 2019

_____
Thomas Unger

_____ May 2019

_____
Dr. Thomas Ludwig

2 May 2019

_____
Prof. Dr. Dieter Vogel

_____ May 2019

_____
Michael Dees

3

361

AM-189

**Signature Page**
**ADVISORY BOARD RESOLUTION**

_____ May 2019

_____

Thomas Unger

_____ May 2019

_____

Dr. Thomas Ludwig

_____ May 2019

_____

Prof. Dr. Dieter Vogel

17 May 2019

_____

Michael Dees

AM-189

# SCHEDULE 1



363

AM-189

## SCHUR FLEXIBLES-SCHEDULE OF RESPONSIBILITIES OF THE MANAGEMENT BOARD

The management board of Schur Flexibles Holding GesmbH consists of Michael Schernthaner (CEO), Friedrich Humer (CSO) and Juan Luis Arteaga (COO). In addition to the Company's rules of procedure for the management, the areas of responsibilities of the individual management directors are divided as follows:

| Name | Responsibilities |
|---|---|
| **Michael Schernthaner** | **Chief Executive Officer – CEO, Chairperson of the Management Board:**<br><br>• Strategy/ M&A<br>• Legal & HR<br>• IT<br>• Communication<br>• Finance<br>• Tax |
| **Friedrich Humer** | **Chief Sales Officer - CSO:**<br><br>• Sales<br>• Marketing<br>• Key Account Management<br>• Research and Development |
| **Juan Luis Martínez Arteaga** | **Chief Operations Officer - COO:**<br><br>• Operations (Extrusions and Converting)<br>• Procurement |

Vienna, May 2019

_____
Michael Schernthaner

_____
Friedrich Humer

_____
Juan Luis Martínez Arteaga

AM-189

## SCHEDULE 2

365

AM-189

### Rules of Procedure for the
### Management of
### Schur Flexibles Holding GesmbH (the "Company")

## § 1
### General

The managing directors shall conduct the business of the Company with due care and diligence and in accordance with the provisions of the law, the articles of association of the Company, these Rules of Procedure, the resolutions of the shareholders, the instructions of the advisory board, the business plan applicable to the respective financial year, the schedule of responsibilities and their service agreements.

## § 2
### Management by Individual Managing Directors

1.  The management board shall resolve a schedule of responsibility with the advisory board's consent. The respective applicable schedule of responsibility is an integral part of these Rules of Procedure. The areas of responsibilities of the managing directors can in this case be derived from the schedule of responsibilities. Each managing director shall have the competence to manage the business area assigned to him or her in the schedule of responsibilities.

    Irrespective of the schedule of responsibilities, each managing director shall be responsible for the management as a whole.

2.  The managing directors notify the chairperson of the management board (cf. § 4) on an ongoing basis on any material matters in their business department. Upon request, they shall notify the chairperson of the management board of individual matters as well. In case there is no chairperson, the managing directors shall notify each other.

3.  Where measures and transactions of one area of responsibility also affect one or more other the area(s) of responsibility, the managing director shall find an agreement with the managing director(s) of the other affected area(s). If no agreement can be reached, a resolution of the full management board on the matter shall be adopted, except to the extent that, according to the reasonable discretion of the acting managing director, immediate action is required in order to avoid impending disadvantages for the Company. The chairperson of the management board, or if there is no chairperson the entire management board, shall be informed immediately about such autonomous actions, and in the first case the full management board shall be informed in the course of the next meeting.

4.  Without prejudice to the joint responsibility of the management, each managing director shall manage the area of responsibility entrusted to him or her on his/her own responsibility. In particular, each managing director shall be responsible for implementing resolutions that concern his or her area of responsibility.

5.  If the responsible managing director is not available and danger is imminent, each of the other managing directors may act in lieu of the responsible managing director. However, the acting managing

1/9

director shall inform the responsible managing director without undue delay about the relevant incident and the measures taken.

6.  The managing directors shall work together in a cooperative manner. They shall keep each other constantly informed about important measures and events in their respective area of responsibility. A managing director who has concerns in respect of measures in another area of responsibility shall procure that a resolution of the full management board is adopted, unless the concerns can be resolved in a discussion with the other managing director.

## § 3
### Decisions of the Entire Management Board

1.  The full management board shall decide

    a.  on matters for which the law, the Company's articles of association, a shareholder resolution, a resolution of the advisory board or these Rules of Procedure call for a decision to be made by the full management board;

    b.  on matters for which the approval of the shareholder meeting or of the advisory board must be obtained;

    c.  on the preparation of the Company's annual financial statements, the consolidated financial statements and the management report of the Company;

    d.  on the Budget, including the financial, investment and personnel planning of the Company, and on other basic questions regarding the organisation and business policies of the Company;

    e.  on the recruitment, appointment and dismissal of managing directors of direct and indirect subsidiaries or of employees with group management functions. (reference to § 8: in case an unanimous resolution cannot be passed, the chairperson of the management board has to bring the matter to the attention of the chairperson of the advisory board to request a decision notwithstanding § 9 lit. u)

    f.  on the convening of a shareholder meeting and on motions and proposals of the management board for resolutions of the shareholder meeting or the advisory board; and;

    g.  upon request of a managing director.

2.  The full management board may assign the implementation of resolutions of the full management board to individual managing directors.

## § 4
### Chairperson of the Management Board

1.  The advisory board may assign the function of the chairperson of the management board to a managing director. A withdrawal of such assignment and/or a transfer of such functions to another managing director is possible at any time.

2.  The chairperson of the management board may object to any management measure of a managing director and to resolutions of the entire management board. In case the chairperson of the management board objects to a managing director's management measure, the matter shall be submitted to

2/9

9

the entire management board for decision. In case the chairperson of the management board objects to a resolution of the entire management board, the matter shall be submitted to the advisory board for decision.

3.  In case these Rules of Procedure for the Management assign duties and functions to the chairperson of the management board, but no such chairperson has been appointed, the fulfillment of these duties and functions shall be the responsibility of the management board as a whole, unless decided otherwise by the advisory board.

### § 5
### Meetings and Resolutions

1.  Resolutions are passed in meetings of the management board. Upon request of the chairperson of the management board, or if there is no chairperson, upon request of any managing director, resolutions may be passed outside meetings by voting in writing, by telephone, by telefax or email, provided that no managing director objects to this procedure without undue delay

2.  Meetings of the management board shall take place on a regular basis; if possible every four weeks. They have to take place if the welfare of the Company so requires or upon request of a managing director.

3.  Meetings of the management board shall be prepared and chaired by the chairperson of the management board or, if he is prevented from doing so, by the longest serving member of the management board. The chairperson of the management board shall convene the meetings of the management board, if possible with notification of the agenda and with a deadline appropriate to the circumstances. In case there is no chairperson, any member of the management board shall be entitled to convene a meeting.

4.  The management board constitutes a quorum, if it consists of no more than two members and those two members participate in the adoption of a resolution. Otherwise, it shall constitute a quorum, if at least half of the total number of its members participate in the adoption of a resolution.

5.  Managing directors who are not present in person may participate in a meeting of the management board by transmission via telephone, via video or telephone conference, or other means of telecommunication, provided that it is ensured that all participants of the meeting may speak and hear each other.

6.  Absent managing directors may participate in the adoption of a resolution by submitting their written vote via a present managing director.

7.  The management board shall decide by a simple majority of the votes cast unless otherwise ordered. In case of a tie vote the vote of the chairperson of the management board shall be decisive. If there is no chairperson, the matter shall be submitted to the other managing director who did not participate at the meeting. If there is no majority of votes even then, the matter shall be submitted to the advisory board for decision. Provided that the management board consists of no more than two members, it shall decide unanimously.

8.  If resolution matters fall within the scope of the business department of a managing director who is not present in person, the managing director shall participate in the adoption of the resolution either

personally or by transmission via video or via telephone. Only if that is not possible with justifiable efforts, the managing director's absence shall be authorized. The managing director concerned may then immediately object to a resolution taken in his absence vis-à-vis the chairperson of the management board. If so, the decision matter has to be discussed at the next meeting and finally decided upon. In case of imminent danger, the resolution is to be implemented despite the objection of the managing director concerned.

9. Minutes shall be drawn up for each meeting of the management board, stating the place and date of the meeting, the participants, the agenda and the content of the resolutions of the management. If resolutions are passed outside meetings, all managing directors must be informed at least in the form of an e-mail about the content of the resolution, the manner in which the resolution is passed and the result of the vote, provided that this information is not derived from the resolution in question itself (e.g. in the case of resolutions passed in writing).

## § 6
### Information of the Meeting of Shareholders

1. The management board via the chairperson of the management board shall inform the shareholder meeting in all cases determined in accordance with the law, the Company's articles of association, these Rules of Procedure and the resolutions of the shareholder meeting or the advisory board.

2. Documents required for decision-making, in particular the annual financial statements, the consolidated financial statements and the audit report, shall be forwarded to the shareholders in sufficient time before the meeting.

## § 7
### Information of the Advisory Board

1. The management board via the chairperson of the management board shall inform the advisory board of the Company regularly, promptly and comprehensively of all issues of relevance to the Company and all direct and indirect subsidiaries relating to planning, business development, the risk situation and risk management.

2. The management board via the chairperson of the management board shall inform the advisory board in particular of

   a. actions for which the consent of the advisory board is required, usually in writing and in sufficient time to allow the advisory board sufficient time to consider its decision;

   b. the profitability of the Company and its divisions and, if necessary (generally in the event of budget deviations) the special topics of the individual companies;

   c. the intended business policy of the Company and all direct and indirect subsidiaries and other material questions of future management at least once a year, unless changes in the situation or new questions require immediate reporting;

   d. any risks involved in achieving the Company's sales/earnings/cash flow budget, for which a new sales/earnings/cash flow projection must be prepared;

36?

AM-189

    e.  the event that it is foreseeable that the approved credit/leasing limits of the Company and all direct and indirect subsidiaries will probably be exceeded or that limits (covenants) or other obligations arising from existing credit/leasing agreements will probably not be met.

3.  Irrespective of any statutory duties to provide information, the management board via the chairperson of the management board is obliged to forward the following information to the advisory board (in accordance with § 6, items a.-d. refer to Schur Flexibles GmbH; "Working Days" mean Monday to Friday):

    a.  Consolidated balance sheets, profit and loss accounts and cash flow statements (the "financial statements") for the respective financial year which have not been audited within 60 Working Days after the end of each financial year and which have been audited within 120 Working Days after the end of each financial year;

    b.  within 20 Working Days of the end of each month, the unaudited financial statements for that month;

    c.  no later than 10 business days before the end of each financial year, a draft annual budget for the following financial year ("Budget") for consent by the meeting of shareholders. The Budget for the following financial year must include monthly plans for profit and loss, cash flow, income, expenditure and cash, as well as a budgeted balance sheet at the end of each quarter. As part of the Budget, an abbreviated plan for the two financial years following the following financial year shall also be submitted, taking into account the above criteria; and

    d.  prompt notification of (i) all material negative changes with respect to the Company or its direct and indirect subsidiaries and (ii) all current or (to the Company's knowledge) threatened legal disputes, lawsuits, proceedings or investigations as well as judgements, judicial or administrative orders or orders which affect the Company or its direct and indirect subsidiaries and from which it can reasonably be expected that they will have material negative effects on the Company or its direct and indirect subsidiaries.

4.  The obligation to report to the advisory board is incumbent on the entire management board under the leadership of the chairperson of the management board, who shall also provide the respective information to the advisory board. As a rule, the management reports shall be submitted in writing monthly, unless oral reporting is sufficient or required in individual cases due to the urgency of the situation. Reports and proposals of other managing directors to the advisory board shall be submitted to the chairperson of the management board with a request for forwarding.

5.  In addition to reporting in accordance with No. 1, the chairperson of the management board shall regularly inform the chairperson of the advisory board about the course of business and the situation of the Company including its affiliated companies orally and, if the latter so wishes, also in writing. All managing directors shall assist the chairperson in fulfilling this task.

6.  In all matters which are of particular importance for the Company or which lie outside the ordinary course of business, the chairperson of the management board shall immediately report orally or in writing to the chairperson of the advisory board.

§ 8
## Annual Planning and Risk Management, Personnel Planning

1. The management board will find an agreement on the recruitment, appointment and dismissal of managing directors of the direct and indirect subsidiaries or of employees with group management functions and will pass a unanimous resolution in this regard. If no unanimous resolution can be reached, the chairperson of the management board must submit the matter to the chairman of the advisory council for a decision without prejudice to § 9 lit. u. (cf. § 3 No. 1, lit c).

2. The management board via the chairperson of the management board shall submit to the advisory board, at the latest 10 days before the end of each fiscal year, the budget of the Company approved by the entire management board for the following fiscal year, including a shortened plan for the following two fiscal years as well as a risk concept for hedging transactions in foreign currencies (other than Euro).

3. The management board will coordinate the personnel planning with the advisory board as part of an annual personnel meeting in the third quarter of the financial year. Here the focus is on the managing directors and employees with group management functions at the first level below the managing directors, both of the Company and of SF GmbH (i.e. the holding companies); furthermore on the managing directors of the direct and indirect subsidiaries. For this purpose, information on remuneration is to be provided and an assessment and succession planning prepared in each case. The management board will submit salary ranges for this employee group for consent in the personnel meeting. If there is an urgent need for personnel, however, the management may exceed this budget; the advisory board must then be informed of this by the chairperson of the management board.

§ 9
## Acts Requiring Consent; Right of Instruction

1. The management board requires the consent of the advisory board for the implementation of the following measures and transactions or the assumption of obligations for the implementation of such measures and transactions by the Company and all direct and indirect subsidiaries. In particular, consent is required in the following cases:

   a. determination of the Budget as well as determination and/or change of the accounting and valuation policies;

   b. substantial changes to business activities or organisational structure of the Company and its affiliates as well as assumption of new or discontinuation of existing business lines or areas of activity;

   c. purchase, sale, and transfer of properties or property-equivalent rights and the assignment or change of encumbrances of properties and property-equivalent rights of a volume of more than EUR 1,000,000;

   d. acquisitions of companies, shares (including increase of shareholdings), or enterprises;

e. sale, disposal, lease or encumbering of entire enterprises or parts thereof (be it by means of asset deal or share deal, while it is being clarified in this regard that this shall apply to parts of enterprises only if they constitute functional units and not to the purchase of single assets) including division, separation, and participation in capital increases against distribution;

f. closure and establishment of branch offices;

g. conclusion or alteration of domination agreements, profit transfer agreements, profit pooling agreements, partial profit transfer agreements, business leasing agreements and operating supply agreements (enterprise agreements pursuant to Sections 291 et seqq. German Stock Corporation Act · *Aktiengesetz* or comparable agreements under Austrian law), including silent partnerships and comparable legal relations;

h. Cooperation or joint venture agreements, if this also involves an obligation (e.g. contribution obligation) of more than EUR 200,000.00;

i. issue of participation rights or establishment of comparable legal relations as well as conclusion and termination of non-competition agreements and other agreements preventing the Company from exercising essential business functions;

j. assumption or granting of loans, including finance leases, issue of bonds, conclusion, alteration, and termination of factoring agreements as well as other measures of corporate financing, insofar as these exceed an amount of EUR 1,000,000 in the fiscal year and insofar as these have not already been approved in the investment applications or acquisition project applications;

k. undertaking of sureties, guarantees, comfort letters or similar responsibilities for third party liabilities (i.e. liabilities incurred outside the Schur Flexibles group), except for the undertaking of sureties, guarantees, comfort letters or similar responsibilities for third party liabilities in favour of suppliers of a direct or indirect subsidiary of the Company, insofar as this occurs in the ordinary course of business;

l. taking of non-hedged currency or security risks, except for the conclusion and closing of supplier and customer contracts in foreign currencies (other than Euro) in the ordinary course of business;

m. unbudgeted investment projects of more than EUR 250,000 each, as well as, even if already included in the Budget, the assumption of a liability in connection with an investment project of at least EUR 1,000,000 (in each case with a profitability calculation for the investment project concerned);

n. conclusion, alteration, and termination of lease agreements and other long-term agreements and continuing obligations with the exception of employment or consultancy contracts, insofar as the payments resulting from these agreements exceed the amount of EUR 500,000 per year;

o. conclusion of consultancy agreements – with the exception of personnel consultants – with annual payment obligations towards the respective consultant of more than EUR 200,000 altogether per financial year;

p. disposal of and other legal acts concerning intellectual property rights exceeding the ordinary course of business, and including the conclusion, alteration, and termination of agreements on the assumption or the granting of the relevant rights of use;

q. initiation of legal disputes or conclusion of judicial or extra-judicial settlements, each with an amount in dispute of more than EUR 500,000;

r. conclusion, alteration and termination of contracts which give rise to obligations for the Company or one of its direct or indirect subsidiaries in the amount of more than EUR 5,000,000 once or annually; however, contracts for the supply of raw materials are excluded from this;

s. conclusion, alteration, or termination of retirement provisions or other pension promises (except (i) for company pension and insurance solutions in the form of deferred compensation in accordance with tax provisions and (ii) insofar as legally required), pension schemes and the establishment of retirement provision systems;

t. other acts substantially altering the asset, financial, or profit situation of the Company;

u. recruitment, appointment and dismissal of managing directors of the direct or indirect subsidiaries of the Company.

2. The shareholder meeting and the advisory board are authorized at any time to expand or restrict the scope of business requiring consent.

3. The advisory board may issue instructions to the management board to the extent that the shareholder meeting of a limited liability company may issue instructions to the management board of the limited liability company. The shareholder meeting's right to issue instructions shall remain unaffected and shall have priority in the event of contradictions.

4. The shareholder meeting or the advisory board may give their consent to acts pursuant to Section 9.1 for several acts of the same kind in advance.

§ 10

**Duties with Regard to Subsidiary Companies**

The management board has to ensure the continuous and effective surveillance of the Company's direct and indirect subsidiaries and their respective business operations and to take all measures required and proportional thereto. In particular, the management board has to ensure that the articles of association (statutes) and rules of procedure of the subsidiaries each contain consent catalogues in accordance with these Rules of Procedure (adapted to the actual business operations of the subsidiaries).

§ 11

**Unusual Business**

1. The exercise of secondary employments, and, in particular, the assumption of supervisory or advisory board mandates outside of the Schur Flexibles Group, requires the prior consent of the advisory board. Existing secondary employments, including memberships in supervisory and advisory boards outside of the Schur Flexibles Group, are to be co-ordinated with the chairperson of the advisory board as well.

2. Each managing director is obliged to immediately inform about conflicts of interest towards the advisory board for the attention of the chairperson of the advisory board and to inform the other members of the management board on the matter. All agreements between the Company or an enterprise controlled by it on one side and a managing director, a company or an enterprise controlled

373

**AM-189**

by a managing director, or a Close Relative of a managing director on the other side have to comply with the requirements and standards applying to agreements with third parties. Such agreements require the consent of the advisory board if the agreement, in the respective case, exceeds EUR 5,000.00 in worth.

„**Close Relatives**" in the sense of these Rules of Procedure are all relatives pursuant to Section 38 Austrian Insolvency Code (*Insolvenzordnung; IO*) as well as other persons standing in a comparably close relation to a managing director and with which a conflict of interest is conceivable, as there is reason to believe that the managing director is capable of exercising immediate influence on them.

\* \* \* \* \* \* \*

16

Beilage 14

587

## Re: Schur

| From: | "Dees, Michael" <dees@lindsaygoldbergllc.com> |
|---|---|
| To: | "Narayan, Rohan" <narayan@lindsaygoldbergllc.com> |
| Date: | Fri, 06 Jul 2018 10:27:08 -0400 |

Rohan,

I think that, on the financing, Michael is playing no role. Paul is running this, when he is not focused on███████ Based on a call yesterday, I think that his current plan is as follows:
- keep the Macquarie PIK loan in place, but with a lower interest rate (9% all-in rate?)
- increase the senior debt to ~4x
- take out a dividend this fall (but probably smaller than EUR 85 million; maybe EUR 65 million)

I think that he is implicitly communicating two messages. First, it might be harder to convince lenders of our pro forma EBITDA. Second, placing a small second lien loan is hard in this market.

I think that it is helpful for Unger to refocus on this deal. He needs to deliver the results in 2018-2019, as the clear plan is an exit late 2019 / early 2020.

The reasons for the CEO departure are unclear. Paul had some theories that made sense, but they really don't matter. I don't think that Michael S was helpful, but that was not the key reason.

Michael

Sent from my iPad

On Jul 4, 2018, at 10:15 AM, Narayan, Rohan <Narayan@lindsaygoldbergllc.com> wrote:

> Thank you for the update Michael, that is disaapointing but consistent with the body language that you have been describing for both sides; clearly not the kind of business that one can operate remotely.
>
> I had my call with Michael S. yesterday, not sure I learned much beyond what he already told you. In my opinion about 1mm of the miss to 2018 budget which is driven by the tobacco redesign sounds less concerning and will be back on a drun-rate basis by the end of the summer. The other two misses - Zwart (about 500k) and the food extrusion (another 1mm or so) sound more concerning and doesn't seem like a we have a firm handle on. Michael is confident that we will be back on a run-rate level for both by end of the year (by finding new employees at Zwart, and our R&D department developing the new shrink products for food extrusion) but he's been saying that for some time now. It does sound like there is some upside in overall synergies from the M&A that might allow him to make it all up assuming we can execute. It will be good to have Unger's focus back on.
>
> I briefly discussed the financing and again it doesn't seem like we are anywhere. Michael said he wanted to get it done by the end of August which surprised me but when I pressed him on PF numbers, banks process etc. he deferred and said we should catch up when he has it more developed.
>
> On Jul 4, 2018, at 7:34 AM, Dees, Michael <Dees@lindsaygoldbergllc.com> wrote:
>
>> I wanted to let you know that Thomas Unger will likely be stepping back into an executive chairman role. We will be terminating the new CEO. We will likely add a COO to the management board.
>>
>> One major issue is that the new CEO wants to continue to live in Switzerland for tax purposes. This does not allow him to serve properly as CEO, and it is inconsistent with his agreements and any discussions.
>>
>> We may not search for a new CEO, as we are focused on pushing for an exit in late 2019 / early 2020. A new CEO will likely slow this down.
>>
>> Sent from my iPad

fyi - goes public Monday 6pm CET

| From: | Thomas Unger <unger@lindsaygoldbergvogel.com> |
|---|---|
| To: | "Dees, Michael" <dees@lindsaygoldbergllc.com> |
| Date: | Fri, 03 Aug 2018 09:06:48 -0400 |
| Attachments: | 180806_Schur_Führungsstruktur final_EN.pdf (1.12 MB) |





Lindsay Goldberg Vogel

## Schur Flexibles with new management structure – company remains on growth trajectory

**Wiener Neudorf, August 6, 2018. Schur Flexibles is making adjustments to its management structure and will be led in future by a team consisting of the Chief Operating Officer, Chief Sales Officer and Chief Financial Officer. As of August 16, Juan Luis Martinez Arteaga (44) is to become the new COO of the Schur Flexibles Group. In his most recent position, he was SVP Operations of the Constantia Flexibles Group's Pharmaceutical division. As of October 1, Friedrich Humer (54) is to be appointed as the company's Chief Sales Officer. In his former position at Constantia Flexibles, he was responsible for food packaging in the growth markets. Michael Schernthaner (40) will remain in his position of CFO. Thomas Unger (57), former CEO of Constantia Flexibles and partner of Schur owner Lindsay Goldberg, will support the team as Chairman of the Advisory Board. Thorsten Kühn (45), CEO of the Schur Flexibles Group since April 2018, will be withdrawing from the company to take up new tasks. Thomas Unger regrets this move and wishes him all the best for his professional and personal future.**

In 2016, Lindsay Goldberg acquired the company that specializes in flexible packaging, with sales of approximately €350 million and around 1,200 employees. Schur Flexibles offers high quality, customized high-barrier packaging solutions for the food, tobacco and pharmaceuticals industries. With its integrated value chain, from extrusion through to printing and lamination and on to the large-scale production of pouches and bags, Schur Flexibles ranks among Europe's leading companies in the sector. Having made four acquisitions since 2016, Schur Flexibles currently generates sales of around €500 million (pro forma) with a workforce of more than 1,750 employees in 22 production sites in Western and Eastern Europe. These locations are highly specialized and technology leaders in their respective fields. This "Center of Excellence" concept makes the group an attractive and competent partner for customers of selected industries.



Lindsay Goldberg Vogel

**About Lindsay Goldberg:**

Lindsay Goldberg is a private equity investor focusing on partnerships with family offices, founders and management teams with a long-term orientation wishing to actively participate in building up their business. Lindsay Goldberg is represented in Europe by Düsseldorf-based Lindsay Goldberg Vogel GmbH. The partners of Lindsay Goldberg Vogel are Prof. Dr. Dieter Vogel, former CEO of Thyssen AG, and Dr. Thomas Ludwig, former CEO of Klöckner & Co SE, as well as Thomas Unger, former CEO of Constantia Flexibles and Vice Chairman of Metro AG.

**Contact for inquiries addressed to Lindsay Goldberg Vogel:**

Tobias M. Weitzel
BSK Becker+Schreiner Kommunikation GmbH
Tel.: +49 (0) 2154 - 81 22 16
Mobile: +49 (0) 177 721 57 60
Fax: +49 (0) 2154 - 81 22 11
email: weitzel@kommunikation-bsk.de

Beilage 17

An
Zentrale Staatsanwaltschaft zur Verfolgung
von Wirtschaftsstrafsachen und Korruption
Dampfschiffstraße 4
1030 Wien

**Eingabe zu: 5 St 1/22g**

Elektronisch eingebracht am 03.12.2024
PLCB Pauer Law & Caspar-Bures
Rechtsanwalts GmbH

**Einbringer (P133386)**

Günthergasse 3/3, 1090 Wien
E-Mail: office@pauerlaw.at
IBAN: AT744213090101011378
BIC: VBOEATWWKLA
FirmenbuchNr: 624363g
Zeichen: FiscMi/1

## Äußerung zu den Stellungnahmen von Thomas Unger und zur Rolle des Managements von Lindsay Goldberg

Bitte beachten Sie das Dokument in der Beilage.

Herzlichen Dank!

**1 Anhang**

1. **Äußerung zu den Stellungnahmen von Thomas Unger und zur Rolle des Managements von Lindsay Goldberg**



PAUER LAW &
CASPAR-BURES

STRAF- UND WIRTSCHAFTSSTRAFRECHT

Partner RA Mag. Johann Pauer
Partnerin RA[in] Bettina Caspar-Bures, LL.M.
RAA[in] Florina Fischer, LL.M., BSc
RAA[in] Mag.[a] Nina Beganović

Zentrale Staatsanwaltschaft zur Verfolgung
von Wirtschaftsstrafsachen und Korruption
Dampfschiffstraße 4
1030 Wien
**via web-ERV**

**AZ 5 St 1/22g**

Wien, am 03.12.2024
FiscMi/1 / FF

Beschuldigter:    Dr. Michael Fischkin
Vorgartenstrasse 120/14, 1020 Wien

vertreten durch:    PLCB Pauer Law & Caspar-Bures Rechtsanwalts GmbH
Günthergasse 3/3, A-1090 Wien
Vollmacht erteilt gemäß § 8 RAO
Code P 133386

wegen:    §§ 153 (3) 2. Fall StGB; §§ 165 (1), 165 (4) StGB; § 163a (1) Z 1 StGB;

§ 12 3. Fall StGB §§ 146,147 (1) Z 1, 147 (3) StGB

# ÄUSSERUNG ZU DEN STELLUNGNAHMEN VON THOMAS UNGER (ON 598, ON 740, ON 1161) UND ZUR ROLLE DES MANAGEMENTS VON LINDSAY GOLDBERG BEI DER SCHUR

1-fach
Beilagen: **0**

**PLCB Pauer Law & Caspar-Bures Rechtsanwalts GmbH**
Günthergasse 3/3 | A-1090 Wien
FN 624363g | UID-Nummer ATU80460635
T: +43 1 388 0207 | F: +43 1 388 0207-83
E: office@pauerlaw.at | H: www.pauerlaw.at

Sprechstelle Kärnten:
Herzog Bernhard Platz 5 | A-9300 St. Veit/Glan

IBAN AT74 4213 0901 0101 1378 | BIC VBOEATWWKLA

Der Beschuldigte erstattet zu den bisherigen Äußerungen von Thomas UNGER zu seiner Rolle bei der SCHUR (Stellungnahmen von Thomas UNGER vom 16.06.2023 [ON 598], 06.11.2023 [ON 740] und zuletzt vom 20.11.2024 [ON 1161]) sowie zur Rolle der weiteren Lindsay Goldberg Beiräte und Lindsay Goldberg Management sowie deren Berater die nachstehende

## ÄUSSERUNG:

Obwohl immer noch einem Großteil der Beweisanträge des Beschuldigten nicht entsprochen wurde, zahlreiche entlastende E-Mails, Nachrichten, Dokumente, Dateien und weitere Informationen – obwohl mehrmals beantragt – nicht beigeschafft wurden und diese daher nach wie vor nicht im Ermittlungsakt sind, möchte der Beschuldigte bereits jetzt – noch ohne Beischaffung der Vielzahl an entlastenden Beweismitteln – Stellung zu beziehen, da einige Personen im gegenständlichen Verfahren ihre Position und Rolle sowie deren Wirkungskreis im Unternehmen der Schur Flexibles Holding GmbH (idF: „SCHUR") völlig falsch darstellen, ihre Verantwortung auf den Beschuldigten abwälzen und der Beschuldigte so zu Unrecht belastet wird.

Hintergrund all dieser strafrechtlichen Vorwürfe ist der Verkauf der SCHUR von Atlas Flexibles B.V. sowie der Lindsay Goldberg Europe GmbH (idF: „Lindsay Goldberg") an die B & C KB Holding GmbH (idF: „B & C") in 2021. Nachdem der Beschuldigte zu keinem Zeitpunkt mit der B & C Verkaufsverhandlungen geführt hat, konnte er die Organe der B & C naturgemäß auch nicht täuschen. Der Beschuldigte kannte weder den Kaufpreis, noch die kaufpreisbestimmenden Faktoren. **Der Vorwurf des Betruges gegenüber dem Beschuldigten ist daher schon allein aus diesen Gründen verfehlt**. Dass SCHUR das Aktivierungspotential entsprechend den International Financial Reporting Standards (im nachfolgenden „IFRS") nutzte, wurde transparent kommuniziert und war allgemein bekannt, so insbesondere auch den B&C Due Diligence Beratern (u.a. E&Y und McKinsey) sowie dem Wirtschaftsprüfer der SCHUR (PwC). Aktivierungen und EBITDA-Berechnungen wurden an Lindsay Goldberg Europe GmbH übermittelt und mit dem dortigen Management – allen voran Thomas UNGER, aber auch Paul PRUSS - intensiv erörtert.

2



Mehr noch: die Bilanzierungspolitik – nämlich die Nutzung von nach IFRS vorgegebenen Bilanzierungsregelungen zu Aktivierungen – wurde von Lindsay Goldberg vorgegeben. Thomas UNGER kannte nicht nur das Zahlenwerk der SCHUR im Detail, sondern war auch als „Active Chairman" und de-facto CEO- und Geschäftsführer im operativen Bereich der SCHUR tätig. Die bisherigen Angaben von Thomas UNGER entsprechen daher nicht den wahren Gegebenheiten, weshalb gegenständliche Äußerung sich insbesondere mit dem Angaben Thomas UNGERS auseinandersetzt. Die falschen Angaben des UNGER sind für den Beschuldigten auch **in keiner Weise nachvollziehbar**, sind ja die Aktivierungen und EBITDA-Berechnungen stets transparent, detailliert und nachvollziehbar aufgeschlüsselt worden, wodurch eine „Täuschung" der B & C iSd § 146 StGB schon allein aus diesem Grund ausgeschlossen ist.

Ob Thomas UNGER nur deshalb fälschlicherweise behauptet, er wäre in das operative Geschäft der SCHUR nicht eingebunden gewesen, weil das Management Lindsay Goldbergs im Zuge des Verkaufsprozesses B & C Informationen vorenthalten hat, welches es von der SCHUR bekommen hat, kann der Beschuldigte naturgemäß nicht sagen, da er in den Verkaufsprozess nicht eingebunden war. Möglicherweise ist der Hintergrund dieser falschen Behauptung auch dem Umstand geschuldet, dass der Verkauf durch eine W&I Versicherung „abgesichert" war. Die Versicherung könnte sich nämlich unter gewissen Voraussetzungen (ua Fehlverhalten von Entscheidungsträgern wie UNGER) an Lindsay Goldberg wenden.

Nachdem die unrichtigen Angaben des Thomas UNGER insinuieren, dass Lindsay Goldberg nicht über die Aktivierungen und EBITDA-Berechnungen im Detail Bescheid gewusst hat, äußert sich der Beschuldigte schon jetzt, obwohl noch zahlreichen Beweisanträgen nicht entsprochen wurde, welche die Angaben des Beschuldigten bestätigen werden:

### I. Einleitung

In dieser Äußerung wird belegt, dass

- das Management von Lindsay Goldberg laufend, regelmäßig, transparent und

vollinhaltlich über die Bilanzierung nach IFRS und EBITDA-Berechnungen unterrichtet wurde;

- das Management von Lindsay Goldberg intensiv und laufend in operative Finanzthemen der SCHUR sowie EBITDA Kalkulationen der SCHUR aktiv involviert war;

- das Management von Lindsay Goldberg durch Beteiligungs- und Incentivierungsmodelle sowie Bonusprogramme ein massives Interesse an einem höchstmöglichen Verkaufspreis an B&C hatte,

- das Management von Lindsay Goldberg, allen voran Thomas UNGER und Paul PRUSS, eigenständig mit B&C verhandelte und selbst entschied, welche Unterlagen und Informationen an B&C weitergegeben werden

- das Management von Lindsay Goldberg bereits 2017 (unter anderem gemeinsam - von Thomas UNGER initiiert - mit dem Beratungshaus Stern Stewart) eine operative Organisationsstruktur und entsprechende operative Projekte aufgesetzt hat, die die Basis für die späteren nach IFRS vorgenommenen Aktivierungen bildeten.

- das Management von Lindsay Goldberg eigenständig mit B&C verhandelte und entschied, welche Unterlagen und Informationen an B&C weiterzugeben sind.

## II. Vorbemerkung

Die bisherigen Stellungnahmen des Thomas UNGER vermitteln den Eindruck, dieser wäre in das **operative Geschäft** der SCHUR sowie in IFRS **Bilanzierungs- und allgemein in Finanzthemen der SCHUR nicht involviert** gewesen. Dies ist faktisch falsch und versucht Thomas UNGER hier offenbar, die tatsächliche Rolle, die er – über mehrere Jahre hinweg – innerhalb der SCHUR-Gruppe einnahm, nämlich die Funktion eines „Active Chairman" und *de facto*-Geschäftsführers (CEO) von SCHUR, „kleinzureden" und darüber hinaus sämtliche **Verantwortung für Finanzen und Bilanzierungsthemen der SCHUR** (vollständig) auf Mitarbeiter der SCHUR **„abzuladen"**. Dies wird unter anderem aus folgenden Passagen seiner Ausführungen ersichtlich:

So betont Thomas UNGER bereits in seiner ersten Stellungnahme vom 16.06.2023 (ON

598) auf AS 12 wie folgt:

*„Entgegen der Ansicht von B&C war Thomas Unger **nicht in das Tagesgeschäft der SFH eingebunden**. Die **operativen Entscheidungen wurden ausschließlich von der Geschäftsführung getroffen**. Weder dem Beirat noch dem Beiratsvorsitzenden kamen **Kompetenzen zur operativen Leitung und Geschäftsführung** der SFH zu und der Beirat mischte sich auch nicht in das operative Tagesgeschäft ein.*

*Um Missverständnissen oder bewussten Falschdarstellungen vorzubeugen: Thomas Unger hatte auch **nicht die Aufgabe, die Geschäftsführung der SFH zu überwachen oder deren finanzielle Gebarung zu kontrollieren!"***

Zum Thema der behaupteten *Bilanzmanipulationen* bei SCHUR machte Thomas UNGER in seiner ersten Stellungnahme vom 16.06.2023 (ON 598) zunächst von seinem Recht auf Aussageverweigerung Gebrauch (siehe AS 36 in ON 598).

In seiner zweiten Stellungnahme vom 06.11.2023 (ON 740) geht Thomas UNGER dann auch auf den Vorwurf der Bilanzmanipulationen und die vermutete Involvierung seiner Person in diesen Themenkomplex näher ein.

So betont Thomas UNGER in seiner zweiten Stellungnahme vom 06.11.2023 (AS 7 ff in ON 740), er sei für die **Aufstellung und Prüfung der Jahresabschlüsse der SCHUR nicht zuständig** und in diese auch **nicht involviert** gewesen. Auf AS 7 in ON 740 führt er wie folgt aus:

*„Thomas Unger war **weder für die Aufstellung des Jahres- bzw Konzernabschlusses der SFH verantwortlich noch war er in diesem Prozess <ins>involviert</ins>**. Er hatte auch <ins>**keine Kenntnis über operative Details der Buchführung oder der Jahresabschlusserstellung**</ins> der SFH und war in die Entscheidung **nicht eingebunden, welche Aufwendungen als Anlagevermögen <ins>aktiviert</ins>** und welche als **Geschäftsaufwand in der Gewinn- und Verlustrechnung erfasst** wurden. Es war auch nicht seine Aufgabe, die Buchführung bzw den Jahres- oder Konzernabschuss der SFH zu prüfen. Diese Aufgabe kam vielmehr dem jeweiligen Abschlussprüfer PwC Deutschland bzw PwC Österreich zu."*

Auch in Bezug auf die **Bilanzierungspolitik und Rechnungslegung** und die **Entwicklung von Finanzkennzahlen** der SCHUR, wie insbesondere das EBITDA, macht Thomas UNGER unrichtige Angaben. Thomas UNGER beruft sich auf seine formale Stellung als Beirat und vermittelt das Bild, er habe sich (als Beiratsmitglied) lediglich in einer **Informationsempfänger-Rolle** befunden, selbst jedoch **keinerlei Einfluss auf das operative Geschäft** genommen.

So führt Thomas UNGER in seiner zweiten Stellungnahme vom 06.11.2023 im Hinblick auf das EBITDA aus, dass ihm über diese Größe lediglich *„Bericht erstattet"* worden sei und man ihn über dessen Entwicklung *„informiert"* habe. Konkret gibt er dazu wie folgt an (vgl AS 8 in ON 749):

*„Als Beiratsvorsitzender der SFH war es seine* [Anm.: Thomas UNGERS] *Kernaufgabe, die Geschäftsführung bei* **strategischen Entscheidungen zu beraten und zu unterstützen** *und die Gesellschafter der SFH gegenüber der Geschäftsführung zu vertreten. Für diese Aufgaben benötigte der Beirat aktuelle Informationen zur Entwicklung des Geschäftsganges und der Ertragslage der SFH.* **Das EBITDA ist eine der für den Geschäftsgang und die Ertragslage der Gesellschaft wesentlichen Kennzahlen, weswegen die Geschäftsführung der SFH regelmäßig an den Beirat entsprechend** *Bericht zu erstatten* **hatte.**

**Auch für die Mehrheitsgesellschafterin der Schur Flexibles-Gruppe war das EBITDA eine relevante betriebswirtschaftliche Kennzahl. Der Beirat der SFH wurde daher regelmäßig über die Entwicklung des EBITDA der Schur Flexibles-Gruppe** *informiert."*

Auch diese Ausführungen sind **verfehlt und faktisch unrichtig**, haben sich sowohl Thomas UNGER als auch Paul PRUSS und die weiteren Beiratsmitglieder eben **nicht** bloß **in einer „Informationsempfänger"-Rolle** befunden, sondern ganz im Gegenteil, haben sie im Rahmen der Bilanzierungspolitik sogar einen **aktiven** und sehr **wesentlichen Einfluss auf die Bilanzierung und Entwicklung der Unternehmenskennzahlen (insbesondere das EBITDA) genommen.**

Entgegen seinen Ausführungen im gegenständlichen Verfahren haben sich Thomas

6



UNGER in seiner Zeit als Beiratsvorsitzender der SCHUR sehr wohl in operative (Finanz-)Themen aktiv eingebracht und insbesondere die Zielvorgabe erteilt, die nach IFRS erlaubten **Aktivierungsmöglichkeiten auszunutzen.**

Auch den Versuch, die Tatsachen betreffend seiner Involvierung sowie die seiner Beiratskollegen Thomas **LUDWIG**, Paul **PRUSS** und Michael **DEES** sowie der Lindsay Goldberg Senior Analysten (Philipp **SCHALL**) in das **operative Geschäft**, also das Tagesgeschäft der SCHUR, abzustreiten, kann der Beschuldigte **nicht** nachvollziehen. So ist dem Beschuldigten – entgegen den Angaben von Thomas UNGER – noch sehr gut in Erinnerung, wie stark Thomas UNGER und seine Beiratskollegen tatsächlich nicht nur in das **Tagesgeschäft der SCHUR** eingebunden waren, sondern sie auch die **Definition und Entwicklung der Unternehmenskennzahlen** seit seinem Eintritt bei der SCHUR in 2016 **maßgeblich aktiv bestimmt** haben. Dies wird der Beschuldigte mit einigen Unterlagen, die er erhalten hat, im Rahmen dieser Stellungnahme zeigen. Thomas UNGER sowie die übrigen Beiratsmitglieder waren stark in die Finanzthemen der SCHUR eingebunden und – wie belegt werden kann – **zu jeder Zeit** und **vollständig über die Finanzkennzahlen sowie die Höhe der IFRS-Aktivierungen detailliert im Bilde.** So kam die **Vorgabe, welche Aktivierungen ausgeübt werden sollen**, ja **von Lindsay Goldberg** selbst.

Lindsay Goldberg zog zu diesen Themen auch externe Berater hinzu, welche sehr eng in die Diskussionen rund um die (Aufbereitung der) Finanzkennzahlen involviert waren. Seitens Lindsay Goldberg war **Paul PRUSS** bspw. in jeder Refinanzierung federführend tätig (entwickelte bspw. EBITDA Überleitungen) für die ebenso Finanz- und andere Unternehmenskennzahlen an die refinanzierenden Banken übermittelt werden mussten. Die Abstimmung und Aufbereitung dieser Kennzahlen hatte Paul PRUSS immer über das Beratungshaus **CUBUS** (Richard RÖSENER und Steffen SCHÖN) initiiert. **Goldman Sachs** (namentlich unter anderem Christopher DRÖGE und Matthias WICH) war ebenso **ständiger Berater** (insbesondere während der beiden Exit-Prozesse in 2019 und 2021) und **Investment Bank** von Lindsay Goldberg.

Goldman Sachs war, wie der Beschuldigte aus zahlreichen Meetings selbst wahrgenommen hatte, im **Verkaufsprozess mit B&C** gemeinsam mit Thomas UNGER

627

und Paul PRUSS **erster Ansprechpartner für die Käufer und – wie diverse Unterlagen zeigen – hat Goldman Sachs die EBITDA-Diskussionen mitgesteuert und entschied mit Lindsay Goldberg gemeinsam, welches EBITDA dem potentiellen Käufer kommuniziert wird**.

Vor diesem Hintergrund vermitteln die Stellungnahmen des Thomas UNGER den Eindruck, er möchte **für sich, seine Beiratskollegen** (Lindsay Goldberg) und den ständigen Beratern von Lindsay Goldberg (unter anderem Goldman Sachs) von den tatsächlichen Gegebenheiten und deren intensiver Involvierung in Bilanzierungs- und Finanzthemen der SCHUR bewusst **ablenken** und seine und Lindsay Goldbergs Verantwortung **abschieben**. So zeichnen seine Ausführungen – unzutreffender Weise – das Bild, das Management von SCHUR habe in folgenden Bereichen die **alleinige Verantwortung** gehabt:

(i) Definition steuerungsrelevanter Leistungskennzahlen („Key Performance Indicators", idF: „KPI");

(ii) Bilanzierungspolitik und Entscheidungen hinsichtlich der Auslegung von Bilanzierungsstandards;

(iii) Erstellung und Prüfung des Konzernabschlusses sowie Wahl und Wechsel des Wirtschaftsprüfers.

Mehr noch: Diese Aussagen des Thomas UNGER vermitteln den Eindruck, dass sogar versucht wird, sich **der Verantwortung als Verkäufer gegenüber dem Käufer** bei einer Transaktion, hier dem Unternehmensverkauf der Schur an B&C, völlig zu entledigen.

Dieser Versuch wird u.a. besonders aus folgender Aussage Thomas UNGERS in seiner Stellungnahme vom 16.06.2023 (ON 598, AS 11) deutlich: *„Das EBITDA und die darin enthaltenen Werte wurden von B&C und ihren Beratern im Rahmen der Käufer-DD analysiert und mit dem Management von Schur intensiv diskutiert."* Auch diese Angaben sollen offenbar von dem Umstand ablenken, dass die Verkaufshandlungen mit B&C **ausschließlich von Lindsay Goldberg** erfolgten. Fakt ist, dass **Lindsay Goldberg Europe / U.S.** die **Verkäufer** waren. **Lindsay Goldberg führte als Verkäuferin die Verhandlungen** und entschied über die werttreibenden Faktoren des Kaufpreises. Das

„*Management von SCHUR*" war entgegen dieser Behauptung in diese **Verkaufsverhandlungen mit B&C nicht eingebunden und hat bis zuletzt den Kaufpreis nicht gekannt bzw. nicht gewusst, auf welcher Basis dieser Kaufpreis berechnet wurde.** Dies ist dem Beschuldigten bekannt, weil er sich an Gespräche mit dem damaligen CEO Michael SCHERNTHANER erinnerte, in welchem sich dieser beschwerte, weder Kaufpreisgrundlage noch Kaufpreis zu kennen.

SCHUR hatte im Rahmen der Transaktion mit B&C die Aufgabe, **Lindsay Goldberg und ihren Beratern (zB Goldman Sachs) alle angeforderten Informationen bereitzustellen**. Diese Aufgabe wurde auch **nachweislich erfüllt**.

Insbesondere lag bei der Aufbereitung des Zahlenwerks im Rahmen des B&C-Exit-Prozesses sowie dessen Vorbereitung ein starker Fokus auf IFRS Themen (der Fokus von B&C lag im Rahmen der Financial Due Diligence Handlungen wesentlich auf Aktivierungsthemen) und auf der Abbildung des Cash-EBITDA (Adjusted-EBITDA abzgl. IFRS-Aktivierungen); dies wurde (auch mithilfe von detaillierten Überleitungen von „Adjusted-EBITDA" auf „Cash-EBITDA") an Lindsay Goldberg kommuniziert. Inwieweit bzw. in welcher Transparenz diese Informationen dann letztlich seitens Lindsay Goldberg an die Käuferin B&C weitergegeben wurden, ist dem Beschuldigten **nicht bekannt**.

Weshalb Thomas UNGER sämtliche Verantwortung von sich abschiebt und – den **Tatsachen widersprechend** – mehrfach betont, in das operative Geschäft der SCHUR sowie die Entwicklung der Unternehmenskennzahlen (etwa das EBITDA) von SCHUR nicht involviert gewesen zu sein, ist **nicht nachvollziehbar**. Dies insbesondere deshalb, weil die Nutzung von Bilanzierungswahlrechten im Sinne von IFRS – wie sie von Thomas UNGER vorgegeben wurde – ohnedies **zulässig** und rechtmäßig war.

Jedenfalls gab es hohe **wirtschaftliche Interessen der Beiräte**, die offenbar ein wesentlicher Grund für die Einflussnahme der Beiratsmitglieder auf die operativen Themen und die Entwicklung der Unternehmenskennzahlen von SCHUR waren. Dass Thomas UNGER an den Kennzahlen ein erhebliches Interesse hatte, ergibt sich somit daraus, dass er durch das **Management Equity Programm** („MEP") **direkt am Verkaufspreis partizipierte** und er seine Anteile an der SCHUR von ca. 2 % in 2017 bis

ca. 5 % zum Zeitpunkt des Verkaufs an B&C erhöhte. Thomas UNGER erhielt aufgrund des **erfolgreichen Verkaufs** an B&C **zwischen € 15 Mio und € 20 Mio**. Dass Thomas UNGER daher zu jedem Zeitpunkt die Finanzkennzahlen des Managements prüfte und im operativen Geschäft eingebunden war, ist daher evident. Umso weniger nachvollziehbar ist das bisherige Aussageverhalten von Thomas UNGER.

Bilanzierung und IFRS Rechnungslegung wurden von SCHUR auch (wie Thomas UNGER im Übrigen ja auch **selbst darlegt**, vgl AS 11 ff in ON 740) – **zu jeder Zeit ordnungsgemäß ausgeübt und auch offengelegt**. So lag auch im Zuge der Aufbereitung der Unternehmenskennzahlen im Rahmen beider Exit-Prozesse (2019/2020 sowie 2021) großer Wert darauf, dass die *„Adjusted EBITDA"* beinhalteten Aktivierungen detailliert, transparent und nachvollziehbar dargelegt werden. Aus diesem Grund wurde nämlich – wie aus zahlreichen Unterlagen hervorgeht – auch bei der Aufbereitung der Unternehmenskennzahlen für den Exit-Prozess 2021 der Fokus auf die **Abbildung und Darstellung des „Cash-EBITDAs"** (EBITDA abzüglich nicht cash-wirksamer Rechnungslegungssachverhalte, wie z.B. IFRS-Aktivierungen) gelegt. Es wurden Michael DEES, Thomas LUDWIG, Thomas UNGER, Paul PRUSS sowie Philipp SCHALL und **Goldman Sachs** als Investment Bank und M&A-Berater von Lindsay Goldberg detaillierte **Überleitungen** des **„Cash-EBITDA"** zur Verfügung gestellt. Dass sich Lindsay Goldberg beim B&C-Verkaufsprozess sehr intensiv und eng mit Goldman Sachs im Hinblick auf das EBITDA (2019 bis 2021) abstimmte und die Finanzkennzahlen sehr ausführlich diskutierte (EBITDA-Überleitungen und wertrelevante KPIs wurden – wie diverse Excels zeigen – sogar großteils von Lindsay Goldberg und Goldman Sachs selbst erstellt), wird durch mehrere dem Beschuldigten bekannte E-Mail-Korrespondenzen (etwa mit Christopher DRÖGE, Matthias WICH und weiteren Beteiligten und Mitarbeitern von Goldman Sachs) belegt.

**Welche Finanzkennzahlen Lindsay Goldberg** und deren beauftragter Finanzberater, **Goldman Sachs**, der Käuferin (B&C) **im Rahmen der Verkaufsverhandlungen 2021 letztlich als kaufpreisrelevant tatsächlich präsentierte** und ob sie der Käuferin auch das *„Cash-EBITDA"* vollständig und transparent kommunizierten, kann der Beschuldigte **nicht beurteilen**. Er war in die Verhandlungen zum Verkauf an B&C nicht eingebunden. Thomas UNGER und Paul PRUSS als Vertreter von Lindsay Goldberg hingegen fungierten

10



– wie im Rahmen dieser Eingabe noch gezeigt werden wird – als **Schlüsselpersonen** für den Exit-Prozess 2021 und waren wesentliche Verhandlungsführer gegenüber B&C.

Die Prozessstrukturen im Rahmen des Exit Prozesses 2021 (Verkauf der SCHUR an B&C) waren so aufgebaut, dass Thomas UNGER und Paul PRUSS (von Lindsay Goldberg) die Verhandlungen mit Herbert ORTNER, Thomas ZIMPFER, Markus FÜRST und Patrick LACKENBUCHER (seitens B&C) führten. Auf der Beraterseite waren für Lindsay Goldberg Goldman Sachs, für B&C Morgan Stanley beteiligt.

**Verhandlungen über das EBITDA, die Werttreiber, Kaufpreismodelle und letztlich den Kaufpreis** wurden **innerhalb dieses Kreises (Thomas UNGER, Paul PRUSS, Herbert ORTNER, Thomas ZIMPFER, Patrick LACKENBUCHER, Goldman Sachs, Morgan Stanley)** geführt.

Dabei war Thomas **UNGER** die *„Key Person"* des Exit-Prozesses mit B&C und ist nun **danach bestrebt**, sich vom operativen Geschäft der SCHUR und der Involvierung in die Entwicklung des EBITDAS zu **„distanzieren"**, obwohl es seine Rolle **in den Verkaufsverhandlungen mit B&C** gewesen ist, **die ihm zur Verfügung gestellten finanzrelevanten Kennzahlen inkl. des „Cash-EBITDAs" vollumfänglich zu übermitteln**.

Im Rahmen der vorliegenden Äußerung wird der Beschuldigte nun folgende Umstände darlegen und mithilfe geeigneter Unterlagen belegen:

- Thomas UNGER ist ein ausgewiesener **Finanzexperte** (langjähriger CFO der Metro Gruppe) mit langjähriger Expertise im Finanz-Bereich, welcher auch mit Private Equity-basierten M&A-Transaktionen, in denen er eine aktive Rolle einnahm, umfassende Erfahrung gesammelt hat;

- Thomas UNGER hat bereits bei der Constantia Flexibles GmbH (idF: „Constantia Flexibles") den **Exit-Prozess** in 2014 **aktiv vorangetrieben** und gesteuert und war auch bei Constantia Flexibles in **sämtliche EBITDA-relevante Themen involviert**;

- Im Zeitraum zwischen 2017 und 2019 brachte sich Thomas UNGER in seiner Rolle als **„Active Chairman"** aktiv in die Geschäfte der SCHUR ein und nahm in dieser

Zeit *de facto* die Aufgaben des **CEOs von SCHUR** wahr;

631

- Die **Vorgabe,** IFRS-Standards im Sinne der Private Equity-Struktur **auszulegen** und damit die von IFRS gegebenen **Aktivierungsmöglichkeiten umfassend zu nutzen,** kam **von Thomas UNGER**. Thomas UNGER und auch die anderen Beiräte **kannten** die nach IFRS zulässigen **Aktivierungsthemen**, die **Aktivierungshöhe**, die **Adjustments** und damit die **Zusammensetzung des EBITDA** von SCHUR. Mehr noch, Lindsay Goldberg gab vor, welche EBITDA-Adjustments vorzunehmen waren.

- Lindsay Goldberg, konkret Thomas UNGER, Paul PRUSS, Thomas LUDWIG und Phillip SCHALL, stellten jahrelang **laufend zahlreiche, detaillierte und umfangreiche Anfragen (auf Basis von ihnen selbst erstellter Unterlagen)** zu finanzbezogenen Themen an das Management und die Mitarbeiter von SCHUR.

Der Beschuldigte hat Anfragen von Thomas UNGER, Paul PRUSS und Phillip SCHALL teilweise selbst dokumentiert, erwartet sich aber bei **Sicherstellung der Postfächer** der genannten Personen eine **umfassende Dokumentation**.

Anfragen seitens dieser Mitglieder von Lindsay Goldberg wurden im Rahmen regelmäßiger Beiratssitzungen, Besprechungen zu den Exit-Prozessen sowie auch als Ad-hoc-Anfragen gestellt. Solche Anfragen wurden dabei u.a. auch auf der Grundlage von Lindsay Goldberg erstellter, Excel-basierter EBITDA-Überleitungen gestellt. Nachfolgend eine Explorer-Ordner-Struktur des Beschuldigten mit (lediglich) ausgewählter **Kommunikation** zu Finanz- und insbesondere EBITDA-Themen zwischen Michael SCHERNTHANER, Michael FISCHKIN, Conny STÖHRER und Thomas UNGER Thomas UNGER, Paul PRUSS, Philip SCHALL, Lindsay Goldberg Europe und Lindsay Goldberg US der Jahre 2020 und 2021:

## Finanzkommunikation aus 2020



## Finanzkommunikation aus 2021

633

| | | | |
|---|---|---|---|
| 1st February_TU Request M&A and BP | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 6th February_TU request Stelvio orgchart & ress... | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 6th May Q1 Net Debt | ⊘ | 31.08.2023 16:49 | Dateiordner |
| 7th June_FC | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 11th January_PP GS request 2019-2021 EBITDA | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 12th April_Schall request_Antitrust | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 12th February_Deloitte audit request | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 13th January_Schall request minorities update | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 16th April_Schall request Minorities | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 16th February_TU request CFLEX_SF operational... | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 16th March_TU request EBITDA 2019 2020 | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 17th March_Schall request SF acquisitions | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 19th April_Net Debt_Minorities | ⊘ | 31.08.2023 16:51 | Dateiordner |
| 22nd February_regular meeting | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 22th April_regular meeting | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 23rd March_Schall request minorities_Sky invoice | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 23th March_regular meeting | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 24th June_Earn Out Model | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 25th April_Earn Out | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 25th January_Pruss request project SACHER | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 25th May_regular meeting | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 26th March_MiS request M&A | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 26th May_B&C Refi IM | ⊘ | 16.10.2022 21:24 | Dateiordner |
| 27th January_TU request CFLEX synergies | ⊘ | 16.10.2022 21:24 | Dateiordner |

- Thomas UNGER wurde von Lindsay Goldberg, konkret Michael DEES, als **Schlüsselperson** („Key Man") für die **Transaktion** mit der **B&C** auserkoren. Thomas UNGER hat sich folglich in dem Exit-Prozess 2021 auch als solche Schlüsselfigur **positioniert.**

- Dies resultierte darin, dass **Thomas UNGER und Paul PRUSS federführend mit B&C** betreffend den **Kaufpreis und Bewertungsmethoden** <u>**verhandelten**</u> und im **Projektmanagement zum Exit-Prozess 2021 aktiv mitwirkten. Die Prozessstrukturen waren dahingehend klar geregelt, sodass Thomas UNGER und Paul PRUSS die Verhandlungen mit Thomas ZIMPFER, Herbert ORTNER**

14

und Patrick **LACKENBUCHER** führten.

- Weiters mussten im Rahmen des Exit-Prozesses 2021 Due Diligence Unterlagen, für den Konzernabschluss 2020 relevante Audit-Unterlagen sowie finanzrelevante Kennzahlen (KPI) von Thomas UNGER und Paul PRUSS **freigegeben** werden.

Im Zuge der nachfolgenden Ausführungen wird der Beschuldigte nun einige E-Mails und Excel-Dateien Thomas UNGERS, die er erhalten hat, zeigen, welche Thomas UNGERS intensive Einbindung in die Bilanzierungspolitik, die EBITDA-Steuerung und die Finanzthemen der SCHUR sowie allgemein seine operative Rolle, die er innerhalb von SCHUR einnahm, eindrucksvoll vor Augen führen. Dabei wird auch die Rolle der übrigen Beiratsmitglieder, insb im Exit-Prozess 2021, gezeigt. **Eine Übermittlung weiterer relevanter E-Mails wird derzeit aufgearbeitet und wird nachgereicht. Ein vollständiges Bild werden sich die Ermittlungsbehörden nur durch Sicherstellung jener Kommunikationskanäle, die für die Verkaufsverhandlungen benutzt wurden, machen können.**

### III. Zu Thomas UNGERS Rolle im Detail

#### 1.     Zum beruflichen Hintergrund von Thomas UNGER

Was den beruflichen Hintergrund von Thomas UNGER betrifft, so zeigt sich, dass dieser – auch schon zum Zeitpunkt seines Eintritts bei Lindsay Goldberg – viele Jahre Erfahrung im Finanzbereich gesammelt hatte und somit ein ausgewiesener **Experte für Finanzen** war.

So startete Thomas UNGER seine Karriere bei der VAW Aluminium AG, wo er 5 Jahre lang als „Chief Financial Officer" (CFO) arbeitete.[1] Von 2002 bis 2010 bekleidete er die Funktion des **„Chief Financial Officers"** (CFO) und des stellvertretenden „Chief Executive Officer" (CEO) bei der **Metro AG**.[2] Als solcher war er für die Finanzen eines Konzerns mit

---

[1] https://www.presseportal.de/pm/64034/3554333

[2] https://www.presseportal.de/pm/64034/3554333

15



635

über **€ 60 Mrd Umsatz**[3] zuständig.

Im Jahr 2010 wechselte Thomas UNGER schließlich zu **Constantia Flexibles**, wo er bis 2015 die Funktion des Vorstandsvorsitzenden (CEO) wahrnahm. Sein Ziel beim Wechsel zu Constantia Flexibles war es, das Ergebnis (EBITDA) des Unternehmens zu maximieren und dieses für einen Verkauf innerhalb der nächsten 3-5 Jahre vorzubereiten und den Verkauf tatsächlich durchzuführen. Dies gelang ihm auch, so baute er den Umsatz von Constantia Flexibles zwischen 2010 und 2015 um 90% auf € 1,9 Mrd aus und steigerte das EBITDA überproportional. Letztlich erwarb dann Ende 2014 die französische Beteiligungsgesellschaft Wendel SE (idF: „WENDEL") Constantia Flexibles für € 2,3 Mrd.[4]

Thomas UNGER war bei Constantia Flexibles nicht nur sehr eng in den Exit-Prozess (Verkauf an WENDEL) eingebunden, sondern begleitete zuvor auch schon den 2013 angestrebten[5] Börsengang der Constantia Flexibles. In beiden Projekten hatte er einen starken Fokus auf Finanzkennzahlen und insbesondere auf EBITDA-Steuerung gelegt. Bereits zu seiner Zeit bei der Constantia Flexibles – so die Wahrnehmung des Beschuldigten – war es Thomas UNGER ausgesprochen wichtig, sowohl im IPO Prozess als auch in dem Prozess des Verkaufs der Constantia an die französische WENDEL-Gruppe, im Rahmen der Verhandlungen im Vordergrund zu stehen, über alle Zahlen-Details Bescheid zu wissen und selbst zu verhandeln. Der Beschuldigte hatte den Eindruck, dass Thomas UNGER bereits zu seinen Constantia Zeiten von der operativen Finanz nicht loslassen konnte.

Zur Zeit, als Thomas UNGER CEO von Constantia Flexibles war, war auch der Beschuldigte bei Constantia Flexibles tätig. Hier arbeitete der Beschuldigte bei einigen Themen mit Thomas UNGER zusammen. Schon bei Constantia Flexibles war Thomas UNGER in seiner Funktion als CEO **sehr eng** in die **Entwicklung und Abbildung des EBITDA involviert**

---

[3] https://www.faz.net/aktuell/wirtschaft/unternehmen/handel-metro-mit-groess-tem-umsatzwachstum-seit-sechs-jahren-1408927.html

[4] https://www.presseportal.de/pm/64034/3554333

[5] https://kurier.at/wirtschaft/constantia-flexibles-sagt-boersengang-ab/37.732.583

16

und brachte sich aktiv in die Bilanzierungspolitik ein. Thomas UNGER gab dem Management von Constantia Flexibles klare Vorgaben zur umfassenden Auslegung von IFRS-Standards und trieb dort **IFRS-Aktivierungen aktiv voran**.

Thomas UNGER war im Rahmen des Exit-Prozesses von Constantia Flexibles 2015 verantwortlich für die **Kommunikation der Unternehmenskennzahlen** an die damals interessierten Käufer CVC, Cinven und WENDEL. Die Investoren CVC und CINVEN waren später auch in den Exit-Prozessen der SCHUR beteiligt. Thomas UNGER war später (gemeinsam mit der Investment Bank von Lindsay Goldberg, Goldman Sachs) bei der SCHUR für die Auswahl der potentiellen Käufer der SCHUR-Gruppe verantwortlich.

Wie die voranstehenden Ausführungen zeigen, war Thomas UNGER somit bereits bei Constantia Flexibles als CEO mit klarem Schwerpunkt auf die Finanzen (aus Sicht des Beschuldigten war UNGER eigentlich operativer CFO) tätig. Er legte dort insbesondere im Rahmen des Exit-Prozess 2015 einen starken Fokus auf Finanzkennzahlen und brachte sich aktiv in die Entwicklung des EBITDA ein.

Im Jahr 2017 trat Thomas UNGER sodann als Managing Partner bei Lindsay Goldberg Vogel GmbH ein.[6] Zu diesem Zeitpunkt hatte er, wie die oben stehenden Ausführungen belegen, bereits umfassende Erfahrung als Verantwortlicher für Finanzen in mehreren großen Unternehmern gesammelt und umfangreiche M&A-Transaktionen im Private-Equity-Bereich federführend begleitet.

## 2.    Zur Rolle Thomas UNGERS bei SCHUR

Als Managing Partner des Private-Equity-Investors Lindsay Goldberg war Thomas UNGER für die Beteiligungen in der Verpackungsindustrie, so auch die SCHUR-Gruppe, zuständig. Thomas UNGER war als von Lindsay Goldberg entsandter Beirat bei SCHUR eingesetzt und bekleidete von September 2017 bis September 2021 die Position des **Beiratsvorsitzenden**. Thomas UNGER nahm in dieser Position nicht nur eine „passive" Rolle des Beirats ein. Vielmehr agierte er – wie im Folgenden noch

---

[6] https://www.presseportal.de/pm/64034/3554333



veranschaulicht wird – von Anfang an in der Zeit **zwischen 2017 und 2021** als **faktischer CEO von SCHUR** und wurde auch so innerhalb der SCHUR wahrgenommen (wie mittlerweile aus zahlreichen Vernehmungen deutlich hervorgeht). Das äußerte sich unter anderem darin, dass Thomas UNGER und seine Beirats- und Lindsay Goldberg Kollegen (unter anderem Paul PRUSS und Philipp SCHALL), direkt ihre Anfragen an SCHUR Mitarbeiter richteten und mit ihnen direkt kommunizierten. Das betraf unter anderem den Beschuldigten selbst, Conny STÖHRER, Sebastian ARTLIEB sowie bspw. Daniela SCHALKO.

Die Darstellung Thomas UNGERS, dass ihm lediglich berichtet worden sei und er selbst in die Geschäftsführung von SCHUR nicht eingebunden gewesen sei (siehe etwa seine Ausführungen in ON 598, AS 14 ff), ist somit **nicht zutreffend**. Beispielhaft sei an dieser Stelle erwähnt, dass Thomas UNGER selbst die Kommunikation mit den lokalen Geschäftsführern der SCHUR-Werke übernahm, Leistungsbeurteilungs-Gespräche mit den Geschäftsführern der SCHUR-Werke führte und sogar deren Boni selbst kalkulierte (was **klassische Aufgaben eines CEOs** sind).

Dass sich Thomas UNGERS Wirken im Bereich der SCHUR in der Tat nicht bloß auf seine formale Stellung als (nicht in das operative Geschäft involvierter) Eigentümervertreter im Beirat beschränkte, wird unter anderem aus folgenden Umständen offenkundig:

(i)   Ausführliche Thematisierung der Bilanzierung von SCHUR seitens Thomas UNGER bereits in 2016/2017 und sohin die Grundsteinlegung für die Bilanzierung der Folgejahre

Sowohl Paul PRUSS (Director bei Lindsay Goldberg) als auch Thomas UNGER kannten die Bilanzierung der SCHUR bereits im Jahr 2016 – also schon bevor bzw kurz vor dem Erwerb der SCHUR durch Lindsay Goldberg. So wurden schon im **Oktober 2016** (somit zu einem Zeitpunkt, als die Beschuldigten Michael SCHERNTHANER und Michael FISCHKIN noch gar nicht in das Unternehmen eingetreten waren) unter Thomas UNGER und Paul PRUSS die **Aktivierungen** von SCHUR als bewertungsrelevante Thematik **diskutiert**. Bei dem Kauf der SCHUR durch Lindsay Goldberg im Oktober 2016 ging es um die Aktivierung von sog. „Tooling Kosten" in Millionenhöhe. In diese Thematik waren Thomas UNGER (als

Experte der Verpackungsbranche), Ernst & Young (als Prüfer der SCHUR-Gruppe in 2016) sowie das M&A Beratungshaus MPCF (mit Sitz in Wien) involviert.

(ii) <u>Absetzen des bisherigen CEOs der SCHUR</u>

Nachdem SCHUR von Lindsay Goldberg erworben wurde, ließ Thomas UNGER den damals amtierenden CEO und Gründer der SCHUR, Jakob MOSSER (den Thomas UNGER schon kannte und welchem Thomas UNGER offenbar nicht vertraute) **entlassen**. Einziger Geschäftsführer der SCHUR war dann Michael SCHERNTHANER, welcher als CFO allerdings nur mit dem Bereich Finanzen betraut war. Die Stelle des CEOs hingegen war von 2017 bis Mitte 2019 (fast durchgehend) offiziell vakant. In der Zeit nach der Entlassung Jakobs MOSSERS als CEO (2017) nahm Thomas UNGER schließlich **selbst** – fast durchgehend – bis Mitte 2019 die Agenden des **CEOs** von SCHUR wahr. Lediglich im Zeitraum zwischen April 2018 und Juli 2018 war Thomas KÜHN als CEO der SCHUR eingesetzt. Thomas KÜHN beendete seine Tätigkeit bereits nach 3 Monaten und nahm danach eben wieder Thomas UNGER als *faktischer* CEO diese Aufgaben wahr (siehe dazu auch noch später unter Punkt (iv)).

(iii) <u>Intensive Involvierung Thomas UNGERS, Paul PRUSS' ua in Finanzthemen der SCHUR nach dem Erwerb durch Lindsay Goldberg</u>

Insgesamt wurden Thomas UNGER und Paul PRUSS als ein sehr *finanzlastiges* Duo wahrgenommen. So gewann der Beschuldigte ab seinem Eintritt bei SCHUR im August 2017 generell den Eindruck, dass sich Lindsay Goldberg (insbesondere Thomas UNGER und Paul PRUSS, z.T. auch dann später Phillip SCHALL) **sehr stark** in die **Finanzthemen der SCHUR einbrachten.**

Konkret manifestierte sich dieser Eindruck etwa in folgenden Umständen:

- Thomas UNGER und Paul PRUSS legten bereits zu Beginn ihrer Tätigkeit Ende 2016 / Anfang 2017 fest, welche **Key Performance Indicators** (KPI) ihnen monatlich berichtet werden sollten. Besonderes Augenmerk legten sie dabei auf die Größe des **EBITDA**. So stieß Thomas UNGER 2017 in seiner Funktion als „Active" Chairman und faktischer CEO von SCHUR etwa das sogenannte Projekt



639

„**Manndeckung"** an, bei welchem es um die **EBITDA-Verbesserung** der einzelnen SCHUR-Standorte ging. Auch hier definierte er aktiv einzelne leistungsbezogene Kennzahlen (KPI) und gab den Standorten diesbezügliche Ziele vor, wie bspw. aus einer E-Mail-Korrespondenz vom 12.07.2017 hervorgeht, welche der Beschuldigte erhielt:

| From: | Michael Schernthaner |
|---|---|
| Sent: | Mittwoch, 12. Juli 2017 18:06 |
| To: | Thomas Unger |
| Cc: | Christian Kolarik; Bernhard Mumelter; Michael Schernthaner |
| Subject: | Manndeckung1_v2 |
| Attachments: | Manndeckung1_v2.docx |

Hallo Herr Unger,

anbei – wie im Meeting besprochen - die Zusammenfassung der Themen bzw. Focused Entities für die A-Themen inkl. der Projektorganisation.

Bei Rückfragen jederzeit gerne.

Liebe Grüße,
MiS

Zum Zwecke der schnellen Weiterentwicklung von SCHUR engagierte Thomas UNGER ohne Rücksprache zusätzliche externe Berater (bspw Walter OMETTO oder Stern Stewart & Co). Diese unterstützen Lindsay Goldberg nicht nur bei der Festlegung der strategischen Ausrichtung des Unternehmens, sondern vor allem auch bei der operativen Umsetzung der von Lindsay Goldberg definierten Projekte (zB „Footprint"-Projekte).

So beauftragte Thomas UNGER externe Berater (Stern Stewart & Co) für die SCHUR-Gruppe sogar mit der Durchführung eines sogenannten „**EBITDA Benchmarking"** (Vergleich des EBITDAs von SCHUR mit jenen der Wettbewerber, u.a. im Hinblick auf die Bilanzierung) sowie der „EBITDA-Maximierung" (siehe hierzu diverse Präsentationsunterlagen von Stern Stewart & Co). Der **Initiator** solcher Programme und EBITDA-Vergleiche war **Thomas UNGER**. Weiters wollte Thomas UNGER, dass PwC (PwC Partner: Hans HARTMANN) eine Benchmark-Studie durchführt, um die SCHUR mit ihren Wettbewerbern betreffend die Nutzung von IFRS-Aktivierungen im Detail zu



vergleichen und sicherzustellen, dass SCHUR dahingehend nicht schlechter dasteht als andere Marktteilnehmer.

Die Entwicklung des EBITDAs wollte Lindsay Goldberg – auch auf die jeweiligen Einzelwerke bezogen – im Detail verstehen. Lindsay Goldberg wollte im Detail wissen, wie **IFRS-Aktivierungen** umgesetzt wurden. Aus diesem Grund gab es ebenfalls sehr häufig Termine (auch ad hoc) mit Lindsay Goldberg. In diesen Terminen wurden **unzählige EBITDA-Bridges** und Reported-EBITDA-Themen **ausführlich thematisiert und erörtert**. Initiatoren dieser unzähligen EBITDA-Diskussionen und Detailanalysen waren Thomas UNGER (auch im Tagesgeschäft), Goldman Sachs (Christopher DRÖGE, Matthias WICH) in ihren Funktionen als finanzierende Bank einerseits und führender Exit-Berater andererseits sowie Paul PRUSS, der die SCHUR-Refinanzierungen (2018, 2020) verantwortete und dort u.a. die Kommunikation der Finanzkennzahlen an die Banken übernahm.

Im weiteren Verlauf dieser Stellungnahme zeigt der Beschuldigte anhand ihm bekannter E-Mails, Excels und weiterer Unterlagen, dass die treibende Kraft hinter der SCHUR-EBITDA-Steuerung Thomas UNGER war.

Für die formalen Budget-Unterlagen 2021 wurde eine Überleitung zwischen „Reported-EBITDA", „Adjusted-EBITDA" und „Cash-EBITDA" inklusive einer genauen Erklärung der dargestellten **Aktivierungen** aufbereitet, um Lindsay Goldberg über die Zusammensetzung des EBITDA **transparent zu informieren**. Dies zeigt u.a. folgender Auszug aus den Budget-Unterlagen (Präsentation) zum 31.12.2020 wonach ersichtlich ist, dass der Unterschied zwischen adjusted EBITDA und cash based EBITDA ca. 30m EUR beträgt:

## Budget 2021 assumed between the full and 50% COVID-19 recovery scenarios

SCHUR FLEXIBLES

### Budget 2021

| in m€ / % of Net Sales | 2019 Actual | 2020 FC | COVID scenarios | | | BUD 21' Core |
| --- | --- | --- | --- | --- | --- | --- |
| | | | FY21 Full Covid recovery | FY21 50% COVID recovery | FY21 no Covid recovery | |
| Flexibles Sales | 417,8 | 417,0 | 433,7 | 425,3 | 417,0 | 431,1 |
| Reported EBITDA* | 77,8 | 76,0 | | | | |
| Adjusted EBITDA** | 82,6 | 84,4 | 95,0 | 89,0 | 84,5 | 81,9 |
| Cash Based EBITDA*** | 57,5 | 55,7 | 71,7 | 66,7 | 63,2 | 69,6 |
| Flexibles Division adj. EBITDA Margin | 18,9% | 19,3% | 20,8% | 20,0% | 19,3% | 20,0% |
| | | | ❶ | ❷ | ❸ | |

* Reported Group EBITDA means audited EBITDA // 2019 reported EBITDA adjusted by Moneta litigation receivable
** Adjusted Group EBITDA means EBITDA according to SFA definition, 2019 EBITDA incl. PwC quality of earnings (QoE) adj.
*** Cash based Group EBITDA means reported EBITDA minus IFRS 16, IT, R&D and Cylinder Engravings
**** including adjustments from badwill, IFRS 5 and severance cost

### Assumptions COVID cases

❶ **Full Covid Recovery**
- Covid-19 crisis not existing from 1st January 2021
- Q4 2020 volume losses are regained in Q1 2021

❷ **50% Covid Recovery**
- Q4 2020 volume losses are regained in Q1 2021
- COVID crisis over from Q2 2021
- From HY2 2021 business as normal

❸ **No Covid Recovery**
- no volume pick-up in Q1 2021
- slight result improvement vs. 2020 Forecast

Bereits diese Budget-Unterlagen, die dem **gesamten Beirat von Lindsay Goldberg zur Verfügung gestellt** wurden, weisen das „Reported-EBITDA", das „Adjusted-EBITDA" sowie das „Cash-based EBITDA" separat aus. Der signifikante Unterschied zwischen dem „Adjusted-EBITDA" und dem „Cash-based-EBITDA", der auf die IFRS Aktivierungen zurückzuführen ist, ist daraus ebenso klar ersichtlich. Schon allein deswegen waren dem **gesamten Beirat die Aktivierungen und die Höhe des Cash-EBITDAs bekannt**.

- Thomas UNGER und Paul PRUSS erstellten **selbst aktiv** unzählige **(Excel-)Aufstellungen** mit **EBITDA-Berechnungen und EBITDA-Überleitungen** und übermittelten diese zur Prüfung, mit ergänzenden Anfragen und deren Überlegungen, ob bzw. wie dieses EBITDA erreicht werden könne.

Hierzu gibt es einige E-Mails von Thomas UNGER, die nachweisen, wie tief seine Kenntnisse über das EBITDA von SCHUR waren (diesbezügliche Excel-Aufstellungen, Überleitungen etc. kamen von ihm) und dass er federführend bei der EBITDA-Steuerung war. Exemplarisch gezeigt werden nachstehende E-Mail-Korrespondenzen, die der Beschuldigte erhalten hat, mit welcher Thomas UNGER **von ihm selbst erstellte EBITDA-Überleitungen** an Paul PRUSS bzw.

Michael SCHERNTHANER und Michael FISCHKIN übermittelt *("Kopie von*

| | |
|---|---|
| **From:** | Unger, Thomas <Unger@lindsaygoldbergvogel.com> |
| **Sent:** | Dienstag, 5. Mai 2020 18:20 |
| **To:** | Pruss, Paul; Schernthaner, Michael; Fischkin, Michael |
| **Subject:** | Ergebnis 19-22 |
| **Attachments:** | Kopie von EBITDA 2020 calculation TU.xlsx |

Für morgen

*EBITDA 2020 calculation* **TU[7]***")*.

| | |
|---|---|
| **From:** | Unger, Thomas <Unger@lindsaygoldbergvogel.com> |
| **Sent:** | Mittwoch, 6. Mai 2020 10:02 |
| **To:** | Schernthaner, Michael |
| **Cc:** | Pruss, Paul |
| **Subject:** | Kopie von EBITDA 2020 calculation TU.xlsx -Update |
| **Attachments:** | Kopie von EBITDA 2020 calculation TU.xlsx |

Weitere E-Mail-Korrespondenzen, die der Beschuldigte erhalten hat, belegen, wie Thomas UNGER weitergehende Berechnungen zu den SCHUR-Kennzahlen aufstellt und dahingehend um „Telefonate" oder „Prüfung" ersucht bzw. konkrete Aufträge zur weitergehenden Bearbeitung dieser Berechnungen erteilt:

| | |
|---|---|
| **From:** | Unger, Thomas <Unger@lindsaygoldbergvogel.com> |
| **Sent:** | Donnerstag, 10. September 2020 09:17 |
| **To:** | Schernthaner, Michael |
| **Cc:** | Pruss, Paul |
| **Subject:** | EBITDA 019-2021.xlsx |
| **Attachments:** | EBITDA 019-2021.xlsx |

Guten Morgen,
anbei meine Versuch, covid impact / 2021 Entwicklung besser zu verstehen.
Können wir heute kurz telefonieren?
LG
TU

[7] Anm.: Thomas UNGER.

643

| | |
|---|---|
| **From:** | Unger, Thomas <Unger@lindsaygoldbergvogel.com> |
| **Sent:** | Donnerstag, 19. März 2020 13:39 |
| **To:** | Schernthaner, Michael |
| **Subject:** | Minoritiy Valuation Uni Packaging 19-03-20 TU.xlsx |
| **Attachments:** | Minoritiy Valuation Uni Packaging 19-03-20 TU.xlsx |

Bitte kurz prüfen

| | |
|---|---|
| **From:** | Unger, Thomas <Unger@lindsaygoldbergvogel.com> |
| **Sent:** | Montag, 14. September 2020 15:44 |
| **To:** | Schernthaner, Michael |
| **Subject:** | Schurr EBITDA 019-2021.xlsx |
| **Attachments:** | Schurr EBITDA 019-2021.xlsx |

Bitte noch die NWC Veränderungen einbauen

Die nachfolgende Überleitung des EBITDA von Thomas UNGER zeigt lediglich exemplarisch (es gab zahlreiche von Thomas UNGER selbst erstellte Excels mit EBITDA-Berechnungen) ein von diesem erstelltes Excel. Aus dem Excel wird deutlich, dass Thomas UNGER nicht nur „versiert" sämtliche relevante **EBITDA-Positionen im Detail kannte**, sondern dass er sich auch sehr gut mit den **Aktivierungsthemen auskannte** und diese bei der Höhe des darin zugrunde gelegten EBITDA berücksichtigte.

24





27

| | | | | | |
|---|---|---|---|---|---|
| Reported | 82,80 | 4 Mio Settlement agreement mit Atlas Flexibles in | | | |
| Monetas Forderung | 5,00 | | | | |
| Reported EBITDA neu | 77,80 | | | | |
| operative Restunschärfe | 1,20 | Forderungen gegen insolvente Kunden, etc | davon non cash | 22,50 | |
| kommuniziert | 76,60 | | | | |
| | | | | | |
| Reported EBITDA neu | 77,8 | | | | |
| | | | | | |
| one offs | 8,30 | laut Definition Bankenvertrag | | | |
| | | | | | |
| Severance payment | 2,00 | | | | |
| M&A | 1,90 | | | | |
| RecP Finnacing | 0,80 | | | | |
| Business transfer cost | 0,60 | | | | |
| Sky Kostern | 0,50 | | | | |
| Verlagerungskosten aus Werkschließu | 2,50 | | | | |
| | 8,30 | 86,10 | | | |
| | | | | | |
| Pro Rata | 5,50 | | | | |
| Synmax | 1,50 | 50% realisiert, da Corona verschoben | | | |
| Codrie | 1,80 | nicht | | | |
| Sales Departemet Restrucuring | 2,00 | voll realisiert | | | |
| UPA Verlagerung | 0,20 | | Budget mit Thermopl | 96,00 | |
| Scaniflex | 0,50 | | - davon Thermoplast | 8,00 | |
| davon in 2020 nachweisbar | 3,50 | einsetzen | | | |
| | | | Budget 2020 | 90,00 | |
| Ergebnis 2019 | 89,60 | | synamx projekte verś | -2,00 | |
| Ergebnis 2019 mit Budget vergleichba | 86,60 | | Wachstumsverlust d | -3,00 | 6 Monate Corona |
| abzügl. 2 Mio LTS | 84,60 | | | 85,00 | |
| | | | Allgäu | -4,00 | |
| Budget 2019 mit Scandiflex | 73,80 | Bank Case | | 81,00 | |
| Kundenverlust im Budget 2019 | 6,00 | | | | |
| 50% Abschlag auf Savings Einkauf | 5,30 | | | | |
| 2019 | 85,10 | | | | |
| | | | Umsatzwachstum 202 | 20,00 | |
| Capex | 15,00 | | Ergebnsiwachstum 2 | 7,00 | 35% |
| Zylinder Aktivierung | 10,00 | | Verlust im Allgäu | -4,00 | |
| F&E | 5,00 | | | 3,00 | |
| IT | 2,50 | | Aufbau Overhead | -1,00 | |
| Ifrs 16 | 5,00 | in Bilanz | 20 | | |
| | 22,50 | | | | |

## Metadaten:

### Eigenschaften ˅

| | |
|---|---|
| Größe | 75,9 KB |
| Titel | Titel hinzufügen |
| Tags | Tag hinzufügen |
| Kategorien | Kategorie hinzufügen |

### Relevante Datumsangaben

| | |
|---|---|
| Letzte Änderung | 05.05.2020 18:19 |
| Erstellt | 29.04.2020 12:35 |
| Zuletzt gedruckt | |

### Relevante Personen

| | |
|---|---|
| Autor | TU Thomas Unger |
| | Autor hinzufügen |
| Zuletzt geändert von | TU Thomas Unger |

- Thomas UNGER übernahm sogar den Koordinations-Prozess des

Konzernabschlusses 2020 und machte auch in Bezug auf den Prüfungsprozess und die **Zeitleiste für die Finalisierung der Zahlen des Jahresabschlusses 2020** (somit in Bezug auf die Finalisierung der für den Exit mit B&C 2021 relevanten Zahlen) konkrete Vorgaben. Dass der **Beiratsvorsitzende von Lindsay Goldberg** nahezu die **Rolle des Leiters Rechnungswesen der Gesellschaft übernimmt** und **operativ den Prüfungsprozess seitens SCHUR koordiniert**, zeigt, wie tief Thomas UNGER in die operativen Abläufe der SCHUR involviert war.

- So ergibt sich aus einem E-Mail von Thomas UNGER an Paul PRUSS, das Thomas UNGER in Kopie an Michael SCHERNTHANER schickte und auch der Beschuldigte erhielt, dass die Zahlen für den Jahresabschluss 2020 am 25.03.2021 finalisiert und dann „stabil" sein sollen.

| | |
|---|---|
| **From:** | Unger, Thomas <Unger@lindsaygoldbergeurope.com> |
| **Sent:** | Montag, 15. März 2021 19:06 |
| **To:** | Pruss, Paul |
| **Cc:** | Schernthaner, Michael |
| **Subject:** | [EXTERNAL] Schur - Ergebnis 2020 |

Am 25.3 sind die Zahlen stabil und mit PWC abgestimmt.

Thomas Unger - von meinem iPhone gesendet

- Auch in das Projekt der „Vertriebseffektivität" brachte sich Thomas UNGER ein und steuerte dieses „aktiv", wie weitere E-Mail-Korrespondenzen, die der Beschuldigte erhielt und zum Teil im Bericht von Alvarez und Marsal aufgearbeitet wurden (z.B. Exhibit AM-199), belegen.

26

AM-199

From: Gerhard Nenning
Sent: 2 Nov 2017 15:23:06 +0000
To: Michael Schernthaner
Subject: AW: Vertriebseffektivität_v3

Hallo Herr Schernthaner,

vielen Dank für die Information..... Ich freue mich auf unsere Zusammenarbeit.

Bez. des CSO und dem 10.11. .... Planen Sie an dem Termin bereits mit uns (ich ggf. und Herr Belobokov)?

Ansonsten offizieller Kick Off am 13.11. in Baden? Wir würden ein Kick Off Paper vorbereiten.

Davor bekommen Sie noch eine Ressourcenschätzung

VG Gerhard Nenning

---

**Gerhard Nenning**
**Senior Partner**

**Stern Stewart & Co.**
**Salvatorplatz 4**
**80333 Munich, Germany**

**P: +49 89 242071 50**
**F: +49 89 242071 11**
**E: gnenning@sternstewart.com**
**I: www.sternstewart.com**

**Registered office: Munich**
**Company registration number: HRB 120 789**
**Management: Markus Pertl // Dimitri Belobokov // Thomas Berner // Dr. Tobias Braun // Stefan Heppelmann // Milan Manduch // Marcus Middelmann // Gerhard Nenning // Olaf Paltian // Carlo Paoloni // Sibo Sollors // Konstantin Wrona**
**VAT ID for Stern Stewart & Co. GmbH: DE 195 604 920**

**Von:** Michael Schernthaner [mailto:Michael.Schernthaner@schurflexibles.com]
**Gesendet:** Dienstag, 31. Oktober 2017 13:30
**An:** Gerhard Nenning <gnenning@sternstewart.com>
**Cc:** Michael Schernthaner <Michael.Schernthaner@schurflexibles.com>
**Betreff:** Vertriebseffektivität_v3

Hallo Herr Nenning,

anbei ein zwischen Herrn Unger und mir abgestimmtes Papier zum Inhalt des Projektes.

Wir würden am 10.11 den CSO dazu abholen und hätten in der darauffolgenden Woche gestartet.

Herr Unger und ich werden im Steering Committee sein, wobei Herr Unger das Projekt auch AKTIV steuern wird.

Wir sollten uns hierzu abstimmen.

Beste Grüße,

647

AM-199

Mit freundlichen Grüßen / Kind regards

**MICHAEL SCHERNTHANER**
CFO, Managing Director

 **SCHUR FLEXIBLES**

**Schur Flexibles Holding GesmbH**
Weilburgstraße 16a · 2500 Baden · Austria
T +43 2252 286 014 · M +43 699 16 555 229
E michael.schernthaner@schurflexibles.com
www.schurflexibles.com

Geschäftsführung / Management board: Michael Schernthaner
Sitz der Gesellschaft / Registered office: 2500 Baden, Austria
Registergericht / Court of registration: Landesgericht Wr. Neustadt, FN 368305i

This e-mail, including any attachment, may contain confidential and privileged information. If you have received it by mistake, please notify us by reply e-mail and then delete this e-mail and any attachment from your system. Thank you!

| | |
|---|---|
| From: | Gerhard Nenning <gnenning@sternstewart.com> |
| Sent: | Donnerstag, 16. November 2017 09:59 |
| To: | Michael Schernthaner |
| Cc: | Thomas Unger; Christian Kolarik; Dimitri Belobokov |
| Subject: | AW: Projekt "Vertriebseffektivität" |

Hallo Herr Schernthaner,

vielen Dank für die Information. Ich freue mich darauf, Sie mit meinem Team zu unterstützen.

Wir haben die Themenblöcke in sehr ähnlicher Form in den letzten Jahren für viele Unternehmen optimiert – u.a. auch in der Packaging Industrie. Wir werden deshalb versuchen, den Kick Off bereits für Diskussionen zu nutzen und bringen Kundenbeispiele und – soweit die Zeit für die Vorbereitung reicht – ein mögliches Zielbild für Schur mit.

Mit freundlichen Grüßen

Gerhard Nenning

Gerhard Nenning
Senior Partner

Stern Stewart & Co.
Salvatorplatz 4
80333 Munich, Germany

P: +49 89 242071 50
F: +49 89 242071 11
E: gnenning@sternstewart.com
I: www.sternstewart.com

Registered office: Munich
Company registration number: HRB 120 789
Management: Markus Pertl // Dimitri Belobokov // Thomas Berner // Dr. Tobias Braun // Stefan Heppelmann // Milan Manduch // Marcus Middelmann // Gerhard Nenning // Olaf Paltian // Carlo Paoloni // Sibo Sollors // Konstantin Wrona
VAT ID for Stern Stewart & Co. GmbH: DE 195 604 920

Von: Michael Schernthaner [mailto:Michael.Schernthaner@schurflexibles.com]
Gesendet: Mittwoch, 15. November 2017 12:59
An: Gerhard Nenning <gnenning@sternstewart.com>
Cc: Thomas Unger <Unger@lindsaygoldbergvogel.com>; Christian Kolarik <cko@schurflexibles.com>; Michael Schernthaner <Michael.Schernthaner@schurflexibles.com>
Betreff: Projekt "Vertriebseffektivität"

Hallo Herr Nenning,

Im Auftrag von Herrn Unger übersende ich Ihnen anbei das Erwartungs-/Diskussionspapier für unseren Kick Off am Freitag.

Von unserer Seite wird dabei sein:
- Herr Unger
- Herr Christian Kolarik (CSO)
- Ich

Wir freuen uns auf das gemeinsame Meeting mit Ihnen. Wenn Sie noch Fragen haben oder Unterlagen benötigen, geben Sie mir bitte kurz Bescheid.

Danke!

Mit besten Grüße,

Mit freundlichen Grüßen / Kind regards

**MICHAEL SCHERNTHANER**
CFO, Managing Director



**Schur Flexibles Holding GesmbH**
Weilburgstraße 18a · 2500 Baden · Austria
T +43 2252 266 014 · M +43 699 16 555 229
E michael.schernthaner@schurflexibles.com
www.schurflexibles.com

Geschäftsführung / Management board: Michael Schernthaner
Sitz der Gesellschaft / Registered office: 2500 Baden, Austria
Registergericht / Court of registration: Landesgericht Wr. Neustadt, FN 368305i

This e-mail, including any attachment, may contain confidential and privileged information. If you have received it by mistake, please notify us by reply e-mail and then delete this e-mail and any attachment from your system. Thank you!

- Zahlreiche weitere, dem Beschuldigten bekannte E-Mail-Korrespondenzen führen vor Augen, wie intensiv Thomas UNGER sich Rechnungslegungsthemen widmete und er sich aktiv in Fragen der Bilanzierung einbrachte. So erkundigte er sich etwa im November 2020 bei Michael SCHERNTHANER danach, ob es *„irgendeine Accounting Möglichkeit"* gäbe, den *„PS Umsatz[8] nicht zu zeigen und damit die Marge zu verbessern?"*. Dieses E-Mail zeigt exemplarisch, dass Thomas UNGER sich proaktiv in Rechnungslegungsthemen der SCHUR einbrachte. Dies geht bspw. aus einem E-Mail vom 01.11.2020, das der Beschuldigte erhielt, hervor:

---

[8] Anm: Umsatz der PS Polymer Sourcing GmbH.

From:        Unger, Thomas <Unger@lindsaygoldbergvogel.com>
Sent:        Sonntag, 1. November 2020 08:48
To:          Schernthaner, Michael
Subject:     PS

Gibt es irgend eine Accounting Möglichkeit, den PS Umsatz nicht zu zeigen und damit die Marge zu verbessern?

- Es gab sehr häufig auch **Ad-hoc-Anfragen** von Lindsay Goldberg zu diversen Kennzahlen der SCHUR bzw. zu finanzrelevanten Themen. Diese wurden sehr kurzfristig an SCHUR herangetragen und waren ebenso detailliert.

- Was die Meetings zwischen Lindsay Goldberg und SCHUR, an denen der Beschuldigte teilnahm, betrifft, so gab es auch hier seitens Lindsay Goldberg, insbesondere in den Jahren 2020 und 2021, zahlreiche Anfragen zu den Finanzzahlen.

Lindsay Goldberg ließ sich in diesen Sitzungen auch ausführlich über den Prüfungsprozess und den Status des Audits berichten.

So zeigt bspw der dem Beschuldigten bekannte E-Mail-Verkehr zwischen Michael SCHERNTHANER und Thomas UNGER, wie Michael SCHERNTHANER die Tagesordnungspunkte für solche Meetings iZm dem Prozess der Jahresabschlussprüfungen abstimmte. Wie aus der Korrespondenz hervorgeht, hat Thomas UNGER die von Michael SCHERNTHANER vorgeschlagenen Tagesordnungspunkte bspw sogar noch um einige Detailaspekte (*„Operative Maßnahmen in den Werken"*, *„Sicherung Rohmaterial"*, *„Vertriebsmaßnahmen"*, *„Liquidität"*) **erweitert**:

31

651

| From: | Unger, Thomas <Unger@lindsaygoldbergvogel.com> |
|---|---|
| Sent: | Montag, 16. März 2020 11:43 |
| To: | Schernthaner, Michael |
| Subject: | AW: Agenda SBM |

    a. COVID Virus Update ????
        a. Operative Maßnahmen in den Werken
        b. Sicherung Rohmaterial
        c. Vertriebsmaßnahmen
        d. Liquidität
    b. January Reporting / Feb Flash
    c. Budget 2020
    d. Deep Dive – Sales Risk Analyses
    e. Status Update "Year end audit 2019"

Von: Schernthaner, Michael <Michael.Schernthaner@schurflexibles.com>
Gesendet: Montag, 16. März 2020 11:17
An: Unger, Thomas <Unger@lindsaygoldbergvogel.com>
Betreff: Agenda SBM

Hallo Herr Unger,

Tieferstehend mein Vorschlag:

    a. COVID Virus Update ????
    b. January Reporting / Feb Flash
    c. Budget 2020
    d. Deep Dive – Sales Risk Analyses
    e. Status Update "Year end audit 2019"

Wenn Sie noch Punkte haben, lassen sie mich es gerne wissen.

Beste Grüße,

**MICHAEL SCHERNTHANER**
Chief Executive Officer (CEO)



**Schur Flexibles Holding GesmbH**
IZ NÖ Süd · Straße 1 · Objekt 50 · Haus C · 2351 Wiener Neudorf · AUSTRIA
T +43 2252 266 014 22
E michael.schernthaner@schurflexibles.com
www.schurflexibles.com

Geschäftsführung / Management board: Michael Schernthaner, Juan Luis Martinez Arteaga, Friedrich Humer
Sitz der Gesellschaft / Registered office: 2351 Wiener Neudorf, Austria

(iv)    **Entscheidungen und Vorgaben Thomas UNGERS in seiner Rolle als faktischer Geschäftsführer (CEO) von SCHUR**

Wie bereits eingangs erwähnt, nahm Thomas UNGER bei SCHUR *de facto* die Aufgaben des CEOs wahr. Dies äußerte sich nicht nur darin, dass er sich allgemein sehr intensiv in Finanzthemen der SCHUR einbrachte. Er nahm auch aktiv folgende Agenden bei SCHUR wahr:

32

- Thomas UNGER gab faktisch die **Strukturen** innerhalb des Betriebs **vor.**
Bereits im Rahmen der **Sales Conference** 2017, welche Thomas UNGER
**persönlich abhielt**, stellte Thomas UNGER eine neue Organisationsstruktur
vor. **Thomas UNGER hatte seine ehemalige Stellung als Active Chairman
in seine Funktion als Beiratsvorsitzender übernommen und sie
tatsächlich als faktischer CEO der SCHUR ausgeübt hat.**

Dies ergibt sich bspw. aus einer Präsentation Thomas UNGERS, die er für
Lindsay Goldbergs Investoren in den USA anfertigen ließ und aus der klar
hervorgeht, dass die drei **Geschäftsführer direkt an ihn berichteten.**



- Thomas UNGER kommunizierte selbst **direkt** mit den jeweiligen
Geschäftsführern der verschiedenen SCHUR-Werke, wie bspw eine dem
Beschuldigten bekannte E-Mail-Korrespondenz vom 08.07.2018 zeigt:

653

| From: | Thomas Unger <Unger@lindsaygoldbergvogel.com> |
|---|---|
| Sent: | Sonntag, 8. Juli 2018 12:08 |
| To: | Michael Schernthaner |
| Subject: | Fwd: Situation Schur/Zwart |

Keine Reaktion

Von meinem iPad gesendet
Thomas Unger

Anfang der weitergeleiteten Nachricht:

> Von: "unger@lindsaygoldbergvogel.com" <unger@lindsaygoldbergvogel.com>
> Datum: 6. Juli 2018 um 13:56:57 MESZ
> An: Harry Sieljes <md@zwartfp.nl>
> Betreff: Situation Schur/Zwart

> Harry,

> I would like do speak with your about the actual developments which seems not going into the right direction.

> Do you have time for a call tonight or on Sunday?

> I am reale looking forward meeting you again and having a couple of beers.

> Thomas

> Thomas Unger
> Partner
> Lindsay Goldberg Vogel GmbH | Neuer Stahlhof | Breite Straße 69 | 40213 Düsseldorf
> Phone +49 (0) 211-86 20 15-0 | Fax +49 (0) 211-86 20 15-25
> unger@lindsaygoldbergvogel.com

> Sitz Düsseldorf | Amtsgericht Düsseldorf HRB 50994
> Geschäftsführer: Prof. Dr. Dieter H. Vogel, Dr. Thomas Ludwig

Thomas UNGER nahm auch an den Leistungsbeurteilungs-Gesprächen der Geschäftsführer der verschiedenen SCHUR-Werke teil und legte deren Boni fest, wie bspw. aus einer E-Mail-Korrespondenz vom 07.08.2018, in der Thomas UNGER **ein von ihm selbst erstelltes Excel** mit Berechnungen zum Bonus des Geschäftsführers Harry SIELJES (Geschäftsführer der niederländischen Schur Tochtergesellschaft „Zwart") übermittelt und auch der Beschuldigte erhielt, hervorgeht:

| From: | Thomas Unger <Unger@lindsaygoldbergvogel.com> |
|---|---|
| Sent: | Dienstag, 7. August 2018 12:09 |
| To: | Schernthaner, Michael |
| Subject: | Harry_Incentive TU.xlsx |
| Attachments: | Harry_Incentive TU.xlsx |

34

37

- Thomas UNGER gab, wie der Beschuldigte selbst wahrgenommen hat, diverse **Projekte/Dienstleistungen in Auftrag**. So beauftragte er bspw. Horvath & Partner bzw. Stern Stewart & Co (idF „SSCO") mit der Durchführung eines **Financial Reporting Health-Checks** sowie eines **Accounting Benchmarks** für SCHUR. Auch stellte er zB einen **Restrukturierungsberater** (Herbert NOICHL) ein, um das Unternehmen im Allgäu zu restrukturieren.

(v)  Zu Thomas UNGERS Rolle rund um die Exit-Prozesse von SCHUR und der Involvierung der übrigen Beiratsmitglieder

**Erster Exit Prozess in 2019 (Projekt „Sky")**

Auch in den von Lindsay Goldberg initiierten **Verkaufs-Prozessen der SCHUR** (v.a. Projekt „Sky" und Projekt „Stelvio") – in der Zeit ab 2019 – nahmen Thomas UNGER und Paul PRUSS eine **federführende Rolle** ein. Beide brachten sich in diese Prozesse **intensiv ein** – insbesondere was die finanziellen Themen anbelangte.

Den Exit-Prozess zum **Projekt Sky** im Jahr 2019 begleiteten Thomas UNGER und Paul PRUSS aktiv mit. Das Projekt scheiterte damals daran, dass aus Sicht des interessierten Investors (Partners Group) das Delta zwischen dem „Adjusted EBITDA" und dem „Cash-based EBITDA" letztendlich zu groß war (dieses betrug rund € 30 Mio). Die Aktivierungshöhe – welche Lindsay Goldberg bekannt war – wurde im Rahmen des Due Diligence-Prozesses sowohl mit dem Käufer als auch dessen Beratern von Lindsay Goldberg ausführlich besprochen. Letztlich teilte **Thomas UNGER** mit, dass der potenzielle Investor (Partners Group) schließlich das Projekt wegen des Unterschieds zwischen „Adjusted EBITDA" und „Cash-based EBITDA" nicht umsetzen wollte. **Lindsay Goldberg und insbesondere auch Thomas UNGER führten diese Gespräche mit dem potenziellen Investor direkt.**

Da der Exit-Prozess in 2019 aufgrund der aus Sicht der potentiellen Käufer

35



zu großen Unterschiede zwischen den EBITDA-Größen und der damit einhergehenden – Lindsay Goldberg bekannten – Aktivierungshöhe gescheitert war, wurde für das folgende Jahr, also 2020, die **Überleitungen** zwischen **„Reported EBITDA", „Adjusted EBITDA"** um eine zusätzliche Überleitung zum **„Cash-EBITDA" erweitert**, die dem Management von Lindsay Goldberg zur Verfügung gestellt und ausführlich erklärt wurden. Das Management von Lindsay Goldberg kannte die entsprechenden Überleitungspositionen im Detail.

**Zweiter Exit Prozess in 2021 Projekt „Stelvio"**

Letztlich nahm Thomas UNGER auch in Bezug auf den Exit-Prozess zum **Projekt Stelvio**, also den Erwerb von SCHUR durch B&C im Jahr 2021, eine zentrale Rolle ein: So wurde Thomas UNGER – wie bspw. ein E-Mail-Verlauf zwischen Michael DEES und Herbert ORTNER belegt (siehe ON 396)– für die Transaktion mit B&C als **Schlüsselperson** von Lindsay Goldberg **auserkoren**. Im Sinne dieses Auftrags positionierte sich Thomas UNGER daher auch gegenüber B&C als Chairman der SCHUR und als **Hauptansprechpartner und wesentlicher Verhandlungsführer**.

37

Von:                    Herbert Ortner
Gesendet:               Montag, 22. März 2021 12:42
An:                     Markus Fürst
Betreff:                Fwd: Project Stelvio

Von meinem iPad gesendet

Anfang der weitergeleiteten Nachricht:

Von: "Dees, Michael" <Dees@lindsaygoldbergllc.com>
Datum: 20. März 2021 um 14:55:44 MEZ
An: Herbert Ortner <H.Ortner@bcholding.at>
Kopie: "Unger, Thomas" <Unger@lindsaygoldbergeurope.com>
Betreff: Project Stelvio

Mr. Ortner,

I hope that you are having a nice weekend.

I am writing to express my sincere appreciation for the offer letter that B&C provided yesterday regarding
Schur Flexibles. I have been in close communication with Thomas Unger regarding your discussions over the
last several weeks, and I am excited to see that we have taken this important step. The proposed transaction
and partnership with B&C would be beneficial for LG, Schur and B&C, and I look forward to supporting the
process to reach that objective.

As chairman of Schur Flexibles, Thomas has my full support (as well as the support of the entire firm) in these
discussions. We are entirely aligned in our interest in the proposed partnership with B&C and look forward to
reaching an agreement by the end of April.

As travel to Europe remains nearly impossible, I will likely be unable to meet in person during this process.
However, if you would like to connect at any time, please do not hesitate to reach out.

Best,
Michael Dees

Michael Dees
Managing Partner
Lindsay Goldberg

This message, including any attachments, may contain information that is proprietary, privileged
and/or confidential and is intended only for use of the individual or entity named above. If the reader
of this message is not the intended recipient, or the employee or agent responsible to deliver it to the
intended recipient, you are hereby notified that any dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this communication in error, please
immediately notify us by email, and destroy the original message. Thank you.

Auch **Paul PRUSS** nahm im Exit-Prozess 2021 neben Thomas UNGER eine
**wesentliche Rolle** ein. Paul **PRUSS** fungierte als **Projektmanager und
zusätzlich mit UNGER als *single source of communication* für das
Projekt Stelvio** und übernahm federführend die Abstimmung mit Thomas
ZIMPFER (Ansprechpartner für den Verkauf seitens B&C). So schickt Paul
PRUSS bspw. am 22.03.2021 (also zum Zeitpunkt des Beginns des
Verkaufsprozesses mit B&C) ein dem Beschuldigten bekanntes E-Mail, in
dem Paul PRUSS über seine Gespräche mit Thomas ZIMPFER berichtet und



erklärt, wie die Experten-Sitzungen zum B&C-Exit ablaufen (sollen). Auch führt er aus, dass er diesbezüglich *„jeden Abend eine Liste mit Fragen"* bekommen werde. Aus diesem Email wird weiterhin deutlich, dass PRUSS entschied, wer die Fragen von B&C sehen sollte (*„Das können wir m.E. vor Goldman* (Anm. Gemeint ist Goldman Sachs) *nicht verheimlichen"*):

| | |
|---|---|
| From: | Pruss, Paul <Pruss@lindsaygoldbergeurope.com> |
| Sent: | Montag, 22. März 2021 17:45 |
| To: | Unger, Thomas; Schernthaner, Michael |
| Subject: | [EXTERNAL] BCH |

All,

ich hatte eben ein Telefonat mit Herrn Zimpfer. Können wir heute, z.B. um 19:00h telefonieren, um die Punkte durchzugehen?
Vorab:

- Virtuelle Expert Sessions am Donnerstag (25.3.) – B&C möchte keine persönlichen Treffen (Berater u.a. aus FFM);
- Beginn mit einer 90. Min MP (coffe talk deck): Geschäftsmodell, Wachstum, etc.
- Teilnehmer B&C: Fürst, Zimpfer, DD-Teams buy-side
- Sessions: Commercial, Financial, Tax, Legal (ggf. Tax und Legal auf nächste Woche)
- Agenda (Themenkreise) kommt bis morgen, COB

Weiteres:

- Ich bekomme jeden Abend eine Liste mit Fragen. Die Beantwortung wird sicherlich im VDR erfolgen. Das können wir m.E. vor Goldman nicht verheimlichen!
- B&C hätte auch gerne im weiteren Verlauf die Möglichkeit 2-3 Werke physisch zu besichtigen
- Wunsch nach den DD-Berichten der getätigten Akquisitionen, nicht nur SIDAC (Zwart, UNI, CHN)

PP

So wie Thomas UNGER, hat Paul PRUSS zudem auch selbst an der Zusammenstellung des EBITDA mitgewirkt. So verdeutlicht bspw. ein weiteres dem Beschuldigten bekanntes E-Mail vom 09.12.2020, wie intensiv sich Paul PRUSS mit dem Thema EBITDA beschäftigte und EBITDA-Überleitungen verschickt. In diesem Email befasst sich PRUSS ausführlich mit EBITDA Adjustments 2019-2020 und spricht darüber, dass er *„Stabilität im Ergebnis (...) zeigen"* möchte:

| From: | Pruss, Paul <Pruss@lindsaygoldbergeurope.com> |
| Sent: | Mittwoch, 9. Dezember 2020 13:53 |
| To: | Schernthaner, Michael |
| Cc: | Unger, Thomas |
| Subject: | SF EBITDA FY19-FY20 Adjustments |
| Attachments: | Schur Flexibles - QofE update FY19 – 16Oct20.pdf; Kopie von SF EBITDA 2020 Adjusted_v4 (9.12.20).xlsx |

Hallo Herr Schernthaner,

ich habe die Tabelle mit dem QofE-Papier aus dem Refinanzierungsprozess verglichen und wollte sichergehen, dass Sie auf der gleichen Basis aufsetzen. Ich nehme an, Sie haben manche (PF-)Normalisierungen nicht übernommen, um einen Abschwung im EBITDA von FY19 nach FY20 zu vermeiden (FY19 PWC € 92,3 Mio. vs. € 89,0 Mio., ohne B&K-JV).

Ohne B&K-JV ist das EBITDA €84 Mio., damit unter Vorjahr (€87,1 Mio.). Footprint und Lean Management sind zusammen €4,6 Mio. – ist hier einiges nach 2020 oder sogar 2021 verschoben? Wir können die € 82,6 Mio. in FY19 mit den € 84,0 Mio. in FY20 vergleichen, oder die € 87,1 Mio. in FY19 mit einer Zahl um € 90 Mio. in FY20 (mit B&K). Ich würde gerne – sofern es geht – eine Stabilität im Ergebnis (als Like-For-Like) zeigen.

Viele Grüße
Paul Pruss

Dass Thomas UNGER sowie auch Paul PRUSS federführend im Verkaufsprozess mit B&C wirkten und sie überdies die **Informationsweitergabe an die Käuferin** (zentral) **steuerten und vorgaben**, kann mithilfe einiger weiterer E-Mails deutlich belegt werden:

So geht bspw. aus einer E-Mail-Korrespondenz von Michael FISCHKIN an Paul PRUSS hervor, dass der Beschuldigte Paul PRUSS vor Finalisierung des B&C-Exit-Prozesses um **Freigabe** ersucht, die sog. Prüfungsdifferenzen aus dem Konzernabschluss in den Datenraum hochzuladen (*„Bitte lassen Sie uns wissen, ob wir dieses Dokument zusätzlich noch in den VDR hochladen sollen."*). In der Folge kommentiert PRUSS dieses Email und leitet Paul das E-Mail des Beschuldigten auch an Christopher DRÖGE von **Goldman Sachs** mit seinen Kommentaren weiter. Daraufhin nimmt Christopher Dröge von Goldman Sachs seine eigene zahlenmäßige Überleitung sowie Interpretation vor und kommuniziert diese an PRUSS. Aus dem Email von PRUSS an DRÖGE geht auch hervor, dass Lindsay Goldberg und Goldman Sachs sich bilateral austauschten, in welcher Form Daten an B&C zur Verfügung gestellt werden sollten (*„sollen wir das über den VDR oder bilateral über Morgan Stanley?"*).

659

From:           Pruss, Paul <Pruss@lindsaygoldbergeurope.com>
Sent:          Dienstag, 11. Mai 2021 11:50
To:             Fischkin, Michael
Cc:            Schernthaner, Michael; Droege, Christopher
Subject:     RE: Summary of uncorrected misstatements FY 2020

 **CAUTION: This email has been sent from an external source. Please treat links and attachments in this email with caution and click on them only if they come from a trusted source.**

Siehe unten, Kommentare von Herrn Droege

From: Droege, Christopher <christopher.droege@gs.com>
Sent: Tuesday, May 11, 2021 11:41 AM
To: Pruss, Paul <Pruss@lindsaygoldbergeurope.com>
Subject: RE: Summary of uncorrected misstatements FY 2020

ad 1 hate ma. die drei Positionen (interest, Depreciation, income Tax) + die Kommentare ___ ___ _____
___ __ ändern verbleiben in der Tat 602k

ad würde da eher Bullets runtersetzen ins pdf – bevor man es an Mb zurückspielt
    £1.2m P&L impact from misstatements, thereof £502k related to de___ mway, d___ B ___ ___
    +£84)
    implies remaining EBITDA impact of £702k
    however, 145k thereof (included in position [xxx]) relate to tooling (BV-3) is treated as de___
    and deducted in the bridge (£3.8m)
    This leaves a remaining EBITDA impact of 506k
    in TPA in the audit was £206k higher (as shown in race)
    This leaves a total and small EBITDA impact of 300k

From: Pruss, Paul <____uss@lindsaygoldbergeurope.com>
Sent: 11 Mai 2021 11:26
To: Droege, Christopher [IBD] <christopher.droege@lindsaygoldbergeurope.com>
Subject: FW: Summary of uncorrected misstatements FY 2020

Hallo Herr Droege, anbei die Überleitung. Ist auf den ersten Blick nicht selbsterklärend. Ich muss gleich ___loch einleiten ___
wollte es Ihnen vorab schicken. Sollen wir das über den VDR oder bilateral über Morgan Stanley?

From: Fischkin, Michael <michael.fischkin@schurfeldbug.com>
Sent: Tuesday, May 11, 2021 11:06 AM
To: Pruss, Paul <Pruss@lindsaygoldbergeurope.com>
Cc: Schernthaner, Michael <Michael.schernthaner@schurfeldbug.com>
Subject: Summary of uncorrected misstatements FY 2020

Hallo Herr Pruss

anbei die SUM Liste für FY 2020. Der EBITDA Effekt beträgt 701.005€



Bitte berücksichtigen Sie, dass in diesen 701k EUR ein Effekt von 195k EUR aus Tooling enthalten ist, die in der B&C ebenfalls inkludiert ist (in der B&C Bridge mit 3,8m EUR). Das heißt, diese 195k EUR durften nicht berücksichtigt werden. Wenn man noch die EBITDA Verbesserung von 170k EUR vs. PwC Factbook (78,6m EUR auditiertes reported EBITDA vs 78,4m EUR PwC Factbook reported EBITDA) dagegen rechnet, wäre der EBITDA Effekt auf der SUM Liste mit (346) EUR zu sehen.

Bitte lassen Sie uns wissen, ob wir dieses Dokument zusätzlich noch in den VDR hochladen sollen.

Beste Grüße,
Michael Fischkin

Mit freundlichen Grüßen / Kind regards
Michael Fischkin

Eine E-Mail-Korrespondenz zeigt etwa, wie der Beschuldigte den Beiräten Thomas UNGER und Paul PRUSS den Bericht von PwC des PwC Financial Factbook sowie das PwC Financial Databook *„mit der Bitte um* ***Freigabe"*** der Dokumente übermittelt. *„Nach der Freigabe werden wir die Dokumente in den Datenraum hochladen".* Paul PRUSS gibt daraufhin allerdings noch Änderungsvorschläge und Thomas UNGER **verlangt** eine „interne" Abstimmung, bevor es versendet wird.

661

| | |
|---|---|
| From: | Unger, Thomas <Unger@lindsaygoldbergeurope.com> |
| Sent: | Dienstag, 30. März 2021 07:58 |
| To: | Pruss, Paul; Fischkin, Michael; Schernthaner, Michae... |
| Subject: | Re: items to consideRE: Financial Fact Book - Executive Report und Databook |

**CAUTION:** This email has been sent from an external source. Please treat links and attachments in this email with caution and click on them only if they come from a trusted source.

Bevor wir heute etwas raus senden, sollten wir uns intern abstimmen.

Von: "Pruss, Paul" <Pruss@lindsaygoldbergeurope.com>
Datum: Montag, 29. März 2021 um 21:23
An: "michael.fischkin@schurflexibles.com" <michael.fischkin@schurflexibles.com>, "Unger, Thomas" <Unger@lindsaygoldbergeurope.com>, Michael Schernthaner <Michael.Schernthaner@schurflexibles...>
Betreff: items to consideRE: Financial Fact Book - Executive Report und Databook

All

nach erster Durchsicht und vorab

- S. 34 - Ich würde Factoring aus der Net Debt-Brücke rausnehmen (und S. 35 #7). Es steht ja bereits ... in der M&A Sektion
- S. 34 - Ich würde die „items to consider" komplett rausnehmen, lediglich die M&A bonds ... und ... R... erwähnen. Deferred assets/taxes sind ja aus der Bilanz ablesbar. Ich bin mir auch nicht sicher, ob es wirklich eine Abzugsposition ist.

pp

From: Fischkin, Michael <michael.fischkin@schurflexibles.com>
Sent: Monday, March 29, 2021 8:50 PM
To: Unger, Thomas <Unger@lindsaygoldbergeurope.com>; Pruss, Paul <Pruss@lindsaygoldbergeurope.com>
Cc: Schernthaner, Michael <Michael.Schernthaner@schurflexibles.com>
Subject: Financial Fact Book - Executive Report und Databook

Hallo Herr Unger, Herr Pruss

anbei der Executive Report des PwC Financial Factbook sowie das PwC Financial Databook (als Excel). Bitte um Ihre Freigabe der Dokumente. Nach Ihrer Freigabe, werden wir die Dokumente in den Datenraum hochladen.

Bitte berücksichtigen Sie, dass im Financial Factbook PwC keine Wertung (sprich keine PwC "CD-Sicht") vornehmen ...

Danke für Ihr Feedback.

Beste Grüße
Michael Fischkin

Mit freundlichen Grüßen / Kind regards

MICHAEL FISCHKIN
Group Finance Director



Schur Flexibles Holding Gesmbh
IZ NÖ Süd · Straße 1 · Objekt 50 · Haus C · 2351 Wr Neudorf · Austria
T +43 2252 266014 19   M +43 676 841 205 219
E schurflexibles@schurflexibles.com
H www.schurflexibles.com

Our best for
your goods.



Auch dies belegt, dass Paul PRUSS und Thomas UNGER einerseits konkret
steuerten und bestimmten, (wann) *welche* Dokumente B&C im Datenraum
zum Verkaufsprozess **bereitgestellt** wurden. **Freigaben waren
diesbezüglich stets von Thomas UNGER und Paul PRUSS einzuholen.**
Anderseits nahmen Thomas UNGER und Paul PRUSS auch Einfluss auf den
*Inhalt* der B&C bereitgestellten Informationen. So machten sie bspw.
konkrete Vorgaben in Bezug auf die zu berücksichtigenden Positionen im
Financial Fact Book.

Auch wurde von Paul PRUSS klar angeordnet, **wer (wann) Zugriff** auf den
**Datenraum** erhält (*„können Sie bitte den VDR schließen, dass niemand von
BC darauf Zugriff hat"*), wie bspw. eine dem Beschuldigten bekannte E-Mail-
Korrespondenz vom 19.04.2021 zeigt:

43

663

| | |
|---|---|
| From: | Pruss Paul Pruss@lindsaygoldberg[europe]... |
| Sent: | Montag, 19. April 2021, 11.16 |
| To: | Artlieb, Sebastian |
| Cc: | Scheritharier Michael; Hanke, Michael, Schar-Philipp |
| Subject: | VDR |

CAUTION: This email has been sent from an external source. Please treat links and attachments in this email with caution and click on them only if they come from a trusted source.

Hallo Herr Artlieb

Können Sie bitte den VDR schließen, dass niemand von BC darauf Zugriff hat.

Vielen Dank
Paul Pruss

P.S. ... de the new company name and email address and update ...

Paul Pruss

Lindsay Goldberg Europe GmbH | Neuer Stahlhof | Breite Str. 69 | 40213 Düsseldorf
Phone +49 (0) 211 46 20 15-42 | Fax +49 (0) 211 46 20 15-29 | Mobile +49 (0) ...
...@lindsaygoldbergeurope.com

Assistant
Doris Diam Phone +49 (0) 211 46 20 15-28 | doris.diam@lindsaygoldbergeurope.com

LG Düsseldorf | Amtsgericht Düsseldorf HRB 69904
Geschäftsführer: Dr. Thomas Ludwig, Thomas Unger

Lindsay Goldberg (insbesondere Thomas UNGER und Paul PRUSS) entschieden somit einerseits, **wann B&C welche Informationen bereitgestellt wurden**. Sie gaben **inhaltlich vor**, wie die Informationen – insb auch die Finanzkennzahlen – aufbereitet werden. Die **Verkaufsverhandlungen mit B&C** wurden **ausschließlich von Lindsay Goldberg (als Eigentümerin und somit Verkäuferin) geführt**.

Wie zahlreiche weitere E-Mail-Korrespondenzen belegen, **kommunizierte Lindsay Goldberg (Paul PRUSS und Thomas UNGER) direkt (eigenständig) mit B&C auch in Bezug auf die Kennzahl des EBITDA und trifft (eigenständig) Aussagen darüber, ob die Zahlen zum Budget passen**. So übermittelte Paul PRUSS bspw Berechnungen zum EBITDA an Thomas ZIMPFER, Markus FÜRST und Thomas UNGER (UNGER auf Kopie des Emails) und hält in der (direkten) Kommunikation mit B&C die Höhe des **Adjusted EBITDA** (nicht des Cash-EBITDA, in welchem die Aktivierungen herausgerechnet werden) fest. Er gibt auch eigenständig Auskunft darüber, ob diese Zahlen zum Budget passen, wie bspw. eine E-Mail-Korrespondenz vom 14.04.2021, die der Beschuldigte erhielt, zeigt:

44

| From | Pruss, Paul < Pru__@lindsaygoldbergeurope.co__ |
|---|---|
| Sent | Mittwoch, 14. April 2021 21:34 |
| To | Droege, Christopher Wich Matthias: Fellhauer Ern_ |
| Cc | Schall, Philipp: Schernthaner, Michael |
| Subject | FW: KARAKUL Q1 LTM EBITDA |
| Attachments | 2021-04-14 - Covenant calculation_LTM_Q12021.pdt  2021-04-14 ...TM... |

| Importance: | High |

CAUTION: This email has been sent from an external source. Please treat links and attachments in this email with caution and click on them only if they come from a trusted source.

From: Pruss, Paul
Sent: Wednesday, April 14, 2021 9:33 PM
To: Thomas Zimpfer <t.zimpfer@bcholding.at>
Cc: M.Fuerst@bcholding.at, Unger, Thomas <Unger@lindsaygoldbergeurope.com>
Subject: KARAKUL Q1 LTM EBITDA
Importance: High

Lieber Herr Zimpfer,

anbei erhalten Sie die LTM Adj. EBITDA Berechnung zum 31.3.21 mit € 98,2 Mio. (vs. € 94.5 Mio. FY21, Damit __ wir im track mit Budget. Zudem die EBITDA-Berechnung zum Covenant-Test

Viele Grüße
Paul Pruss

Please note the new company name and email address and update your records _____

Paul Pruss
Director
Lindsay Goldberg Europe GmbH | Neuer Stahlhof | Breite Str. 69 | 40213 Düsseldorf
Phone +49 (0) 211-86 20 15-32 | Fax +49 (0) 211-86 20 15-25 | Mobile +49 (0) 178... ... 45
pruss@lindsaygoldbergeurope.com

Assistant
Gundula Doris: Phone +49 (0) 211-86 20 15-28  doris@lindsaygoldbergeurope.com

Sitz Düsseldorf | Amtsgericht Düsseldorf HRB 80994
Geschäftsführer: Dr. Thomas Ludwig  Thomas Unger

# IV. Abschließendes zum Verkaufsprozess samt ergänzenden Anträgen

Wie die oben stehenden Ausführungen und exemplarischen Belege veranschaulichen, führte **Lindsay Goldberg** als Eigentümerin – allen voran mit **Thomas UNGER** als deren „**Key Person**" für den Verkaufsprozess – die Verkaufsverhandlungen mit B&C durch und brachte sich sehr intensiv in die Finanzthemen und die Entwicklung der Unternehmenskennzahlen von SCHUR ein.

Als Investmentbank und M&A-Berater von Lindsay Goldberg war auch Goldman Sachs sehr eng – etwa auch in die Diskussionen zum EBITDA – in den Verkaufsprozess eingebunden. Es ist davon auszugehen, dass sowohl Lindsay Goldberg (insbesondere Thomas UNGER und die anderen Beiratsmitglieder) als auch Goldman Sachs steuerten,



welche Informationen in welcher Form gegenüber B&C kommuniziert wurden. Auch das Beratungshaus CUBUS war in die Abstimmung und Aufbereitung von Unternehmenskennzahlen involviert.

Vor diesem Hintergrund stellt der Beschuldigte den Antrag auf Beischaffung der E-Mail-Postfächer der folgenden Personen (jeweils im **Zeitraum 2017 bis 2021**), welche die im Exit-Prozess mit B&C involvierten Berater der jeweiligen Institution waren:

- **Michael DEES** (Lindsay Goldberg), Domain @lindsaygoldbergllc.com;
- **Dieter VOGEL** (Lindsay Goldberg), Domain entweder @lindsaygoldbergvogel.com *oder* @lindsaygoldbergeurope.com
- **Thomas LUDWIG** (Lindsay Goldberg), Domain entweder @lindsaygoldbergvogel.com *oder* @lindsaygoldbergeurope.com;
- **Thomas UNGER** (Lindsay Goldberg), Domain entweder @lindsaygoldbergvogel.com *oder* @lindsaygoldbergeurope.com;
- **Paul PRUSS** (Lindsay Goldberg), Domain entweder @lindsaygoldbergvogel.com *oder* @lindsaygoldbergeurope.com;
- **Phillip SCHALL** (Lindsay Goldberg), Domain entweder @lindsaygoldbergvogel.com *oder* @lindsaygoldbergeurope.com;
- **Christopher DRÖGE** (Goldman Sachs), Domain @gs.com *oder* @ln.ibd.email.gs.com;
- **Eric FELLHAUER** (Goldman Sachs), Domain @gs.com *oder* @ln.ibd.email.gs.com;
- **Tobias KÖSTER** (Goldman Sachs), Domain @gs.com *oder* @ln.ibd.email.gs.com;
- **Matthias WICH** (Goldman Sachs), Domain @gs.com *oder* @ln.ibd.email.gs.com;
- **Nikolas SCHINDLER** (Goldman Sachs), Domain @gs.com *oder* @ln.ibd.email.gs.com;
- **Christina BOSSE** (Goldman Sachs), Domain @gs.com *oder* @ln.ibd.email.gs.com;
- **Richard RÖSENER** (Cubus Partners), roesener@cubuspartners.com;

- **Steffen SCHÖN** (Cubus Partners), schoen@cubuspartners.com.


**IV. Zusammenfassung**

Abschließend ist abermals darauf hinzuweisen, dass zahlreichen Beweisanträgen des Beschuldigten – trotz bereits sehr lange andauernder Ermittlungen – bis dato **nicht** gefolgt wurde. Zu einer Vielzahl an relevanten, den Beschuldigten erheblich **entlastenden** E-Mails, Chat-Nachrichten etc. hat der Beschuldigte nach wie vor **keinen Zugang**. [9] Obwohl dem Beschuldigten bis dato also lediglich ein Bruchteil an Informationen zur Verfügung steht, zeigen schon wenige auszugsweise Belege, dass das Management von Lindsay Goldberg im gegenständlichen Verfahren ihre Position im Unternehmen völlig falsch darstellt und so der Beschuldigte völlig zu Unrecht belastet wird. Die im Rahmen dieser Stellungnahme dargelegten Ausführungen führen klar vor Augen, dass Thomas UNGER bis dato ein völlig unzutreffendes Bild in Bezug auf die Vorgänge bei SCHUR zeichnete.

Vor diesem Hintergrund kann der Beschuldigte im Hinblick auf die bevorstehende Vernehmung zum jetzigen Zeitpunkt Folgendes festhalten:

Aus den oben dargestellten Gründen und Dokumenten ergibt sich nunmehr eindeutig, dass Thomas UNGER tatsachenwidrig behauptet, nicht ins operative Geschäft der SCHUR involviert gewesen zu sein. Gerade umgekehrt: Thomas UNGER war in die operativen Abläufe der SCHUR intensiv eingebunden und war – wie Marek PAWLAK ausführt – der „Lenker und Denker" (siehe hierzu zuletzt die Aussage von Marek PAWLAK[10]). Daraus erhellt, dass auch seine Verantwortung dahingehend, dass ihm das EUR 4 Mio. Darlehen an Michael SCHERNTHANER nicht erinnerlich sei (AS 31 ff in ON 598), unrichtig ist.

---

[9] Siehe hierzu etwa die Anträge des Beschuldigten ON 234, ON 294 und ON 336 sowie auch die zahlreichen Anträge der Mitbeschuldigten, denen ebenfalls bloß geringfügig entsprochen wurde.

[10] Vernehmung Seite 3 in ON 1112.

667

Thomas UNGER kannte den Sachverhalt und war als Eigentümervertreter mit dieser Vorgehensweise einverstanden.

Eine umfassende Äußerung zu den Vorwürfen behält sich der Beschuldigte vor, bis den offenen Beweisanträgen entsprochen wird, wobei eine solche dann wohl ohnehin obsolet sein wird, da die Vorwürfe dann durch objektive Beweisergebnisse widerlegt sein werden.

Dr. Michael FISCHKIN

To
Zentrale Staatsanwaltschaft zur Verfolgung von
Wirtschaftsstrafsachen und Korruption [Central
Public Prosecutor's Office for the Prosecution of
Economic Crimes and Corruption]
Dampfschiffstrasse 4
1030 Vienna

[Handwritten:] /1172

**Submitted on: 5 St 1/22g** [Handwritten:] – 850

Electronically submitted on December 3, 2024
PLCB Pauer Law & Caspar-Bures
Rechtsanwalts GmbH

**Contributor (P133386)**

Günthergasse 3/3, 1090 Vienna
E-Mail: office@pauerlaw.at
IBAN: AT744213090101011378
BIC: VBOEATWWKLA
Company register number: 624363g
Reference: FiscMi/1

## Statement on the comments by Thomas Unger and on the role of the management of Lindsay Goldberg

Please note the attached document.

Thank you very much!

### 1 Appendix

1. **Statement on the comments by Thomas Unger and on the role of the management of Lindsay Goldberg**



[Logo:] **PAUER LAWS CASPAR-BURES**
CRIMINAL LAW AND COMMERCIAL CRIMINAL LAW

Partner Attorney Mag. Johann Pauer
Partner Attorney Bettina Caspar-Bures, LL.M.
Attorney Florina Fischer, LL.M., BSc
Attorney Mag.ª Nina Beganovic

Zentrale Staatsanwaltschaft zur Verfolgung von
Wirtschaftsstrafsachen und Korruption [Central
Public Prosecutor's Office for the Prosecution of
Economic Crimes and Corruption]
Dampfschiffstrasse 4
1030 Vienna
**via web-ERV**

**AZ 5 pcs I/22g**

Vienna, dated 12/03/2024
FiscMi/1/FF

| | |
|---|---|
| **Defense attorney:** | Dr. Michael Fischkin |
| | Vorgartenstrasse 120/14, 1020 Vienna |
| represented by: | PLCB Pauer Law & Caspar-Bures Rechtsanwalts GmbH Günthergasse 3/3, A-1090 Vienna |
| | Power of attorney granted in accordance with § 8 of the Austrian Code of Conduct for Attorneys *[Rechtsanwaltsordnung, **RAO**])* |
| | Code P 133386 |

| | |
|---|---|
| due to: | §§ 153 (3) 2nd case of the Austrian Criminal Code *[Strafgesetzbuch, **StGB**]*; §§ 165 (1), 165 (4) of the StGB; § 163a (1) Clause 1 of the StGB; |
| | § 12 3rd case of the StGB §§ 146,147 (1) Clause 1, 147 (3) of the StGB |

# COMMENTS ON THE STATEMENTS BY THOMAS UNGER (ON 598, ON 740, ON 1161) AND ON THE ROLE OF LINDSAY GOLDBERG'S MANAGEMENT AT SCHUR

1 copy
Enclosures: **0**

**PLCB Pauer Law & Caspar-Bures Attorneys LLC**
Günthergasse 3/3 | A-1090 Vienna
FN 624363g | VAT registration number ATU80460635
T: +43 1 388 0207 | F: +43 1 388 0207-83
E: office@pauerlaw.at | H: www.pauerlaw.at

Carinthia office:
Herzog Bernhard Platz 5 | A-9300 pcs Veit/Gian

IBAN AT74 4213 0901 01011378 | BIC VBOEATWWKLA

With respect to Thomas UNGER's previous statements on his role at SCHUR (statements by Thomas UNGER as of June 16, 2023 [ON 598], November 6, 2023 [ON 740] and most recently as of November 20, 2024 [ON 1161]) and on the role of the other Lindsay Goldberg advisory boards and Lindsay Goldberg management and their advisors, the defendant submits the following

## STATEMENT:

Although a large part of the accused's requests for evidence has still not been granted, numerous exculpatory e-mails, messages, documents, files and other information have not been obtained, despite having been requested several times, and these are therefore still not in the investigation file. The accused would like to make a statement at this stage, even without the exculpatory evidence, because some persons in the present proceedings are completely misrepresenting their position and role and their sphere of influence in the company Schur Flexibles Holding GmbH (hereinafter: "SCHUR"), shifting their responsibility onto the accused and thus wrongly incriminating the accused.

The background to all these criminal charges is the sale of SCHUR by Atlas Flexibles B.V. and Lindsay Goldberg Europe GmbH (hereinafter: "Lindsay Goldberg") to B & C KB Holding GmbH (hereinafter: "B & C") in 2021. Since the defendant never conducted sales negotiations with B & C, he could not, by definition, deceive the B & C officers. The defendant did not know the purchase price or the factors determining the purchase price. **The accusation of fraud against the defendant is therefore misplaced for these reasons alone.** The fact that SCHUR used the activation potential in accordance with the International Financial Reporting Standards (hereinafter "IFRS") was clearly communicated and generally known, in particular to the B&C due diligence advisors (including E&Y and McKinsey) and the auditor of SCHUR (PwC). Activations and EBITDA calculations were submitted to Lindsay Goldberg Europe GmbH and discussed in detail with the management there, in particular Thomas UNGER, but also Paul PRUSS.

[Logo:] [illegible]

[handwritten:] 6)/\

What is more, the accounting policy – namely the use of capitalization rules prescribed by IFRS – was dictated by Lindsay Goldberg. Thomas UNGER not only knew the details of SCHUR's figures, but was also active as "Active Chairman" and de facto CEO and managing director in the operational area of SCHUR. The information provided by Thomas UNGER so far therefore does not correspond to the true facts, which is why this statement deals in particular with Thomas UNGER's information. The false statements made by UNGER are also **in no way comprehensible to the defendant**, since the activations and EBITDA calculations were always broken down in a transparent, detailed and comprehensible manner, which alone rules out a "deception" of B & C within the meaning of § 146 of the StGB for this reason.

Whether Thomas UNGER only falsely claims that he was not involved in the operational business of SCHUR because the management withheld information from Lindsay Goldbergs during the sales process, which it had received from SCHUR, cannot be said by the defendant, since he was not involved in the sales process. The background to this false claim may also be due to the fact that the sale was "secured" by a W&I insurance policy. The insurance company could in fact turn to Lindsay Goldberg under certain conditions (including misconduct on the part of decision-makers such as UNGER).

After the incorrect statements by Thomas UNGER insinuate that Lindsay Goldberg was not aware of the activations and EBITDA calculations in detail, the defendant is already making a statement, although numerous requests for evidence have not yet been granted that will confirm the defendant's statements:

## I. Introduction

This statement shows that

- Lindsay Goldberg's management was kept informed of the accounting in accordance with IFRS and EBITDA calculations on an ongoing, regular, transparent and comprehensive basis;

- Lindsay Goldberg's management was actively involved in operational financial matters at SCHUR and in EBITDA calculations for SCHUR;

- Lindsay Goldberg's management had a massive interest in maximizing the sale price to B&C through equity and incentive programs and bonus schemes,

- Lindsay Goldberg's management, in particular Thomas UNGER and Paul PRUSS, independently negotiated with B&C and decided themselves which documents and information to share with B&C.

- Lindsay Goldberg's management had already set up an operational organizational structure and corresponding operational projects in 2017 (among other things, together with the consulting firm Stern Stewart, initiated by Thomas UNGER), which formed the basis for the later capitalizations carried out in accordance with IFRS.

- Lindsay Goldberg management independently negotiated with B&C and decided which documents and information to disclose to B&C.

## II. Preliminary remarks

The statements made by Thomas UNGER so far give the impression that he was **not involved in the operational business** of SCHUR, in IFRS **accounting or in general financial matters at SCHUR**. This is factually incorrect and Thomas UNGER is apparently trying to downplay the actual role he played within the SCHUR Group for several years, namely the function of an "Active Chairman" and de facto CEO of SCHUR, and to **"offload"** all **responsibility for SCHUR's finances and accounting issues** onto SCHUR employees. This is evident, among other things, from the following passages in his remarks:

Thus, Thomas UNGER already emphasizes in his first statement as of June 16, 2023 (ON 598) on AS 12 as follows:

4

[Logo:] [illegible]                                            [handwritten:] 7

[handwritten:] 673

*"Contrary to B&C's view, Thomas Unger was **not involved in the day-to-day business of SFH.»** **Operational decisions were made exclusively by the Board of Management.** Neither the Advisory Board nor the chairman of the Advisory Board had the **authority to manage the SFH operationally** and the Advisory Board did **not interfere in the daily operational business.***

*To prevent misunderstandings or deliberate misrepresentations: **Thomas Unger also did not have the task to supervise the Board of Management of SFH or to control its financial management!»***

In his first statement as of June 16, 2023 (ON 598), Thomas UNGER initially exercised his right to refuse to give evidence on the subject of the alleged accounting manipulations at SCHUR (see AS 36 in ON 598).

In his second statement as of November 6, 2023 (ON 740), Thomas UNGER also addresses the accusation of balance sheet manipulation and his suspected involvement in this matter in more detail.

In his second statement as of 6 November 2023 (AS 7 et seqq. in ON 740), Thomas UNGER emphasizes that he was not responsible for **preparing and auditing SCHUR's annual financial statement** and that he was **not involved** in them. On page AS 7 of ON 740, he writes the following:

*"Thomas Unger was **not responsible for preparing the annual or consolidated financial statement of SFH, nor was he involved in this process.»** He also had <u>**no knowledge of the operational details**</u> of SFH's <u>**accounting or the preparation of its annual financial statement**</u> and was not involved in the decision as to which expenses were <u>**capitalized**</u> as **fixed** assets, and which were **recorded as operating expenses in the Profit and Loss Account.** It was also not his job to audit the accounting or the annual or consolidated financial statements of SFH. This task was the responsibility of the respective auditor, PwC Germany or PwC Austria."*

Thomas UNGER also makes false statements regarding SCHUR's **accounting policies and the development of key financial figures**, in particular EBITDA. Thomas UNGER refers to his formal position as a member of the Advisory Board and gives the impression that he (as a member of the Advisory Board) merely **received information** and did **not influence the operational business in any way.**

In his second statement as of November 6, 2023, Thomas UNGER states with regard to the EBITDA that this figure was only "reported" to him and that he was *"informed"* about its development. Specifically, he states the following (see AS 8 in ON 749):

*"As chairman of the Advisory Board of the SFH, it was his* [note: Thomas UNGERS's] *main task is to **advise and support the Board of Management in strategic decisions** and to represent the shareholders of SFH in their dealings with the Board of Management. For these tasks, the Advisory Board required up-to-date information on the development of the business and the earnings situation of the SFH. **EBITDA is one of the key figures for the company's business performance and earnings, which is why the Board of Management of SFH <u>had to report</u> regularly to the Advisory Board.***

***EBITDA was also a relevant business indicator for the majority shareholder of the Schur Flexibles Group. The Advisory Board of SFH was therefore regularly <u>informed</u> about the development of the EBITDA of the Schur Flexibles Group."***

These statements are also **misleading and factually incorrect**. Thomas UNGER, Paul PRUSS and the other members of the Advisory Board **did not** merely play the **role of "information recipients"**. On the contrary, they **actively** and **significantly influenced the accounting and development of the company's key figures (in particular EBITDA) as part of the accounting policy.**

6

[Logo:] [illegible]

[handwritten:] *9*

Contrary to his statements in the present proceedings, Thomas UNGER was indeed actively involved in operational (financial) matters during his time as chairman of the Advisory Board of SCHUR and, in particular, set the goal of **exploiting the capitalization options permitted under IFRS.**

The defendant also **cannot** comprehend the attempt to deny the facts regarding his involvement and that of his colleagues on the Advisory Board, Thomas **LUDWIG**, Paul **PRUSS** and Michael **DEES**, as well as the Lindsay Goldberg Senior Analysts (Philipp **SCHALL**) in the **operational business,** i.e. the day-to-day business of SCHUR. Thus, the defendant still remembers very well – contrary to the statements of Thomas UNGER – to what extent Thomas UNGER and his colleagues on the Advisory Board were actually not only involved in the **day-to-day business of SCHUR,** but also played a **decisive role in actively** determining the **definition and development of the company's key figures** since he joined SCHUR in 2016. The accused will show this with some of the documents he has received in the context of this statement. Thomas UNGER and the other members of the Advisory Board were closely involved in the financial affairs of SCHUR and, as can be proven, were **fully informed at all times about the key financial figures and the amount of IFRS capitalizations in detail. The decision on <u>which</u> activations should be exercised came from Lindsay Goldberg** herself.

Lindsay Goldberg also consulted external advisors on these matters, who were very closely involved in the discussions around the (restatement of the) financials. On the part of Lindsay Goldberg, **Paul PRUSS** was, for example, in charge of every refinancing (developed, for example, EBITDA reconciliations) for which financial and other key figures also had to be submitted to the refinancing banks. Paul PRUSS had always initiated the coordination and preparation of these key figures through the consulting firm **CUBUS** (Richard RÖSENER and Steffen SCHÖN). **Goldman Sachs** (in particular, Christopher Dröge and Matthias Wich) was also a **permanent advisor** (in particular during the two exit processes in 2019 and 2021) and **investment bank** of Lindsay Goldberg.

As the defendant had himself perceived from numerous meetings, Goldman Sachs, **together with B&C**, Thomas UNGER and Paul PRUSS, was the **first point of contact for buyers in the sales process and, as various documents show, Goldman Sachs helped to shape the EBITDA discussions and decided together with Lindsay Goldberg which EBITDA would be communicated to the potential buyer.**

In this context, the statements made by Thomas UNGER give the impression that he, **his colleagues on the Advisory Board** (Lindsay Goldberg) and the permanent advisors of Lindsay Goldberg (including Goldman Sachs) would like to deliberately **distract from** the actual circumstances and their intensive involvement in SCHUR's accounting and financial matters and to **shift** his and Lindsay Goldberg's responsibility. Thus, his statements draw – incorrectly – the picture that the management of SCHUR had **sole responsibility** in the following areas:

(i)   Definition of control-relevant key performance indicators (hereinafter: KPI);

(ii)  Accounting policies and decisions regarding the interpretation of accounting standards;

(iii) Preparation and audit of the consolidated financial statement and selection and change of auditor.

Moreover: These statements by Thomas UNGER give the impression that he is even trying to completely evade **his responsibility as a seller to the buyer** in a transaction, in this case the sale of the Schur company to B&C.

This attempt is particularly evident from the following statement by Thomas UNGER in his statement as of June 16, 2023 (ON 598, AS 11): *"The EBITDA and the figures it contains were analyzed by B&C and their advisors as part of the buyer DD and discussed in detail with Schur's management."* This information is also apparently intended to distract from the fact that the sales negotiations with B&C were conducted **exclusively by Lindsay Goldberg**. Fact is that **Lindsay Goldberg Europe / U.S. were the sellers. Lindsay Goldberg, the saleswoman, conducted the negotiations** and decided on the factors that would determine the purchase price. Contrary to this claim, the *"management of SCHUR"* was **not involved in these sales negotiations with B&C and did not know the purchase price until the end, nor did it know on what basis this purchase price was calculated.** The defendant is aware of this because he remembers conversations with the then CEO Michael SCHERNTHANER, in which the latter complained that he knew neither the basis for the purchase price nor the purchase price itself.

8

[handwritten:] *11*

[Logo:] [illegible]

As part of the transaction with B&C, SCHUR was required to **provide Lindsay Goldberg and its advisors (e.g. Goldman Sachs) with all requested information.** This task was also **demonstrably fulfilled.**

In particular, the preparation of the figures as part of the B&C exit process and its preparation focused strongly on IFRS topics (B&C's focus in the context of the financial due diligence actions was mainly on capitalization issues) and on the presentation of the cash EBITDA (adjusted EBITDA less IFRS capitalizations); this was communicated to Lindsay Goldberg (also with the help of detailed reconciliations from "adjusted EBITDA" to "cash EBITDA"). To what extent and with what degree of transparency this information was ultimately passed on by Lindsay Goldberg to the buyer B&C is **not known to the defendant.**

It is not clear why Thomas UNGER is shifting all responsibility away from himself and repeatedly emphasizing – **contrary to the facts** – that he was **not involved** in the operative business of SCHUR or the development of the company's key figures (such as the EBITDA). This is especially true because the use of accounting options within the meaning of IFRS - as specified by Thomas UNGER - was in any case **permissible** and lawful.

In any case, the **economic interests of the advisory board members** were considerable, which was apparently a significant reason for the influence of the Advisory Board members on operational issues and the development of SCHUR's key figures. The fact that Thomas UNGER had a significant interest in the key figures is evident from the fact that he participated **directly in the sales price** through the **Management Equity Program** ("MEP") and increased his stake in SCHUR from around 2% in 2017 to around 5% at the time of the sale to B&C. Due to the **successful sale** to B&C, Thomas UNGER received **between 15 million euro and 20 million euro**. It is therefore evident that Thomas UNGER constantly reviewed the financial figures of the management and was involved in the operational business. The statements made by Thomas UNGER so far are all the more incomprehensible.

9

Accounting and IFRS financial reporting were also **properly carried out and disclosed by** SCHUR **at all times** (as Thomas UNGER himself also states, cf. AS 11 et seqq. in ON 740). When the company's key figures were prepared as part of both exit processes (2019/2020 and 2021), great importance was therefore attached to the fact that the capitalizations including *"Adjusted EBITDA"* were presented in a detailed, transparent and comprehensible manner. For this reason, as numerous documents show, the focus was also placed on the **presentation and disclosure of the "cash EBITDA"** (EBITDA less non-cash accounting items, such as IFRS capitalizations) when preparing the company's key figures for the 2021 exit process. Michael DEES, Thomas LUDWIG, Thomas UNGER, Paul PRUSS, Philipp SCHALL and **Goldman Sachs** as investment bank and M&A advisor to Lindsay Goldberg were provided with detailed **reconciliations** of **"cash EBITDA"**. The fact that Lindsay Goldberg coordinated very closely and intensively with Goldman Sachs with regard to the EBITDA (2019 to 2021) during the B&C sales process and discussed the financial key figures in great detail (EBITDA reconciliations and value-relevant KPIs were even largely created by Lindsay Goldberg and Goldman Sachs themselves, as various Excel sheets show), is evidenced by several e-mail correspondences known to the defendant (for example, with Christopher DRÖGE, Matthias WICH and other participants and employees of Goldman Sachs).

**The suspect is unable to assess which key financial figures Lindsay Goldberg** and its financial advisor, **Goldman Sachs, ultimately presented to** the buyer (B&C) **as purchase price-relevant during the 2021 sales negotiations** and whether they also communicated the "cash EBITDA" to the buyer completely and transparently. He was not involved in the negotiations for the sale to B&C. Thomas UNGER and Paul PRUSS, as representatives of Lindsay Goldberg, on the other hand, were – as will be shown in the context of this submission – **key figures** in the 2021 exit process and were the main negotiators with B&C.

[handwritten:] *13*

[Logo:] [illegible]

The process structures for the 2021 exit process (sale of SCHUR to B&C) were set up in such a way that Thomas UNGER and Paul PRUSS (from Lindsay Goldberg) led the negotiations with Herbert ORTNER, Thomas ZIMPFER, Markus FÜRST and Patrick LACKENBUCHER (from B&C). On the advisory side, Lindsay Goldberg Goldman Sachs was involved for Lindsay Goldberg Goldman Sachs, and for B&C Morgan Stanley.

**Negotiations on the EBITDA, the value drivers, purchase price models and, ultimately, the purchase price** were **conducted within this group (Thomas UNGER, Paul PRUSS, Herbert ORTNER, Thomas ZIMPFER, Patrick LACKENBUCHER, Goldman Sachs, Morgan Stanley).**

Thomas **UNGER** was the **"*key person"*** in the exit process with B&C and is **now endeavoring** to **"distance"** himself from SCHUR's operating business and involvement in the development of EBITDAS, although his role **in the sales negotiations with B&C** was to **fully communicate the financially relevant key figures provided to him, including the "cash EBITDA".**

In the context of the present statement, the accused will now explain the following circumstances and provide suitable documentation to support them:

- Thomas UNGER is a proven **financial expert** (long-standing CFO of the Metro Group) with many years of expertise in the financial sector, who has also gained extensive experience with private equity-based M&A transactions in which he played an active role;

- Thomas UNGER has already **actively driven** and managed the **exit process** at Constantia Flexibles GmbH (hereinafter: "Constantia Flexibles") in 2014 and was also involved in **all EBITDA-related topics** at Constantia Flexibles;

- In the period between 2017 and 2019, Thomas UNGER was actively involved in the business of SCHUR in his role as **"Active Chairman"** and during this time he *de facto* performed the duties **of the CEO of SCHUR**;

11

- The **requirement** to **interpret** IFRS standards in the sense of the private equity structure and thus to **make comprehensive use of the capitalization options provided by IFRS came from Thomas UNGER**. Thomas UNGER and the other members of the advisory board were **familiar** with the **capitalization issues** permitted under IFRS, the **amount to be capitalized**, the **adjustments** and thus the **composition of** SCHUR's **EBITDA**. Moreover, Lindsay Goldberg dictated which EBITDA adjustments were to be made.

- Lindsay Goldberg, specifically Thomas UNGER, Paul PRUSS, Thomas LUDWIG and Phillip SCHALL, spent years submitting **numerous detailed and extensive inquiries (based on documents they created themselves)** to the management and employees of SCHUR on finance-related topics.

  The defendant has partially documented requests from Thomas UNGER, Paul PRUSS and Phillip SCHALL himself, but expects **comprehensive documentation** when the **mailboxes** of the aforementioned persons **are secured**.

  These members of Lindsay Goldberg submitted inquiries during regular Advisory Board meetings, discussions on the exit processes, and also as ad hoc inquiries. Such requests were also made on the basis of Lindsay Goldberg-prepared, Excel-based EBITDA reconciliations. The following is an Explorer folder structure of the accused with (only) selected **communication** on financial and, in particular, EBITDA topics between Michael SCHERNTHANER, Michael FISCHKIN, Conny STÖHRER and Thomas UNGER Thomas UNGER, Paul PRUSS, Philip SCHALL, Lindsay Goldberg Europe and Lindsay Goldberg US from the years 2020 and 2021:

[handwritten:] *15*

[Logo:] [illegible]

68A

## Financial communication from 2020



1st October TU request for US_ad hoc für SF Liveo Faccor

3rd November 2021 cashflow (autoletion INTERNAL

4th september request region

5th June 2020 requires Meeting

5th October T request EBITDA negotiations 2020/2021

8th December request 2019 and 2020 EBITDA

7th December request Soll and Budget 2021

11th December TU request Soll az

14th September Js Partners Call Szenario

17th December requires Meeting

18th April 2021 template DD steps and strategy

18th March 2021 requires Meeting

19th August Js Partners Call 2021 performance

20th July Partners Call TP key highlights

2nd product Platform ad hoc for of Invest

3rd October T request M&A strategy

6th June request funding planning and Cash Aspect

11th September request Pe template

14th June 2021

19th May 2021 template value creation und SB Unterlage

27th April 2021 requires Meeting

8th key request

7th September update

10th October request meeting

13

## Financial communication from 2021

| Name | | Date modified | Type |
|---|---|---|---|
| 1st February_TU Request M&A and BP | ⊙ | 10/16/2022 09:24 PM | File folder |
| 6th February_TU request Stelvio orgchart & ress... | ⊙ | 10/16/2022 09:24 PM | File folder |
| 6th May Q1 Net Debt | ⊙ | 08/31/2023 04:49 PM | File folder |
| 7th June_FC | ⊙ | 10/16/2022 09:24 PM | File folder |
| 11th January_PP GS request 2019-2021 EBITDA | ⊙ | 10/16/2022 09:24 PM | File folder |
| 12th April_Schall request_Antitrust | ⊙ | 10/16/2022 09:24 PM | File folder |
| 12th February_Deloitte audit request | ⊙ | 10/16/2022 09:24 PM | File folder |
| 13th January Schall request minorities update | ⊙ | 10/16/2022 09:24 PM | File folder |
| 16th April Schall request Minorities | ⊙ | 10/16/2022 09:24 PM | File folder |
| 16th February_TU request CFLEX_SF operational... | ⊙ | 10/16/2022 09:24 PM | File folder |
| 16th March_TU request EBITDA 2019 2020 | ⊙ | 10/16/2022 09:24 PM | File folder |
| 17th March Schall request SF acquisitions | ⊙ | 10/16/2022 09:24 PM | File folder |
| 19th April_Net Debt_Minorities | ⊙ | 08/31/2023 04:51 PM | File folder |
| 22nd February_regular meeting | ⊙ | 10/16/2022 09:24 PM | File folder |
| 22th April_regular meeting | ⊙ | 10/16/2022 09:24 PM | File folder |
| 23rd March_Schall request minorities_Sky invoice | ⊙ | 10/16/2022 09:24 PM | File folder |
| 23th March regular meeting | ⊙ | 10/16/2022 09:24 PM | File folder |
| 24th June_Earn Out Model | ⊙ | 10/16/2022 09:24 PM | File folder |
| 25th April_Earn Out | ⊙ | 10/16/2022 09:24 PM | File folder |
| 25th January_Pruss request project SACHER | ⊙ | 10/16/2022 09:24 PM | File folder |
| 25th May_regular meeting | ⊙ | 10/16/2022 09:24 PM | File folder |
| 26th March_MiS request M&A | ⊙ | 10/16/2022 09:24 PM | File folder |
| 26th May_B&C Refi IM | ⊙ | 10/16/2022 09:24 PM | File folder |
| 27th January_TU request CFLEX synergies | ⊙ | 10/16/2022 09:24 PM | File folder |
| | ⊙ | | |

- Thomas UNGER was chosen by Lindsay Goldberg, specifically Michael DEES, as the **key man** for the **transaction** with **B&C**. Consequently, Thomas UNGER has also **positioned** himself as such a key figure in the 2021 exit process.

- This resulted in **Thomas UNGER and Paul PRUSS taking the lead in negotiations with B&C** regarding **the purchase price and valuation methods,** and **actively participating in the project management for the 2021 exit process.** The process structures were clearly defined so that Thomas UNGER and Paul PRUSS conducted the negotiations with Thomas ZIMPFER, Herbert ORTNER and Patrick LACKENBUCHER.

14

[handwritten:] *17*

[Logo:] [illegible]

- Furthermore, as part of the exit process in 2021, due diligence documents, audit documents relevant to the 2020 consolidated financial statement, and key financial figures (KPIs) from Thomas UNGER and Paul PRUSS had to be **released**.

In the course of the following statements, the defendant will now show some e-mails and Excel files from Thomas Ungers that he has received, which impressively demonstrate Thomas Unger's close involvement in SCHUR's accounting policy, EBITDA management and financial matters, as well as his general operational role within SCHUR. The role of the other Advisory Board members, especially in the 2021 exit process, is also shown. **A transfer of further relevant e-mails is currently being processed and will be provided later. The investigating authorities will only be able to get the full picture by securing the communication channels that were used for the sales negotiations.**

### III. On Thomas UNGER's role in detail

### 1.    On the professional background of Thomas UNGER

As for Thomas UNGER's professional background, it is clear that he had gained many years of experience in finance, even by the time he joined Lindsay Goldberg, and was thus a proven **expert in the field**.

Thomas UNGER began his career at VAW Aluminium AG, where he worked for five years as Chief Financial Officer (CFO).[1] From 2002 to 2010, he held the position of **Chief Financial Officer** (CFO) and Deputy Chief Executive Officer (CEO) at **Metro AG**. [2] In this role, he was responsible **for the finances** of a group with a turnover of over **60 billion euro**[3].

---

[1] https://www.presseportal.de/Dm/64034/3554333

[2] https://www.presseportal.de/Dm/64034/3554333

[3] https://www.faz.net/aktuell/wirtschaft/unternehmen/handel-metro-mit-groess-tem-umsatzwachstum-seit-sechs-iahren-1408927.html

In 2010, Thomas UNGER finally joined **Constantia Flexibles**, where he served as CEO until 2015. His goal in joining Constantia Flexibles was to maximize the company's earnings (EBITDA) and to prepare the company for a sale within the next 3-5 years and to actually carry out the sale. He also succeeded in doing so, increasing Constantia Flexibles' sales by 90% to 1.9 billion euro between 2010 and 2015 and boosting EBITDA disproportionately. Ultimately, at the end of 2014, the French investment company Wendel SE (hereinafter: "WENDEL") acquired Constantia Flexibles for 2.3 billion euro.[4]

Thomas UNGER was not only very closely involved in the exit process (sale to WENDEL) at Constantia Flexibles, but had also previously supported the IPO of Constantia Flexibles in[5] 2013. In both projects, he had placed a strong focus on financial metrics and in particular on EBITDA management. During his time at Constantia Flexibles – or so the defendant perceives – it was extremely important to Thomas UNGER to be at the forefront of the IPO process as well as the process of selling Constantia to the French WENDEL Group, to be aware of all the details and figures, and to negotiate himself. The accused had the impression that Thomas UNGER had been unable to let go of operational finance even during his time at Constantia.

At the time when Thomas UNGER was CEO of Constantia Flexibles, the defendant also worked for Constantia Flexibles. In this area, the defendant worked together with Thomas UNGER on some topics. In his role as CEO of Constantia Flexibles, Thomas UNGER was already **very closely involved in the development and presentation of EBITDA** and was actively involved in accounting policy. Thomas UNGER provided the management of Constantia Flexibles with clear guidelines on the comprehensive interpretation of IFRS standards and **actively promoted IFRS capitalizations there.**

---

[4] https://www.presseportal.de/pm/64034/355433_3

[5] https://kurier.at/wirtschaft/constantia-flexibles-sagt-boersengang-ab/37.732.583

[handwritten:] *19*

[Logo:] [illegible]

685

As part of the exit process of Constantia Flexibles in 2015, Thomas UNGER was responsible for **communicating the company's key figures** to the then interested buyers CVC, Cinven and WENDEL. The investors CVC and CINVEN were later also involved in the exit processes of SCHUR. Thomas UNGER was later responsible (together with the investment bank of Lindsay Goldberg, Goldman Sachs) for selecting potential buyers for the SCHUR Group.

As the above statements show, Thomas UNGER was already working for Constantia Flexibles as CEO with a clear focus on finance (from the point of view of the defendant, UNGER was actually the operational CFO). In particular, he placed a strong focus on financial key figures as part of the 2015 exit process and was actively involved in the development of EBITDA.

In 2017, Thomas UNGER joined Lindsay Goldberg Vogel GmbH as Managing Partner.[6] At that time, as the above statements show, he had already gained extensive experience as a finance director in several large companies and played a leading role in major M&A transactions in the private equity sector.

## 2.    The role of Thomas Ungers at Schur

As managing partner of the private equity investor Lindsay Goldberg, Thomas UNGER was responsible for investments in the packaging industry, including the SCHUR Group. Thomas UNGER was appointed by Lindsay Goldberg as an advisor to the SCHUR Advisory Board and held the position of **Chairman of the Advisory Board** from September 2017 to September 2021. In this position, Thomas UNGER did not just take on a "passive" role on the Advisory Board. Rather, he acted as **de facto CEO of SCHUR from the beginning of the period between 2017 and 2021**, as will be illustrated below, and was also perceived as such within SCHUR (as has since become clear from numerous interrogations). This was reflected, among other things, in the fact that Thomas UNGER and his Advisory Board and Lindsay Goldberg colleagues (including Paul PRUSS and Philipp SCHALL) addressed their questions directly to SCHUR employees and communicated with them directly. Among others, this affected the accused himself, Conny STÖHRER, Sebastian ARTLIEB and, for example, Daniela SCHALKO.

---

[6] https://www.presseportal.de/pm/64034/3554333

[Logo: illegible]

Thomas UNGER's account that he was only informed of events and was not involved in the Board of Management of SCHUR (see, for example, his statements in ON 598, AS 14 et seqq.) is therefore **not correct.** By way of example, it should be mentioned at this point that Thomas UNGER himself took over communication with the local managing directors of SCHUR-Werke, conducted performance reviews with the managing directors of SCHUR-Werke and even calculated their bonuses himself (which are **classic tasks of a CEO**).

The following circumstances, among others, make it clear that Thomas UNGER's influence in the field of SCHUR was in fact not limited to his formal position as the owner's representative on the Advisory Board (without being involved in the operative business):

(i)    Thomas UNGER already discussed the accounting of SCHUR in detail in 2016/2017, thus laying the foundation for the accounting in subsequent years.

Both Paul PRUSS (a director at Lindsay Goldberg) and Thomas UNGER were familiar with SCHUR's accounts as early as 2016 – in other words, either before or shortly before the acquisition of SCHUR by Lindsay Goldberg. In **October 2016** (i.e. at a time when the defendants Michael SCHERNTHANER and Michael FISCHKIN had not yet joined the company), Thomas UNGER and Paul PRUSS **discussed** the **capitalization** of SCHUR as a valuation-relevant topic. When SCHUR was acquired by Lindsay Goldberg in October 2016, the issue was the capitalization of so-called "tooling costs" in the millions. Thomas UNGER (as an expert in the packaging industry), Ernst & Young (as auditors of the SCHUR Group in 2016) and the M&A advisory firm MPCF (based in Vienna) were involved in this topic.

18

[handwritten:] *21*

[Logo:] [illegible]

(687)

(ii)  <u>Dismissal of the former CEO of SCHUR</u>

After SCHUR was acquired by Lindsay Goldberg, Thomas UNGER had Jakob MOSSER, the then CEO and founder of SCHUR (whom Thomas UNGER already knew and apparently did not trust), **dismissed.** Michael SCHERNTHANER was the sole managing director of SCHUR, but as CFO he was only responsible for finance. The position of CEO, on the other hand, was officially vacant (almost continuously) from 2017 until mid-2019. In the period following the dismissal of Jakob MOSSER as CEO (2017), Thomas UNGER finally took over the role of **CEO** of SCHUR **himself** – almost full-time – until mid-2019. Thomas KÜHN was only appointed as CEO of SCHUR between April and July 2018. Thomas KÜHN ended his role after just three months, and Thomas UNGER then took on the role of de facto CEO again (see also point (iv) below).

(iii)  <u>Intensive involvement of Thomas UNGERS, Paul PRUSS and others in SCHUR's</u>
<u>financial matters after the acquisition by Lindsay Goldberg</u>

Overall, Thomas UNGER and Paul PRUSS were perceived as a very *financially* minded duo. From the time he joined SCHUR in August 2017, the defendant generally gained the impression that Lindsay Goldberg (in particular Thomas UNGER and Paul PRUSS, and to some extent later also Phillip SCHALL) **were very involved in SCHUR's financial matters.**

Specifically, this impression was manifested in the following circumstances:

• Thomas UNGER and Paul PRUSS already determined at the beginning of their tenure in late 2016/early 2017 which **key performance indicators** (KPIs) should be reported to them monthly. They paid particular attention to the size of the **EBITDA.** In 2017, for example, Thomas UNGER, in his role as "Active" Chairman and de facto CEO of SCHUR, initiated the so-called **"man-to-man defense"** project, which was aimed at **improving the EBITDA** of the individual SCHUR locations. Here, too, he actively defined individual performance-related key figures (KPIs) and set the locations targets in this regard, as can be seen from an e-mail correspondence dated July 12, 2017, which the defendant received:

19

| | |
|---|---|
| **From:** | Michael Schernthaner |
| **Sent:** | Wednesday, July 12, 2017 06:06 PM |
| **To:** | Thomas Unger |
| **Cc:** | Christian Kolarik; Bernhard Mumelter; Michael Schernthaner |
| **Subject:** | Manndeckung1_v2 |
| **Attachments:** | Manndeckung1_v2.docx |

Hello Mr. Unger,

Enclosed – as discussed in the meeting – is a summary of the topics and focused entities for the A topics, including the project organization.

Please feel free to call if you have any questions.

Kind regards,
MiS

In order to ensure the rapid further development of SCHUR, Thomas UNGER hired additional external consultants (e.g. Walter OMETTO or Stern Stewart & Co) without prior consultation. They not only support Lindsay Goldberg in defining the strategic direction of the company, but also, and above all, in the operational implementation of the projects defined by Lindsay Goldberg (e.g. "Footprint" projects).

For example, Thomas UNGER even commissioned external consultants (Stern Stewart & Co) to carry out a so-called **"EBITDA benchmarking"** (comparison of SCHUR's EBITDA with those of its competitors, including with regard to accounting) and "EBITDA maximization" (see various presentation documents from Stern Stewart & Co) for the SCHUR Group. **The initiator** of such programs and EBITDA comparisons was **Thomas UNGER.** Furthermore, Thomas UNGER wanted PwC (PwC Partner. Hans HARTMANN) to conduct a benchmark study to compare SCHUR in detail with its competitors regarding the use of IFRS capitalizations and to ensure that SCHUR is not worse off than other market participants in this respect.

20

[handwritten:] *23*

[Logo:] [illegible]

689

Lindsay Goldberg wanted to understand the development of EBITDA in detail, including at the individual plant level. Lindsay Goldberg wanted to know in detail how **IFRS capitalizations** were implemented. For this reason, there were also very frequent meetings (including ad hoc ones) with Lindsay Goldberg. In these meetings, **countless EBITDA bridges** and reported EBITDA issues were **discussed in detail.** The initiators of these countless EBITDA discussions and detailed analyses were Thomas UNGER (also in day-to-day business), Goldman Sachs (Christopher DRÖGE, Matthias WICH) in their roles as financing bank on the one hand and leading exit advisor on the other, as well as Paul PRUSS, who was responsible for the SCHUR refinancing (2018, 2020) and was in charge of communicating the financial key figures to the banks.

In the further course of this statement, the accused shows, with the help of e-mails, Excel sheets and other documents known to him, that the driving force behind the SCHUR EBITDA management was Thomas UNGER.

For the formal budget documents for 2021, a reconciliation between "Reported-EBITDA", "Adjusted-EBITDA" and "Cash-EBITDA" was prepared, including a detailed explanation of the **capitalizations** shown, in order to provide Lindsay Goldberg with **transparent information** about the composition of the EBITDA. This is shown, among other things, by the following extract from the budget documents (presentation) as of December 31, 2020, according to which the difference between adjusted EBITDA and cash based EBITDA is approximately 30 million euro:

21

## Budget 2021 assumed between the full and 50% COVID-19 recovery scenarios  SCHUR FLEXIBLES

### Budget 2021

| in m€ / % of Net Sales | 2019 Actual | 2020 FC | COVID scenarios | | | BUD 21' Case |
|---|---|---|---|---|---|---|
| | | | FY21 Full Covid recovery | FY21 50% COVID recovery | FY21 no Covid recovery | |
| Flexibles Sales | 417,8 | 417,0 | 433,7 | 425,3 | 417,0 | 431,1 |
| reported EBITDA* | 77,5 | 76,0 | | | | |
| Adjusted EBITDA** | 82,3 | 84,4 | 95,0 | 89,0 | 84,5 | 91,9 |
| Cash based EBITDA*** | 57,5 | 55,7 | 71,7 | 66,7 | 63,2 | 69,6 |
| Flexibles Division adj. EBITDA Margin | 19,2% | 19,3% | 20,8% | 20,0% | 19,3% | 20,0% |
| | | | ❶ | ❷ | ❸ | |

\* Reported Group EBITDA means audited EBITDA & 2019 reported EBITDA adjusted by Moneta litigation receivable
\*\* Adjusted Group EBITDA means EBITDA according to SFA definition, 2019 EBITDA incl. PwC quality of earnings (CoE) adj.
\*\*\* Cash based Group EBITDA means reported EBITDA minus IFRS 16, IT, R&D and Cylinder Engravings
\*\*\*\* including adjustments from boawill, IFRS 5 and severance cost

### Assumptions COVID cases 🔘

**❶ Full Covid Recovery**
- Covid-19 crisis not existing from 1st January 2021
- Q4 2020 volume losses are regained in Q1 2021

**❷ 50% Covid Recovery**
- Q4 2020 volume losses are regained in Q1 2021
- COVID crisis over from Q2 2021
- From HY2 2021 business as normal

**❸ No Covid Recovery**
- no volume pick-up in Q1 2021
- slight result improvement vs. 2020 Forecast

These budget documents, which were made available to the **entire Lindsay Goldberg Advisory Board,** already show the "Reported-EBITDA", the "Adjusted-EBITDA" and the "Cash-based EBITDA" separately. The significant difference between "Adjusted EBITDA" and "Cash-based EBITDA", which is due to IFRS capitalizations, is also clearly visible. For this reason alone, the **entire Advisory Board was aware of the activations and the amount of the cash EBITDA.**

- Thomas UNGER and Paul PRUSS **actively** prepared countless **(Excel) statements with EBITDA calculations and EBITDA reconciliations** and submitted these for review, with additional questions and their considerations as to whether and how this EBITDA could be achieved.

There are a few e-mails from Thomas UNGER on this subject that show how little he knew about SCHUR's EBITDA (he provided the relevant Excel spreadsheets, reconciliations, etc.) and that he played a leading role in EBITDA management. The following e-mail correspondence, which the defendant received, is shown by way of example, with which Thomas UNGER provided Paul PRUSS and Mr. PRUSS with **EBITDA transfers that he himself had created.**

[Logo:] [illegible]

691

Michael SCHERNTHANER and Michael FISCHKIN *("Copy of*

| From: | Unger, Thomas <Unger@lindsaygoldbergvogel.com> |
|---|---|
| Sent: | Tuesday, 05 May 2020 06:20 PM |
| To: | Pruss, Paul; Schernthaner, Michael; Fischkin, Michael |
| Subject: | Result 19-22 |
| Attachments: | Copy of EBITDA 2020 calculation TU.xlsx |

For tomorrow

*EBITDA 2020 calculation TU[7]").*

| From: | Unger, Thomas <Unger@lindsaygoldbergvogel.com> |
|---|---|
| Sent: | Wednesday, 06 May 2020 10:02 AM |
| To: | Schernthaner, Michael |
| CC: | Pruss, Paul |
| Subject: | Copy of EBITDA 2020 calculation TU.xlsx -Update |
| Attachments: | Copy of EBITDA 2020 calculation TU.xlsx |

Further e-mail correspondence received by the defendant shows how Thomas UNGER prepares further calculations for the SCHUR key figures and requests "telephone calls" or "checks" to this end, or issues specific orders for further processing of these calculations:

| From: | Unger, Thomas <Unger@lindsaygoldbergvogel.com> |
|---|---|
| Sent: | Thursday, September 10, 2020 09:17 AM |
| To: | Schernthaner, Michael |
| Cc: | Pruss, Paul |
| Subject: | EBITDA 019-2021.xlsx |
| Attachments: | EBITDA 019-2021.xlsx |

Good morning,

Enclosed is my attempt to better understand the impact of Covid-19 / developments in 2021.
Can we have a quick chat on the phone today?
Kind regards
TU

---

[7] Note: Thomas UNGER.

| | |
|---|---|
| **From:** | Unger, Thomas <Unger@lindsaygoldbergvogel.com> |
| **Sent:** | Thursday, March 19, 2020 01:39 PM |
| **To:** | Schernthaner, Michael |
| **Subject:** | Minority Valuation Uni Packaging 19-03-20 TU.xlsx |
| **Attachments:** | Minority Valuation Uni Packaging 19-03-20 TU.xlsx |

Please check briefly

| | |
|---|---|
| **From:** | Unger, Thomas <Unger@lindsaygoldbergvogel.com> |
| **Sent:** | Monday, September 14, 2020 03:44 PM |
| **To:** | Schernthaner, Michael |
| **Subject:** | Schurr EBITDA 019-2021.xlsx |
| **Attachments:** | Schurr EBITDA 019-2021.xlsx |

Please include the NWC changes.

The following transfer of Thomas UNGER's EBITDA is only one example of the numerous Excel spreadsheets created by Thomas UNGER himself with EBITDA calculations. The Excel spreadsheet makes it clear that Thomas UNGER was not only "well-versed" in **all the relevant EBITDA items**, but also very familiar with the **capitalization issues**, which he took into account when determining the underlying EBITDA.

24

[Logo:] [illegible]

| | | | | | |
|---|---|---|---|---|---|
| Reported | 82,80 | 4 Mio Settlement agreement mit Atlas Flexibles in | | | |
| Monelas Forderung | 5,00 | | | | |
| Reported EBITDA neu | 77,80 | | davon non cash | 22,50 | |
| operative Restunschärfe | 1,20 | Forderungen gegen insolvente Kunden, etc | | | |
| kommuniziert | 76,60 | | | | |
| Reported EBITDA neu | 77,8 | | | | |
| one offs | 8,30 | laut Definition Bankenvertrag | | | |
| Severance payment | 2,00 | | | | |
| M&A | 1,90 | | | | |
| RecP Finnacing | 0,80 | | | | |
| Business transfer cost | 0,60 | | | | |
| Sky Kostern | 0,50 | | | | |
| Verlagerungskosten aus Werkschließu | 2,50 | | | | |
| | 8,30 | 86,10 | | | |
| Pro Rata | 5,50 | | | | |
| Synmax | 1,50 | 50% realisiert, da Corona verschoben | | | |
| Codrie | 1,80 | nicht | | | |
| Sales Departemet Restrucuring | 2,00 | voll realisiert | | | |
| UPA Verlagerung | 0,20 | | Budget mit Thermopl | 96,00 | |
| Scaniflex | 0,50 | | - davon Thermoplast | 9,00 | |
| davon in 2020 nachweisbar | 3,50 | einsetzen | | | |
| | | | Budget 2020 | 90,00 | |
| Ergebnis 2019 | 89,60 | | synamx projekte vers | -2,00 | |
| Ergebnis 2019 mit Budget vergleichba | 86,60 | | Wachstumsverlust d | -3,00 | 6 Monate Corona |
| abzügl. 2 Mio LTS | 84,60 | | | 85,00 | |
| | | | Allgäu | -4,00 | |
| Budget 2019 mit Scandiflex | 73,80 | Bank Case | | 81,00 | |
| Kundenverlust im Budget 2019 | 6,00 | | | | |
| 50% Abschlag auf Savings Einkauf | 5,30 | | | | |
| 2015 | 85,10 | | | | |
| | | | Umsatzwachstum 20 | 20,00 | |
| Capex | 15,00 | | Ergebniswachstum 2 | 7,00 | 35% |
| Zylinder Aktivierung | 10,00 | | Verlust im Allgäu | -4,00 | |
| F&E | 5,00 | | | 3,00 | |
| IT | 2,50 | | Aufbau Overhead | -1,00 | |
| Ifrs 16 | 5,00 | in Bilanz | 20 | | |
| | 22,50 | | | | |

Metadata:

## Properties

| | |
|---|---|
| Size | 75.9 KB |
| Title | Add title |
| Tags | Add tag |
| Categories | Add category |

## Relevant dates

| | |
|---|---|
| Last updated | 05/05/2020 06:19 PM |
| Created | 04/29/2020 12:35 PM |
| Last printed | |

## Relevant people

| | |
|---|---|
| Author | TU Thomas Unger |
| | Add Author |
| Last changed by | TU Thomas Unger |

[Logo:] [illegible]

- Thomas UNGER even took over the coordination process for the 2020 consolidated financial statement and also made specific proposals regarding the audit process and the **timeline for finalizing the figures in the 2020 annual financial statement** (and thus for finalizing the figures relevant for the 2021 exit with B&C). The fact that **the chairman of the Lindsay Goldberg Advisory Board** almost took on **the role of head of accounting at the company** and **coordinated the audit process at SCHUR operationally** shows how deeply Thomas Unger was involved in SCHUR's operational processes.

- An e-mail from Thomas UNGER to Paul PRUSS, which Thomas UNGER sent in copy to Michael SCHERNTHANER and which the defendant also received, indicates that the figures for the 2020 annual financial statement are to be finalized on March 25, 2021 and then "stable."

| | |
|---|---|
| **From:** | Unger, Thomas <Unger@lindsaygoldbergeurope.com> |
| **Sent:** | Monday, 15 March 2021 07:06 PM |
| **To:** | Pruss, Paul |
| **Cc:** | Schernthaner, Michael |
| **Subject:** | [EXTERNAL] Schur - 2020 result |

On March 25, the figures are stable and agreed with PWC.

Thomas Unger - sent from my iPhone

- Thomas UNGER also got involved in the "sales effectiveness" project and "actively" managed it, as further e-mail correspondence received by the defendant and partially processed in the report by Alvarez and Marsal (e.g., Exhibit AM-199) shows.

AM-199

From:Gerhard Nenning

[Logo:] [illegible]

[handwritten:] *29*

ᵕ₽ᵘ

Sent:November 2, 2017 3:23:06 PM +00:00
To:Michael Schernthaner
Subject:RE: Sales Effectiveness_v3

Hello Mr. Schernthaner,

Thank you for the information...   I look forward to working with you.

Regarding the CSO and the November 10...   Are you already planning with us on that date (me and Mr. Belobokov, if applicable)?

Otherwise, the official kick-off is on November 13 in Baden? We would prepare a kick-off paper.

Before that, you will receive a resource estimate.

Mr. Gerhard Nenning, Chairman of the Board

**Gerhard Nenning**
**Senior Partner**

**Stern Stewart & Co.**
**Salvatorplatz 4**
**86333 Munich, Germany**

**P: +49 89 242071 50**
**F: +49 89 242071 11**
**E: gnenning@sternstewart.com**
**i: www.sternstewart.com**

**Registered office: Munich**
**Company registration number: HRB 120 789**
**Management: Markus Pertl // Dimitri Belobokov // Thomas Berner // Dr. Tobias Braun // Stefan Heppehnann //**
**Milan Manduch // Marcus Middehnann // Gerhard Nenning // Olaf Paltian // Carlo Paoloni // Sibo Sollors //**
**Konstantin Wrona**
**VAT ID for Stern Stewart & Co. GmbH: DE 195 604 920**

**From:** Michael Schernthaner [mailto:Michael.Schemthaner@schurflexibles.com]
**Sent:** Tuesday, October 31, 2017 01:30 PM
**To:** Gerhard Nenning <gnenning@sternstewart.com>
**Cc:**Michael Schernthaner <Michael_Schemthaner@schurflexibles.com>
**Subject:** Sales Effectiveness_v3

Hello Mr. Nenning,

Attached is a paper agreed between Mr. Unger and myself on the content of the project.

We would pick up the CSO on November 10 and would have started the following week.

Mr. Unger and I will be on the Steering Committee, whereby Mr. Unger will also ACTIVELY manage the project.

We should coordinate on this.

Best regards,

27

[Logo:] [illegible]

AM-199

Kind regards

MICHAEL SCHERNTHANER
CFO, Managing Director

[Logo:] SCHUR FLEXIBLES

**Schur Flexibles Holding GesmbH**
Weilburgstraße 18a - 2509 Baden - Austria
T +43 2252 256 014 - M +43 699 16 555 229
E: michael.schernthaner@schurflexibles.com
www.schurftexibles.com

[illegible] / Management board: Michael Schernthaner
Registered office of company: 2500 Baden. Austria
Court of registration: Regional Court Wr. Neustadl. FN 3863051

This e-mail, including any attachment, may contain confidential and privileged information. if you have received it by
mistake. [illegible] notify us by reply e-mail and then delete this e-mail and any attachment from your system. Thank you!

[handwritten:] *31*

[Logo:] [illegible]

[handwritten:] 6(7

| | |
|---|---|
| **From:** | Gerhard Nanning <gnenning@stemstewart.com> |
| **Sent** | Thursday, November 16, 2017 09:59 AM |
| **To:** | Michael Schernthaner |
| **Cc:** | Thomas Unger; Christian Kolarik; Dimitri Belobokov |
| **Subject:** | RE: Project 'Sales Effectiveness' |

Hello Mr. Schernthaner,

Thank you for the information. I look forward to supporting you with my team.

We have optimized the thematic blocks in a very similar form for many companies in recent years – including in the packaging industry. We will therefore try to use the kick-off for discussions and will bring customer examples and – if there is enough time for preparation – a possible target picture for Schur.

Kind regards,

Gerhard Nenning

---

**Gerhard Nenning**
**Senior Partner**

**Stem Stewart & Co.**
**Salvatorplatz 4**
**80333 Munich, Germany**

**P: +49 89 242071 50**
**F: +49 89 242071 11**
**E: gnenning@stemstewart.com**
**I: www.stemstewart.com**

**Registered office: Munich**
**Company registration number: HRB 120 789**
**Management: Markus Pertl // Dimitri Belobokov // Thomas Berner // Dr. Tobias Braun II Stefan Heppehnann //**
**Milan Manduch // Marcus Middehnann // Gerhard Nenning // Olaf Paltian // Carlo Paoloni // Sibo Sollors //**
**Konstantin Wrona**
**VAT ID for Stem Stewart & Co. GmbH: DE 195 604 920**

From: Michael Schernthaner [mailto:Michael.Schemthaner@schurflexibles.coml
Sent: Wednesday, 15 November 2017 12:59 PM
To: Gerhard Nenning <gnenning@sternstewart.com>
Cc: Thomas Unger <Unger@lindsaygoldbergvogel.com>; Christian Kolarik <cko@schurflexibies.com>; Michael Schernthaner <Michaei.Schemthaner@schurflexibles.com>
Subject: Project "Sales Effectiveness"

Hello Mr. Nenning,

On behalf of Mr. Unger, I am sending you the expectations/discussion paper for our kick-off on Friday.

29

We will be there:
- Mr. Unger
- Mr. Christian Kolartk (CSO)
- I

We look forward to meeting you. If you have any questions or require any documents, please let me know.

Thank you!

With best regards,

Kind regards

MICHAEL SCHERNTHANER
CFO, Managing Director


[Logo:] SCHUR FLEXIBLES


**Schur Flexibles Holding GesmbH**
Weilburgstraße 18a - 2509 Baden - Austria
T +43 2252 256 014 - M +43 699 16 555 229
E: michael.schernthaner@schurflexibles.com
www.schurflexibles.com

[illegible] / Management board: Michael Schernthaner
Registered office of company: 2500 Baden. Austria
Court of registration: Regional Court Wr. Neustadl. FN 3863051

This e-mail, including any attachment, may contain confidential and privileged information. if you have received it by
mistake. [illegible] notify us by reply e-mail and then delete this e-mail and any attachment from your system. Thank
you!


- Numerous other e-mail correspondences known to the defendant show how intensively
  Thomas UNGER devoted himself to accounting topics and how actively he contributed
  to accounting issues. In November 2020, for example, he asked Michael
  SCHERNTHANER whether there was *"any accounting option" to "[8]not show the PS*
  *revenue and thus improve the margin?"*. This email is an example of how Thomas
  UNGER proactively contributed to SCHUR's accounting issues. This can be seen, for
  example, from an e-mail dated November 1, 2020, which the accused received:


| From: | Unger, Thomas <Unger@lindsaygoldbergvogel.com> |
| Sent: | Sunday, November 1, 2020 08:48 AM |
| To: | Schernthaner, Michael |

---

[8] Note: Sales of PS Polymer Sourcing GmbH.

[Logo:] [illegible]

**Subject:**                    PS

*bPP*

Is there any accounting option to not show the PS revenue and thus improve the margin?

- Lindsay Goldberg also very often made **ad hoc requests** for various key figures from SCHUR and on financially relevant topics. These were submitted to SCHUR at very short notice and were equally detailed.

- As for the meetings between Lindsay Goldberg and SCHUR in which the accused participated, there were also numerous requests for financial figures from Lindsay Goldberg, particularly in 2020 and 2021.

  At these meetings, Lindsay Goldberg also received detailed reports on the audit process and the status of the audit.

  For example, the e-mail correspondence between Michael SCHERNTHANER and Thomas UNGER, which is known to the defendant, shows how Michael SCHERNTHANER coordinated the agenda items for such meetings in connection with the process of auditing the annual financial statement. As can be seen from the correspondence, Thomas UNGER has even **expanded** the agenda items proposed by Michael SCHERNTHANER to include a few detailed aspects *("Operative Measures in the Works", "Securing Raw Materials", "Sales Measures", "Liquidity")*:

| | |
|---|---|
| **From:** | Unger, Thomas <Unqer@Iindsayqoldbergvagel.com> |
| **Sent:** | Monday, March 16, 2020 11:43 AM |
| **To:** | Schernthaner, Michael |
| **Subject:** | RE: SBM Agenda |

    a.  COVID Virus Update ????
        a.  Operational measures in the plants
        b.  Securing raw materials
        c.  Distribution measures
        d  Liquidity
    b.  January Reporting/Feb Flash
    c.  Budget 2020
    d.  Deep Dive - Sales Risk Analyses
    e.  Status Update "Year end audit 2019"

**From:** Schernthaner, Michael <Michael.Schernthaner@schurflexibles.com>
Sent: Monday, 16 Mar 2020 11:17 AM
**To:** Unger, Thomas <Unger@lindsaygoIdbergvogel.com>
**Subject:** SBM Agenda

Hello Mr. Unger,

My suggestion is below:

    a.  COVID Virus Update ????
    b.  January Reporting/Feb Flash
    c.  Budget 2020
    d.  Deep Dive-Sales Risk Analyses
    e.  Status update "Year end audit 2019"

If you still have points, please let me know.

Best regards,

MICHAEL SCHERNTHANER
Chief Executive Officer (CEO)

[Logo:] SCHUR FLEXIBLES

**Schur Flexibles Holding GesmbH**
IZ NÖ South - Straße 1 - Building 50 - House C - 2351 Wiener Neudorf - AUSTRIA
T +43 2252 266 014 22
E michael.schernthaner@schurigexibles.com
www.schurflexibles.com

[illegible] / Management board: Michael Schernthaner, Juan Luis Martinez Arteaga, Friedrich Humer
Registered office of company: 2500 Baden. Austria

(iv)    <u>Decisions and instructions of Thomas Ungers in his role as de facto managing director</u>
        <u>(CEO) of Schur</u>

As mentioned at the beginning, Thomas UNGER de facto performed the duties of the
CEO at SCHUR. This was not only expressed in the fact that he was generally very
involved in financial matters at SCHUR. He also actively pursued the following
agendas at SCHUR:

[Logo:] [illegible]

[handwritten:] *35*

701

- Thomas UNGER effectively dictated the **structures** within the company. At the **Sales Conference** 2017, which Thomas UNGER **personally held**, Thomas UNGER presented a new organizational structure. **Thomas UNGER had taken on his former position as Active Chairman in his role as Chairman of the Advisory Board and actually exercised it as de facto CEO of SCHUR.**

This is evident, for example, from a presentation Thomas UNGERS had prepared for Lindsay Goldbergs investors in the USA, from which it is clear that the three **managing directors reported directly to him.**

## Management @ Schur Flexibles



- Thomas UNGER himself communicated **directly** with the respective managing directors of the various SCHUR plants, as shown, for example, by an e-mail correspondence dated July 8, 2018, which is known to the defendant:

33

[Logo : illegible]

| | |
|---|---|
| **From:** | Thomas Under <Unqer@lindsayqoldberqvoqel.com> |
| **Sent:** | Sunday, July 8, 2018 12:08 PM |
| **To:** | Michael Schernthaner |
| **Subject:** | Fwd: Situation Schur/Zwart |

No reaction

Sent from my iPad
Thomas Unger

The beginning of the forwarded message

> From: "unger@lindsaygoldbergvogel.com" <unger@lindsaygoldbergvogel.com>
> Date: July 5, 2018 at 01:56:57 PM CEST
> To: Harry Sielies <md@zwartfp.nl>
> Subject: Situation Schur/Zwart

> Harry,

> I would like do speak with your about the actual developments which seems not going into the right direction.

> Do you have time for a call tonight or on Sunday?

> I am really looking forward to meeting you again and having a couple of beers.

> Thomas

> Thomas Unger
> Partner
> Lindsay Goldberg Vogel GmbH | Neuer Stahlhof | Breite Straße 69 | 40213 Dusseldorf
> Phone +49 (0) 211-86 20 15-0 | Fax +49 (0) 211-86 20 15-25
> unaer@lindsavooldberavooel.com

> Registered office Düsseldorf | Local Court Düsseldorf HRB 50994
> Managing Director: Prof. Dr. Dieter H. Vogel, Dr. Thomas Ludwig

Thomas UNGER also took part in the performance reviews of the managing directors of the various SCHUR plants and determined their bonuses, as can be seen, for example, from an e-mail correspondence dated August 7, 2018, in which Thomas UNGER sent **an Excel file he had created himself** with calculations regarding the bonus of managing director Harry SIEUES (managing director of the Dutch Schur subsidiary "Zwart"), which the defendant also received,

| | |
|---|---|
| **From:** | Thomas Under <Unqer@lindsayqoldberqvoqel.com> |
| **Sent:** | Tuesday, 07 August 2018 12:09 PM |
| **To:** | Schernthaner Michael |
| **Subject:** | Harry_Incentive TU.xlsx |
| **Attachments:** | Harry_Incentive TU.xlsx |

[handwritten:] *37*

[Logo:] [illegible]                                                                703

- As the defendant himself perceived, Thomas UNGER **commissioned various projects/services.** For example, he commissioned Horvath & Partner and Stern Stewart & Co (hereinafter "SSCO") to carry out a **financial reporting health check** and an **accounting benchmark** for SCHUR. He also hired a **restructuring consultant** (Herbert NOICHL), for example, to restructure the company in the Allgäu region.

(v)    Regarding Thomas UNGER's role in the exit processes of SCHUR and the involvement of the other members of the Advisory Board

**First exit process in 2019 (project "Sky")**

Thomas UNGER and Paul PRUSS also played a **leading role in the sale of SCHUR** (in particular the "Sky" and "Stelvio" projects), initiated by Lindsay Goldberg, in the period from 2019. Both were closely **involved** in these processes, particularly with regard to financial matters.

Thomas UNGER and Paul PRUSS actively supported the exit process for the **Sky project** in 2019. The project failed at the time because, from the point of view of the interested investor (Partners Group), the gap between the "Adjusted EBITDA" and the "Cash-based EBITDA" was ultimately too large (this amounted to around 30 million euro). The amount of the capitalization – of which Lindsay Goldberg was aware – was discussed in detail with both the buyer and its advisors as part of the due diligence process. Ultimately, **Thomas UNGER** informed UNGER that the potential investor (Partners Group) ultimately did not want to implement the project due to the difference between "Adjusted EBITDA" and "Cash-based EBITDA". **Lindsay Goldberg and in particular Thomas UNGER also held these discussions directly with the potential investor.**

35

[Logo.] [illegible]

Since the exit process failed in 2019 due to the large differences between the EBITDA figures and the associated amount of capitalization, which was known to Lindsay Goldberg, from the perspective of potential buyers, following year, i.e. 2020, the **reconciliations** between **"Reported EBITDA", "Adjusted EBITDA"** were extended by an additional **reconciliation** to **"Cash-EBITDA"**, which was provided and explained in detail to the management of Lindsay Goldberg. Lindsay Goldberg's management was familiar with the details of the relevant reconciling items.

**Second exit process in 2021 "Stelvio" project**

Ultimately, Thomas UNGER also played a central role in the exit process from the **Stelvio project**, i.e. the acquisition of SCHUR by B&C in 2021: Thus, Thomas UNGER was **chosen** by Lindsay Goldberg as the **key person** for the transaction with B&C, as evidenced, for example, by an e-mail exchange between Michael DEES and Herbert ORTNER (see ON 396). In line with this mandate, Thomas UNGER also positioned himself vis-à-vis B&C as Chairman of SCHUR and as the **main point of contact and key negotiator.**

[handwritten:] *39*

705

[Logo:] [illegible]

From:           Herbert Ortner
**Sent:**       Monday, March 22, 2021 12:42 PM
**To:**         Markus Först
**Subject:**    Fwd: Project Stelvio

Sent from my iPad

Beginning of forwarded message:

> **From:** "Dees, Michael" <Dees@lindsaygoldbergllc.com>
> **Date:** March 20, 2021 **at** 02:55:44 PM CET
> **To:** Herbert Ortner <H.Ortner@bcholding.at>
> **Copy:** "Unger, Thomas" <Unger@lindsaygoldbergeurope.com>
> **Subject:** Project Stelvio

Mr. Ortner,

I hope that you are having a nice weekend.

I am writing to express my sincere appreciation for the offer letter that B&C provided yesterday regarding Schur Flexibles. I have been in dose communication with Thomas Unger regarding your discussions over the last several weeks, and I am excited to see that we have taken this important step. The proposed transaction and partnership with B&C would be beneficial for LG, Schur and B&C, and I look forward to supporting the process to reach that objective.

As chairman of Schur Flexibles, Thomas has my full support (as well as the support of the entire firm) in these discussions. We are entirely aligned in our interest in the proposed partnership with B&C and look forward to reaching an agreement by the end of April.

As travel to Europe remains nearly impossible, I will likely be unable to meet in person during this process. However, if you would like to connect at any time, please do not hesitate to reach out.

Best,
Michael Dees

Michael Dees
Managing Partner
Lindsay Goldberg

This message, including any attachments, may contain information that is proprietary, privileged and/or confidential and is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, and destroy the original message. Thank you.

**Paul PRUSS** also played an **important role** in the 2021 exit process alongside Thomas UNGER. Paul **PRUSS** acted as **project manager and, together with UNGER,** *as single source of communication* **for the Stelvio project**, taking the lead in coordinating with Thomas ZIMPFER (B&C's sales contact). On March 22, 2021 (i.e., at the time of the start of the sales process with B&C), Paul PRUSS sends an e-mail known to the defendant in which Paul PRUSS reports on his discussions with Thomas ZIMPFER and explains how the expert meetings on the B&C exit are (to be) conducted. He also explains that he will receive *a list of questions every evening* in this regard. This email also makes it clear that PRUSS

37

decided who should see B&C's questions *("I don't think we can keep this from Goldman (note: referring to Goldman Sachs)"*:

| From: | Pruss, Paul <Pruss@lindsaygoldbergeurope.com> |
|---|---|
| Sent: | Monday, March 22, 2021 05:45 PM |
| To: | Unger, Thomas; Schernthaner, Michael |
| Subject: | [EXTERNAL] BCH |

Everyone,

I just had a phone call with Mr. Zimpfer. Can we talk today, e.g. at 07:00 PM, to go over the points?
First of all:
- Virtual Expert Sessions on Thursday (03/25) - B&C does not want personal meetings (consultants from FFM, among others);
- Start with a 90 Min MP (coffe talk deck): Business model, growth, etc.
- Participants B&C: Prince, Zimpfer, DD teams buy-side
- Sessions: Commercial, Financial, Tax, Legal (if necessary, tax and legal to next week)
- Agenda (topics) will be sent by tomorrow, COB

Furthermore:
- I get a list of questions every evening. The answer will surely be given in the VDR. We can't hide that from Goldman, in my opinion!
- B&C would also like to have the opportunity to physically inspect 2-3 plants in the further course.
- Request for DD reports on the acquisitions made, not just SIDAC (Zwart, UNI, CHN)

PP

Like Thomas UNGER, Paul PRUSS was also personally involved in compiling the EBITDA. For example, another e-mail from December 9, 2020, which is known to the defendant, shows how intensively Paul PRUSS dealt with the topic of EBITDA and sent EBITDA reconciliations. In this email, PRUSS goes into detail about the 2019-2020 EBITDA adjustments and talks about wanting to "show stability in earnings":

[Logo:] [illegible]

[handwritten:] *41*

[handwritten:] 707

| | |
|---|---|
| **From:** | Pruss, Paul <Pruss@lindsaygoldbergeurope.com> |
| **Sent:** | Wednesday, December 9, 2020 01:53 PM |
| **To:** | Schernthaner, Michael |
| **Cc:** | Unger, Thomas |
| **Subject:** | SF EBITDA FY19-FY20 Adjustments |
| **Attachments:** | Schur Flexibles - QofE update FY19 - 16Oct20.pdf; Kopie von SF EBITDA 2020 Adjusted_v4 (9.12.20).xlsx |

Hello Mr. Schernthaner,

I compared the table with the QofE paper from the refinancing process and wanted to make sure that you were starting from the same basis. I assume you have not adopted some (PF) normalizations to avoid a downturn in EBITDA from FY19 to FY20 (FY19 PWC 92.3 million euro vs 89.0 million euro, excluding B&K JV).

Excluding B&K-JV, EBITDA amounted to 84 million euro, down on the previous year (87.1 million euro). Footprint and lean management together are 4.6 million euro – has some of this been postponed to 2020 or even 2021? We can compare the 82.6 million euro in FY19 with the 84.0 million euro in FY20, or the 87.1 million euro in FY19 with a figure around 90 million euro in FY20 (with B&K). I would like to show a stability in the result (as a like-for-like), if possible.

Kind regards
Paul Pruss

The fact that Thomas UNGER and Paul PRUSS played a leading role in the sales process with B&C and also **controlled and dictated** the (centralized) **flow of information to the buyer** can be clearly demonstrated with the help of a few more e-mails:

For example, an e-mail correspondence between Michael FISCHKIN and Paul PRUSS shows that the defendant Paul PRUSS requested **approval** to upload the so-called audit differences from the consolidated financial statement into the data room before the finalization of the B&C exit process *("Please let us know if we should additionally upload this document to the VDR")*. PRUSS then comments on this email and forwards Paul's email from the defendant to Christopher DRÖGE of **Goldman Sachs** with his comments. Christopher Dröge from Goldman Sachs then provides his own numerical reconciliation and interpretation and communicates this to PRUSS. PRUSS's email to DRÖGE also shows that Lindsay Goldberg and Goldman Sachs exchanged information bilaterally on how data should be provided to B&C *("should we do it via the VDR or bilaterally via Morgan Stanley?")*.

39

[Logo:] [illegible]

| | |
|---|---|
| **From:** | Pruss, Paul <Pruss@hndsayqoldberqeurope.com> |
| **Sent:** | Wednesday, May 12, 2021 11:50 AM |
| **To:** | Fischkin, Michael |
| **Cc:** | Schernthaner, Michael: Droege, Chnstopher |
| **Subject:** | RE: Summary of uncorrected misstatements FY 2020 |

> **CAUTION:** This email has been sent from an external source Please treat links and attachments in this email with caution and Click on them only if they come from a trusted source.

See below. Comments from Mr. Droege:

**From:** Droege, Christopher <christopher.droege@gs.com>
**Sent:** Tuesday, May 11, 2021 11:41 AM
**To:** Pruss. Paul <Pruss@lindsaygoldbergeurope.com>
**Subject:** RE: Summary of uncorrected misstatements FY 2020

I once added the three positions (Interest. Depreciation, Income Tax) + the fifth from the end. Then I come across 501,000. In this respect, 602,000 do indeed remain.

I would rather put bullets in the PDF before sending it back to MS:
- 12 million euro P&L impact from misstatements; thereof 501,000 euro related to items below EBITDA (1,871,000 - 105,000 - 907,000 - 358,000)
- Implies remaining EBITDA impact of 701,000 euro
- However, 195,000 thereof (included in position [xxx]) relate to tooling, which is treated as debt position by B&C and deducted in the bridge (3.8 million euro)
- This leaves a remaining EBITDA impact of 506,000
- EBITDA in the audit was 200,000 euro higher (as shown in Excel)
- This leaves a total and small EBITDA impact of 300,000

**From:** Pruss, Paul <Pruss@lindsaveoldbergeurope.com>
**Sent:** 11 MAY 2021 11:26 AM
**To:** Droege, Christopher [IBD] <christopher.droege@ln.ibd.email.ES.com>
**Subject:** FW: Summary of uncorrected misstatements FY 2020

Hello Mr. Droege, Please find the transfer attached. It is not self-explanatory at first glance. I have to get on board in a moment, but I wanted to send it to you in advance. Should we do this through the VDR or bilaterally through Morgan Stanley?

**From:** Fischkin, Michael <michael.fischkin@schurfiexibles.com>
**Sent:** Tuesday, May 11, 2021 11:06 AM
**To:** Pruss, Paul <Pruss@lindsavgoldbergeurope.com>
**Cc:** Schernthaner, Michael <Michael.Schernthaner@schurflexibles.com>
**Subject:** Summary of uncorrected misstatements FY 2020

Hello Mr. Pruss,

Please find attached the summary of expenses for FY 2020. The EBITDA effect amounts to 701,005 euro.

40

[handwritten:] *43*

[Logo:] [illegible]

7 ℓ

Please note that the 701,000 euro includes an effect of 195,000 euro from tooling, which is also included in B&C (included in the B&C bridge at 3.8 million euro). This means that the 195,000 euro could not be taken into account. you also consider the EBITDA improvement of 170,000 euro vs. PwC Factbook (78.6 million euro audited reported EBITDA vs. 78.4 million euro PwC Factbook reported EBITDA), the EBITDA effect would be seen on the SUM list at 0.3 million euro.

Please let us know if we should also upload this document to the VDR.

Best regards,
Michael Fischkin

Kind regards
Michael Fischkin

[Logo:] Schur Flexibles

**Michael Fischkin**
Group Finance Director

t +43 2252 266014 19
m+43 676 841 205 219
e michael.fischkin@schurflexibles com

**Schur Flexibles Holding GesmbH**
**IC NO South / Street 1 / Obj. 50C**
2351 Wr Neudorf / Austria
schurflexibles.com

[illegible] / Management board: Michael Schernthaner
Registered office of company: 2500 Baden. Austria
Court of registration: Regional Court Wr. Neustadl. FN 3863051

This e-mail, including any attachment, may contain confidential and privileged information. if you have received it by mistake.
[illegible] notify us by reply e-mail and then delete this e-mail and any attachment from your system. Thank you!



[illegible]

An e-mail correspondence shows, for example, how the defendant sent the report from PwC, the PwC Financial Factbook and the PwC Financial Databook to the advisory board members Thomas UNGER and Paul PRUSS *"with the request for **approval"** of the documents. "After approval, we will upload the documents to the data room."* Paul PRUSS then suggests some amendments, and Thomas UNGER **requests** an "internal" vote before it is sent.

41

[Logo: illegible]

| | |
|---|---|
| **From:** | Unger, Thomas <Unger@lindsaygoldbergeurope.com> |
| **Sent:** | Wednesday, March 30, 2021 07:58 AM |
| **To:** | Pruss, Paul; Fischkin, Michael; Schernthaner, Michael |
| **Subject:** | Re: items to consider: Financial Fact Book - Executive Report und Databook |

**CAUTION:** This email has been sent from an external source Please treat links and attachments in this email with caution and Click on them only if they come from a trusted source.

Before we send anything out today, we should coordinate internally.

**From:** "Pruss, Paul" <Pruss@lindsaygoldbergeurope.com>
**Date:** Monday, 29 Mar 2021 at 09:23 PM
**To:** "michael.fischkin@schurflexibles.com" <michael.fischkin@schurflexibles.com>, "Unger, Thomas" <Unger@lindsaygoldbergeurope.com>, Michael Schernthaner Michael.Schernthaner@schurflexibles.com
**Subject:** items to consider: Financial Fact Book - Executive Report und Databook

All

after a first review and in advance:

- P. 34 – I would remove factoring from the net debt bridge (and p. 35 #7). It is already in the NWC section;
- P. 34 - I would completely remove the "items to consider" and only mention the minorities on p. 32 or 33. Deferred taxes are shown on the balance sheet. I am also not sure whether it is really a deduction item.

PP

**From:** Fischkin, Michael <michael.fischkin@schurflexibles.com>
**Sent:** Monday. March 29, 2021 08:50 a.m.
**To:** Unger, Thomas <Unger@lindsaygoldbergeurope.com>; Pruss, Paul <Pruss@lindsaygoldbergeurope.com:>
**Cc:** Schernthaner, Michael <Michael.Schernthaner@schurflexibles.com>
**Subject:** Financial Fact Book - Executive Report und Databook

Hello Mr. Unger, Mr. Pruss,

Please find attached the Executive Report of the PwC Financial Factbook and the PwC Financial Databook (as Excel) with the request for approval of the documents. After your approval, we will upload the documents to the data room.

Please note that PwC is not allowed to provide a valuation (i.e. no PwC DD view) in the Financial Factbook.

Thank you for your feedback.

Best regards,
Michael Fischkin


Kind regards

**MICHAEL FISCHKIN**
Group Finance Director

42

[Logo:] [illegible]

[handwritten:] ᴚᴧᴧ

[Logo:] Schur Flexibles

**Schur Flexibles Holding GesmbH**
IZ NÖ South - Straße 1 - Building 50 - House C - 2351 Wr Neudorf - Austria
T +43 2252 266014 19 M +43 676 841 205 219
E michael.fischkin@schurflexibles.com
H www.schurflexibles.com

[illegible] / Management board: Michael Schernthaner, Juan Luis Martinez Arteaga, Friedrich Humer
Registered office of company: 2500 Baden. Austria
Court of registration: Regional Court Wr. Neustadl. FN 3863051

This e-mail, including any attachment, may contain confidential and privileged information. if you have received it by mistake. [illegible]
notify us by reply e-mail and then delete this e-mail and any attachment from your system. Thank you!

[Logo:] Our best for              [Logo:] SCHUR FLEXIBLES
your goods.

This also proves that Paul PRUSS and Thomas UNGER, on the one hand, specifically controlled and determined which **documents B&C** were **made available** to B&C in the data room for the sales process and when. **Approvals were always to be obtained from Thomas UNGER and Paul PRUSS in this regard.** On the other hand, Thomas UNGER and Paul PRUSS also influenced the content of the information provided to B&C. For example, they set out specific requirements regarding the items to be included in the Financial Fact Book.

Paul PRUSS also clearly ordered **who (when)** would have **access** to the **data room** *("can you please close the VDR so that no one from BC has access to it")*, as shown, for example, by an e-mail correspondence dated April 19, 2021, of which the defendant is aware:

| | |
|---|---|
| **From:** | Pruss, Paul <Pruss@lindsaygoldbergeurope.com> |
| **Sent:** | Monday, April 19, 2021 11:16 AM |
| **To:** | Artlieb, Sebastian |
| **Cc:** | Schernthaner, Michael; Fischkin, Michael; Schall, Phillip |
| **Subject:** | VDR |

> **CAUTION:** This email has been sent from an external source Please treat links and attachments in this email with caution and Click on them only if they come from a trusted source.

Hello Mr. Artlieb,

Please close the VDR so that nobody from BC can access it.

Thank you very much.
Paul Pruss

---

Please note the new company name and email address and update your records accordingly.

Paul Pruss
Director
Lindsay Goldberg Europe GmbH | Neuer Stahlhof l Breite Str. 69 | 40213 Dusseldorf
Phone +49 (0) 211-86 20 15-32 ] Fax +49 (0) 211-86 20 15-25 | Mobile +49 (0) 178-87 72 945
pruss@lindsaygoldberqeurooe com

Assistant:
Claudia Doris | Phone +49 (0) 211-86 20 15-28 | doris@hndsaygoldbergeurope.com

Registered office: Düsseldorf | Local Court Düsseldorf HRB 50994
Managing Director: Dr. Thomas Ludwig, Thomas Unger

Lindsay Goldberg (in particular Thomas UNGER and Paul PRUSS) thus decided, on the one hand, **when B&C was provided with which information.** They **specified the content** and how the information – in particular the financial figures – should be presented. The **sales negotiations with B&C** were **conducted exclusively by Lindsay Goldberg (as owner and thus seller).**

As numerous other e-mail correspondences show, **Lindsay Goldberg (Paul PRUSS and Thomas UNGER) also communicated directly (independently) with B&C regarding the EBITDA figure and made (independent) statements about whether the figures matched the budget.** For example, Paul PRUSS sent calculations of the EBITDA to Thomas ZIMPFER, Markus FÜRST and Thomas UNGER (UNGER on copy of the email) and, in his (direct) communication with B&C, states the amount of the **adjusted** EBITDA (not the cash EBITDA, from which the capitalizations are deducted). He also provides independent information as to whether these figures fit the budget, as shown, for example, by an e-mail correspondence dated April 14, 2021, which the accused received:

[handwritten:] *47*

[Logo:] [illegible]

| | |
|---|---|
| **From:** | Pruss, Paul <Pruss@lindsaygoldbergeurope.com> |
| **Sent:** | Wednesday, April 14, 2021 09:34 PM |
| **To:** | Droege, Christopher; Wich, Matthias; Fellhauer, Eric |
| **Cc:** | Schall, Phillip; Schernthaner, Michael |
| **Subject:** | FW: KARAKUL Q1 LTM EBITDA |
| **Attachments:** | 2021 -04-14 - Covenant calculation_LTM_Q12021.pdf; 2021 -04-14 - LTM_Q12021.pdf |
| | |
| **Importance:** | High |

[handwritten:] 713

> **CAUTION:** This email has been sent from an external source Please treat links and attachments in this email with caution and Click on them only if they come from a trusted source.

FYI

**From:** Pruss, Paul
**Sent:** Wednesday, April 14, 2021 09:33 PM
**To:** Thomas Zimpfer <t.zimpfer(6>bcholding.at>
**Cc:** M.Fuerst@bcholding.at; Unger, Thomas <Unger@lindsaygoldbergeurope.com>
**Subject:** KARAKUL Q1 LTM E3ITDA
**Importance:** High

Dear Mr. Zimpfer,

Please find attached the LTM Adj. EBITDA calculation as of March 31, 2021 at 98.2 million euro (vs. 94.5 million euro FY20). This means that it is "well on track" with the budget. In addition, the EBITDA calculation for the covenant test.

Kind regards
Paul Pruss

_____

Please note the new company name and email address and update your records accordingly.

Paul Pruss
Director
Lindsay Goldberg Europe GmbH | Neuer Stahlhof i Breite Str. 69 | 40213 Dusseldorf
Phone +49 (0) 211-86 20 15-32 | Fax +49 (0) 211-86 20 15-25 | Mobile +49 (0) 178-87 72 945
pruss@lindsaygoldbergeurope.com

Assistant:
Claudia Doris I Phone +49 (0) 211-86 20 15-28 | doris@lindsaygoldbergeurope.com

Registered office Düsseldorf | Local court Dusseldorf HRB 50994
Managing directors Dr. Thomas Ludwig, Thomas Unger

## IV. Concluding remarks on the sales process, including supplementary motions

As the above explanations and exemplary evidence illustrate, **Lindsay Goldberg**, as the owner, led the sales negotiations with B&C, with **Thomas UNGER** as their **"key person"** for the sales process. Lindsay Goldberg was very intensively involved in the financial issues and the development of SCHUR's key figures.

As investment bank and M&A advisor to Lindsay Goldberg, Goldman Sachs was also very closely involved in the sales process, including in the discussions on EBITDA. It can be assumed that both Lindsay Goldberg (in particular Thomas UNGER and the other members of the Advisory Board) and Goldman Sachs controlled what information was communicated to B&C and in what form. The CUBUS consulting firm was also involved in the coordination and preparation of key company figures.

45

In view of this, the defendant requests that the e-mail accounts of the following persons be provided (in each case for the **period 2017 to 2021**), who were the advisors of the respective institution involved in the exit process with B&C:

- **Michael DEES** (Lindsay Goldberg), Domain @lindsaygoldbergllc.com;
- **Dieter VOGEL** (Lindsay Goldberg), domain either @lindsaygoldbergvogel.com or@lindsaygoldbergeurope.com
- **Thomas LUDWIG** (Lindsay Goldberg), domain either @lindsaygoldbergvogel.com or @lindsaygoldbergeurope.com;
- **Thomas UNGER** (Lindsay Goldberg), domain either @lindsaygoldbergvogel.com or@lindsaygoldbergeurope.com;
- **Paul PRUSS** (Lindsay Goldberg), domain either @lindsaygoldbergvogel.com or @lindsaygoldbergeurope.com;
- **Phillip SCHALL** (Lindsay Goldberg), domain either @lindsaygoldbergvogel.com or@lindsaygoldbergeurope.com;
- **Christopher DRÖGE** (Goldman Sachs), domain @gs.com or @ln.ibd.email.gs.com;
- **Eric FELLHAUER** (Goldman Sachs), domain @gs.com or @ln.ibd.email.gs.com;
- **Tobias KÖSTER** (Goldman Sachs), domain @gs.com or @ln.ibd.email.gs.com;
- **Matthias WICH** (Goldman Sachs), Domain @gs.com or @ln.ibd.email.gs.com;
- **Nikolas SCHINDLER** (Goldman Sachs), Domain @gs.com or @ln.ibd.email.gs.com;
- **Christina BOSSE** (Goldman Sachs), Domain @gs.com or @ln.ibd.email.gs.com;
- **Richard RÖSENER** (Cubus Partners), roesener@cubuspartners.com;
- **Steffen SCHÖN** (Cubus Partners), schoen@cubuspartners.com.

[handwritten:] *49*

[Logo:] [illegible]

$\mathcal{H}5$

## IV. Summary

In conclusion, it should be noted once again that numerous requests for evidence by the defendant have **not** been followed to date, despite the investigations having been ongoing for a very long time. The defendant still has **no access** to a large number of **relevant e-mails, chat messages, etc. that would significantly exonerate him.** [9] Although the accused has only had access to a fraction of the information to date, a few excerpts from the evidence already show that the management of Lindsay Goldberg is completely misrepresenting its position in the company in the proceedings and that the accused is being unfairly incriminated as a result. The statements made in this opinion clearly show that Thomas UNGER has so far painted a completely inaccurate picture of the events at SCHUR.

<u>In view of the above, the accused can state the following at this point with regard to the forthcoming hearing:</u>

On the basis of the reasons and documents presented above, it is now clear that Thomas UNGER is claiming, contrary to the facts, that he was not involved in the operative business of SCHUR. Quite the opposite: Thomas UNGER was deeply involved in the operational processes of SCHUR and was – as Marek PAWLAK explains – the "mastermind and driving force" (see also the most recent statement by Marek PAWLAK[10]). From this it is clear that his claim that he does not remember the 4 million euro loan to Michael SCHERNTHANER (AS 31 et seqq. in ON 598) is also incorrect.

Mr. Thomas UNGER was aware of the facts and, as the owner's representative, agreed with this approach.

---

[9] See, for example, the applications of the principal defendant ON 234, ON 294 and ON 336, as well as the numerous applications of the co-defendants, which were also only slightly complied with.

[10] Interrogation page 3 in ON 1112.

[Logo:] [illegible]

The defendant reserves the right to make a comprehensive statement regarding the accusations until the outstanding requests for evidence have been granted, although such a statement will then probably be obsolete anyway, as the accusations will have been refuted by objective evidence.

Dr. Michael FISCHKIN





TRANSPERFECT

City of New York, State of New York, County of New York

I, Shayna Himelfarb, hereby certify that the document "1172 RAe PLCB – Opinion Statement-1" is, to the best of my knowledge and belief, a true and accurate translation from German into English.

Shayna Himelfarb

Sworn to before me this
December 9, 2024

Signature, Notary Public



Stamp, Notary Public